# Exhibit 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITESTONE CONSTRUCTION CORP., *Plaintiff*, v. YUANDA USA CORPORATION, *Defendant*. | 1:20-cv-01006-GHW <br><br> **DECLARATION OF STEVEN GRZIC IN SUPPORT OF WHITESTONE'S MOTION FOR SUMMARY JUDGMENT** |

STEVEN GRZIC, pursuant to 27 U.S.C. §1746, attests as follows:

1. I am the president of plaintiff Whitestone Construction Corp. ("Whitestone"). In that capacity, I have personal knowledge of the facts set forth herein.

2. I submit this declaration pursuant to Fed. R. Civ. P. 56 in support of Whitestone's motion for summary judgment on Count I of the complaint filed on February 5, 2020 ("Complaint") which seeks entry of a money judgment against defendant Yuanda USA Corporation ("Yuanda") for breach of contract.

3. I supervised Whitestone's staff on the project known as "New York City College of Technology – New Academic Building," located at 285 Jay Street, Brooklyn, New York ("Project") which was administered and financed under the auspices of the City University Construction Fund ("CUCF").

4. As explained below, the relevant facts in this action arise from three (3) contracts that relate to the Project: (1) the Prime Contract (defined below) between CUCF and F.J. Sciame Construction Co. Inc. ("Sciame"), its construction manager; (2) a contract between Whitestone

and Sciame (defined herein as the Whitestone-Sciame Agreement); and (3) a contract between Whitestone and Yuanda (defined herein as the Purchase Order).

5. Whitestone alleges in the Complaint that Yuanda breached the Whitestone-Yuanda Agreement when it failed to remediate certain work that Sciame claimed was non-confirming. Upon Yuanda's refusal to perform the remediation, Whitestone corrected the work itself. By this action, Whitestone seeks to recover the costs of such corrective work from Yuanda in accordance with terms of the Purchase Order.

### A. The Prime Contract and the Administrative Dispute Resolution Process

6. In March 2010, Sciame contracted with CUCF ("Prime Contract") to serve as the Construction Manager of the Project. The Prime Contract contains mandatory administrative procedures for resolution of claims and disputes.

7. Section 29.1.1 of the Prime Contract states, in pertinent part, as follows:

> In relation to only this Agreement, all claims, controversies or disputes the Construction Manager may have against CUCF, **including, without limitation, all claims, controversies or disputes a Subcontractor or a supplier may have in relation to this Agreement** (each a "Disputes to the extent permitted by law, shall be resolved **exclusively** by the procedures set forth in this Article. (Emphasis added).

A true copy of Section 29.1.1 of the Prime Contract is annexed as Exhibit "3."[1]

8. The exclusive administrative process set forth in the Prime Contract contemplates decision-making by the Executive Director of CUNY's Department of Design, Construction and Management and by CUNY's Vice Chancellor for Facilities Planning, Construction and Management. *See* Exhibit "3," Section 29.1.3.

---

[1] Exhibits "1" and "2" consist of the Complaint and Yuanda's answer ("Answer") filed in this action which are annexed to the declaration of Whitestone's counsel, Gary M. Kushner, dated November 9, 2020 ("Kushner Decl.").

9. There is a defined procedure involving notices of dispute, detailed dispute reports, administrative appeals (if warranted), and ultimately a single judicial remedy, namely an proceeding pursuant to Article 78 of the Civil Practice Law and Rules if an administrative ruling is alleged to be arbitrary or capricious. *See* Exhibit "3," Sections 29.2 - 29.5.

10. Further, the Prime Contract specifies certain "Subcontract Requirements" in Section 10.2.3. Subsection (e) (5) thereof requires each subcontract to contain the provisions of Article 29 of the Prime Contract and to "require the Subcontractor's compliance with the same." A true copy of Section 10.2.3 of the Prime Contract is annexed as Exhibit "4."

11. Reinforcing this requirement, subsection (g) of Section 10.2.3 in the Subcontract Requirements provides as follows:

> In removing all ambiguity concerning the resolution of every dispute between the Construction Manager and its Subcontractors related to the Project, each subcontract shall contain the provision regarding the resolution of disputes set forth at Article 29 hereof, including, without limitation, the provision regarding the appeal from CUCF decisions as set forth at Article 29 hereof; such provisions shall apply to every dispute between the Subcontractor and the Construction Manager related to the Project. Excluding decisions that are the result of this dispute resolution process and are disputed by the Construction Manager or its Subcontractor, which the process requires to be appealed otherwise, either the Construction Manager or a Subcontractor must commence the resolution of a dispute pursuant to the provisions of this Article upon written notice to the other and to CUCF that such dispute will be resolved by CUCF.

*See* Exhibit "4," ¶ "10.2.3."

12. This administrative dispute resolution process applies to all disputes including whether certain work performed by a subcontractor was non-conforming – requiring remediation with no additional compensation – or, as a result of a design change requiring Sciame to pay additional compensation in accordance with a change order.

-3-

### B. The Subcontract Between Whitestone and Sciame

13. On October 7, 2013, Sciame contracted with Whitestone to perform certain exterior wall system work as a subcontractor on the Project. The entire agreement between Sciame and Whitestone dated October 7, 2013, is comprised of the following documents: (1) AIA Document A401-2007; (2) Rider "A;" (3) Construction Checklist; and (4) Rider "B" (collectively, "Whitestone-Sciame Agreement"). Relevant sections of the Whitestone-Sciame Agreement (AIA Document and Rider "B") are annexed collectively as Exhibit "5."[2]

14. To be awarded the Whitestone-Sciame Agreement, Whitestone had to submit bids based upon a set of plans and specifications provided by Sciame setting Whitestone's scope of work ("Construction Documents"). The Construction Documents were 100% complete, meaning that a builder could construct the Project to 100% completion without any deviation from the plans. Based upon Whitestone's review of the Construction Documents, among other materials, Whitestone was awarded the contract by Sciame at a bid of $32,000,000.

15. Whitestone commenced work on the Project in April 2014, anticipating only minimal changes would arise during the course of the Project given Sciame's representation that the Construction Documents were 100% complete.

### C. The Contract Between Whitestone and Yuanda

16. On or about October 24, 2013, in furtherance of the Whitestone-Sciame Agreement and in order to complete a portion of its contractually required work on the Project, Whitestone

---

[2] The scope of work at the Project involved the fabrication and installation of 13 different wall types (each a "WT"). The relevant aspects of the Whitestone-Sciame Agreement for purposes of Exhibit "5" are the AIA Documents; Rider "B" and the Submittal Procedures.

-4-

entered into a subcontract with Yuanda ("Purchase Order"). A copy of the Purchase Order is annexed as Exhibit "6."[3]

17. Pursuant to the Purchase Order, Yuanda agreed to provide Whitestone with "all curtain wall system design, engineering, structural calculations, shop drawings, product data & sample submittals … material, fabrication, transportation … and testing, as required to furnish and deliver all curtain wall system materials" ("Yuanda Work"). *See* Exhibit "6;" Purchase Order at ¶ 1.

18. In exchange for completion of the Yuanda Work, Yuanda was to be compensated by a lump sum payment of Five Million Nine Hundred Eleven Thousand Five Hundred Nine and 27/100 ($5,911,509.27) Dollars. *See* Exhibit "6;" Purchase Order at ¶ 1."

19. Between late 2014 and early 2015, Whitestone and Yuanda were working to prepare all submittals, drawings and materials needed to obtain the Sciame design team's approval and, thereafter, to construct and install the Project's curtain wall system including but not limited to the WT-3 Clerestory system.

20. A clerestory is generally described as a high section of a wall that contains windows above eye level to admit light, fresh air or both. The WT-3 Clerestory System at the Project was installed between the top of the auditorium roof and the bottom of the second floor of the main building where classes are conducted. The WT-3 Clerestory system at the Project is captured by the following photograph:[4]

---

[3] The Purchase Order is further identified as purchase order number 13-0139-002.

[4] The picture is taken from the Project architect's rendering.



21.     Yuanda and Whitestone provided Sciame and its design team with Shop Drawing Submittal #084413-020-02 and a related Calculation Submittal which were approved by the Project architect on February 23, 2015. The architect's approval of Shop Drawing Submittal #084413-020-02 was returned with the notation "MCN."

22.     Pursuant to the agreed-upon submittal procedures in the Whitestone-Sciame Agreement, submittals marked "MCN" ("Make Corrections Noted") required only minor corrections. MCN means the Sciame design team's review is complete and all corrections are obvious without ambiguity. Fabrication is allowed to proceed on submittals marked "MCN" provided such action will expedite construction and the noted corrections are adhered to. If fabrication is not made strictly in accordance with corrections noted, the item will be rejected in the field and the contractor will be required to replace such work in accordance with corrected

submittals at the contractor's own expense. *See* Whitestone-Sciame Agreement, Submittal Procedures 01-33-00-5, June 12, 2012, annexed as Exhibit "5."

23. When Shop Drawing Submittal #084413-020-02-MCN was returned by the Project architect (and Sciame), there were no obvious and unambiguous corrections noted with respect to the ability of the WT-3 Clerestory System to accommodate movement.

24. The "MCN" submittal disposition on #084413-020-02 provided Whitestone (and Yuanda) with approval to proceed with fabrication and installation in accordance with the submittal, without risk of having to make changes to the installed work without additional compensation for any changes which were due to new design criteria issued by Sciame after the submittal was approved and the work was fabricated and installed.

25. Consequently, Yuanda fabricated and delivered the WT-3 Clerestory system which Whitestone installed and completed in or about December 2016 in accordance with the approved shop drawings.

26. Yuanda was paid in full for the Yuanda Work.

**D.** **Sciame Ultimately Rejects the WT-3 Clerestory System Work**

27. On or about January 23, 2017, Sciame issued "RFI-1130" to the Project engineer. RFI-1130 was a "request for information" concerning the design criteria of the WT-3 Clerestory system which had been fabricated by Yuanda and installed by Whitestone pursuant to approved Shop Drawing Submittal 08443-020-02-MCN.[5]

---

[5] RFI-1130 questioned the adequacy of the WT-3 Clerestory System to accommodate building movement. The WT-3 Clerestory System is made of glass that was installed on aluminum rails affixed to the top of the auditorium roof and to the bottom of the second floor of the academic building. Movement of the building could potentially cause the glass panels to derail – much like a sliding door does when it becomes unhinged.

28. On January 30, 2017, the project engineer responded to RFI-1130. In that response, Sciame, the project engineer, and ALT Limited (Sciame's curtain wall consultant) made four notations which indicated, among other things that "concern was previously noted in 2014 under [prior] submittals ... to verify a larger movement joint to accommodate roof deflections ...." The response to RFI-1130 by the Project engineer issued new relative movement design criteria between the auditorium and main academic building after the façade was fabricated and installed by Yuanda and Whitestone in accordance with the approved Shop Drawing Submittal #08443-020-02 MCN. *See* RFI-1130 response to RFI-1130, annexed collectively as Exhibit "7."

29. Whitestone immediately notified Yuanda about the engineer's response to RFI-1130. Both Whitestone and Yuanda took a unified position against Sciame. Our position was that the architect's submittal dispositions (#084413-020-02-MCN) provided the necessary approval to proceed to fabrication and installation in accordance with the submittal. What is more, Whitestone and Yuanda had fabricated and installed the WT-3 Clerestory system exactly as approved by Sciame.

30. The project engineer's response to RFI-1130 resulted in a direction by Sciame to Whitestone that the previously installed WT-3 Clerestory structural members be modified in the field.

31. Consequently, the issuance of the response to RFI-1130 and the direction by Sciame to modify the structural members of the WT-3 Clerestory system prompted Yuanda and Whitestone to collaborate on a proposal which addressed what we believed to be work necessitated by new design criteria. As such, Whitestone and Yuanda believed that we would be entitled to additional compensation for the work that Sciame was rejecting.

32. Notwithstanding the disagreement about whether the work that Sciame had rejected was proper or newly compensable, Whitestone was required under the administrative dispute resolution process to correct the work immediately, while the issue over payment would be decided later. Yuanda was aware of the need to fix now and agree to get paid later (if at all) pending the outcome of the dispute resolution process.

33. On or about November 27, 2018, Whitestone submitted its proposed change order ("PCO-#098") to Sciame seeking to secure its entitlement to additional compensation as a result of what Whitestone asserted was a new design and additional work required by the response to RFI-1130. The submission of PCO-#098 to Sciame marked Whitestone's request for $348,794.00 for the work directed by Sciame on the WT-3 Clerestory system. A true copy of PCO-#098 is annexed as Exhibit "8."

34. On or about May 3, 2019, Sciame delivered an email to Whitestone which formally rejected PCO-#098. In its rejection, Sciame indicated that it had reviewed PCO-#098 with CUCF and the architect and determined that the extra work was remedial in nature and not a result of a design change warranting a change order to Whitestone. A true copy of Sciame's email dated May 3, 2019 is annexed as Exhibit "9."

35. More critically, Whitestone was directed to proceed immediately with the remediation by finalizing any submissions, obtaining new approvals from the Sciame design team, procuring all materials and beginning coordination with Sciame to accomplish this repair by the end of August 2019. *See* Exhibit "9."

36. Sciame's May 3, 2019 email also notified Whitestone that it was moving PCO-#098 to "rejected" status in its change order log. *See* Exhibit "9." In light of Sciame's rejection of

PCO-#098, Whitestone was relegated to resolve the payment dispute through the administrative resolution process set forth in the Whitestone-Sciame Agreement and begin work immediately.

### E. Whitestone Complies With the Administrative Dispute Resolution Procedures in the Whitestone-Sciame Agreement

37. Article 16 of Rider "B" of the Whitestone-Sciame Agreement addresses disputes and claims between Sciame and Whitestone. It is intended to constitute the required pass-through by Sciame, and acceptance by Whitestone, of the exclusive procedures for adjudication of claims and disputes. Article 16 of Rider B of the Whitestone-Sciame Agreement therefore tracks the dispute resolution procedures mandated by Article 29 of the Prime Contract. The exclusivity of those procedures is plainly articulated in Section 16.1.1 of Rider B as follows:

> All claims, controversies or disputes Subcontractor may have in relation to this Agreement or the Work hereunder, including without limitation all claims, controversies or disputes a sub-subcontractor or a supplier to Subcontractor may have in relation to this Agreement, (each a "Dispute"), to the extent permitted by law, shall be resolved **exclusively** by the procedure set forth in this Article. Without limitation, this procedure covers Disputes concerning … **(5) if an amount, and what amount, if any, is to be paid for Work or Extra Work or disputed Work performed in connection with this Agreement, (6) every payment to and by Subcontractor** … and (8) any combination of these.

*See* Exhibit "5."

38. The Whitestone-Sciame Agreement describes the process for submission of change orders, as well as a process for disputes and appeals. Yuanda was given a full opportunity to review this process – an opportunity that was expressly mandated in the Purchase Order. The change order process is summarized by the following timeline:

- If CUCF, the owner, elects to make a change to the work, Sciame will submit a detailed Change Order Reques*t* to Whitestone. Within **three (3) days** after receipt of the Change Order Request, Whitestone must furnish a Change Order Proposal to Sciame. *See*

-10-

- Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 6.1.2.

- If the Proposal from Whitestone is timely submitted to Sciame and approved, a Change Order will be executed **"promptly"** by both Sciame and Whitestone. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 6.1.2.

- If the Change order Proposal requests an adjustment to the Subcontract Sum or Milestone Event, but the parties cannot agree on a Change Order with respect to the requested adjustment within **three (3) days** after the issuance of the Change order Proposal, Sciame may still issue a *Directed* Change order directing Whitestone to proceed with the work constituting the change and provide for an adjustment. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 6.1.3.

- Whitestone has **seven (7) days** from the receipt of a Directed Change Order to object. If Whitestone does not object within the prescribed time, then it has (i) waived any right to object to any adjustment provided for in the Directed Change order; (ii) agreed to such adjustment; or (iii) acknowledged that such adjustments shall constitute the complete and final consideration for all costs, claims, delays or damages incurred by Whitestone as a consequence of the change. A Directed Change Order is thereupon deemed to constitute a Change Order. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 6.1.3.

- If Whitestone rejects the Directed Change Order or Sciame rejects Whitestone's Change Order Proposal, a "dispute" has arisen. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.1.2.

39. The dispute resolution and appeal process under the Whitestone-Sciame Agreement also established the following deadlines:

- Whitestone must file a notice of a dispute within **ten (10) days** of any act, omission or condition that gives rise to the dispute. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.2.

- Sciame shall submit the Notice of Dispute to CUCF. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.2.

- Within **twenty (20) business days** of submission of the Notice of Dispute, Whitestone must submit a "Dispute Report." *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.3.

- Sciame shall submit the Dispute Report to CUCF. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.3.

- CUCF will investigate and will resolve the dispute in writing by issuing either (i) a "Negotiated Resolution" or (ii) a "Unilateral Resolution." CUCF can elect to investigate however it sees fit, including conducting meetings with Sciame and Whitestone. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.4.1.

- If CUCF renders a Unilateral Resolution, Sciame shall **"promptly"** furnish a copy thereof to Whitestone. Sciame need not send a copy of a negotiated resolution to Whitestone. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.4.1.

- Within **ten (10) days** after receipt of a resolution with which it disagrees, Whitestone may request that Sciame issue an appeal. Sciame must submit the Notice of Appeal to CUCF. *See* Exhibit "5," Rider to the Whitestone-Sciame Agreement, at 16.4.2.

- If no resolution has been forthcoming from CUCF after CUCF received a Dispute Report, Whitestone may also require Sciame to file a Notice of Appeal with CUCF within **thirty (30) days** after CUCF's receipt of the Dispute Report. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.4.2.

- CUCF will then investigate the circumstances of the appeal. If CUCF is not able to resolve the appeal within **thirty (30) calendar days** after receiving the Notice of Appeal, or if **ten (10) consecutive calendar days** elapse after Sciame receives from CUCF a final written decision with which Sciame disagrees, Whitestone's sole remedy shall be an appeal pursuant to **Article 78**. *See* Exhibit "5," Rider B to the Whitestone-Sciame Agreement, at 16.5.

40. By letter dated May 3, 2019 (the same day Sciame rejected PCO-#098), Whitestone timely served Sciame with a "Notice of Dispute" in accordance with the dispute resolution process set forth in the Whitestone-Sciame Agreement. A true copy of the May 3, 2019 letter from Whitestone to Sciame is annexed as Exhibit "10."

41. Thereafter, by letter dated May 6, 2019, Whitestone timely served Sciame with a "Description of Dispute" (the Dispute Report) in accordance with the dispute resolution process

set forth in the Whitestone-Sciame Agreement. A true copy of the May 6, 2019 letter from Whitestone to Sciame is annexed as Exhibit "11."

42. The "Description of Dispute" informed Sciame of the following:

- Whitestone and Yuanda's respective WT-3 clerestory work was compliant with Sciame's approved Submittal #084413-020-02 MCN which, in turn, was compliant with the contract documents;

- Whitestone and Yuanda mutually agreed that Sciame's design team changed the contract deflection criteria in 2017 **after** the #084413-020-02 MCN work had been fabricated and installed;

- Any new design criteria should have been noted on the 084413-020-02 MCN submittal, or in a revise and resubmit request before Whitestone and Yuanda commenced their work;

- Whitestone and Yuanda timely completed their work in December 2016 in accordance with the approved plans and specifications; and

- Subsequent to the fabrication and installation of approved WT-3 clerestory work in accordance with the #084413-020-02 MCN submittal, Sciame issued corrections and new deflection criteria that were not noted.

**F.** **Whitestone Rejected Yuanda's Work**

43. Between May 3, 2019, when Sciame formally rejected PCO-#098, and late June 2019, Whitestone had numerous discussions with Yuanda, both verbally and in writing. During that time period, Whitestone made numerous requests for Yuanda to prepare a new plan and submittals for the work Sciame rejected as non-confirming and to bear its responsibilities under the Purchase Order relating to the duty to remediate work that was rejected by Whitestone, Sciame and/or CUCF.

44. Whitestone informed Yuanda on multiple occasions that the right to seek additional compensation from Sciame under PCO-#098 was specifically preserved by Whitestone's timely filing of the Notice of Dispute and Description of Dispute as required under the administrative resolution process. Whitestone further urged Yuanda to complete the remediation work under

protest because, regardless of our mutual belief that additional compensation was due and owing from Sciame, we were required to perform such work. Yuanda refused all requests.

45. By letter dated June 24, 2019, Whitestone formally directed Yuanda to remediate the purportedly misfabricated previously installed WT-3 Clerestory system as directed by Sciame. A true copy of Whitestone's June 24, 2019 letter to Yuanda is annexed as Exhibit "12."

46. In its June 24, 2019 letter, Whitestone informed Yuanda that Whitestone had fully and timely complied with the administrative claims resolution process in the Whitestone-Sciame Agreement by, among other things, filing a Notice of Dispute. Yuanda was further assured that Whitestone would continue to press the dispute with Sciame that the work which Sciame required consisted of a belated design change for which Whitestone (and Yuanda) was entitled to a Change Order (i.e., additional compensation). Yuanda was provided with a copy of the Notice of Dispute and PCO-#098.

47. In response to the Whitestone June 24, 2019, Yuanda dispatched a letter dated June 28, 2019 letter. A true copy of Yuanda's June 28, 2019 letter is annexed as Exhibit "13."

48. In its June 28, 2019 letter, Yuanda relied upon the approved submittals to excuse it from performing any additional work on the WT-3 Clerestory system without additional pay. Notably, Yuanda did not dispute Sciame's authority to reject work as non-conforming. It merely disagreed with Sciame's contentions.

49. Accordingly, Yuanda refused to do any work to correct the WT-3 Clerestory system as directed by Whitestone.

50. Following receipt of Yuanda's letter of June 28, 2019, Whitestone engaged counsel to make one final request of Yuanda. By counsel's letter dated July 26, 2019, Whitestone again asked Yuanda to proceed with the remediation work in accordance with the Whitestone-Yuanda

Agreement. The letter specifically asked Yuanda for plans, specifications, and shop drawings as required by the Purchase Order.

51. Counsel also asked Yuanda for a schedule of completion of Yuanda's Work. Yuanda was given notice that if the foregoing requests were not provided immediately, Whitestone would deem Yuanda to have breached the Purchase Order and would seek recovery of all costs and expenses for work that it did on Yuanda's behalf. A true copy of counsel's July 26, 2019 letter is annexed as Exhibit "14."

52. Despite these requests, Yuanda did not perform any further work on the Project – and provided no plans, no specifications and/or no materials.

53. Whitestone completed its work on the remediation project on its own. In doing so, Whitestone incurred costs and expenses of no less than $400,000.00.

54. The Notice of Dispute has not been ruled upon by Sciame or CUCF. Whitestone continues to vigorously pursue collection of PCO-#098.

Dated: New York, New York
       November 9, 2020

                                /s/ Steven Grzic
                                STEVEN GRZIC