Exhibit 27

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF NEW YORK
2
3    WHITESTONE CONSTRUCTION, CORP.,)
                                    )
4            Plaintiff,             )
                                    )
5        vs.                        )   No. 20-cv-1006
                                    )
6    YUANDA USA CORPORATION,        )
                                    )
7            Defendant.             )
8
9
             The videotaped videoconference deposition of
10
     JAMES DEARTH, called for examination, taken pursuant to
11
     the Federal Rules of Civil Procedure of the United States
12
     District Courts pertaining to the taking of depositions,
13
     taken before KELLY A. BRICHETTO, CSR No. 84-3252,
14
     Certified Shorthand Reporter of the State of Illinois, on
15
     the 20th day of January, 2021, at 10:04 a.m.
16
17
18
19
     REPORTED REMOTELY FROM CHICAGO, ILLINOIS
20
21
22
23
24

Page 2

```
1 REMOTE APPEARANCES:
2
       On behalf of the Plaintiff:
3
       GOETZ FITZPATRICK, LLP, by
4      MR. DONALD J. CARBONE
       1 Pennsylvania Plaza
5      Suite 3100
       New York, New York  10119
6      (212) 695-8100
       dcarbone@goetzfitz.com
7
8      On behalf of the Defendant:
9      FOX SWIBEL LEVIN & CARROLL, LLP, by
       MR. ADAM GILL
10     222 West Madison Street
       Chicago, Illinois  60606
11     (312) 224-1200
       agill@foxswibel.com
12
13     - - - - - - -
14
15 ALSO PRESENT:
16 MR. ADAM NUDELMAN, Legal Videographer
17
18
19
20
21
22
23
24
```

Page 4

```
1            INDEX OF EXHIBITS
2 NUMBER        DESCRIPTION        IDENTIFIED
3 Exhibit No. 1    Notice of 30(b)(6)
                   deposition          13
4 Exhibit No. 2    Complaint          14
  Exhibit No. 3    New York State Complaint   28
5 Exhibit No. 4    Whitestone Construction
                   Corporation purchase order
6                  13-0139-002        40
  Exhibit No. 5    (Skipped)
7 Exhibit No. 6    RFI Transmittal    67
  Exhibit No. 7    Whitestone's PCO number 90  95
8 Exhibit No. 8    E-mail from Michael Pardee
                   May 3, 2019        104
9 Exhibit No. 9    Notice of Dispute
                   May 3, 2019        108
10 Exhibit No. 10   Description of Dispute
                   letter from Whitestone
11                 May 6, 2019        109
   Exhibit No. 11   (Skipped)
12 Exhibit No. 12   Letter from Whitestone
                   to Yuanda June 24, 2019   122
13 Exhibit No. 13   E-mail from Dearth
                   to Yuanda          136
14 Exhibit No. 14   E-mail chain from Dearth
                   to Yuanda          141
15 Exhibit No. 15   (Skipped)
   Exhibit No. 16   E-mail chain
16                 April 27, 2020     148
   Exhibit No. 17   Supporting documentation
17                 for Whitestone's damages  149
   Exhibit No. 18   (Skipped)
18 Exhibit No. 19   Supporting documentation
                   for Whitestone's damages  153
19
20
21
22
23
24
```

Page 3

```
1            TRANSCRIPT INDEX
2 APPEARANCES . . . . . . . . . . . . . . . . . . . . . 2
3
4 INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . 4
5
6 EXAMINATION OF JAMES DEARTH
7 BY MR. GILL . . . . . . . . . . . . . . . . . . . . . 7
8
9 CERTIFIED QUESTIONS . . . . . . . . . . . . . . . . 5
10
11 REPORTER'S CERTIFICATE . . . . . . . . . . . . . 191
12
13 EXHIBIT CUSTODY
14 COURT REPORTER
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1            CERTIFIED QUESTIONS
2 QUESTION           PAGE            LINES
3 Question No. 1     129             3-4
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

1     THE VIDEOGRAPHER:  Good morning.  Today's date
2 is January 20th, 2021.  The time on the record is 10:04
3 a.m.
4         This is the videorecorded deposition of
5 James Dearth in reference to Whitestone Construction
6 Corp. versus Yuanda USA Corporation in the United States
7 District Court for the Southern District of New York,
8 case Number 20-cv-1006.  This video deposition is taking
9 place remotely.
10         Would all attorneys present please
11 identify themselves and state whom they represent
12 beginning with the party noticing this proceeding.
13     MR. GILL:  This is Adam Gill, G-I-L-L,
14 representing the Defendant, Yuanda USA Corporation.
15     MR. CARBONE:  This is Donald Carbone with
16 Goetz Fitzpatrick, LLP, and we represent the Plaintiff in
17 the action, Whitestone Construction Corp.
18     THE VIDEOGRAPHER:  My name is Adam Nudelman.
19 I'm the videographer with Veritext.  The court reporter
20 today is Kelly Kilcoyne, also with Veritext.  She will
21 now administer the oath.  We can proceed.
22         (Witness sworn.)
23     MR. GILL:  Thank you.
24

Page 7

1 WHEREUPON:
2         JAMES DEARTH,
3 called as a witness herein, having been first duly sworn,
4 was examined and testified as follows:
5         DIRECT EXAMINATION
6 BY MR. GILL:
7     Q.   Can you state your name and spell your last
8 name for the record, please.
9     A.   James Dearth, D-E-A-R-T-H.
10     MR. GILL:  For the record, this is the
11 discovery deposition of James Dearth as the corporate
12 representative of Whitestone Construction Company taken
13 pursuant to notice, the Federal Rules of Civil Procedure
14 and all applicable rules.
15         Before I begin, counsel, we are taking
16 this deposition pursuant to a stipulation for conducting
17 remote depositions.  Do you agree to the terms in that
18 stipulation?
19     MR. CARBONE:  Yes.  I believe -- I believe we
20 signed it and returned it.
21     MR. GILL:  Okay.  Actually, you did not sign
22 and return it.  That's why I'm asking you for your
23 agreement on the record.
24

Page 8

1 BY MR. GILL:
2     Q.   Mr. Dearth, have you ever given a deposition
3 before?
4     A.   No.
5     MR. CARBONE:  Mr. Gill, just for a moment --
6 and if we didn't sign it -- you're talking about the
7 stipulation and order concerning protocol for conducting
8 remote depositions which is seven pages dated sometime in
9 January 2021?
10     MR. GILL:  Correct.
11     MR. CARBONE:  Okay.  Yes, we agree to that.
12     MR. GILL:  Thank you.
13     MR. CARBONE:  And, Mr. Gill, with respect to
14 proceeding under the Federal Rules, I just want to be
15 clear.  With respect to any objections, that in order to
16 preserve our rights at the time of trial with respect to
17 the objections, all we have to do is object.  We do not
18 have to explain the reasons for objections.  Do you
19 agree?
20     MR. GILL:  I -- if that is what your
21 interpretation of the rules is, then yes.
22     MR. CARBONE:  Well, Mr. Gill, it's a question
23 of -- if we're going to proceed, I'd like to proceed on
24 the same page.  So that's my interpretation of the rules.

Page 9

1 If you disagree with me, let me know because rather than
2 object, just saying objection, I'll explain the reasons
3 for my objection which as you know will extend the
4 deposition.  So I just need to know whether you agree and
5 you have the same interpretation as I do.
6     MR. GILL:  I do.  I do have the same
7 interpretation because -- yes, I agree.
8     MR. CARBONE:  Okay, great.  Thank you.
9     MR. GILL:  Thank you.
10 BY MR. GILL:
11     Q.   So let me go over some ground rules since you
12 have not given a deposition before.  Obviously there's a
13 court reporter here taking down everything you and I say.
14 And even in the best of times when we're in the same
15 room, it's difficult.  This is not intended to be a
16 conversation.  And for the clarity of what is said and
17 the court reporter's sanity, you -- I ask you please to
18 let me finish a question before you provide -- start an
19 answer, and I will make every effort to not step on your
20 answers.  We want to make sure that the record and what
21 you say and what I'm asking are clear so that later when
22 we go back and review this it's understood what the
23 questions and answers were.
24         In the same vain, all of your answers must be

3 (Pages 6 - 9)

Page 10

1 verbal. Nods of the head, um-hum, na-huh, things like
2 that are going to make it extremely difficult for the
3 court reporter to take down accurately what we say and
4 for your attorney and me to later understand what exactly
5 the answer was. Is that fair enough?
6    A.   Yes.
7    Q.   Thank you.
8         If at any time you need to take a break, just
9 let me know, and I only ask that you answer a question
10 that is pending before we take a break. This is not
11 supposed to be a marathon, and the purpose is just to get
12 to the bottom of some of these factual issues.
13        So aside from any discussions with your
14 attorney -- and I certainly don't want any -- to know
15 about any communication you had with the attorney here or
16 any other attorney that has been advising Whitestone, but
17 aside from communications with your attorney have you
18 discussed this deposition with anyone?
19    A.   No.
20    Q.   Okay. Did you discuss the topics of the
21 deposition with anyone at Whitestone in preparation for
22 this deposition?
23    A.   I just told my office that I was gonna be
24 here for the deposition.

Page 11

1    Q.   Okay. What did you do in preparation for
2 this deposition?
3    A.   I met with Mr. Carbone yesterday and I
4 believe it was the Friday before last.
5    Q.   Did you review any documents?
6    A.   Yes.
7    Q.   What documents did you review?
8    A.   A number of documents.
9    Q.   Okay. What -- including what?
10    A.   I'm not sure. If I had a list, I would be
11 able to identify or visually see them, but I don't know
12 off the top of my head.
13    Q.   You don't remember any document you reviewed
14 in preparation for this deposition?
15    A.   I do remember them. I would just have to
16 visually see them to recall.
17    Q.   As you sit here without looking at any
18 documents, you don't recall what documents you reviewed
19 though; is that accurate?
20    A.   Yes.
21    Q.   Okay. And you understand that Whitestone has
22 designated you as its corporate representative for the
23 purpose of this litigation. Do you understand that?
24    A.   Yes.

Page 12

1    Q.   And today you are answering questions on
2 behalf of Whitestone not on your own personal knowledge.
3 Do you understand that?
4    A.   Yes.
5    Q.   At this time if you can open the exhibits. I
6 provided exhibits to Mr. Carbone earlier this week. Can
7 you open up the redwell that contains them?
8         MR. CARBONE: Yeah, Adam, do you want me to
9 open it or do you want him to open it?
10         MR. GILL: I would like it opened on camera.
11 I don't care who opens it.
12         MR. CARBONE: Okay.
13         Here it is.
14         MR. GILL: Thank you.
15         There's two copies. One copy is for the
16 deponent and one is for counsel.
17         THE VIDEOGRAPHER: The video is -- that I am
18 doing is just on the deponent. Is that okay or do you
19 want --
20         MR. GILL: That's fine.
21         THE VIDEOGRAPHER: -- it on the video?
22         MR. GILL: That's fine. Mr. Carbone is
23 showing me what -- what he has, and it's acceptable.
24         So one copy is for you, Mr. Carbone, and

Page 13

1 one copy is for the deponent.
2         MR. CARBONE: Do you care which copy, the
3 rubber band or the non-rubber band copy?
4         MR. GILL: Nope. They are identical.
5         MR. CARBONE: Okay.
6 BY MR. GILL:
7    Q.   If you can please take a look at the exhibit
8 that's previously been marked as Defendant's Exhibit 1.
9 Have you seen this document before?
10    A.   No. No.
11    Q.   Okay. For the record, this is a notice of
12 deposition, 30(b)(6) deposition that I provided to
13 counsel for Whitestone on or about -- I don't recall. A
14 couple weeks ago. I can get the exact date later, but
15 you have not seen this document; is that correct?
16    A.   No.
17    Q.   If you can turn to Page 3 and 4, have you
18 seen this list of topics before?
19    A.   No.
20    Q.   Are you capable and able to answer questions
21 regarding all the topics listed on Page 3 and 4 of this
22 notice of 30(b)(6) deposition?
23    A.   I'm going to list off the ones that I won't
24 be able to.

4 (Pages 10 - 13)

Page 14

1    Q.   Okay.
2    A.   Three, Page 3, item 3.
3    Q.   Yep. I understand.
4    A.   I'll answer to the best of my ability item 4.
5  To the best of my ability for 5. To the best of my
6  ability for 6. To the best of my ability for 7. Eight
7  is fine. I can answer 8.
8    Q.   Understood. Thank you.
9    A.   Nine as well. I can answer 9 as well. To
10  the best of my ability for 10. I can answer 11. I can
11  answer 12. I can answer 13. I can answer 14. I can
12  answer 15. I can answer 16. I can answer 16 to the best
13  of my ability. I can answer 17 to the best of my
14  ability. I can answer 18 to the best of my ability. I
15  won't be able to answer 19. I won't be able to answer
16  20. I'll be able to answer 21.
17    Q.   Thank you. Okay. If you can take -- take a
18  look at what's been previously marked as Defendant's
19  Exhibit 2 which, for the record, is the Complaint filed
20  in this litigation on February 6, 2020 in the Southern
21  District of New York. It's my understanding that you
22  will be able to answer questions as Whitestone's
23  designated representative regarding the allegations
24  contained in this document; is that accurate?

Page 15

1    A.   Yes, I will do my best.
2    Q.   If you turn to Page 2, paragraph number 7,
3  allegation 7, can you read that to yourself, please.
4         (Witness peruses document.)
5         "Has been rejected and declared defective by
6  CUCF, as owner, and its general contractor, F.J. Sciame
7  Construction Company, Inc.; is that correct?
8    A.   Yes.
9    Q.   As far as you know, does Sciame have a
10  contract with Yuanda?
11    A.   No.
12    Q.   Who does Sciame have a contract with?
13    A.   Whitestone.
14    Q.   Did both Sciame and the owner reject
15  Whitestone's work?
16    A.   They rejected Yuanda's work.
17    Q.   Well, in order to reject Yuanda's work, did
18  they have to reject Whitestone's work?
19    A.   I'm unsure.
20    Q.   But Yuanda doesn't have a contract with
21  Sciame; is that accurate?
22    A.   Yes.
23    Q.   Who rejected the work -- the owner or Sciame?
24    A.   Both.

Page 16

1    Q.   When did they both reject that work?
2    A.   I would need to review the documents. I
3  don't know the exact date --
4    Q.   Okay.
5    A.   -- offhand.
6    Q.   Do you know specifically what work they
7  rejected?
8    A.   They rejected the clerestory assembly.
9    Q.   The entire assembly?
10    A.   Of the clerestory specifically.
11    Q.   But the entire assembly of the clerestory?
12    A.   I'm unsure of how to answer that.
13    Q.   Well, what did they reject? What did they
14  find was not compliant with the contract documents?
15    A.   Movement criteria between two buildings.
16    Q.   If you can look at Exhibit 2 again. Read
17  paragraph 8 to yourself.
18         (Witness peruses document.)
19    A.   Okay.
20    Q.   Okay. What does Whitestone mean in this
21  allegation when it talks about defective work?
22    A.   Would you mind rephrasing that question?
23    Q.   I can't. The second -- the last part of this
24  says: "Defendant is contractually obligated to repair or

Page 17

1  replace said defective work." I want to know what
2  Whitestone means by defective work.
3    A.   Defective work is what the owner determines
4  is not in compliance with their drawings and
5  specifications.
6    Q.   Does that require that the work actually not
7  be in compliance or just determined to be not in
8  compliance?
9         MR. CARBONE: Objection.
10         You can answer.
11  BY THE WITNESS:
12    A.   I'm unsure.
13  BY MR. GILL:
14    Q.   Whitestone doesn't know what it means when it
15  wrote defective work in its Complaint; is that your
16  answer?
17         MR. CARBONE: Objection.
18  BY MR. GILL:
19    Q.   Please answer.
20    A.   Could you say that one more time, please.
21    Q.   Does Whitestone know what it meant when it
22  stated defective work in paragraph 8 of its Complaint?
23    A.   Yes.
24    Q.   What did Whitestone mean?

5 (Pages 14 - 17)

Page 18

1    A.    That the owner determined that the work was
2  defective.
3    Q.    If work is not defective -- or strike that.
4        If work does actually conform or comply to
5  the requirements in the contract documents, is that work
6  required to be replaced or corrected if the owner's
7  wrong?
8    A.    Would you mind saying that one more time, I'm
9  sorry, a little bit slower?
10    Q.    If work is, in fact, correct in that it
11  complies with the requirements of the contract documents,
12  is Whitestone or Yuanda required to correct or replace it
13  if the owner is wrong in their determination?
14    A.    I believe so, yes.
15    Q.    And what is that belief based on?
16    A.    If the owner or construction manager believes
17  that the work is defective, we need to replace it.  We
18  need to bear the sole cost as well.
19    Q.    We who?
20    A.    Whitestone and its vendors and
21  subcontractors.
22    Q.    According to Whitestone, who has the right to
23  determine whether Yuanda's work conforms or does not
24  conform to the project -- the contract documents?

Page 19

1        MR. CARBONE:  Objection.
2  BY MR. GILL:
3    Q.    Go ahead and answer.  For all of your
4  attorney's objections, you have to answer unless he says
5  it's privileged or there's some other reason why you
6  shouldn't answer.
7    A.    I understand.  I'm sorry.  Would you mind
8  just saying that once again?
9    Q.    Yeah.  According to Whitestone, who has the
10  right to determine that Whitestone's or Yuanda's work
11  fails to conform with the contract documents?
12        MR. CARBONE:  He's already -- you already
13  asked that question.  He already answered that question,
14  I believe.
15        MR. GILL:  No.  You just objected.  He did not
16  answer.
17        MR. CARBONE:  Okay.
18  BY THE WITNESS:
19    A.    I believe it's the owner and their designated
20  design team, the construction manager and Whitestone
21  itself.
22  BY MR. GILL:
23    Q.    If you can turn to Page 3 of Exhibit 2 and
24  read paragraph 9 to yourself.

Page 20

1        (Witness peruses document.)
2    A.    Yes.
3    Q.    According to this allegation, Whitestone says
4  that Yuanda has failed or refused to correct its
5  defective work; is that accurate?
6    A.    Yes.
7    Q.    What did Whitestone demand Yuanda do in order
8  to correct this defective work?
9    A.    Remediate the clerestory assembly to the
10  satisfaction of the owner.
11    Q.    The entire remediation from design through
12  installation, is that your position?
13    A.    Yes.
14    Q.    What exactly did Yuanda refuse to do?
15    A.    They refused to supply the manpower and I
16  believe the material to complete the remediation to the
17  owner's satisfaction.
18    Q.    If you'd look at paragraph 12 on Page 3 of
19  Exhibit 2.  Please read that to yourself.
20    A.    Excuse me.  I'm unsure of the material aspect
21  of that last thing I just said.
22    Q.    I understand.  If you can read paragraph 12
23  to yourself.
24        (Witness peruses document.)

Page 21

1    A.    Okay.
2    Q.    Does this description and definition of what
3  is defined in here as "work," does that accurately
4  describe Yuanda's scope of work?
5        MR. CARBONE:  I'm going to object.  Oh, never
6  mind.  Objection withdrawn.
7  BY THE WITNESS:
8    A.    I believe so.  I don't know if it's
9  everything, but I believe so.
10  BY MR. GILL:
11    Q.    You understand what I mean by scope of work?
12    A.    Yes.
13    Q.    What is scope of work?
14    A.    What they're contractually obligated to
15  deliver.
16    Q.    You see in this that the allegation is that
17  Yuanda was contractually obligated to install the
18  curtainwall system?
19    A.    No.
20    Q.    You don't see that that's what this says?
21  This states that Yuanda -- or sorry.  Yuanda agrees to
22  provide Whitestone with "all curtainwall system design,
23  engineering, structural calculations" and a list of other
24  things, "installation and testing."  Do you see that it

6 (Pages 18 - 21)

Page 22

1  says Yuanda was required to perform installation?
2      A.   Yes.
3      Q.   Is that correct?
4      A.   Yuanda did not install anything on the
5  project.
6      Q.   Were they required to install anything on the
7  project?
8      A.   I'm not aware of that if they were.  I know
9  they did not though.
10     Q.   You're not aware whether they were required
11 to under the terms of the purchase order?  I'm just
12 clarifying.
13     A.   Correct.
14     Q.   Okay.
15     A.   Correct.
16     Q.   And there will be times where I will repeat
17 your statement as just clarification making sure I
18 understand what you're saying, so I'm not trying to be
19 difficult or trick you.  I just want to make sure I
20 understand.  Is that okay?
21     A.   Yes.
22     Q.   Who installed the curtainwall system that
23 Yuanda fabricated and delivered?
24     A.   Metro-Tech Erector's Corp.

Page 23

1      Q.   And was that under a subcontract with
2  Whitestone?
3      A.   Yes.
4      Q.   If you can look at Page 4 and read paragraph
5  17 to yourself.
6          (Witness peruses document.)
7      A.   Okay.
8      Q.   Okay.  According to this, Perkins Eastman,
9  the architect, discovered "alleged severe discrepancies
10 in the project structures projected movement."  Does
11 Whitestone agree that there were severe discrepancies in
12 the project structures projected movement?
13     A.   Yes.
14     Q.   You can turn to the next page.  You can read
15 paragraph 24 to yourself.
16         (Witness peruses document.)
17     A.   Okay.
18     Q.   This allegation states that in June 2019
19 Whitestone contacted Yuanda and notified Yuanda that the
20 general contractor, Sciame, declared that Yuanda's WT-3
21 clerestory was non-conforming.  Is that a fair assessment
22 of what -- paraphrase of what is stated?
23         MR. CARBONE:  I'll object.
24

Page 24

1  BY THE WITNESS:
2      A.   I believe so, yes.
3  BY MR. GILL:
4      Q.   Okay.  How did Sciame inform Whitestone that
5  the WT-3 system was non-conforming?
6      A.   I believe via a letter or e-mail.
7      Q.   Was that the first time that Sciame informed
8  Whitestone that the WT-3 clerestory was non-conforming?
9          MR. CARBONE:  I'm going to object.  Could you
10 just give him a time frame?
11 BY MR. GILL:
12     Q.   I am asking whether the date stated in the
13 Complaint, June 29th, is the first time that Sciame
14 informed Whitestone that the WT-3 was non-conforming.
15         MR. CARBONE:  Okay.  Thank you.
16 BY THE WITNESS:
17     A.   I don't believe that's -- that's true.
18 BY MR. GILL:
19     Q.   Okay.  When was the first time that Sciame
20 informed Whitestone that the WT-3 was non-conforming?
21     A.   That Sciame informed Whitestone?
22     Q.   Yes.
23     A.   Within the two years prior.  A year and a
24 half, two years prior I would say.  And that's Sciame

Page 25

1  informing Whitestone.
2      Q.   Right.
3          The second half of this allegation says that
4  "Whitestone in turn demanded that Yuanda remediate the
5  non-conforming work."  Do you see that?
6      A.   Yes.
7      Q.   Did Whitestone direct Yuanda to remediate the
8  non-conforming work only because Sciame declared
9  Whitestone's work or Yuanda's work to be non-conforming?
10     A.   Yes.
11     Q.   How did Yuanda's work fail to conform to the
12 requirements of the contract documents?
13     A.   In the curtainwall specifications, it
14 specifies that, in more words or less, that there's two
15 buildings and that we need to accommodate the movement
16 between the two buildings.
17     Q.   What specification is that in?
18     A.   I would need to look at it.
19     Q.   Is it in the curtainwall specification?
20     A.   It is, yes, which is -- I'm not too sure of
21 the exact number.
22     Q.   If you could turn to Page 7 of Exhibit 2 and
23 read paragraph 37 to yourself.
24         (Witness peruses document.)

7 (Pages 22 - 25)

Page 26

1      A.    Yes.
2      Q.    As of February 6, 2020, how much had
3  Whitestone spent to remediate the WT-3 clerestory system?
4          MR. CARBONE:  Adam, what paragraph are we on?
5  Excuse me.
6          MR. GILL:  Thirty-seven.
7          MR. CARBONE:  Thank you.
8  BY THE WITNESS:
9      A.    I'm unaware of the exact -- I don't remember
10  the exact number, but I did prepare the documents, so
11  I -- if I was presented the documents, I'd be able to
12  tell you.
13  BY MR. GILL:
14      Q.    In February of last year, 2020, had
15  Whitestone incurred any costs to remediate?
16      A.    It would just be the design costs, the cost
17  of us eating the design.
18      Q.    So as of February 2020, Whitestone had not
19  incurred costs of $500,000; is that accurate?
20      A.    I believe so, yes.
21      Q.    If Sciame determined that Whitestone's --
22  Strike that.
23          If Sciame determined that Yuanda's work did
24  not conform to the requirements of the contract documents

Page 27

1  or specifications, does that also mean that Whitestone's
2  work did not conform?
3          MR. CARBONE:  Objection.
4  BY THE WITNESS:
5      A.    Would you mind reading that one more time,
6  please.  I'm sorry.
7  BY MR. GILL:
8      Q.    If White -- if Sciame determined that
9  Yuanda's work did not conform to the contract documents
10  and specifications, does that also mean that Whitestone's
11  work does not conform?
12      A.    I'm unsure.
13      Q.    Well, Yuanda was performing work for
14  Whitestone; correct?
15      A.    Yuanda provided us the fabricated assembly.
16      Q.    Right.  And that fabricated assembly was
17  something that Whitestone agreed to provide to Sciame;
18  correct?
19      A.    Yes.
20      Q.    Could Yuanda's work be non-conforming or
21  defective but Whitestone's work be conforming and
22  correct?
23          MR. CARBONE:  Objection.
24

Page 28

1  BY THE WITNESS:
2      A.    I think yes.
3  BY MR. GILL:
4      Q.    How?
5      A.    We installed -- sorry.  Not we.  Metro-Tech
6  installed the system that Yuanda provided in coordination
7  with the documents that Yuanda provided us.
8      Q.    Was Whitestone responsible to Sciame for the
9  installation of the WT-3 clerestory including the design
10  and fabrication?
11      A.    Yes.
12      Q.    I want to turn your attention to the state --
13  the New York State Complaint filed by Whitestone against
14  Sciame.  Are you aware of that litigation?
15      A.    Yes.
16      Q.    What project does that relate to?
17          MR. CARBONE:  Are we talking about Defendant's
18  Exhibit 3?
19          MR. GILL:  Yes.
20          MR. CARBONE:  Okay.
21          MR. GILL:  No, we're not talking about it yet,
22  but we're talking about that litigation, yes.
23          THE WITNESS:  Should I go there?
24          MR. GILL:  Not yet, please.

Page 29

1  BY MR. GILL:
2      Q.    I want to know what you know about that and
3  what project it relates to.
4      A.    The CUNY New -- I am aware of it, and it was
5  for the CUNY New Academic Building project.
6      Q.    The project that we're talking about today?
7      A.    Yes.
8      Q.    Okay.  Are you familiar with the allegation
9  that Whitestone made against Sciame?
10      A.    Yes.
11      Q.    And you're able to answer questions about the
12  allegations contained in that Complaint --
13          MR. CARBONE:  Objection.
14  BY MR. GILL:
15      Q.    -- as -- as Whitestone's designated
16  representative?
17          MR. CARBONE:  Objection.  He's being produced
18  as a representative for this deposition in connection
19  with the Southern District action.
20          MR. GILL:  I understand.
21          MR. CARBONE:  He's not being produced as a
22  representative with respect to a state court action.
23          MR. GILL:  I understand, but the rider
24  specifically says in point 2, Page 3 of Exhibit 1

8 (Pages 26 - 29)

Page 30

1 allegations Whitestone made against Sciame. There was no
2 objection raised prior to the deposition. It is a proper
3 line of questions, so unless you're going to direct the
4 witness not to answer, I'm going to proceed.
5       MR. CARBONE: I am not going to direct the
6 witness not to answer. I think the -- pursuing that line
7 of questioning is improper. It's not relevant to this
8 lawsuit. However, you could ask him any questions you
9 want, and he'll answer them to the best of his ability.
10      MR. GILL: Okay.
11 BY MR. GILL:
12      Q.   If you can look at Exhibit 3, have you seen
13 that document before?
14      A.   I believe so, yes.
15      Q.   If you can turn to Page 2 of Exhibit 3,
16 paragraph 9 relates to -- it says that Whitestone
17 proposed a number of change orders to address -- it's at
18 the bottom of Page 2 --
19      MR. CARBONE: Two of twelve?
20      MR. GILL: Sorry. Three of twelve. It's
21 number 2 of the actual Complaint, 3 of 12. Thank you for
22 the clarification.
23      THE WITNESS: Where would you like me to look?
24

Page 31

1 BY MR. GILL:
2      Q.   Allegation 9 at the very bottom. "Whitestone
3 proposed a number of change orders to address," and then
4 there's a bunch of listed items. Flip to the next page,
5 iv. "Exchanges which were needed to correct
6 architectural and engineering errors and/or omissions in
7 the plans and specifications of the project." Do you see
8 that?
9      A.   Yes.
10      MR. CARBONE: Could you just tell me where we
11 are? My apologies.
12      MR. GILL: Not a problem. We're in the
13 Complaint Page 2 and 3. Of the document it's Page 3 of
14 12 and 4 of 12.
15      MR. CARBONE: Okay. I'm on Page 2 and 3 of
16 12. Okay. Thank you.
17 BY MR. GILL:
18      Q.   Does that reference to changes which were
19 needed to correct architectural and engineering errors
20 relate to any work related to the WT-3 clerestory system?
21      A.   Yes.
22      Q.   What were the errors and omissions in the
23 architect's and engineer's drawings?
24      A.   The omission of critical movement criteria

Page 32

1 between the -- the academic building and the auditorium.
2      Q.   Who was responsible for providing Whitestone
3 with that information?
4      A.   I'm unsure, but I believe it's Sciame, but
5 it's originated by someone else.
6      Q.   It wasn't Yuanda? Yuanda was not responsible
7 for generating that information; is that correct?
8      A.   Specific to the building movements --
9      Q.   Yes.
10      A.   -- no.
11      Q.   Okay.
12          I'm sorry. Madam Court Reporter, there was
13 a -- I jumped in too quickly. Was that okay? Did you --
14 I just want to make sure that I'm not stepping on
15 anyone's --
16      THE REPORTER: It was fine, but, yeah, you did
17 kinda step on him. I got it though.
18 BY MR. GILL:
19      Q.   Paragraph 11 on Page 4 of 12, please. States
20 that: "Whitestone performed all work in accordance with
21 the terms of the contract and has complied with all
22 obligations contained therein." Is that an accurate
23 statement?
24      A.   Yes.

Page 33

1      Q.   Does that statement include the
2 installation -- providing an installation of the WT-3
3 clerestory?
4      A.   Yes.
5      Q.   If you can turn to Page 10 of the exhibit, 10
6 of 12, paragraph 58.
7      A.   Yes.
8      Q.   You could read that to yourself.
9          (Witness peruses document.)
10          In part -- Whitestone alleges in part in this
11 allegation that Sciame failed to approve and/or
12 improperly rejected the change orders without providing
13 sufficient basis for same under the contract? Does that
14 allegation include the rejection of Change Order Number
15 98, proposed Change Order Number 98?
16      MR. CARBONE: Objection.
17 BY THE WITNESS:
18      A.   Give me one second.
19 BY MR. GILL:
20      Q.   Yep.
21          (Witness peruses document.)
22      A.   Sciame provided us with what they believe is
23 a sufficient basis. They provided us with a letter that
24 rejected this work, and they have their reasons listed on

9 (Pages 30 - 33)

Page 34

1 that.
2    Q.   I understand.  I'm asking about Whitestone's
3 position and allegations.  In this allegation, Whitestone
4 has stated that Sciame failed to provide -- Strike that.
5 Has failed to approve and/or improperly rejected the
6 change order.  I want to know what change orders
7 Whitestone's referring to and if that includes any change
8 order related to the WT-3 clerestory.
9    A.   Yes.
10     MR. CARBONE:  Objection.
11     THE WITNESS:  Sorry.
12     MR. GILL:  Did you get that, Madam Court
13 Reporter?
14     THE REPORTER:  I did.
15     MR. GILL:  Thank you.
16 BY MR. GILL:
17    Q.   And just for clarification, yes, this
18 allegation regarding change order does include change
19 orders related to the WT-3 clerestory?
20    A.   Yes.
21    Q.   Okay.  I want to turn your attention to the
22 purchase order or Whitestone's purchase orders in general
23 before looking at the purchase order specific to this
24 project.  Are you able to discuss Whitestone's purchase

Page 35

1 orders?
2    A.   No.
3    Q.   Are you able to answer questions regarding
4 the terms and conditions in the agreement -- in the
5 purchase order between Sciame and Whitestone?  Sorry.
6 Strike that.
7     Are you able to address the terms and
8 conditions in the purchase order between Sciame and
9 Yuanda?
10    A.   No.
11     MR. CARBONE:  Objection.
12     MR. GILL:  What's the objection?
13     MR. CARBONE:  I'm sorry.  What's the
14 objection?
15     MR. GILL:  Yeah.
16     MR. CARBONE:  Documents speak for itself.
17 It's crystal clear.
18     MR. GILL:  I'm still entitled to ask the
19 corporate representative about the purchase order.  So,
20 counsel, for the record, why did Whitestone offer a
21 corporate representative who cannot address that topic?
22     MR. CARBONE:  With respect to the topics that
23 are listed, this corporate representative for the
24 purposes of this deposition could answer the bulk of your

Page 36

1 questions.
2     MR. GILL:  That was not what was represented
3 to me.  What was represented to me as late as last
4 Thursday and as early as November was that Mr. Dearth was
5 going to answer all of the questions or was capable of
6 the corporate representative of answering the questions
7 that are listed in the topics for deposition that are
8 attached to the notice of deposition.  So I want to know
9 why Whitestone failed to disclose or failed to prepare
10 this witness to answer these questions.
11     MR. CARBONE:  Well, first of all, I'm not
12 going to get into a belabored argument with you with
13 respect to whether or not this witness is a proper
14 representative or not.  As you -- as you're well aware,
15 sometimes when you have a deposition you will have
16 multiple witnesses who could answer all the questions
17 that are, you know, listed in -- in your proposed list of
18 questions.  This witness is the one who is most capable
19 in the opinion of Whitestone vis-a-vis the technical
20 aspects of the suit which are really the crux of the
21 matter between the clients.  Okay.  With respect to -- if
22 you want to ask him questions, you want to show him the
23 purchase order and ask him about it, you're free to do
24 that.  Okay.

Page 37

1     But we did not intentionally as you're
2 inferring produce a witness could not answer the bulk of
3 your questions.  And I also understand that Mr. Kushner's
4 made representations to you that to the extent there's
5 any questions that this witness cannot answer that are
6 legitimate questions and are questions that go to the
7 gravamen of the dispute between the parties, we would
8 produce another witness.  So you could go forward if you
9 wish.
10     MR. GILL:  I will go forward, but you
11 understand what you just said are not the rules of the
12 Federal -- the Federal Rules of Civil Procedure.  You
13 have to disclose witnesses prior to the deposition and
14 the topics on which they will provide testimony.  And
15 prior to today I was told only that Mr. Dearth would
16 provide testimony on all of the topics, so I was not told
17 he would provide answers to the bulk of the topics or on
18 which topics he would provide answers.  I was told he was
19 the representative.
20     And so in some way lay this at my feet
21 and say I have to come back in a later deposition, this
22 is my one chance and you know under the Federal Rules to
23 take a deposition of the corporate representative, and I
24 get to take the deposition based on the topics I believe

10 (Pages 34 - 37)

1 are pertinent and material not on the topics you believe
2 are pertinent and material, and I believe the purchase
3 order is pertinent and material, and it was disclosed.
4 That's my --
5         MR. CARBONE:  I'm not -- you know but you're
6 belaboring your point.  You're being argumentative for no
7 particular reason.
8         I think that I've seen a number of e-mails
9 that have gone back and forth and letters that have gone
10 back and forth between you and Mr. Kushner of my office
11 indicating that if there were any questions that this
12 witness could not answer we would produce another
13 witness.  Okay.
14         So if you want to ask him questions about
15 the purchase order -- all you did is you referred to the
16 purchase order.  You didn't show it to him.  If you want
17 to show it to him, you want to ask him questions about it
18 that are pertinent to the dispute between the parties,
19 you're entitled to do that.  And I am not disputing that
20 you're entitled to depose a corporate representative or
21 representatives that could answer all of the relevant
22 questions that you may have.
23 BY MR. GILL:
24   Q.  Does Whitestone have a standard form purchase

1 order for the purchase of curtainwall system?
2         MR. CARBONE:  You're not talking about this
3 case?  You're just talking about in general just to be
4 clear?
5         MR. GILL:  Correct.  I did not say regarding
6 this matter or this purchase order.
7 BY MR. GILL:
8   Q.  Does Whitestone have a standard form purchase
9 order for the purchase of curtainwall system?
10         MR. CARBONE:  Objection.
11 BY THE WITNESS:
12   A.  I'm unaware.
13 BY MR. GILL:
14   Q.  You are unaware of whether they do or do not;
15 correct?
16   A.  I'm unaware whether they do or do not.  I
17 don't know if they have a standard form.
18   Q.  Does Whitestone have a standard terms and
19 conditions -- Strike that.
20         Does Whitestone have a standard "purchase
21 agreement terms and conditions" for its purchase orders?
22         MR. CARBONE:  Objection.
23 BY THE WITNESS:
24   A.  Yes.

1 BY MR. GILL:
2   Q.  Did -- in 2013 did Whitestone have a standard
3 purchase agreement terms and conditions?
4         MR. CARBONE:  Objection.
5 BY THE WITNESS:
6   A.  Not that I would be made privy to.  I -- I
7 don't know.
8 BY MR. GILL:
9   Q.  You can take a look at Exhibit 4.
10   A.  Okay.
11   Q.  Describe -- and Exhibit 4, for the record, is
12 the Whitestone Construction Corporation purchase order
13 13-0139-002.  Can you describe the negotiations between
14 Whitestone and Yuanda for this purchase order?
15   A.  No.
16   Q.  Do you know how Whitestone and Yuanda came to
17 an agreement on the terms included in this purchase
18 order?
19   A.  No.
20   Q.  Do you know if there were any negotiations
21 regarding the purchase agreement terms and conditions
22 which begin on Page 3 of this exhibit?
23   A.  No.
24   Q.  Do you recognize this document that's

1 Exhibit 4?
2   A.  One more time, please.
3   Q.  Do you recognize this exhibit or this
4 document that is Exhibit 4?
5   A.  Yes.
6   Q.  If you turn to the second page, at the bottom
7 in the middle do you recognize that signature?
8   A.  I recognize one signature.
9   Q.  Whose signature is that?
10   A.  Steven Grzic.
11   Q.  And, for the record, Grzic is spelled
12 G-R-Z-I-C.
13   A.  Yes.
14   Q.  Do you know if Whitestone and Yuanda
15 negotiated any part of this purchase order?
16   A.  Please repeat yourself.
17   Q.  Do you know if Yuanda and Whitestone
18 negotiated any parts of this purchase order?
19   A.  I'm unaware of any negotiation.
20   Q.  Turn to Page 3 of the exhibit.  Are these
21 Whitestone standard form terms and conditions as they
22 existed in 2013?
23   A.  Did you say standard from 2013?
24   Q.  Correct.

Page 42

1    A.   I -- I wouldn't know.
2    Q.   If you could turn to the first page of this
3 exhibit, do you see in that middle paragraph where Yuanda
4 is listed as the "vendor"?
5        MR. CARBONE:  Which paragraph are you in,
6 Adam?
7        MR. GILL:  The large one in the middle.  It
8 starts "Yuanda USA Corporation."
9 BY THE WITNESS:
10    A.   I see it.
11        MR. CARBONE:  Okay.  They're also noted as
12 vendor up on top as well.
13        MR. GILL:  Correct.
14 BY MR. GILL:
15    Q.   And in this purchase order agreement
16 Whitestone is referred to as the subcontractor?
17    A.   It appears that way, yes.
18    Q.   Read to yourself the first half of that big
19 paragraph there where -- go down to where it says
20 "vendor's work."
21        (Witness peruses document.)
22    A.   Okay.
23    Q.   As far as Whitestone is aware or concerned,
24 does that accurately state the work that Yuanda was

Page 43

1 required to provide for this project?
2    A.   I don't think I'm qualified to answer that
3 question.  I don't know what the rest of this document
4 says.  I don't know if it overrides anything in this
5 paragraph.
6    Q.   I don't know if Yuanda was supposed to
7 provide anything other than what's described in there and
8 defined as vendor's work.
9        MR. CARBONE:  Objection.  Are you summarizing
10 what he testified to?  I'm not sure what your last
11 statement was.  That's what I'm saying.
12        MR. GILL:  I was summarizing what I think he
13 said.
14 BY THE WITNESS:
15    A.   I just don't know if anything in the back --
16 beyond this paragraph supersedes anything in that
17 paragraph.  I'm not qualified to interpret it nor have I
18 seen it.  I've seen the physical document.  I haven't
19 actually read anything in it.  I don't --
20 BY MR. GILL:
21    Q.   Was Yuanda required to provide any on-site
22 services for this project?
23    A.   I don't believe so.
24    Q.   You said that Metro-Tech did the

Page 44

1 installation.  Was Yuanda required to provide any
2 installation for the WT-3 clerestory?
3    A.   No.
4    Q.   Was Yuanda required to pay Whitestone or
5 Metro-Tech for those installation services?
6        MR. CARBONE:  Objection.
7 BY MR. GILL:
8    Q.   Please answer.
9    A.   I don't believe so, no.
10    Q.   Was Yuanda required to provide any equipment
11 that was necessary to install the curtainwall system?
12        MR. CARBONE:  Objection.  And the reason --
13 Adam, the reason why I'm objecting -- I'm not trying to
14 be obstructionist to your deposition, but the reason why
15 I'm objecting is you're talking about the initial work
16 versus the remedial work.
17        MR. GILL:  I'm not talking about work itself.
18 I'm talking about what's required -- Strike that.  I'm
19 not talking about work itself.  I'm talking about what
20 Whitestone understood the purchase order required.  I'm
21 not asking for legal conclusion, and I'm assuming that's
22 what the objection was, about a legal conclusion.  I want
23 to know what Whitestone believed under the terms of the
24 purchase order Yuanda was required to provide.

Page 45

1        MR. CARBONE:  And that's the -- that's the
2 reason why I objected -- because there's two different
3 phases.  There's the original, initial phase of the work,
4 and then there's the remedial work, and there's a
5 separate criteria vis-a-vis the remedial work.
6        MR. GILL:  That's an interesting
7 interpretation.
8 BY MR. GILL:
9    Q.   So back to my question.  Was Yuanda required
10 to provide any equipment for the installation of the
11 curtainwall system?
12        MR. CARBONE:  Objection.
13 BY THE WITNESS:
14    A.   I don't know.
15 BY MR. GILL:
16    Q.   If you could turn to Page 3 of the exhibit
17 which is Page 1 of the purchase agreement terms and
18 conditions.  You can look at Article 1 and read the last
19 sentence to yourself.
20        (Witness peruses document.)
21    A.   Okay.
22    Q.   What does that mean to Whitestone?  And I'm
23 not asking for a legal interpretation.  I want to know
24 what Whitestone -- how it interpreted that sentence.

12 (Pages 42 - 45)

1     MR. CARBONE:  And you're talking about the
2 sentence that begins with the word:  "No changes"?
3     MR. GILL:  Correct.
4     MR. CARBONE:  Okay.
5 BY THE WITNESS:
6     A.  I don't know how to interpret that sentence.
7 BY MR. GILL:
8     Q.  Is it a change to the requirements of the
9 purchase order if Whitestone provides Yuanda with new
10 information that is not contained in the contract
11 documents?
12     A.  I don't know.
13     Q.  What additional information would you need in
14 order to answer that question?
15     A.  I would need to know how to interpret the
16 language.
17     Q.  If the architect provides new design
18 criteria, is that a change to the purchase order
19 requirements?
20     MR. CARBONE:  Objection.
21 BY THE WITNESS:
22     A.  I don't know.
23 BY MR. GILL:
24     Q.  If you can turn to I believe it's the sixth

1 page of the exhibit.  It's Article 10 of the purchase
2 order terms and conditions.
3     MR. CARBONE:  You have Bates stamped copies;
4 right?  Because mine are Bates stamped that you provided.
5     MR. GILL:  Oh, yes, yes, I do.  I actually did
6 not have a Bates stamp in front of me.  I had marked up
7 mine before getting the Bates stamped copies.
8     So for the record -- for the record --
9     MR. CARBONE:  It would be easier if you refer
10 to Bates stamps.
11     MR. GILL:  Understood.  For the record, it's
12 WCC1105.
13 BY MR. GILL:
14     Q.  And you see at the bottom under inspection
15 and defective work there is a sentence that says -- I
16 believe it's the second sentence in that subparagraph.
17 It says -- it starts:  "Vendor shall promptly prepare the
18 plan for the approval of the subcontractor in order to
19 replace or correct any vendor's work which subcontractor
20 shall reject."  Do you see that?
21     A.  Yes.
22     Q.  Is it Whitestone's interpretation that
23 someone other than Whitestone may reject Yuanda's work?
24     MR. CARBONE:  Objection.

1 BY THE WITNESS:
2     A.  Can you repeat that one more time?
3 BY MR. GILL:
4     Q.  Is it Whitestone's interpretation of that
5 requirement that someone other than Whitestone may reject
6 Yuanda's work?
7     A.  Yes.
8     Q.  Where do you get that interpretation or why
9 do you come to that conclusion?
10     MR. CARBONE:  Objection.
11 BY THE WITNESS:
12     A.  Let me have a minute to think.
13 BY MR. GILL:
14     Q.  Absolutely.
15     (Brief pause.)
16     A.  I'm not entirely sure how to interpret the
17 last sentence but I believe the answer's --
18     Q.  The last sentence where?  I'm sorry.  The
19 last sentence where?
20     A.  I'm sorry.  In the inspection and defective
21 work logs I guess, the last sentence.  Possibly.  I don't
22 really know how to interpret that but --
23     Q.  The last sentence which is on --
24     A.  106 right above paragraph 11.  It looks like

1 there's a -- maybe a strike through through it.
2     Q.  So the -- it's Whitestone's position possibly
3 that the sentence that's been stricken through and
4 deleted provides -- may provide authority to others to
5 reject the work?
6     MR. CARBONE:  Objection to the form and also
7 objection.
8 BY MR. GILL:
9     Q.  I just want to understand if that was your
10 testimony, Mr. Dearth.  I'm not -- certainly not trying
11 to mischaracterize or --
12     A.  Understand.  And I don't know if I'm correct
13 in that to be honest with you.  I have never reviewed
14 this document.  I would need to review it to make a
15 determination to be honest with you.
16     Q.  Okay.
17     A.  I should not have made a shot in the dark
18 like that.
19     Q.  That's fine.
20     A.  I apologize.
21     Q.  We will -- we will move on from the terms and
22 conditions, but if you can turn to Attachment A, 11.10.
23     A.  Yes.
24     Q.  What is Attachment A?

13 (Pages 46 - 49)

1    A.   At the top it reads:  "Scope Worksheet
2  Attachment A."
3    Q.   What is it?  What does that mean?
4    A.   It appears to be a scope checklist that
5  specifies what's Yuanda -- what's by Yuanda and not by
6  Yuanda and/or Whitestone.
7    Q.   This list -- the scope of work is
8  requirements that Yuanda is responsible for providing to
9  comply with the requirements of the purchase order; is
10  that an accurate statement?
11    MR. CARBONE:  Objection.
12  BY THE WITNESS:
13    A.   It appears to be.  I don't know if any other
14  section of this purchase order would supersede any of it
15  or add or remove anything.
16  BY MR. GILL:
17    Q.   My -- intent of my question was not
18  saying that this was the -- the limits of their scope of
19  work but this is -- this -- this helps define the scope
20  of work; is that an accurate statement?
21    A.   Yes.
22    Q.   Okay.  Item 1, line item 1 lists plans and
23  then it lists three specification sections.  Why are
24  those three listed?

1    A.   I believe they're listed because this is what
2  we want Yuanda to provide service for.
3    Q.   If a specification is not listed, is Yuanda
4  responsible or not responsible for that work?
5    MR. CARBONE:  Objection.
6  BY THE WITNESS:
7    A.   I'm unsure.
8  BY MR. GILL:
9    Q.   Let me withdraw the -- let me withdraw and
10  ask it a different way that might be easier.
11    A.   Okay.
12    Q.   There are specifications for steel structure,
13  concrete, drywall, all -- all kinds of building
14  components; correct?
15    A.   Yes.
16    Q.   And they all have different numbers?
17    A.   Yes.
18    Q.   And if Yuanda were responsible for cast in
19  place concrete or structural steel, those specification
20  numbers would have been listed in this document; correct?
21    MR. CARBONE:  Objection.
22  BY THE WITNESS:
23    A.   Yes.
24

1  BY MR. GILL:
2    Q.   Okay.  And since Yuanda wasn't responsible
3  for cast in place concrete or structural steel those were
4  not listed, those are omitted from this list; correct?
5    MR. CARBONE:  Objection.
6  BY THE WITNESS:
7    A.   I don't know if that's necessary --
8  necessarily the case.
9  BY MR. GILL:
10    Q.   Okay.  Is it Whitestone's testimony or
11  position that Yuanda could have been responsible for work
12  described in specifications that are not listed in
13  Attachment A?
14    MR. CARBONE:  Objection.
15  BY THE WITNESS:
16    A.   I'm sorry.  Can you say it one more time?
17  BY MR. GILL:
18    Q.   Is it Whitestone's position that Yuanda could
19  have been responsible for work described in specification
20  sections that are not listed in Attachment A?
21    A.   Yes.
22    Q.   How would Whitestone -- how would Yuanda know
23  that it was responsible for that work?
24    A.   I need a minute to think about my answer.

1    Q.   Absolutely.
2    (Brief pause)
3    A.   I believe that the work outlined in the plans
4  and specifications that are listed here, they also
5  reference related spec sections that are interrelated
6  with their work, so they would be responsible with
7  complying with those other contract documents.
8    Q.   The specification sections listed here,
9  084413 and 084426, relate to structural glass curtainwall
10  systems and aluminum curtainwall systems; is that
11  correct?
12    A.   I believe so, yes.
13    Q.   And those two specifications also reference
14  structural steel and cast in place concrete as may have
15  impact on the curtainwall system; correct?
16    A.   They may.  I would need to review the
17  documents to --
18    Q.   Okay.  And if they do refer to cast in place
19  concrete or structural steel, was Yuanda responsible for
20  the proper installation of cast in place concrete and
21  structural steel?
22    MR. CARBONE:  Objection.
23  BY THE WITNESS:
24    A.   No.

14 (Pages 50 - 53)

Page 54

BY MR. GILL:

2    Q.   So going back to your prior answer, how would
3 you want to know what specification sections it was
4 responsible for complying with if they are not listed in
5 Attachment A?
6       MR. CARBONE:  Objection.  I believe he already
7 answered that question but . . .
8       MR. GILL:  He did, and I pointed out that
9 those specifications refer to things that Yuanda was not
10 responsible for.  I want to know how Yuanda knew what it
11 was responsible for.
12      MR. CARBONE:  Objection.  Again, he's already
13 answered that question.
14 BY MR. GILL:
15    Q.   Please answer.
16    A.   As I said before, there are plans and
17 specifications that list related specifications and work
18 assemblies that are listed in the plans and
19 specifications that were provided to Yuanda, so that's
20 how they would know.
21    Q.   How would Yuanda know which related sections
22 it was responsible for versus those it was not
23 responsible for?
24      MR. CARBONE:  Objection.

Page 55

1 BY THE WITNESS:
2    A.   Other than they're referenced in the spec
3 section.  I don't know.
4 BY MR. GILL:
5    Q.   Did Whitestone provide Yuanda with design
6 criteria for the WT-3 clerestory?
7    A.   I'm unaware.  Other than -- are you talking
8 in the beginning of the project?  I'm sorry.
9    Q.   I'm talking about related to the documents
10 that are listed in Attachment A of the purchase orders.
11 Were there the design criteria listed in any of these
12 documents or that were provided at the time or as a
13 requirement under the purchase orders?
14      MR. CARBONE:  Objection.
15 BY THE WITNESS:
16    A.   I don't know.
17 BY MR. GILL:
18    Q.   You mentioned a couple of times, I think you
19 mentioned a couple of times, roof deflection or the
20 building movement, and my understanding, correct me if
21 I'm wrong, that the dispute between Whitestone and Sciame
22 and the dispute between Whitestone and Yuanda relates to
23 roof deflection and the WT-3 Clerestory's ability to
24 accommodate for it; is that accurate?

Page 56

1      MR. CARBONE:  Objection.  He never mentioned
2 roof deflection earlier today, but you can go on.
3      MR. GILL:  Okay.  I -- I stand corrected.
4 BY THE WITNESS:
5    A.   Yes.
6 BY MR. GILL:
7    Q.   What is Whitestone's understanding of what
8 roof deflection means?
9    A.   The amount the roof deflects.
10    Q.   You mentioned -- you did testify earlier that
11 the specification sections -- Whitestone believes that
12 the specification discloses differential building
13 movement.  Is that relatively accurate?
14    A.   Yes.
15    Q.   And are those the specification sections
16 listed in Attachment A?
17    A.   I'm unsure how to answer that.  It is noted
18 in the specs which is noted on this.
19    Q.   Okay.  Where is it noted in the specs?
20 Strictly talking about the movement of two separate
21 buildings, where is that noted?
22    A.   I would need the document.  Then I could tell
23 you where.
24    Q.   Okay.  In what section?  Is it in the

Page 57

1 curtainwall section or is it --
2    A.   Yes.
3    Q.   -- in a different section?
4    A.   Yes, it's in the curtainwall section.
5    Q.   Okay.  Does the curtainwall section of the
6 specifications identify the amount of roof deflection
7 that Yuanda or Whitestone should accommodate for?
8    A.   I don't know.
9    Q.   Do you know -- does Whitestone know what the
10 identified or the specified amount of roof deflection was
11 when it received the contract documents from Sciame?
12    A.   Yes.
13    Q.   What was that roof deflection?
14    A.   It would be noted on drawing S003.
15    Q.   So if the roof deflection were not noted
16 on -- Strike that.
17      If you can turn to, still in Exhibit 4, if
18 you can turn to Page 1114.
19    A.   Yes.
20    Q.   What is this Attachment B?
21    A.   I don't know.
22    Q.   Do you know who drafted this?
23    A.   No, I do not.
24    Q.   Are you able to answer questions as the

15 (Pages 54 - 57)

1 Whitestone designated representative regarding the terms
2 and conditions of the contract between Sciame and
3 Whitestone?
4     A.   No.
5     Q.   Do you understand what the term warranty work
6 means in the construction industry?
7     A.   Yes.
8     Q.   What does it mean?
9     A.   An extended period of time when the work
10 that's installed or provided would be covered under
11 warranty, for lack of a better word, a guarantee of the
12 craftsmanship and quality of the material for a period of
13 time.
14    Q.   If a contractor's required to perform
15 warranty work, is it paid for performing that warranty
16 work?
17        MR. CARBONE:  Objection.
18 BY THE WITNESS:
19    A.   I believe it would depend on the agreement.
20 BY MR. GILL:
21    Q.   Does warranty work -- does warranty work --
22 Strike that.
23        Is warranty work required to correct
24 defective work that was originally installed by the

1 contractor?
2        MR. CARBONE:  Objection.
3 BY THE WITNESS:
4     A.   I believe it would depend on the agreement.
5        MR. GILL:  For the record, we're going to skip
6 Exhibit 5.
7        We've been going for about an hour and 15
8 minutes.  Do you want a break, Mr. Dearth, or do you want
9 to continue?
10       THE WITNESS:  May I have a little break,
11 please.
12       MR. GILL:  Yeah.  Five minutes is fine.
13       THE WITNESS:  Okay.  Thank you.
14       MR. GILL:  Thank you.
15       MR. CARBONE:  Put it on mute.  Put yours on
16 mute.
17       THE VIDEOGRAPHER:  Off the record, 11:22.
18             (WHEREUPON, a break was
19             taken.)
20       We are back on the record, 11:28.
21 BY MR. GILL:
22    Q.   When did Whitestone begin installation of the
23 WT-3 clerestory?
24    A.   I don't have an exact date.

1     Q.   Do you have an approximate date?
2     A.   I would say between the middle of 2016 and
3 '17.
4     Q.   So mid 2016?  Summer of 2016?
5     A.   I would say so, but I don't have exact dates.
6     Q.   When was installation complete?
7     A.   The latter half of 2017, I believe.
8     Q.   I think you might be off a year.  I think the
9 documentation's saying it was done in December 2016.  Is
10 that accurate?
11        MR. CARBONE:  If you want to show him -- I
12 would ask you to show him the documents to refresh his
13 recollection.
14 BY MR. GILL:
15    Q.   Does Whitestone have daily logs of when it
16 performed its work?
17    A.   Yes, but I don't have them.
18    Q.   Okay.  Why weren't they produced?
19    A.   Is that a question to me?
20    Q.   Yeah.  Why did Whitestone not produce the
21 daily logs for the installation of the WT-3 clerestory?
22        MR. CARBONE:  Well, I think that's really a
23 more appropriate question with respect to -- for the
24 attorneys to answer.

1        To the extent you requested document
2 production, it's my understanding in communication with
3 Mr. Kushner and Mr. Rodriguez any documents you requested
4 were, in fact, produced.  I don't know if you asked for
5 daily logs, and quite frankly, I can't answer -- tell you
6 whether or not daily logs were, in fact, produced.  If
7 you're telling me they were not for the purposes of this
8 dialogue, I will certainly take your word for it.
9        MR. GILL:  I am telling you they were not
10 produced, and they were requested.
11       MR. CARBONE:  Okay.  I'm sorry?
12       MR. GILL:  And they were requested too.
13 BY MR. GILL:
14    Q.   Was there any e-mail communication during
15 either -- Strike that.
16       Did Whitestone have any e-mail communication
17 either with Yuanda, Sciame or internally during the
18 installation of the WT-3 clerestory?
19    A.   Yes.
20    Q.   Is there a reason why those documents weren't
21 produced?
22       MR. CARBONE:  I have the same response.  To
23 the extent you made the proper request for documents,
24 it's my understanding that they were produced by

Page 62

1  Mr. Kushner and Mr. Rodriguez.
2        MR. GILL:  I've been demanding since the
3  middle of October that those documents be produced, and
4  Mr. Kushner has refused to produce them.
5        MR. CARBONE:  I'm sure he has a good reason.
6  BY MR. GILL:
7    Q.  Did Whitestone encounter any issues or
8  problems during the installation of the WT-3 clerestory?
9    A.  Is it specifically relating to something --
10   Q.  No.
11   A.  -- or just overall?
12   Q.  Yeah.  Were there issues?  Were there
13 problems?
14   A.  Yes.
15   Q.  Did you encounter -- okay.  What were some of
16 the problems?  Strike that.
17        Were there problems with the material that
18 Yuanda provided or the details that Yuanda provided?
19        MR. CARBONE:  Just give a time frame, please.
20 BY MR. GILL:
21   Q.  During the installation of the WT-3
22 clerestory.
23   A.  And would you mind just saying that one more
24 time, please.

Page 63

1    Q.  Yes.  During the installation of the WT-3
2  clerestory, did Whitestone or its subcontractor encounter
3  any problems with the installation of that clerestory
4  that are specific to the materials Yuanda provided or the
5  details Yuanda provided?
6    A.  Yes.
7    Q.  Okay.  What were the problems specific to the
8  materials provided or the details provided?
9    A.  There's the base condition where -- the
10 clerestory sits on the curb.  There was an edge distance
11 issue with the fastener as detailed, so we had to consult
12 Yuanda and get an alternate detail.
13   Q.  Okay.  That goes to my next question.  There
14 was an NCR which is a non-conformity report; right?
15   A.  Yes.
16   Q.  And there was an NCR regarding that sill
17 detail; right?
18   A.  Yes.
19   Q.  Did Yuanda design all the clips, brackets,
20 shims, in-beds, anchors for the WT-3 clerestory?
21   A.  Yes.
22   Q.  Did Whitestone field modify any of the clips,
23 angles, brackets, miscellaneous metals that Yuanda
24 supplied?

Page 64

1    A.  We modified the assembly per the details that
2  Yuanda gave us.
3    Q.  As of -- pardon me.
4        (Brief pause.)
5        Sorry.  I had to reclose my door.  I
6  accidentally left it open.
7        So as of the date that Yuanda -- Strike that.
8        As of the date that Whitestone completed
9  installation, original installation of the clerestory,
10 did Yuanda's design conform to the requirements of the
11 purchase order?
12        MR. CARBONE:  Objection.
13 BY THE WITNESS:
14   A.  I'm unsure how to answer that question.
15 BY MR. GILL:
16   Q.  Why are you unsure?
17   A.  From the brief review that we did this
18 morning of the purchase order, I'm unaware if there is
19 any other stipulations in the con -- in the purchase
20 order that would say that the owner could make a
21 determination if something was not in compliance.
22   Q.  Did Whitestone believe that Yuanda -- that
23 Yuanda's design to the clerestory conformed to the
24 requirements as of the date Whitestone completed

Page 65

1  installation?
2        MR. CARBONE:  Could you just read that back
3  for me, please.  I'm sorry.
4        (Requested portion of the
5        record read.)
6        Object to form.  You could answer.
7  BY THE WITNESS:
8    A.  It conformed with the documents that Yuanda
9  provided.
10 BY MR. GILL:
11   Q.  The design specifically is what I'm talking
12 about.
13   A.  It conformed with the documents that Yuanda
14 provided.
15   Q.  Did they conform to the requirements of the
16 purchase order?
17        MR. CARBONE:  Objection.
18 BY THE WITNESS:
19   A.  I don't know.
20 BY MR. GILL:
21   Q.  You don't know if Whitestone had an opinion
22 about Yuanda's design at the time that Whitestone
23 installed it?
24   A.  The opinion is that it conformed with the

17 (Pages 62 - 65)

Page 66

1 documents that Yuanda provided.
2      Q.   Not the documents Yuanda provided.  Did
3 Yuanda's design conform to the purchase orders?  Did
4 Whitestone have that opinion?
5          MR. CARBONE:  Objection.
6 BY THE WITNESS:
7      A.   I believe so, yes.
8 BY MR. GILL:
9      Q.   Just to clarify, the yes is they had an
10 opinion and that opinion was that it did -- the design
11 did conform to the purchase order?
12     A.   I'd like to add on to the end of that if I
13 could.
14     Q.   Sure.  Sure.  Absolutely.
15     A.   I apologize for not knowing this better, but
16 somewhere within this document it specifies that the
17 owner can reject the work.  So in the terms they conform
18 with the purchase order, I just don't know if I could
19 accurately answer that because if it's something that it
20 was determined after the work was installed, there might
21 be something in here that says that it doesn't conform
22 with the PO.
23     Q.   And, for the record, in here in this
24 document, you're referring to Exhibit --

Page 67

1      A.   I'm sorry.  Four.
2      Q.   Got it.  I'm not asking about whether the
3 owner can reject later and what the ramifications of that
4 are.  I'm asking about what Whitestone believed at the
5 time that Whitestone finished installing the clerestory.
6 Did Whitestone believe that the design conformed to their
7 purchase order?
8      A.   Yes.
9      Q.   Okay.  When Whitestone was done installing
10 the clerestory, did Whitestone believe that the
11 components that Yuanda fabricated and delivered conformed
12 to the purchase order?
13         MR. CARBONE:  Objection.
14 BY THE WITNESS:
15     A.   Other than the alternate detail at the base
16 of the clerestory, yes.
17 BY MR. GILL:
18     Q.   If you can look at Exhibit 6.  Do you
19 recognize this document?
20     A.   Yes.
21     Q.   Okay.  For the record, this is titled "RFI
22 Transmittal."  This is a document that was filed on ACF's
23 system as document 7 -- or 75-5.  It contains Pages 2
24 through 9 of that exhibit.  Page 1 was simply the cover

Page 68

1 page listing it as I believe Exhibit 5 to a filing by
2 Whitestone.
3          Did Whitestone receive a copy of this, a
4 clean copy of this at the time it was issued?
5      A.   Yes.
6      Q.   Was this RFI when it was originally issued
7 result in internal communication between or within
8 Whitestone regarding the contents of this?
9      A.   Could you repeat that?
10     Q.   Actually, I will withdraw and ask a different
11 question.
12         At any time did Whitestone have internal
13 e-mail communication regarding the RFI or the RFI
14 response?
15     A.   I don't remember.
16     Q.   Okay.  Were there any meetings at Whitestone
17 to discuss the RFI or the RFI response?
18     A.   Yes.
19     Q.   Were there any notes of those meetings?
20     A.   No, I don't believe so.
21     Q.   Who was present during those meetings?
22     A.   Definitely myself and Philip Carvelas, also
23 Pawel Lepkowski, and I believe that's it.  That's all I
24 can remember at this time.

Page 69

1      Q.   Okay.  Who is Philip Carvelas just for the
2 record?
3      A.   Yeah, he's the project executive.
4      Q.   Okay.  And Pawel Lepkowski you said?
5      A.   Was co-project manager with myself.
6          MR. CARBONE:  Just for clarification, his
7 name's spelled P-A-W-E-L as opposed to P-A-U-L?
8          THE WITNESS:  Yeah --
9          MR. CARBONE:  Okay.
10         THE WITNESS:  -- P-A-W-E-L.
11 BY MR. GILL:
12     Q.   And, for the record, what is an RFI?
13     A.   A request for information.
14     Q.   In your experience, who issues the RFI?
15     A.   The entity that has the specific question.
16     Q.   And in this, it's Dan Dillon.  Do you see
17 that?
18     A.   Yes.
19     Q.   And do you know who Dan Dillon is?
20     A.   Yes.
21     Q.   What was his role on the project?
22     A.   Senior project -- senior project manager.
23     Q.   For who?
24     A.   Sciame.

18 (Pages 66 - 69)

1    Q.   So Sciame is the one who issued this RFI, and
2  it appears it's issued to Perkins Eastman; is that
3  correct?
4    A.   Yes.
5    Q.   Okay.  Do you know who Dan Grimaldi is?
6    A.   No.
7    Q.   Do you know who Juan Mejia is, M-E-J-I-A?
8    A.   Yes.
9    Q.   Who is Juan?
10   A.   He is a member of the design team.
11   Q.   Do you know who Mindy No is?
12   A.   Yes.
13   Q.   Who is Mindy No?
14   A.   She is the lead architect.
15   Q.   Do you know who wrote the information in the
16  question portion of this RFI?
17   A.   Yes.
18   Q.   Who?
19   A.   Dan Dillon.
20   Q.   How do you know that Dan Dillon wrote this?
21   A.   Well, I just know.  I know he did.
22   Q.   Have you talked to Dan about this?
23   A.   Yes, I did.
24   Q.   Okay.  Did he say he wrote this?

1    A.   Possibly.  I know he wrote it.
2    Q.   What is the purpose of this RFI?
3         And, for the record, this is RFI 1130.  We're
4  going to be referring to that number frequently, I think.
5    A.   The purpose of the RFI is to close out an
6  issue brought up on superstructures report I believe it
7  was 8404, I believe.
8    Q.   Where does it say anything about
9  superstructures report in 8404?
10        (Witness peruses document.)
11   A.   It doesn't appear to say it on this.
12   Q.   How do you know this relates to 8404 then?
13   A.   In the question section, it says in reviewing
14  Submittal 084426-007-01.  That could possibly be the
15  submittal the RFI was incorporated into.  It could
16  possibly be.  I -- I just don't know.
17   Q.   Okay.  In multiple court filings Whitestone
18  has stated that this RFI questions the adequacy of the
19  WT-3 clerestory as designed by Yuanda to accommodate
20  building movement.  Is that what this RFI does?  Does it
21  question the adequacy by Yuanda's design?
22        MR. CARBONE:  Objection.
23  BY THE WITNESS:
24   A.   This RFI specifies movement criteria on the

1  auditorium roof.
2  BY MR. GILL:
3    Q.   I couldn't hear you.  Your papers were in
4  front of your face.
5    A.   I'm sorry.
6    Q.   Not a problem.
7    A.   This RFI describes the movement criteria of
8  the auditorium roof.
9    Q.   I understand.  Actually, the RFI is simply
10  the first few pages; correct?  The remaining pages are
11  the response; correct?
12   A.   Correct.
13   Q.   Okay.  Does the RFI as posed by Dan Dillon on
14  January 23rd, 2017 question the adequacy of the -- of
15  Yuanda's design to accommodate building movement?
16        MR. CARBONE:  Objection.
17  BY THE WITNESS:
18   A.   It appears that way.
19  BY MR. GILL:
20   Q.   Where does it say that Yuanda -- that Sciame
21  is questioning the adequacy of Yuanda's design?
22   A.   On the first page --
23   Q.   Yeah.
24   A.   -- of the RFI.

1    Q.   Yeah.
2    A.   Bullet point Number 2.
3    Q.   That's not part of the RFI.  That's part of
4  the response; right?
5    A.   Yes.
6    Q.   Okay.  Dan Dillon's question is: "Please
7  define what the relative movement between the auditorium
8  roof and the main building is per design;" is that
9  correct?
10   A.   Yes.
11   Q.   Okay.  That's not questioning Yuanda's design
12  at that point; correct?
13        MR. CARBONE:  Objection.
14  BY THE WITNESS:
15   A.   The original question on the RFI does not,
16  but by inference, my interpretation of the response does.
17  BY MR. GILL:
18   Q.   Who wrote that response?
19   A.   I'm not sure if it was a single person or a
20  collaborative effort between the design team, but we
21  refer to all responses.  They come from the design team.
22   Q.   Okay.  Who was that?
23   A.   Perkins Eastman in coordination with WSP and
24  most likely ALT which is the facade consultant.

19 (Pages 70 - 73)

Page 74

1    Q.   Who is WSP?
2    A.   WSP is the engineer of record for the
3  building.
4    Q.   Does Whitestone know if the statements
5  included in that yellow box on the first page are
6  accurate?
7    A.   Some, yes.
8    Q.   Which ones does Whitestone know to be
9  accurate?
10    A.   Item 1 appears to be accurate, and number 4
11  appears to be accurate.
12    Q.   Whitestone doesn't know if statements in 2
13  and 3 are accurate or not?
14              (Witness peruses document.)
15    A.   I'm definitely not sure if number 3 is
16  accurate.
17    Q.   What about number 2?
18              (Witness peruses document.)
19    A.   Yes, it's accurate.
20    Q.   What concerns, looking at Item 2, staying
21  with Item 2, what concerns did Perkins Eastman previously
22  note in Submittal 084413-020-01 and 084413-020-02?
23    A.   They questioned the ability of the head
24  anchor, its ability to accommodate the roof deflections.

Page 75

1    Q.   Do you know whether Perkins Eastman provided
2  what its -- when its -- Strike that.
3        Those concerns or those comments were
4  returned on -- Strike that.
5        I want to avoid going through the whole
6  submittal process.  I understand the submittal process,
7  and I know you do.
8        So the comments from the architect were
9  returned after the first version submitted by Yuanda for
10  the WT-3 clerestory; right?
11    A.   Yes.
12    Q.   And according to Perkins Eastman, it had
13  comments or concerns regarding building movement;
14  correct?
15    A.   Yes.
16    Q.   Did Yuanda address those comments and
17  concerns when it submitted the second version of those
18  shop drawings?
19        MR. CARBONE:  Objection to form, and I'll be
20  happy to explain it to you, Adam.  I'm not trying to
21  obstruct you.
22        MR. GILL:  Okay.  Go ahead.  Yeah, I
23  understand.
24        MR. CARBONE:  Okay.  There were two

Page 76

1  submittals.
2        MR. GILL:  Yeah.
3        MR. CARBONE:  So if they had any comments with
4  respect to the second submittal, they couldn't have been
5  addressed by the second submittal.
6        MR. GILL:  I -- I absolutely understand.  I'm
7  going step by step.
8  BY MR. GILL:
9    Q.   After Perkins Eastman returned Submittal 1
10  with comments, were those comments on Submittal Revision
11  1, revise and resubmit, were those addressed -- did
12  Yuanda address those in their second submission?
13        MR. CARBONE:  Okay.  Object.  Objection.
14  BY THE WITNESS:
15    A.   I believe so.
16  BY MR. GILL:
17    Q.   Prior to submitting those revised shop
18  drawings did Whitestone review the changes Yuanda made
19  with respect to the WT-3 clerestory?
20    A.   Yes.  It would be, I wouldn't say an
21  exhaustive review but yes, a brief review.
22    Q.   Did Whitestone believe that Yuanda properly
23  addressed Perkins Eastman's concerns on that second
24  submittal?

Page 77

1    A.   Yes.
2    Q.   Do you recall whether Perkins Eastman's
3  review of the second submittal contained the same
4  comments or concerns?
5        MR. CARBONE:  As the first submittal?
6  BY MR. GILL:
7    Q.   As the first submittal with respect to the
8  WT-3 clerestory.
9    A.   Yes.
10    Q.   All the same comments and concerns were
11  there?
12    A.   They were similar in nature.
13    Q.   But the second submittal was approved with
14  comments noted; correct?
15    A.   Yes.
16    Q.   And what does that mean to Whitestone that
17  they were -- the submittal was returned as with comments,
18  approved with comments?
19    A.   The specific language is in the
20  specifications, but my interpretation is that it's okay
21  to proceed with fabrication so long as you address the
22  minor comments.
23    Q.   Okay.  Looking back at Exhibit 6, the third
24  page of the exhibit listed as Page 4 of 9 at the top, do

20 (Pages 74 - 77)

Page 78

1  you know what this page represents?
2      A.   Yes.
3      Q.   What is it?
4      A.   This is the estimated roof deflections of the
5  auditorium building.
6      Q.   What -- who wrote the notes in the yellow
7  boxes?
8      A.   The design team.
9      Q.   Whose handwritten notes are those?  And I
10  mean specific person.
11      A.   I don't know.
12      Q.   Okay.  What information is included in that
13  largest handwritten box kind of in the lower right
14  quadrant?
15      A.   The maximum deflections alone, D.
16          MR. CARBONE:  Could I -- could I just ask the
17  witness because my copy is not the clearest copy, could
18  you read what's there?
19          And with your permission, I have a blown
20  up copy of that page that I could show you, but I can't
21  really make out anything in that -- that larger --
22  largest box.
23          MR. GILL:  I understand.  I mean that was part
24  of the copying process, so I understand.  Yeah, I'm --

Page 79

1          MR. CARBONE:  I'm not complaining.  I'm not
2  complaining about the copying process.  I'm just
3  suggesting to you if it's important that we be able to
4  read it I believe I have a blown up page we might be able
5  to use.  That's all.
6          MR. GILL:  I'm not going to have him read all
7  of the handwritten notes, but please provide him with the
8  larger version.  I'm fine with that.
9          MR. CARBONE:  Okay.  Give me a second.  I
10  think I have it.
11          (Brief pause.)
12          Okay.  I don't have a larger page, but I
13  have one that's much, much clearer, so I'm going to give
14  that -- I'm going to give that to the witness with your
15  permission.
16          MR. GILL:  That's fine.  Yes, you have my
17  permission.
18          MR. CARBONE:  Here you go.
19          THE WITNESS:  Thank you.
20  BY MR. GILL:
21      Q.   Okay.  And I believe you answered my question
22  which was that information in the -- that box provides
23  the maximum deflection along column line B?
24      A.   Yes.

Page 80

1      Q.   Okay.  Do you know if that information is
2  correct and accurate as it's stated in this RFI response?
3      A.   No.
4      Q.   Did Whitestone, Whitestone itself do anything
5  to confirm whether that information was correct?
6      A.   I recall asking if it's correct.
7      Q.   Who did you ask?
8      A.   I can't remember if it was members of the
9  design team or Sciame, but I know I asked a couple times.
10      Q.   Whitestone didn't do an independent
11  confirmation with its own engineers or find an engineer
12  to confirm it?
13      A.   No.
14      Q.   And, for the record, it states, that box
15  states that the delta total is 3.4 inches.  Do you know
16  what that means?
17      A.   Yes.
18      Q.   What is it?
19      A.   The deflection of the auditorium roof will
20  deflect downwards 3.4 inches total.
21      Q.   Do you have any idea how Perkins Eastman or
22  its engineers calculated that?
23      A.   No idea.
24      Q.   Do you know if the information used to

Page 81

1  calculate that was in the contract documents as they
2  existed on December 31st, 2016?
3          MR. CARBONE:  Objection.  Which contract are
4  you talking about?
5          MR. GILL:  I'm talking about the contract
6  documents.
7          MR. CARBONE:  Meaning contract documents of
8  the purchase order or the contract documents between
9  Sciame and Whitestone?  You referred to both earlier.
10          MR. GILL:  I am referring to the drawings, the
11  architectural, structural, architectural drawings,
12  structural drawings and the technical specifications.
13          MR. CARBONE:  That are part of the purchase
14  order?
15          MR. GILL:  Okay.  Let me withdraw the
16  question.
17  BY MR. GILL:
18      Q.   Are the architectural drawings and the
19  structural drawings and the technical specifications that
20  relate to the WT-3 clerestory the same in the contract
21  between Sciame and Whitestone as they are between
22  Whitestone and Yuanda?
23          MR. CARBONE:  I'll object.
24

21 (Pages 78 - 81)

Page 82

1 BY MR. GILL:
2    Q.   Yes, please answer.
3    A.   I believe so.
4    Q.   Do you know if this maximum deflection of 3.4
5 inches could be ascertained based on the information
6 contained in the architectural drawings, the structural
7 drawings or the technical specifications as they existed
8 on December 31st, 2016?
9    A.   I just need a minute to think about it.
10    Q.   That's fine.  I'm not going to rush you.  I
11 want you to -- I want the best answer that you can give
12 on this.
13    A.   I understand.  And you said a specific date?
14    Q.   December 31st, 2016.  And for reference, the
15 RFI was issued on January 23rd, 2017.
16         (Brief pause.)
17    A.   I would say yes.  However, it's the job of
18 the design team to specify that.  Our assumptions of the
19 makeup of what's in that area needs to be confirmed by
20 the engineer of record.  It would be a gross estimate
21 which should not be relied upon.
22    Q.   You started that answer by saying you believe
23 it's yes.  That you believe that in the architectural
24 drawings, the structural drawings and the technical

Page 83

1 specifications someone could have determined the maximum
2 deflection of the 3.24, is that -- I want to make sure I
3 got that right.
4    A.   Yes, but I think it would be a gross
5 estimate.  It would be negligent to use that -- those
6 values would need to be confirmed by the engineer of
7 record --
8    Q.   Where --
9    A.   -- in my opinion.
10    Q.   Where in the architectural drawings, the
11 structural drawings or the technical specifications would
12 one get all of the information if needed, that person
13 needed, to come up with this calculation?
14    A.   It would be a culmination of all those -- a
15 review of all those documents.
16    Q.   You mentioned earlier that there was a
17 drawing S003.  Would it be on that drawing?
18    A.   Yes.
19    Q.   Do you know if it would be in other
20 structural drawings?
21    A.   It could be, yes.
22    Q.   You don't know one way or another?
23    A.   Could you ask the question again so I could
24 answer it better?

Page 84

1    Q.   Yeah.  Do you know if the information that
2 calculates this deflection would be on any structural
3 drawing other than S003?
4    A.   I can't answer that question.
5    Q.   Do you know of any technical specification --
6 Or strike that.
7         Do you know of any specifications anywhere in
8 the project manual where the information could be
9 obtained that would help calculate this deflection?
10    A.   It would -- other than the specifications in
11 the structural drawings, like I said before, it would be,
12 you know, a culmination of the architecturals, the
13 structurals and the specifications.  One would have to
14 determine what applies to the specific area.
15    Q.   Do you know if it's in the structural steel
16 specification?
17    A.   I don't know.
18    Q.   Looking at the same page on Exhibit 6,
19 there's a red box, sorry, a yellow box that says
20 "estimated roof deflection."  Do you see that?
21    A.   Yes.
22    Q.   And you previously said that that was written
23 by the design team?
24    A.   Yes.

Page 85

1    Q.   The note states that:  "WSP noted that
2 approximately 50 percent of SDL has already occurred, and
3 that figure can be reduced in the estimation of the total
4 deflection."  Do you know what that means?
5    A.   Yeah, that 50 percent of the value -- the SDL
6 value can be taken from these values, and that derives I
7 would say a new estimated roof deflection.
8    Q.   What does SDL stand for?
9    A.   I don't know.
10    Q.   So do you know what that means with respect
11 to the clerestory as Yuanda designed and fabricated it?
12    A.   No.
13    Q.   Do you know what that means with respect to
14 the clerestory as Whitestone installed it?
15    A.   Not with certainty.
16    Q.   What is your inclination of what it means
17 with respect to the clerestory as installed?
18         MR. CARBONE:  Objection.
19 BY THE WITNESS:
20    A.   My interpretation is this SDL, the value
21 is the amount that the buildings would deflect under the
22 construction process when concrete's applied to the
23 slabs, when all the steel's erected, so on and so forth
24 and the facade's erected.

22 (Pages 82 - 85)

Page 86

1 BY MR. GILL:
2    Q.   How does that impact the installation or
3 Whitestone's installation of the clerestory?
4    A.   I need to think about it for a second.
5         (Brief pause.)
6         I believe the only consequence would be or
7 the only factor that would affect the installation of the
8 WT-3 clerestory would be -- it's a timing thing.  It must
9 be installed after everything above is installed.  When
10 the SDL occurs, the facade should be installed
11 afterwards.  That's -- that's my interpretation of it.
12    Q.   If you can turn to -- I believe it's the next
13 page.  There's a couple of drawings.  It's Page 5 of 9 at
14 the top of this document.
15    A.   Yes.
16    Q.   It's listed or labeled as ASK 266.  What is
17 an ASK?
18    A.   An architectural sketch.
19    Q.   Do you know who created this ASK?
20    A.   The design team.
21    Q.   Did -- did the drawings, architectural,
22 structural drawings, received, that Whitestone received
23 from Sciame of Perkins Eastman include any pen details
24 for the WT-3 clerestory?

Page 87

1    A.   Yes.
2    Q.   Did they -- did those details -- were those
3 included -- Strike that.
4         And for clarification, those were included
5 prior to the fabrication and installation?
6    A.   The contract details you're referring to?
7    Q.   Yes.
8    A.   Yes.
9    Q.   Did Yuanda provide assembly and connection
10 details with its submittal for the WT-3 clerestory?
11    A.   Yes.
12    Q.   If you could turn to the last page of this
13 exhibit.  Do you recognize that document?
14    A.   Yes.
15    Q.   What is this document or this page?
16    A.   It's page D331.
17    Q.   Of what?
18    A.   Of the Yuanda project shop drawings.
19    Q.   Of Submittal 1 of the shop drawings; correct?
20    A.   Yes, 01, yes.
21    Q.   And this page includes the Perkins Eastman
22 comments at the time that Perkins Eastman returned it to
23 Sciame and Sciame returned it to Whitestone; is that
24 correct?

Page 88

1    A.   I don't know.  If I could look at the
2 original document, I could confirm.
3    Q.   Well, in the lower right-hand corner, there's
4 a note that says WT 1, 3 and 8 all first review 2014-10-9
5 Submittal 084413-020-01?
6    A.   I see that.
7    Q.   So this is the first submittal; right, with a
8 copy?
9    A.   Yeah, it's a sheet copied and pasted to the
10 back of this file.
11    Q.   It's one page.  It's D331 of that entire
12 submittal.  I'm not saying it's the entire submittal but
13 it's one page of it?
14         MR. CARBONE:  When you're referring to the
15 entire submittal, are you talking about Submittal 1, are
16 you talking about Submittal 2?
17         MR. GILL:  I'm talking about Submittal 1 as
18 it's referred to in the document.
19         MR. CARBONE:  Object.  Objection.
20 BY THE WITNESS:
21    A.   Yeah, the only reason why I can't 100 percent
22 confirm without looking at the 01 is because it's just a
23 page that's copied to the back of it.  I don't know if
24 they added these comments.  I know it's the same color,

Page 89

1 but I just don't know.
2 BY MR. GILL:
3    Q.   Okay.
4    A.   If I looked at the other one, I could say yes
5 definitely.  That's all I'm saying.
6    Q.   So if you look at the note in the middle of
7 the page, it says:  "Bottom of this connection."  It goes
8 on from there, but then there's a break in the second
9 line.  It says or second note that says:  "See
10 deflections of roof beam."  Do you see that?
11         MR. CARBONE:  Just -- Mr. Gill, you said
12 bottom of this connection.  It says:  "Bottom of this
13 condition."  I think you misread it.
14         MR. GILL:  Thank you for correcting me.
15 BY MR. GILL:
16    Q.   Do you see the second note that says:  "See
17 deflections of roof beam"?
18    A.   Yes.
19    Q.   When Whitestone received this submittal back,
20 what did it do, if anything, regarding that comment about
21 deflections of the roof beam?
22    A.   I don't know.
23    Q.   Did Whitestone undertake any investigation
24 into the deflection of the roof beam?

23 (Pages 86 - 89)

Page 90

1    A.   I don't know.
2    Q.   Did Whitestone provide any additional
3  information to Yuanda regarding deflections of the roof
4  beam?
5    A.   No.   We would rely upon Yuanda to ask that
6  question to us.
7    Q.   If this note were not on the -- Strike that.
8         If Perkins Eastman removed this note when it
9  returned the -- its comments to the second submittal,
10  does that have any importance to Whitestone with respect
11  to this detail?
12       MR. CARBONE:   Objection.
13  BY THE WITNESS:
14    A.   Would you mind repeating that, please.
15  BY MR. GILL:
16    Q.   Yeah.   If the second submittal of this
17  detail --
18    A.   Okay.
19    Q.   -- was returned from Perkins Eastman with
20  comments and that note on this detail that says:  "See
21  deflection of roof beam" were no longer on this detail,
22  would that have any impact on Whitestone or what would
23  that mean to Whitestone, if anything?
24    A.   I don't believe it would have an impact.

Page 91

1    Q.   Okay.   Would the roof beam deflection still
2  be a cause for concern if that note were no longer on
3  this drawing?
4       MR. CARBONE:   Objection.
5  BY THE WITNESS:
6    A.   I'm sorry.   Can you say it one more time,
7  please.
8  BY MR. GILL:
9    Q.   Would roof beam deflection be a cause for
10  concern after Submittal 2 was returned if that note was
11  removed?
12    A.   I don't believe so.
13    Q.   Referring back to the ASK in this Exhibit 6,
14  does this ASK revise the -- revise or otherwise alter the
15  agreement between Whitestone and Sciame with respect to
16  how Whitestone was going to install the WT-3 clerestory?
17       MR. CARBONE:   Objection.
18  BY THE WITNESS:
19    A.   I'm sorry I keep asking you to repeat but
20  could you repeat it just a little bit slower?
21       MR. GILL:   Can you read that back, please.
22            (Requested portion of the
23            record read.)
24         I'm sorry.   We could not understand you at

Page 92

1  all.   Can you try that again?
2       THE REPORTER:   Sure.
3       MR. GILL:   It was -- it's not going to work.
4  I'll try and rephrase it.   I'll try and rephrase it.
5       THE REPORTER:   Am I -- can you not hear me
6  or --
7       MR. GILL:   There's an echo.
8       THE REPORTER:   There's an echo.   I'm going to
9  go on mute then.   Sorry about that.
10       MR. CARBONE:   It's like you have a
11  reverberator
12       THE REPORTER:   Okay.
13  BY MR. GILL:
14    Q.   Did this ASK, the issuance of this ASK 266
15  change the requirements of the subcontract between Sciame
16  and Whitestone with respect to this clerestory system,
17  the installation of the clerestory system?
18       MR. CARBONE:   Objection.
19  BY THE WITNESS:
20    A.   I don't believe so.
21  BY MR. GILL:
22    Q.   Did Perkins Eastman ever issue a formal
23  modification to the architectural or structural drawings
24  that incorporated this detail?

Page 93

1    A.   No.   It existed from the first day.
2    Q.   What do you mean it existed from the first
3  day?
4    A.   The general design and assembly of this head
5  detail where you see the brown lines and, yeah, the brown
6  lines and the anchor attachment point is very similar to
7  what's shown on the contract documents.
8    Q.   It's very similar but they have a larger
9  movement slot, doesn't it?
10    A.   There is a movement slot.   That's all I can
11  say.   I don't know if it's bigger or smaller or the same,
12  but there is a movement slot there.
13    Q.   Okay.   In 2017 did Sciame and Whitestone have
14  e-mail correspondence regarding RFI 1130?
15    A.   Can you repeat that once?
16    Q.   In 2017 did Sciame and Whitestone have e-mail
17  correspondence that discussed RFI 1130?
18    A.   Which is Exhibit 6?
19    Q.   Correct, Exhibit 6.
20    A.   Yes.
21    Q.   In 2017 did Whitestone have correspondence
22  with Perkins Eastman regarding RFI 1130?
23    A.   I don't believe so.
24    Q.   In 2017 did Whitestone have internal e-mail

24 (Pages 90 - 93)

Page 94

1 correspondence regarding RFI 1130?

2     A.   It could be, but I'm not too sure.

3     Q.   Did Whitestone have meetings where response

4 to RFI 1130 was discussed?

5     A.   Yes.

6     Q.   Are there meeting minutes or notes of those

7 meetings?

8     A.   No.

9          MR. GILL:  For the record, I requested

10 repeatedly for e-mails you produce regarding RFI 1130 in

11 2017 and they have not --

12          MR. CARBONE:  Well, I'll take -- I'll take

13 what is, I am assuming is your additional request now.

14 I'll take it under advisement.  My understanding is

15 everything you requested was produced, but I will bring

16 it up with Mr. Kushner and Mr. Rodriguez.

17          MR. GILL:  Mr. Kushner informed me at the end

18 of December that he would produce -- that previously only

19 documents from January 1st, 2018 were produced, and we

20 came to an agreement that if documents back to

21 January 1st, 2017 were produced regarding the proposed

22 Change Order RFI 1130, roof deflection and one other

23 issue that I can't recall, that would satisfy the

24 production, but no production has been forthcoming at

Page 95

1 this point.  I'm just putting it on the record.

2          MR. CARBONE:  All right.  Well, I'm not going

3 to -- I'm not privy to the intimacy of whatever

4 agreements you reached with Mr. Kushner, and to the

5 extent you feel that Mr. Kushner or my office has not

6 appropriately responded, I'm sure you'll address it, but

7 we could also have conversations off the record, and if

8 there's something missing that we actually have that

9 you're entitled to, I'm certainly sure we'll produce it.

10 BY MR. GILL:

11     Q.   Are you familiar with the proposed change

12 order that Whitestone issued for the WT-3 clerestory?

13     A.   Yes.

14     Q.   Are you familiar with when Whitestone issued

15 that proposed change order?

16     A.   If I saw the document, I could tell you the

17 date.

18     Q.   Okay.  If you can look at Exhibit 7.

19     A.   Okay.

20     Q.   What is Exhibit 7?

21     A.   This is Whitestone's PCO number 90.

22     Q.   And you see the date in the upper third

23 right-hand side of November 27th, 2018?  Do you see that?

24     A.   Yes.

Page 96

1     Q.   Is that the first date that this PCO was

2 issued to Sciame?

3     A.   As far as I'm aware, yes.

4     Q.   What, if anything, did Whitestone do between

5 January 30th, 2017 when it received the RFI response and

6 November 27th, 2018 with respect to the WT-3 clerestory?

7     A.   Whitestone and Yuanda worked on a remediation

8 concept.

9     Q.   Yuanda was a collaborative partner in that

10 endeavor?

11     A.   Yes.

12     Q.   When did Whitestone decide to submit this

13 proposed Change Order 98?

14     A.   I'm unaware of a specific date or time.

15     Q.   Was there a reason why it was not issued

16 prior to November of 2018?

17     A.   What I think would be a reasonable reason is

18 that we were working on the actual remediation.  We

19 didn't know exactly what we were going to do, and once we

20 got a better idea of what the actual requirements would

21 be to complete the remediation, that's when we -- we

22 submitted it.  We were able to quantify, you know, all

23 the numbers you see here.

24     Q.   Okay.  Who created this document Exhibit 7?

Page 97

1 Strike that.

2       There are drawings and attachments and things

3 like that.  So with respect to the first five to six

4 pages up to WCC794, who created that portion of the

5 document?

6          MR. CARBONE:  What pages -- 0791 through?

7          MR. GILL:  94.

8          MR. CARBONE:  Thank you.

9 BY THE WITNESS:

10     A.   I'm pretty sure I did.

11 BY MR. GILL:

12     Q.   Okay.

13     A.   Except for the -- the values that I -- that I

14 got for the second page were from Metro-Tech Erector's

15 Corp., but I'm pretty sure I created the first page, the

16 second page, the third page, and I most likely had a hand

17 in the fourth page as well.

18     Q.   Okay.  Whitestone created the fourth page

19 though which is the narrative; right?  Is that correct?

20     A.   I said yes.

21     Q.   Oh, I didn't hear you.  Sorry.

22       Was there anyone who was not an employee of

23 Whitestone who helped draft the narrative that's on Page

24 4 of this?

25 (Pages 94 - 97)

1    A.   No.

2    Q.   Okay.  Were the statements that are included

3 on Page 4 true and correct when this was submitted on

4 November 27th, 2018?

5    A.   To the best of my knowledge, yes.

6    Q.   Does Whitestone stand by the correctness of

7 those statements today?

8    A.   Yes.

9    Q.   The introductory paragraph says, in the

10 second sentence on the second line that the "Remediation

11 to existing facade was caused by omission of new

12 auditorium roof deflection criteria prior to MCN."

13       MR. CARBONE:  Wait.  You left out the word

14 design but that's okay.  You were close enough.

15       MR. GILL:  I do that often.  Sorry.  Thank you

16 for correcting me.

17 BY MR. GILL:

18    Q.   So with the insertion of design before

19 criteria, that's what this says; isn't that correct?

20    A.   Yes.

21    Q.   And you believed on November 27th that that

22 was a correct statement?

23    A.   Yes.

24    Q.   And you believe today that's a correct

1 statement?

2    A.   Yes.

3    Q.   And not to beat a dead horse, but that

4 omission was -- that information was supposed to come

5 from whom?

6    A.   The design team.

7    Q.   So in item fact or note number 1, the second

8 line, second sentence it says:  "The submittals clearly

9 detail capacity of system to accommodate movement."  What

10 submittals -- Strike that.

11       You're referring to Submittal 1 and 2 of the

12 Yuanda shop drawings; correct?

13    A.   Yes.  Most specifically 2, the second one.

14    Q.   Okay.  And when you made that statement in

15 November of 2018, that was a correct statement?

16    A.   Yes.

17    Q.   And you stand by that statement today?

18    A.   Yes, I do.

19    Q.   Looking at number 3, it says that:  "RFI

20 returned January 30th, 2017 issued new relative movement

21 design criteria."  Was that statement correct in November

22 2018?

23       MR. CARBONE:  Could you just finish reading

24 that statement if you're going to ask him --

1       MR. GILL:  Okay.

2       MR. CARBONE:  -- you know, if it's correct?

3 BY MR. GILL:

4    Q.   The remainder of that statement after design

5 criteria continues and says:  "Between the auditorium and

6 academic building after the facade was fabricated and

7 installed per MCM submittals causing WCC's PCO number

8 098."

9    A.   Right.  So what was the question?

10    Q.   Do you stand by or the -- that statement was

11 correct when you made it on November 27th, 2018?

12    A.   Yeah.

13    Q.   And you stand --

14    A.   Yes.

15    Q.   -- by that today?

16    A.   Yes, sir.

17    Q.   Item number 4, the last sentence Whitestone

18 states:  "If fabrication's not made strictly in

19 accordance with corrections noted, the items shall be

20 rejected in the field and the contractor will be required

21 to replace such work in accordance with corrected

22 submittals and at their own expense."  That is -- what

23 does that statement refer to?  Strike that.  Let me ask a

24 different way.

1       What is the basis of making that statement?

2    A.   My interpretation of this statement is the

3 shop drawings were returned made corrections noted, and

4 there are notes on it that the vendor is required to

5 fabricate in accordance with those corrections noted

6 in --

7    Q.   Right.

8    A.   -- this sentence.

9    Q.   Where is that -- that comes from somewhere.

10 It sounds like it comes from somewhere, but where does it

11 come from?

12    A.   It comes from the project specifications.

13    Q.   Okay.  Did Whitestone inspect the components

14 that Yuanda fabricated and delivered for the WT-3

15 clerestory prior to installing those components?

16    A.   Yes.

17    Q.   When Whitestone inspected those components,

18 did those components comply with what was shown in the

19 shop drawings?

20    A.   Yes, except for the base condition.  That

21 was --

22    Q.   And the base -- sorry.  Go ahead.

23    A.   That was -- that was resolved, ultimately

24 resolved.

26 (Pages 98 - 101)

Page 102

1    Q.   And just so we're clear, the base condition,
2  the sill condition that we discussed earlier in that NCR
3  report, does that have any impact on building movement?
4    A.   Yes and no depending on the original design.
5    Q.   Was that a complaint that Sciame or the owner
6  or the architect raised with the RFI or after?  And I'm
7  talking about did they raise the issue of this sill
8  condition with RFI 1130 or after?
9        MR. CARBONE:  Could you just repeat that for
10  me, please.  I'm sorry.  I didn't quite follow you.
11  BY MR. GILL:
12    Q.   The base or the sill condition, was that a
13  concern with respect to building movement that Sciame,
14  the owner or the architect raised in RFI 1130 or at some
15  point after?
16    A.   I believe it was before.
17    Q.   Okay.  I just want to limit what we're
18  talking about.  We're talking about the head condition of
19  the clerestory; right?  Strike that.
20        The dispute between Whitestone and Sciame and
21  between Whitestone and Yuanda only deals with the head
22  condition; is that correct?
23    A.   Yes.
24    Q.   Did anyone including Sciame reject any

Page 103

1  element or component of the clerestory system before
2  Whitestone installed it?
3    A.   Before installation, no.
4    Q.   Did anyone including Sciame or the architect
5  reject any element or component of the clerestory before
6  it issued the response to RFI 1130?
7    A.   Issuance of 1130, yes.
8    Q.   Who rejected it?
9    A.   It was brought to our attention in
10  superstructures report 8404, I believe or -- it's written
11  down somewhere.  I think it's 8404.
12    Q.   Okay.  Just so I'm clear, the head condition,
13  the building movement that's accommodated in the head
14  condition was raised as a concern in the superstructures
15  report which may be 8404?
16    A.   The head condition, no.
17    Q.   Okay.
18    A.   The base, yes.
19    Q.   Okay.  Just the head condition I'm talking
20  about though.  Was any element regarding the head
21  condition rejected -- Strike that.  Let me ask a
22  different way.
23        Was any element with respect to the head
24  condition being able to accommodate building movement

Page 104

1  rejected at any time before the architect issued its
2  response in RFI 1130?
3    A.   Yes.
4    Q.   Okay.  When was that?
5    A.   I don't know the date specifically, but it
6  was a result of trying to resolve the superstructures
7  report NCR.
8    Q.   Was Yuanda informed that the WT-3 clerestory
9  was rejected for that reason before RFI 1130 was issued?
10    A.   I don't know.
11        MR. GILL:  I'd like to take another break,
12  brief break.  Five minutes, is that okay?
13        MR. CARBONE:  That's fine.
14        THE VIDEOGRAPHER:  Off the record at 12:36.
15            (WHEREUPON, a break was
16            taken.)
17        We are back on the record at 12:47.
18  BY MR. GILL:
19    Q.   Okay.  Mr. Dearth, if you could look at
20  Exhibit 8, Defendant's Exhibit 8 which, for the record,
21  is an e-mail from Michael Pardee to a number of people
22  including the deponent on May 3rd, 2019.  Do you
23  recognize this document?
24    A.   Yes.

Page 105

1    Q.   Is this the first communication from Sciame
2  to Whitestone where Sciame rejected the proposed Change
3  Order Number 98?
4    A.   Yes.
5        MR. CARBONE:  Could you hold on for one
6  second?
7        MR. GILL:  Yeah.
8        MR. CARBONE:  For some reason I may not have
9  gotten Exhibit 8.  Hold on.  My apologies.  Here it is.
10  BY MR. GILL:
11    Q.   Is this the first communication that
12  Whitestone received from Sciame where Sciame directed
13  Whitestone to proceed with repairs to the WT-3
14  clerestory?
15    A.   I don't believe so.
16    Q.   Okay.  And there were -- you did testify
17  earlier that there was -- I don't recall if you testified
18  earlier whether there was earlier direction or rejection,
19  but how much -- how far in advance of May 3rd, 2019 did
20  Sciame direct Whitestone to proceed with repairs?
21    A.   I'm not too sure.  It was before, and there
22  was like a lot of verbal back and forth.
23    Q.   Is there anything in writing from Sciame
24  where they formally directed Whitestone to proceed with

27 (Pages 102 - 105)

Page 106

1 repairs?
2    A.   I'm not sure.
3    Q.   The prior e-mail or the prior communication
4 where they directed Whitestone to proceed with repairs,
5 is that the same time they indicated that the clerestory
6 as installed was rejected?
7    A.   It would be sometime after that.
8    Q.   Okay.  And I just want to make sure because I
9 don't know if I have seen the communication where Sciame
10 directed Whitestone to make repairs for the first time.
11 When Sciame -- so I understand your testimony, when
12 Sciame directed repairs made to the WT-3 clerestory, that
13 was not the same time they rejected the clerestory as
14 installed, if I understand you correctly?
15    A.   Would you mind saying that one more time,
16 please.
17    Q.   Sure.  Based on your last answer, it sounded
18 like at -- when Sciame first directed Whitestone to make
19 repairs, that was not the same time that Sciame rejected
20 the as-installed clerestory?
21    A.   No, it was not the same time.
22    Q.   Okay.  And did the rejection come before or
23 after the direction to make repairs?
24    A.   The rejection of this PCO?

Page 107

1    Q.   No, the rejection of the clerestory as
2 installed.
3    A.   That came before this --
4    Q.   Right.
5    A.   -- the -- Exhibit 8.
6    Q.   Right.  When did the rejection of the
7 clerestory as installed come relative to or with respect
8 to when Sciame directed Whitestone to make repairs?
9    A.   Sometime afterward.
10    Q.   So I -- and I'm not trying to belabor this.
11 I just want to make sure I understand the time line.
12    A.   Okay.
13    Q.   At some time Sciame directed Whitestone to
14 make repairs?
15    A.   Yes.
16    Q.   At some point after that they then formally
17 or informally rejected the as-installed clerestory?
18    A.   Yeah.  Yes, that -- I think so.
19    Q.   And then even further -- later is when they
20 rejected the proposed change order in this e-mail?
21    A.   Definitely the last one, yes.
22    Q.   In the first paragraph of this e-mail, the
23 second sentence states:  "Based on the attached
24 information from the architect, our collective position

Page 108

1 is that this is remedial work which is believed to be
2 Whitestone's responsibility and not the design change
3 warranty and change order to Whitestone."  Do you see
4 that?
5    A.   Yes, I do.
6    Q.   Do you agree with Sciame that this is -- the
7 work to the WT-3 clerestory is remedial work?
8    A.   I agree that it's remedial work because of
9 the design change.
10    Q.   Do you agree that this is warranty work or
11 punch list work?
12    A.   No.
13    Q.   And I take it then based on your statement
14 that it's remedial work only because there was a design
15 change you disagree with the remainder of that sentence
16 that believe to be Whitestone's responsibility and not a
17 design change?  Whitestone disagrees with that; is that
18 correct?
19    A.   Yes.
20    Q.   If you can look at Exhibit 9 which is titled:
21 "Notice of Dispute" dated May 3rd, 2019.  What is this
22 document?
23    A.   Notice of dispute.
24    Q.   What's the purpose of the notice of dispute?

Page 109

1    A.   The purpose of this notice of dispute is
2 disputing Sciame's rejection of the validity of the
3 change order.
4    Q.   It's disputing the prior Exhibit 8; is that
5 correct?
6    A.   Yes.
7    Q.   Were the statements made in this notice of
8 dispute correct when Whitestone made them on May 3rd,
9 2019?
10    A.   Yes.
11    Q.   Does Whitestone stand by the statements today
12 as being true and accurate and correct of the
13 statements -- Strike that.  That was a terrible question.
14 Sorry.
15       Does Whitestone stand by the statements as
16 true and correct that are included in this notice of
17 dispute today?
18    A.   Yes.
19    Q.   If you can look at Exhibit 10, please.  For
20 the record, it is titled "Description of Dispute."  It's
21 a letter from Whitestone dated May 6, 2019.  What is this
22 document?
23    A.   It's a description of dispute.
24    Q.   What does that mean?

28 (Pages 106 - 109)

Page 110

1     A.   The description of dispute further defines,
2  hence the word description, of the notice of dispute of
3  why we believe that their false rejection of Exhibit 8
4  where PCO 98 is rejected.
5     Q.   Do you know who created the first three pages
6  of this which are labeled YUANDA33306 through 33308?
7     A.   Yes.
8     Q.   Who created it?
9     A.   Philip Carvelas.
10    Q.   Did you take any part in creating this
11 document?
12    A.   I believe so, yes.
13    Q.   Were the statements contained in this Exhibit
14 10 true and correct when Whitestone submitted it to
15 Sciame on May 6, 2019?
16    A.   Yes.
17    Q.   As of today, does Whitestone stand by the
18 statements as true and correct that are contained in this
19 exhibit?
20    A.   Yes.
21    Q.   If you look at the second paragraph, it
22 states: "Whitestone's and Yuanda's respective installed
23 WT-3 clerestory work is compliant with 084413-020-02 MCM
24 which is in turn compliant with the contract documents."

Page 111

1  Was that statement correct when it was made on
2  May 6, 2019?
3     A.   Yes.
4     Q.   That statement is correct today?
5     A.   I believe so, yes.
6     Q.   Whitestone is of the opinion that Yuanda's
7  WT-3 clerestory work is compliant with that submittal
8  which in turn compliant with the contract documents?
9     A.   Yes.
10    Q.   In the third paragraph, Whitestone states
11 that: "Whitestone and Yuanda mutually agree that the
12 design team changed the contract deflection criteria
13 noted on S-003- or .00 when they issued RFI 1130 response
14 in 2017 and after the 084413-020-02 MCM work was
15 fabricated and installed." Was that statement true and
16 correct when it was made or that portion of that sentence
17 true and correct when it was made on May 6, 2019?
18    A.   Yes.
19    Q.   Is that still correct today?
20    A.   Yes.
21    Q.   And as we've discussed, the design team that
22 changed the deflection criteria was Perkins Eastman or
23 the engineer of record; correct?
24    A.   Yes.

Page 112

1     Q.   Does Whitestone believe that Yuanda was
2  responsible for any changes to the deflection criteria?
3     A.   No.  Specifically related to the building
4  movements.  Add that to the end of that statement.
5     Q.   That's fine.  And just so we're clear, based
6  on what you just said, the altered design criteria only
7  related to building movement; right?  Let me back up.
8          There are deflections -- deflection
9  requirements for building components including the WT-3
10 clerestory because of building weight, because of wind
11 loads, things like that; right?  The clerestory must
12 accommodate movement within its framework; is that
13 accurate?
14         MR. CARBONE:  Objection.
15 BY MR. GILL:
16    Q.   Is that accurate?
17    A.   Yes.
18    Q.   Okay.  Those movements are different from
19 building movements; correct?
20         MR. CARBONE:  Objection.
21 BY THE WITNESS:
22    A.   Can you explain how those two sentences
23 relate --
24 BY MR. GILL:

Page 113

1     Q.   Yeah.
2     A.   -- as you see it?
3     Q.   Yeah.  The clerestory needs to accommodate
4  movement because of forces of wind or side loads;
5  correct?
6     A.   Yes.
7     Q.   The clerestory also needs to accommodate
8  movement of different building elements, the structural
9  steel relative to the clerestory; correct?
10    A.   Yes.
11    Q.   And those are two different kinds of
12 movement?  Even though they're deflections, they're two
13 different deflections?
14    A.   Agreed.
15    Q.   Yuanda was responsible for designing the
16 deflection within the clerestory itself because of wind
17 loads or side loads and things like that?
18         MR. CARBONE:  Objection.
19 BY MR. GILL:
20    Q.   Is that accurate?
21    A.   It's -- it's accurate, but they also need to
22 comply with the other movements we were discussing, the
23 building movements as well, but that is part of it, yes.
24    Q.   I understand.  Did Yuanda do anything --

29 (Pages 110 - 113)

Page 114

1  Strike that.
2         Was Yuanda responsible in any way for the
3  design deflection criteria with respect to building
4  movement after December 31st, 2016?
5         MR. CARBONE:  Objection.
6  BY THE WITNESS:
7         A.  I don't believe so.
8  BY MR. GILL:
9         Q.  With respect to Submittal 2 of the shop
10  drawing --
11        A.  Excuse me.  I'm sorry to interrupt you.
12  Unless their system impacted the building's structure.
13  They would have to relay that information to the engineer
14  of record, and then the design criteria may or may not be
15  modified from there.
16        Q.  As far as you know, did the WT-3 clerestory
17  as designed modify the building's structural criteria?
18        A.  As far as I'm --
19        MR. CARBONE:  Objection.
20        THE WITNESS:  I'm sorry.
21        MR. CARBONE:  No, I objected.  You could
22  answer.
23  BY THE WITNESS:
24        A.  As far as I'm aware, no.

Page 115

1
2  BY MR. GILL:
3         Q.  This third paragraph in Exhibit 10, I'm not
4  going to read the whole thing but -- and feel free to
5  read it to yourself -- it talks about a revise and
6  resubmit direction regarding the submittal and any new
7  design features.  Do you see that?
8         A.  Yes.
9         Q.  Does Whitestone have an opinion about whether
10  the Submittal 2 should have been returned as a revised
11  and resubmit rather than a with comments noted?
12        MR. CARBONE:  Objection.
13  BY THE WITNESS:
14        A.  Would you mind repeating that one more time?
15  I'm sorry.
16  BY MR. GILL:
17        Q.  Does Whitestone have an opinion about whether
18  Perkins Eastman should have returned Submittal 2 with the
19  note of revise and resubmit rather than returning it with
20  a make corrections noted?
21        MR. CARBONE:  Objection.
22  BY THE WITNESS:
23        A.  I believe so, yes.
24  BY MR. GILL:

Page 116

1         Q.  Okay.  What would have occurred if Submittal
2  084413-020-02 had been returned from Perkins Eastman with
3  a revise and resubmit note?
4         MR. CARBONE:  Objection.
5  BY THE WITNESS:
6         A.  Is it relating to this issue specifically?
7  BY MR. GILL:
8         Q.  Pardon?
9         A.  Is it relating to this issue specifically
10  or a work order change?
11        Q.  With respect -- well, no.  What would the
12  procedure be after Perkins Eastman returned a -- this
13  submittal with a revise and resubmit direction?
14        A.  There would ultimately be another submittal
15  made, a third revision.  If it was rejected on the basis
16  of this deflection issue, there would be an RFI generated
17  by Yuanda to specify what these requirements were.
18  That's how I see it.
19        Q.  Does Whitestone have reason to doubt that
20  Yuanda would create a third submittal to answer a revise
21  and resubmit notation from the architect?
22        MR. CARBONE:  Objection.
23  BY THE WITNESS:
24        A.  Yeah, I don't quite understand what you're

Page 117

1  getting at.
2  BY MR. GILL:
3         Q.  Do you -- do you have any reason to doubt
4  that Yuanda would provide the submittal as required?
5         MR. CARBONE:  Objection.
6  BY THE WITNESS:
7         A.  No.  I believe they would provide what we
8  asked for.
9  BY MR. GILL:
10        Q.  On the first page of Exhibit 10, the last
11  paragraph is entirely bolded and underlined.  Do you know
12  why Whitestone did that?  Obviously it's for emphasis,
13  but what was the purpose of emphasizing the entire
14  paragraph?
15        A.  I think like you said, just for emphasis.
16  I'm not really too sure why other than that.
17        Q.  If you turn to the second page, the first
18  paragraph, it refers to NCR Report Number 4 referencing
19  the -- referenced in Sciame's e-mail, and that e-mail is
20  Exhibit 8, and that talks about the starter sill.  Is
21  that the starter sill we talked about earlier?
22        A.  Yes.
23        Q.  Do you agree with -- Strike that.
24            Was the last sentence of that paragraph, that

30 (Pages 114 - 117)

Page 118

1  "besides NCR Item Number 4 is not relevant to
2  Whitestone's PCO 098," was that true and correct when the
3  statement was made on May 6, 2019?
4      A.   Yes.
5      Q.   Is that true and correct today?
6      A.   Yes.
7      Q.   If you go down to the fourth paragraph on
8  Page 2, the first half of that first sentence states that
9  "084413-020-02 MCN is detailed in accordance with the
10 design criteria noted on S/003.00." Do you see that?
11     A.   Yes.
12     Q.   Was that a true and correct statement when
13 this notice -- description of view was submitted?
14     A.   To the best of my knowledge, yes.
15     Q.   That continues and says:  "And until the 2019
16 RFI 1130 response after the MCN work was fabricated and
17 installed no other deflection criteria has been issued."
18 Was that statement true and correct when this description
19 of dispute was issued in 2019?
20     MR. CARBONE:  Before he answers, could you
21 just -- are we in the fourth paragraph?
22     MR. GILL:  Yeah.
23     MR. CARBONE:  Where are you reading?  Where
24 are you reading from, which sentence?

Page 119

1      MR. GILL:  The first sentence.  That was the
2  second half of the first sentence on lines 1 and 2 of the
3  fourth paragraph.
4      MR. CARBONE:  Okay.  "After the MCN work was
5  fabricated and installed no other deflection criteria has
6  been issued."
7      MR. GILL:  Correct.
8      MR. CARBONE:  Okay.  Thank you.
9  BY MR. GILL:
10     Q.   Was that second half of the sentence true and
11 correct when it was made in May 2019?
12     A.   Yes.
13     Q.   Is it true and correct today?
14     A.   Yes.
15     Q.   Is there any reason that Whitestone or Yuanda
16 should have known about any other deflection criteria
17 before the RFI response was received in July -- January
18 2017?
19     A.   Can you say that one more time, please.
20     Q.   Is there any reason that Whitestone or Yuanda
21 should have known about any other deflection, sorry,
22 deflection criteria before the RFI response was issued in
23 January 2017?
24     A.   No.  It should be specified in the contract

Page 120

1  documents.
2      Q.   Do you see on the bottom of the second page
3  and going on to the third page Whitestone quotes
4  extensively from a response from Yuanda?  Do you see
5  that?
6      A.   Yeah.  Which portion?
7      Q.   I'm just referring in general to it.  There's
8  a comment:  "The lower excerpts of Yuanda's commentary to
9  this matter," and then there is four paragraphs that are
10 quoted directly.  Do you see those?
11     A.   Yes.
12     Q.   When Whitestone submitted this description of
13 dispute to Sciame, did Whitestone accept as true and
14 correct Yuanda's commentary as stated in this description
15 of dispute?
16     MR. CARBONE:  Objection.
17 BY THE WITNESS:
18     A.   I believe so, yes.
19 BY MR. GILL:
20     Q.   Whitestone wouldn't pass along an analysis or
21 information that it believed to be incorrect; is that
22 accurate?
23     A.   Yes.
24     Q.   If you look at the first full paragraph on

Page 121

1  the third page -- and this is part of the quoted analysis
2  from Yuanda.  If you look at the second -- Strike that.
3  The last sentence of that first full paragraph --
4      A.   Of which -- which page?
5      Q.   Sorry.
6      A.   308?
7      Q.   The third page of the exhibit which is 33308.
8      A.   Okay.  Whereabouts?
9      Q.   The first full paragraph on that page which
10 is still Yuanda's commentary or analysis.
11     A.   Yes.
12     Q.   The last sentence of that paragraph, do you
13 see that Yuanda states:  "The deformation should have
14 been taken into account with the design of the structural
15 steel"?
16     A.   I see that.
17     Q.   Does Whitestone agree with that statement
18 that Yuanda made?
19     A.   Yes.
20     Q.   Between May 6, 2019 when this description of
21 dispute was submitted and today has Whitestone changed
22 its opinion about whether the clerestory as Whitestone
23 installed it conforms to the requirements of the drawings
24 and specifications?

31 (Pages 118 - 121)

1    A.   Would you mind repeating that --

2    Q.   Sure.

3    A.   -- just a little bit slower, please.

4    Q.   Absolutely.  Between May 6, 2019, the date

5 that this description of dispute was submitted, and today

6 has Whitestone changed its opinion about whether the

7 clerestory as Whitestone installed it conforms to the

8 requirements of the drawings and specifications?

9    A.   No, our opinion has not changed.

10    Q.   If you can turn to -- we're going to skip

11 Exhibit 11.  Go to Exhibit 12.  Have you seen this

12 document before?

13    A.   I don't think so, no.

14    Q.   Okay.  For the record, this Exhibit 12 is a

15 letter from Whitestone to Yuanda dated June 24th, 2019.

16 And at the very beginning of this deposition I showed you

17 the rider which is Exhibit 1.  Item 18 of the rider is --

18 refers to "Whitestone's June 24th, 2019 letter to Yuanda

19 and the contents thereof."  You stated you would be

20 unable to -- you would either be unable to answer

21 questions or you would answer to the best of your

22 ability.  Are you able to answer questions about this

23 letter even though you haven't seen it?

24    A.   No.

1        MR. CARBONE:  Adam, what number -- Adam, what

2 number was this in your list in Exhibit 1?

3        MR. GILL:  Eighteen.

4        MR. CARBONE:  Eighteen, thank you.

5        MR. GILL:  Yeah.

6 BY THE WITNESS:

7    A.   Would you mind just repeating that once --

8 BY MR. GILL:

9    Q.   Yeah.

10    A.   -- again?

11    Q.   I'm only asking to see whether I need to

12 waste time on this or not.  Are you able to answer

13 questions about the contents of this letter and the

14 accuracy of the contents since -- even though you have

15 not seen this before?

16    A.   You can ask me questions, but if I don't know

17 the answer, I'll let you know or -- or no.  I don't know.

18    Q.   Well, let me start out --

19    A.   I didn't write the letter, so I'm not aware

20 of the --

21    Q.   Sorry.

22    A.   Pardon?

23    Q.   No.  No.  We're trying to both get to a place

24 here.

1        Do you know what this document is?

2    A.   I just know it's a letter.

3    Q.   Okay.  Let me skip this.

4        As far as you know, did Whitestone ever

5 inform Yuanda that Whitestone was rejecting Yuanda's

6 work?

7    A.   Yes.

8    Q.   When did Whitestone inform Yuanda that

9 Whitestone was rejecting Yuanda's work?

10    A.   I believe it was a letter that Steven or Phil

11 drafted and sent to them.

12    Q.   Okay.  I will represent to you that as far as

13 I know Exhibit 12 is the only letter or maybe not the

14 only letter but is a letter that is referred to in

15 multiple pleadings regarding rejection.  So going back to

16 12, looking at the first paragraph -- Strike that.

17        Go to the second page.  Do you see the

18 signature there?

19    A.   Yes.

20    Q.   Do you recognize that signature?

21    A.   I do.

22    Q.   Whose signature is that?

23    A.   Steven Grzic.

24    Q.   Okay.  Going back to the first page, first

1 paragraph, it states:  "We are writing to formally notify

2 you that Sciame has rejected as non-conforming Yuanda's

3 verification of the WT-3 clerestory structural

4 component."  Do you see that?

5    A.   Yes.

6    Q.   Do you see that Whitestone is saying that

7 Sciame has rejected the fabrication?

8    A.   Yes.

9    Q.   I'll let you read the whole letter, but is

10 there anywhere in this letter that Whitestone informed

11 Yuanda that Whitestone is rejecting the WT-3 clerestory?

12        MR. CARBONE:  Objection.  The letter was

13 written by someone else.  The letter speaks for itself

14 but --

15        MR. GILL:  This witness is being deposed as

16 the corporate designee of Whitestone, and his answers are

17 not his.  They are of the corporation, and the

18 corporation had the duty to educate this witness based on

19 this document, so please answer.

20 BY THE WITNESS:

21    A.   Okay.  So you want me to read this and

22 confirm if what again, please.

23 BY MR. GILL:

24    Q.   Whether or not anywhere in this letter

32 (Pages 122 - 125)

1 Whitestone informed Yuanda that Whitestone as opposed to
2 Sciame was rejecting Yuanda's work.
3     A.   Okay.  Hold on.
4           (Witness peruses document.)
5        From reading the letter, the only thing I see
6 is that Sciame is rejecting.  Whitestone's directing
7 Yuanda to remediate the work.
8     Q.   To be clear, at the time this letter was sent
9 on June 24th, 2019, Whitestone did not agree with Sciame
10 that the work did not conform to the requirements of the
11 architectural drawings, structural drawings or
12 specifications?
13     A.   We did not agree.
14     Q.   Turn to the second page of this letter, the
15 first paragraph.  Do you see in the top line Whitestone
16 states that: "Yuanda is hereby directed to remediate the
17 misfabricated already installed WT-3 clerestory"?
18     A.   Yes.
19     Q.   What does Whitestone mean by misfabricated?
20     A.   Misfabricated as determined by the design
21 team, that the WT-3 clerestory head connection will not
22 accommodate the wind deflections.
23     Q.   And, again, Whitestone does not agree with
24 the design team that that component was misfabricated; is

1 that correct?
2     A.   We don't agree that it was misfabricated
3 based on the second submittal made corrections.
4     Q.   Okay.  That's it for that document.
5        MR. CARBONE:  It's like almost 1:30.  When are
6 we breaking for lunch?
7        MR. GILL:  I wasn't -- if you want to break
8 for lunch, that's fine.  I wasn't planning on it, but we
9 certainly can.
10        MR. CARBONE:  Yeah, well, I would certainly
11 like to break for lunch.
12        MR. GILL:  That's fine.
13        MR. CARBONE:  How many hours do you think?
14        MR. GILL:  Another -- less than two, hour and
15 a half to two.
16        MR. CARBONE:  All right.  So why don't we take
17 a half an hour break for lunch or 45 minutes and then
18 we'll come back?
19        MR. GILL:  Okay.
20        MR. CARBONE:  All right?
21        MR. GILL:  Yes.  Sounds good.
22        MR. CARBONE:  Okay.  Great.  Thank you.
23        MR. GILL:  Thank you.
24        THE VIDEOGRAPHER:  Going off the record at

1 13:23.
2           (WHEREUPON, a lunch break
3           was taken.)
4        We're back on the record, 14:16.
5        MR. CARBONE:  You were in the military.
6 BY MR. GILL:
7     Q.   Mr. Dearth, during your break, did you have
8 any conversations with anyone at Whitestone regarding the
9 substance of the deposition that we have -- the substance
10 of the topics that we've addressed so far in this
11 deposition?
12     A.   No.
13     Q.   Did you have a conversation with your
14 attorney about the substance of the topics that we
15 addressed so far?
16     A.   Yes.
17     Q.   What did you and your attorney discuss?
18        MR. CARBONE:  Objection.  Directing the
19 witness not to answer.  Any conversations I had with him
20 are privileged.
21        MR. GILL:  Conversations regarding coaching a
22 witness are not privileged under Hall versus Clifton
23 which is an Eastern District of Pennsylvania case which
24 was adopted into the Southern District in New York in

1 2011 and Abu Dhabi Commercial Bank versus Morgan Stanley.
2 BY MR. GILL:
3     Q.   So I ask again.  During the break, did Mr.
4 Carbone direct you to answer questions in a certain way?
5        MR. CARBONE:  What I'll do is I'll take a --
6 at the next break or whatever send me those citations.
7 I'll certainly read the cases, but right now I'm
8 directing the witness not to answer the question what we
9 may have discussed regarding the subject matter of this
10 lawsuit.
11        MR. GILL:  I'm not --
12        MR. CARBONE:  And if you're right and I'm
13 wrong, certainly I'll let him answer the questions.
14        MR. GILL:  I'm not talking about the lawsuit
15 in general.  I'm talking about the substance of the
16 deposition, but understood.
17 BY MR. GILL:
18     Q.   Mr. Dearth, on the advice of counsel are you
19 refusing to answer the question?
20     A.   I don't know what to do here.
21        MR. CARBONE:  Well --
22 BY THE WITNESS:
23     A.   No.  Yes.
24        MR. CARBONE:  -- I'm directing you not to

33 (Pages 126 - 129)

Page 130

1 answer the question.
2 BY THE WITNESS:
3    A.  Yes, so I'm not -- I'm not going to.
4       MR. GILL:  Can you please certify the
5 question, Madam Court Reporter.
6       MR. CARBONE:  I'm sorry.  I didn't hear you,
7 Adam.
8       MR. GILL:  I asked the court reporter to
9 certify the question.
10       MR. CARBONE:  Okay.
11       MR. GILL:  I am getting a little bit of reverb
12 or echo.  Are you guys getting that when I talk?
13       THE VIDEOGRAPHER:  I can hear you just fine.
14       THE REPORTER:  Yeah, no, I think it's just on
15 the witness and Mr. Carbone's end.  I'm getting it too.
16       MR. CARBONE:  Some of it may be --
17       THE REPORTER:  Do you want to go off the
18 record?
19       MR. CARBONE:  Some of it may be from me.
20       MR. GILL:  No.  It's rectified now.  It sounds
21 fine now.
22       THE VIDEOGRAPHER:  Okay.  I'm off the record.
23       MR. GILL:  Then I guess that exchange about
24 echo can be off the record if Mr. Carbone agrees.

Page 131

1
2 BY MR. GILL:
3    Q.  So continuing on, Mr. Dearth, we were talking
4 about rejection of -- we were talking about Sciame's
5 rejection of Whitestone's work and Sciame's rejection of
6 Yuanda's work.  After Sciame rejected the installation of
7 the clerestory what did Whitestone expect Yuanda to do?
8 And I'm not referring to a document.  I'm just asking you
9 what did Whitestone expect Yuanda to do in response to
10 the rejection of the work.
11    A.  To remediate at its sole cost per the
12 approved remediation shop drawings.
13    Q.  Remediate what?
14    A.  Remediate the clerestory and head condition.
15    Q.  Did Whitestone expect that Yuanda would
16 redesign the connection between the curtainwall and the
17 structure?
18    A.  Yes.
19    Q.  Did Whitestone expect that Yuanda would
20 provide structural calculations for that new connection?
21    A.  Yes.
22    Q.  Did Whitestone expect Yuanda to fabricate and
23 deliver new components for that connection?
24    A.  Yes.

Page 132

1    Q.  Did Whitestone expect Yuanda to run
2 scaffolding and equipment to install the new components?
3    A.  Yes.
4    Q.  Why?
5    A.  So they could access the work area.
6    Q.  Why was the cost of scaffolding and
7 equipment, why was that Yuanda's responsibility?
8    A.  So they could access the work area.
9    Q.  Why was Yuanda responsible for paying for
10 scaffolding and equipment?
11    A.  Because they're responsible for the
12 remediation.
13    Q.  Are they responsible for remediating the
14 installation?
15       MR. CARBONE:  Objection.
16 BY THE WITNESS:
17    A.  I'm just thinking here.
18       (Brief pause.)
19    Yes, they are.
20 BY MR. GILL:
21    Q.  What is that -- what is the basis of
22 Whitestone's position?
23    A.  The basis of Whitestone's position is that
24 the owner and construction manager rejected the

Page 133

1 installation.
2    Q.  I understand that.  But why is Yuanda
3 responsible -- why is Yuanda financially responsible for
4 installing the new components?
5    A.  The reason why they're responsible for the
6 installation of the remediation is because when
7 something's rejected by the owner, Whitestone is
8 responsible to do the remediation.  Therefore, the vendor
9 is responsible for doing the remediation.
10    Q.  And Whitestone did the original installation;
11 correct?
12    A.  Whitestone did -- or Metro-Tech which is a
13 subcontractor of Whitestone did the installation based
14 off of the information provided by Yuanda.
15    Q.  Yuanda didn't do the original installation?
16    A.  Right, but they did do the drawings --
17    Q.  Correct.
18    A.  -- which is what we used to do the
19 installation.
20    Q.  So why is Yuanda responsible for the
21 installation of new components based on new design
22 criteria?
23       MR. CARBONE:  Objection.  I think you already
24 asked and answered that question but --

34 (Pages 130 - 133)

1        MR. GILL: I asked a little different question
2 I think.
3        MR. CARBONE: Basically the same but okay.
4 BY THE WITNESS:
5        A.   Would you mind just saying that one more
6 time?
7 BY MR. GILL:
8        Q.   Why is Yuanda responsible for installing the
9 new components that were designed based on new design
10 criteria?
11        MR. CARBONE: Objection.
12 BY THE WITNESS:
13        A.   Because the owner directed Whitestone to
14 perform the remediation.  Therefore, we directed our
15 subcontractor to do the same or our vendor to do the
16 same.
17 BY MR. GILL:
18        Q.   I understand, but where is White -- where
19 does it say in any document that Whitestone was
20 responsible, financially responsible for corrective work,
21 remedial work, warranty work, punch list work regarding
22 the head connection of the WT-3?
23        MR. CARBONE: Did you mean to say Whitestone?
24        MR. GILL: I don't -- let me ask again.  Let

1 me withdraw the question and ask again.
2        MR. CARBONE: You said where does it say
3 Whitestone.  I don't know if you --
4        MR. GILL: I didn't mean to say Whitestone.
5 Let me restate that.  Thank you.
6 BY MR. GILL:
7        Q.   Where does it say in any document that Yuanda
8 is liable to Whitestone for the cost of installing the
9 new components for the WT-3 connection to the structure?
10        A.   I don't know where it's stated.
11        Q.   Is it stated anywhere?
12        A.   I don't know where it's stated.
13        Q.   That's not my question.  Is it stated
14 anywhere?
15        A.   I believe so, but I don't know where.
16        Q.   Okay.  If it's stated somewhere, would that
17 be stated in the purchase order agreement?
18        A.   Most likely, but, again, I'm not aware.
19        Q.   Okay.  Did Yuanda redesign the connection
20 between the clerestory and the building structure?
21        A.   It was a collaborative effort between myself
22 and Yuanda.
23        Q.   So Yuanda did redesign the connection?
24        A.   In collaboration with Whitestone, yes.

1        Q.   Did Yuanda provide revised structural
2 calculations for that connection?
3        A.   Yes.
4        Q.   Did Whitestone -- sorry.  Did Yuanda offer to
5 fabricate certain components?
6        A.   Yes, at a cost.
7        Q.   At whose cost?
8        A.   Whitestone, I believe.
9        Q.   If you can look at Exhibit 13.
10        A.   Yes.
11        Q.   Do you recognize this document?
12        A.   Yeah, this is the e-mail that I wrote or it's
13 communication between myself and Yuanda.
14        Q.   Okay.  And the final date -- the date of the
15 finding on the top on Page 1 is July 20th, 2018; correct?
16        A.   Yes.
17        Q.   Okay.  If you can go back about 12 pages --
18        MR. CARBONE: And I -- okay.
19 BY MR. GILL:
20        Q.   There's an e-mail at the bottom of Page 12 of
21 13 from you dated March 6, 2018.  Do you see that?
22        A.   March 6th, yes.
23        Q.   Okay.
24        MR. CARBONE: Let me get there.

1        MR. GILL: Okay.
2        MR. CARBONE: Is that February 26, 2018?
3        MR. GILL: March 6, 2018.
4        MR. CARBONE: March 6th.  Hold on one second.
5 I got it.  From James Dearth at 8:57?
6        MR. GILL: Correct.
7        MR. CARBONE: Okay.
8 BY MR. GILL:
9        Q.   If you turn the page to the body of the
10 e-mail, do you see the second paragraph where you state:
11 "We need to find facts and define a time line showing the
12 design submission in order to have the client bear the
13 cost of the remediation activity."  Do you see that?
14        A.   Yes.
15        Q.   And was that true when you wrote this?
16        A.   Yes.
17        Q.   And you believed when you wrote this that the
18 work was needed due to a design omission?
19        A.   Yes.
20        Q.   If you turn towards the front two pages, you
21 see there's an e-mail March 13th also from you?
22        A.   Yes.
23        Q.   And you start out:  "Kindly respond to the
24 question below."  And --

35 (Pages 134 - 137)

1    MR. CARBONE:  Second -- second page.

2    MR. GILL:  No.  It's about the ninth page.

3 It's March 13th, 2018.

4    MR. CARBONE:  Hold on.

5    MR. GILL:  No, I think it's the eleventh page.

6    MR. CARBONE:  They're not numbered.  That's

7 the hard part.

8    MR. GILL:  I know.  This is the condition that

9 it was produced from Whitestone.

10    MR. CARBONE:  What's the date of the e-mail?

11    MR. GILL:  March --

12    MR. CARBONE:  Is it 3-13-18 "Kindly respond to

13 the question below"?

14    MR. GILL:  Correct.

15    MR. CARBONE:  Thank you.

16 BY MR. GILL:

17    Q.   And you ask Yuanda about the WT-3 system to

18 absorb approximately 2.775 inches of deflection or

19 vertical movement?

20    A.   Yeah.

21    Q.   And if you go forward in time one page,

22 Yuanda responded?

23    A.   Yes.

24    Q.   And they, in fact, sent design calculations

1 or design drawings for that?

2    MR. CARBONE:  Just for clarity, we're talking

3 about the e-mail on March 16, 2018 at 2:45?

4    MR. GILL:  Correct.

5    MR. CARBONE:  Okay.  Thank you.

6 BY MR. GILL:

7    Q.   And the subsequent one which is on the

8 preceding page which is March 16th at 10:25 p.m. where

9 Yuan Yue says:  "Yesterday, in fact has been sent."  Do

10 you see that?

11    MR. CARBONE:  The preceding page, yes.

12 BY MR. GILL:

13    Q.   Mr. Dearth, do you see that?

14    A.   What -- what am I looking at -- looking for?

15    Q.   Where Yuanda is responding on March 16th to

16 your question and providing you drawings?

17    A.   Yes, I'm here.

18    Q.   Do you see that?

19    A.   I see the e-mail, yes.

20    Q.   Well, Yuanda did, in fact, respond and did,

21 in fact, provide the drawings; is that correct?

22    A.   I think I was the one who provided the

23 drawing or sketch.  I believe I was the one who did that.

24    Q.   Well, looking at the bottom of -- between the

1 two Yuanda e-mails --

2    A.   Yes.

3    Q.   -- you sent an e-mail on March 16th at 8:44,

4 20:44 on this, where you ask:  "Kindly forward drawing as

5 soon as time allows."  Do you see that?

6    A.   Yes.

7    Q.   And Yuan Yue responds that Yuanda actually

8 provided the drawing?

9    A.   Okay.

10    Q.   Did Yuanda provide a drawing or not?

11    A.   Yeah, he did.

12    Q.   Okay.

13    A.   I think that I had provided a sketch in

14 that -- in the 3-13 e-mail.  I'm pretty sure I did.

15    Q.   Now I'm not going to go through all of the

16 rest because -- look, between that date and March 16th,

17 2018 through the oldest e-mail on this July there was a

18 back and forth between you and Yuanda regarding the

19 design and a sketch for the head connection; correct?

20    A.   It was tough for me to follow what you were

21 saying.  Would you mind --

22    MR. CARBONE:  Adam, could you just speak up a

23 little bit?  I'm having a hard time hearing you.  My

24 apologies.

1    MR. GILL:  No reason to apologize.

2 BY MR. GILL:

3    Q.   So between March 16th, 2018 and the first

4 e-mail in this string which is July 20th, 2018 there was

5 a back and forth communication, a collaboration I think

6 you said, between you and Yuanda regarding the design of

7 this head detail; correct?

8    A.   Yes.

9    Q.   And as part of that, on July 20th, 2018 Yuan

10 Yue informs you that the calculations for that connection

11 have been completed; right?

12    A.   You said July 11th?

13    Q.   Twentieth.  July 20th.  It's the first e-mail

14 on the top of the first page of Exhibit 13.

15    A.   First page, yes.  Calculation is complete.  I

16 see that.  And it looks like there are CAD files, PDFs

17 and also a calculation check.

18    Q.   Turning to Exhibit 14, for the record,

19 Exhibit 13 ended on July 20th, 2018 and that same e-mail

20 is on Page -- the middle of Page 4 of this Exhibit 14.

21 So the only new e-mails are on Pages 1, 2 and 3 of

22 Exhibit 14.

23    MR. CARBONE:  Could you just explain that?

24 Sorry.  Going from 13 to 14?

36 (Pages 138 - 141)

1        MR. GILL:  Looking at 13 -- looking at 14, the
2   last e-mail at the top of 14 is July 20th, 2018.  That
3   same e-mail is on Page 4 of Exhibit 14.
4        MR. CARBONE:  Okay.  So hold on.  On
5   Exhibit -- on the exhibit I have which is Defendant's
6   Exhibit 14 --
7        MR. GILL:  Yeah.  Turn to the fourth page of
8   14.
9        MR. CARBONE:  Right.  Well, I'm counting one,
10  two, three, four, and there's like a little diagram on
11  top that puts -- (Zoom interruption).
12       Is that correct?
13       MR. GILL:  That is correct.  The e-mail below
14  that --
15       MR. CARBONE:  Is the Friday, July 20?
16       MR. GILL:  That's the same e-mail.
17       MR. CARBONE:  July 20 -- well, there's a
18  different -- am I missing something or is there a
19  different date and time?  The fourth page of Exhibit 14
20  has an e-mail which is July 20, 2018 at 4:22 a.m.  Okay.
21       MR. GILL:  Yeah.
22       MR. CARBONE:  The other one is 7-20-18 which
23  is obviously the same date but now you have -- it says
24  8.21.30.  Are you saying that's the same time?

1        MR. GILL:  No.  I'm saying the content of the
2   e-mail is the same.  These are the documents that
3   Whitestone produced, so to the extent that there's a
4   discrepancy, these are Whitestone documents, and I can't
5   explain why there's discrepancy in the dates or the
6   times.
7        MR. CARBONE:  Well, it's also a different --
8   it's also a different format, okay, because -- I mean if
9   you want to be -- the words may all be the same words,
10  but just by looking at it, you know, there's a
11  different -- a different format.  One has seven lines.
12  One has in excess of seven lines, so -- do you want him
13  to compare the two and indicate is the narrative the
14  same?
15       MR. GILL:  No.
16       MR. CARBONE:  Okay.
17       MR. GILL:  I'm representing those are the same
18  e-mails, and so only the first three pages are different.
19       MR. CARBONE:  I certainly will accept your
20  representation that the verbiage in one e-mail matches
21  the verbiage in the second e-mail, but I will not accept
22  your representation that they're the same e-mail because
23  they're not.  It's a different configuration.
24       MR. GILL:  I understand, and that is the

1   complaint that we have had of Whitestone's production
2   since October, so to the extent that you have a complaint
3   about this production, this is Whitestone's problem and
4   not mine.
5        MR. CARBONE:  Well, I'm not complaining at all
6   about the production.  Okay.  And I'm willing to accept
7   your representation as that the verbiage is the same.
8        MR. GILL:  Okay.
9        MR. CARBONE:  Okay.  I'm just not agreeing
10  that the e-mails are the same because as I pointed out,
11  the configuration is different.
12       MR. GILL:  Okay.
13       MR. CARBONE:  Okay.  And they're at
14  different -- you know, there's different notations, and I
15  don't know if it matters --
16       MR. GILL:  Different notations?
17       MR. CARBONE:  -- but I just point it out.
18       MR. CARBONE:  I'm sorry.
19       MR. GILL:  What is different in the notation?
20       MR. CARBONE:  Notations with respect to time
21  which I previously stated.
22       MR. GILL:  Okay.  Okay.
23  BY MR. GILL:
24       Q.   What did Whitestone do with the calculations

1   that Yuanda provided on July 20th, 2018?
2        A.   We most likely submitted them to the design
3   team for review.
4        Q.   If you look at the bottom of the third page
5   of Exhibit 14, it's an e-mail from you dated
6   September 14th, 2018.  Please read it to yourself.
7   Actually --
8        MR. CARBONE:  We're on Exhibit 14?
9        MR. GILL:  We're Exhibit 14.
10       MR. CARBONE:  First page at the bottom?
11  BY MR. GILL:
12       Q.   Actually, I said the third page, but I'm --
13  this string of e-mails relates to calculations.  Is that
14  the calculations that were in the previous exhibit
15  regarding the WT-3 head connection?
16       A.   It appears to be that way.
17       Q.   Okay.  I was confused because this also
18  relates to an RFI 1436.  Does that relate to the WT-3
19  head connection?
20       A.   Yes.
21       Q.   Did Sciame or the architect accept the
22  structural calculation that Yuanda created for the new
23  connection to the WT-3 head connection?
24       A.   At this point in time, no.  It looks like

Page 146

1 they had some questions, and there was a subsequent
2 submittal.
3    Q.   And that subsequent submittal occurred on
4 August 5th or about August 5th, 2019 or you requested it?
5 Second page, top e-mail.
6    A.   Looks like there's an October 3rd, and they
7 sent -- they sent us some calculations on October 8th.
8 Then I asked for stamped calculation on August 5th, yeah.
9    Q.   Yuanda provided you calculations on
10 October 8th, 2018; right?
11       MR. CARBONE:   Could you just indicate what
12 you're referencing in the document?  Because I'm having a
13 hard time following along.
14 BY MR. GILL:
15    Q.   Second page, middle e-mail from --
16       MR. CARBONE:   You're on Exhibit 14, second
17 page, October 8, 2018 3:59 e-mail?
18       MR. GILL:   Correct.
19       MR. CARBONE:   Okay.  That's all I'm asking so
20 we could follow, so the record's clear too, Adam.
21 BY MR. GILL:
22    Q.   Yuan Yue sent the deponent an e-mail saying:
23 "Please review the adjusted calculations."  Is that a
24 revised set of calculations for the head connection?

Page 147

1    A.   Yes.
2    Q.   Okay.  Why did it take ten months for
3 Whitestone to respond to Yuanda?
4    A.   I'm not sure.
5    Q.   But on October -- the top e-mail, second page
6 Exhibit 14, on August 5th, 2019 at 4:29 p.m. you sent
7 Yuanda an e-mail requesting engineer stamped calculations
8 for that head connection; right?
9    A.   Yes.
10    Q.   And Yuanda provided those engineer stamped
11 calculations; correct?
12    A.   Looks like August 7, 2019 Charles sent us the
13 stamped calculations.
14    Q.   And those calculations are attached to
15 Exhibit 14 as the last four pages; is that correct?
16    A.   Yes.
17    Q.   Were those calculations accepted by the
18 design team?
19    A.   I don't know if this is the last iteration of
20 the calculations, but eventually they were.  I don't know
21 if it was this one exactly, but they were.
22    Q.   Under the requirements of the purchase order
23 Yuanda was required to provide stamped structural
24 calculations; correct?

Page 148

1    A.   Yes.
2    Q.   And they provided stamped structural
3 calculations for the new design criteria for the head
4 connection; correct?
5    A.   Yes.
6    Q.   You can skip Exhibit 15 and go to Exhibit 16.
7 You are not copied on this e-mail string which has the
8 top e-mail on the first page of April 27th, 2020 at 3:41
9 p -- a.m.  Have you ever seen this e-mail before?
10    A.   No.
11    Q.   I'm not going to ask you any questions about
12 that e-mail then.
13       Regarding Whitestone's claim for the cost of
14 the WT-3 clerestory against Sciame, does Whitestone still
15 have a claim or dispute with Sciame regarding the cost to
16 remediate the clerestory?
17    A.   Yes.
18    Q.   Is Whitestone currently pursuing its
19 administrative remedies against Sciame?
20    A.   Yes.
21    Q.   What is Whitestone doing to pursue those
22 remedies?
23    A.   Whitestone is submitting an updated PCO which
24 includes all the -- all the information that is in

Page 149

1 Exhibit 17, I believe.  Yeah.
2    Q.   When is Whitestone submitting that?
3    A.   As soon as possible.
4    Q.   Between July 2019 and today what has
5 Whitestone done to pursue its remedy against Sciame?
6    A.   Well, we've been involved in a lawsuit, so I
7 guess they're handling the matter.
8    Q.   Are there requirements prior to -- do you
9 know if there are requirements prior to doing an action
10 in state court that Whitestone still has to pursue in
11 order to proceed with its lawsuit against Sciame?
12    A.   I don't understand the question.
13    Q.   Are there administrative remedies Whitestone
14 still needs to satisfy such as submitting it to the
15 governor's office or another administrative state agency
16 before Sciame can proceed with its lawsuit -- before
17 Whitestone --
18       MR. CARBONE:   Are you asking him --
19 BY MR. GILL:
20    Q.   -- before Whitestone can proceed with its
21 lawsuit against Sciame?
22       MR. CARBONE:   All right.  I'm going to object.
23 You're asking him to be a lawyer with respect to the
24 Whitestone/Sciame contract.  He's not here as a lawyer to

38 (Pages 146 - 149)

Page 150

1 give legal opinions.
2      MR. GILL: I'm not asking as a -- I'm asking
3 where they are in the process of pursuing the dispute
4 with Sciame.
5      MR. CARBONE: I'll -- I'll be happy to tell
6 you, but I don't think this witness is capable of telling
7 you at what stage a lawsuit is, and I don't think that's
8 part of the education of the witness here to testify with
9 respect to legal -- legal postures with respect to
10 lawsuits.
11      MR. GILL: You understand that Whitestone's
12 motion for summary judgment talks extensively about the
13 agreement and the requirements Whitestone has with Sciame
14 and you understand that Whitestone's motion for summary
15 judgment talks maybe not as extensively about its
16 administrative remedy that it is pursuing against Sciame,
17 so Whitestone has put those issues in play in this
18 litigation, and I just want to know what the status is.
19      MR. CARBONE: Right, and I'll be happy to tell
20 you what the status is. I'm more than happy to give you
21 the index number of the state lawsuit. I'm more than
22 happy to give you the index number of the appeal, and,
23 you know, that will fully explain all of the
24 extraordinary efforts Whitestone is taking to pursue the

Page 151

1 alternative dispute resolution procedures in the
2 Whitestone/Sciame contract, but I don't think it's fair
3 to expect this witness to know all those ins and outs.
4      MR. GILL: One second, please.
5 BY MR. GILL:
6      Q. As part of Whitestone's work for Sciame, are
7 you -- do you have any familiarity -- are you aware of
8 any requirement that Whitestone perform work under
9 protest if it disagreed with Sciame regarding certain
10 work?
11      A. Can you explain the meaning of your question?
12 I don't quite understand.
13      Q. Yes, I will. I will rephrase or -- are you
14 aware whether Whitestone was required to perform work at
15 Whitestone's cost if it disagreed with Sciame regarding
16 Sciame's determination whether work was properly
17 performed or not?
18      A. Yes.
19      Q. Yes, Whitestone was required to continue and
20 perform work?
21      A. Yes.
22      Q. Okay. Is -- did Whitestone perform the
23 remedial work on the WT-3 clerestory under that
24 provision, meaning that Whitestone disagreed with Sciame

Page 152

1 but performed the work anyway?
2      A. Yes.
3      Q. Is that one of the claims or disputes that
4 Whitestone's currently pursuing against Sciame?
5      A. Yes.
6      Q. If Whitestone's successful in pursuing their
7 remedy against Sciame and receives all or some of the
8 costs that Whitestone incurred for this remediation, what
9 is Whitestone going to do with this pending lawsuit it
10 has against Yuanda?
11      MR. CARBONE: Objection.
12 BY THE WITNESS:
13      A. I -- I don't know.
14 BY MR. GILL:
15      Q. If Sciame pays Whitestone $237,000 for the
16 cost to remediate the WT-3 clerestory, what is Yuanda
17 gonna do with this lawsuit versus or what is Whitestone
18 gonna do with this lawsuit against Yuanda? Is it going
19 to continue to pursue the $237,000 against Yuanda?
20      MR. CARBONE: Objection. That's -- that's a
21 decision that's going to be made by the people at the
22 corporation. This is the assistant project manager.
23 He's not going to be able to answer, and I'm not even
24 sure Whitestone has that answer regardless.

Page 153

1
2 BY MR. GILL:
3      Q. Do you have an answer?
4      A. Me?
5      Q. Yes.
6      A. Yeah, I don't know.
7      Q. Okay. I'm going to ask some questions about
8 Whitestone's damages, and when we discussed the rider,
9 you said that you are able to answer questions about the
10 damages; is that correct?
11      A. Yes.
12      Q. You can look at Exhibit 17.
13      A. I'm here.
14      Q. Okay. Does this -- the supporting
15 documentation from WCC5617 through WCC5685, is this all
16 the supporting documentation for Whitestone's damages?
17      A. I believe so.
18      Q. Okay. If you could also turn to Exhibit 19
19 which is very similar to the first four pages of 17.
20      MR. CARBONE: Let me -- let me give that to
21 him, okay, Adam?
22      MR. GILL: Okay. I thought he already had it.
23 Okay.
24      THE WITNESS: Thank you. Okay.

39 (Pages 150 - 153)

Page 154

1 BY MR. GILL:
2    Q.   So if you look at -- compare 17 and 19,
3 that they have the same information, the same line items,
4 the same dollar amounts; correct?
5    A.   Yeah, it appears to be the same.
6    Q.   Okay.  And if you look at Page 2 of 17 and 2
7 of 19, the only difference -- well, the formatting is
8 different, but down to the manpower tracking, Tuesday,
9 September 15th, 2020, the documents are the same except
10 that the chart to the right contains an additional line
11 for supervisor 261 hours, $110 an hour.  Do you see that?
12    A.   Yes.
13    Q.   Okay.  And if you look at Page 3 of 17 and 4
14 of 19, those pages contain the same information, same
15 dollar amounts?
16    MR. CARBONE:  Adam, there's a change -- there
17 is a change that you missed.  I believe it carries over.
18 If you go back to the first page --
19    MR. GILL:  Yeah.
20    MR. CARBONE:  -- and go to the columns let's
21 call them all the way to the right.
22    MR. GILL:  Yeah.
23    MR. CARBONE:  In Defendant's 17 the last
24 column says roofer, roofer hours, notes.  There was a

Page 155

1 column added for WC supervisor.
2    MR. GILL:  Yeah, that's what I said.  I
3 thought I commented that, didn't I?
4    MR. CARBONE:  I thought you were referring to
5 the box.
6    MR. GILL:  No.  No.  No.  No.  To the -- I was
7 referring to the -- oh, I see exactly where you're
8 referring.  Okay.  Yeah.
9    MR. CARBONE:  Okay?
10    MR. GILL:  Yes.
11    MR. CARBONE:  Yeah, I wanted to make sure you
12 got both of them and not just one of them.  There are two
13 changes.
14    MR. GILL:  I understand.
15    MR. CARBONE:  Okay.
16    MR. GILL:  Thank you for that -- bringing that
17 to my attention.
18 BY MR. GILL:
19    Q.   So I'm going to refer mainly to Exhibit 17
20 and then occasionally to Exhibit 19.  Looking at the box
21 on Page 2 of 17 or 2 of 19, I'm not going to talk about
22 the supervisor, but can you explain what that box is?
23    A.   It's manpower summary.
24    Q.   Okay.  What does rate mean?

Page 156

1    A.   The hourly rate in which we pay the employee.
2    Q.   And that includes fringe benefits?
3    A.   I believe so.
4    Q.   What does hours refer to?
5    A.   How many hours they worked.
6    Q.   And the cumulative hours for a carpenter is
7 568?
8    A.   Yes.
9    Q.   And these hours for the carpenter, laborer,
10 iron worker, PCC and roofer are reflected in the time and
11 material reports that are attached to this; is that
12 accurate?
13    A.   Yes.
14    Q.   The time and material reports are at page
15 WCC5661 through WCC5685?
16    A.   Okay.
17    Q.   Do you see in the lower left-hand corner
18 there's a place for a signature of a Whitestone
19 representative?  What was the purpose of a Whitestone
20 representative signing these time and material tickets?
21    A.   The purpose of us signing this piece of paper
22 is to attest that these are the men and the hours they
23 worked and the material used.  It's also cosigned by the
24 construction manager's representative.

Page 157

1    Q.   If you turn to the last page in this exhibit,
2 WCC5685, it is a time and material ticket dated
3 September 28th, 2020?
4    A.   Yes.
5    Q.   Is that the last date that Whitestone
6 performed any remedial work for the WC-3 clerestory?
7    A.   Yes.  It says it in the description "last day
8 of clerestory remediation."
9    Q.   Are there any costs except rental costs that
10 Whitestone would have incurred after that date?
11    MR. CARBONE:  Can you just repeat that, Adam?
12 I'm sorry.  Any costs?  What kind of costs?
13 BY MR. GILL:
14    Q.   Any kind of rental costs that were not paid
15 in advance.  Did Whitestone incur any costs after
16 September 28th, 2020 for the remediation?
17    A.   For equipment rental you're saying?
18    Q.   Any costs at all except for equipment rentals
19 that were paid later.  Did Whitestone incur any costs
20 after that date?
21    A.   Not sure.
22    Q.   When was the last date Whitestone incurred
23 any costs with respect to the remediation of the WT-3
24 clerestory?

40 (Pages 154 - 157)

1    A.    To the best of my knowledge, it would be this
2  26th day.  All the rental termination -- all the rental
3  agreements were terminated.  We had ordered all the
4  material, and there was no more manpower on site.
5    Q.    Okay.  Referring to the supervisor line item
6  in Exhibit 19, why was -- Strike that.
7          Who is that supervisor?
8    A.    Me.
9    Q.    What role did you take in -- during the
10 remediation process?
11   A.    General supervisor role.  I was on site for
12 all late hours.  I was overseeing the work making sure it
13 complied with the construction documents, the new
14 construction documents that Yuanda provided, ordering
15 materials, bringing materials to site, overseeing safety
16 protocols, fielding questions from special inspectors.
17 That's about all I could think of right now.
18   Q.    That chart in the manpower summary on -- in
19 Exhibit 19 says you spent 261 hours for the remediation
20 project?
21   A.    Yeah.
22   Q.    Does Whitestone have any documents to support
23 that claim of 261 hours?
24   A.    I believe so.

1    Q.    Is there a reason those haven't been
2  produced?
3    A.    No, there's no reason.
4    Q.    Okay.  You said this project took 26 days.
5  That's -- the time and material ticket says it's the 26th
6  day; is that correct?
7    A.    Yes.
8    Q.    Twenty-six 8-hour days is 208 hours.  What
9  accounts for the additional 53 hours?
10   A.    I'm not sure.  This is just a tracking
11 spreadsheet that I created.  Everything is formulated and
12 tabulated and put the values in and this is what came
13 out.
14   Q.    Do you have supporting documentation for
15 those hours?
16   A.    For all the hours shown here, like the
17 carpenters and UCCs and that?
18   Q.    For your hours.
19   A.    I -- they're not here.  I -- I guess I didn't
20 provide them.
21   Q.    Looking at Page 1 of Exhibit 17 --
22   A.    Um-hum.
23   Q.    -- for item 2 Whitestone is seeking costs of
24 about $17,000 for Whitestone design time.  Do you see

1  that?
2    A.    Yes.
3    Q.    Does Whitestone employ any structural
4  engineers?
5    A.    No.
6    Q.    Who performed this design work on behalf of
7  Whitestone?
8    A.    I did.
9    Q.    What did you do for 160 hours for this
10 design?
11   A.    CAD drawings.
12   Q.    Didn't the -- Perkins Eastman provide CAD
13 drawings with ASK 266?
14   A.    No.
15   Q.    Didn't Yuanda provide CAD drawings when you
16 requested them to in 2018?
17   A.    Yes.
18   Q.    Why did you produce CAD drawings?
19   A.    As I said before, it was a working session
20 between Yuanda and myself.  We would go back and forth
21 with different design concepts, and we eventually came up
22 with the final remediation, and it's probably a
23 conservative estimate of my time.
24   Q.    Do you have any documents to support the

1  hours that you're claiming here?
2    A.    I don't have them here.
3    Q.    Okay.  Is there a reason you didn't ask
4  Yuanda to do that design work all on its own?
5    A.    No.  I just wanted to help the situation and
6  decided to do it with them.
7    Q.    That design work or your collaboration with
8  Yuanda, that -- you wouldn't consider that overhead,
9  would you?
10   A.    I'm not sure.
11   Q.    What is overhead?
12   A.    Overhead is like operating costs, electrical
13 bill, office employees' salary, paper for the copy
14 machine, stuff like that.
15   Q.    Support staff?
16   A.    Yeah.
17   Q.    Are estimators overhead?
18   A.    I'm not sure.
19   Q.    If you look at the third page of Exhibit
20 17 -- let me back up.  Let me withdraw that question, ask
21 another question.
22          You said you created the manpower tracking
23 that is in Page 2 of 17 and 2 and 3 of 19; is that
24 accurate?

41 (Pages 158 - 161)

1    A.   Yes.

2    Q.   Okay.  Who created Page 1 of 17?

3    A.   I did.

4    Q.   Okay.  Who created Page 3 of 17?

5    A.   I did.

6    Q.   Okay.  On Page 3 of Exhibit 17, are these

7  costs that Whitestone incurred for equipment, material

8  and services for remediation?

9    A.   Yes.

10    Q.   If you look at the line item 1, what is

11  DSENY?

12    A.   They're an engineering firm.

13    Q.   What kind of engineering firm?

14    A.   Structural engineer.

15    Q.   What did they provide to Whitestone with

16  respect to the remediation?

17    A.   Engineering of a site safety plan.

18    Q.   Scaffolding too; right?

19    A.   Yes.

20       MR. CARBONE:  Scaffolding, that's how I

21  understood it.  So could you clarify so the record is

22  clear, please.

23       MR. GILL:  Yes.

24       MR. CARBONE:  Thank you.

1  BY MR. GILL:

2    Q.   DSENY provided engineering services for a

3  site safety program for the remediation; is that

4  accurate?

5    A.   Yes.

6    Q.   And they provided engineering services for

7  scaffolding; is that correct, or a working platform I

8  think you said?

9    A.   Yeah, a work platform, yes.

10    Q.   Okay.  Under the terms of the purchase order

11  was Yuanda required to provide engineering services for a

12  working platform?

13    A.   I don't think so.

14    Q.   Under the terms of the purchase order was

15  Yuanda responsible for providing any site safety program?

16       MR. CARBONE:  I'm going to object.

17  You have to ask him -- the basis of my objection is time.

18  When?

19  BY MR. GILL:

20    Q.   Under the terms of the purchase order was

21  Yuanda at any time responsible for providing a site

22  safety program?

23       MR. CARBONE:  Objection.

24

1  BY THE WITNESS:

2    A.   I'm not entirely sure how to answer that

3  question but I'll try.  I think the fact that Sciame

4  rejected our -- rejected the work, therefore, Whitestone

5  rejecting Yuanda's work, required them to provide this by

6  our direction.

7  BY MR. GILL:

8    Q.   Okay.  What is the basis for you believing

9  that they were required to provide this under your

10  direction?

11    A.   Due to the terms of the purchase order

12  agreement which -- yeah.

13    Q.   You believe that the purchase order agreement

14  required that Yuanda provide the cost for a site safety

15  protocol during remediation?

16       MR. CARBONE:  That's already asked and

17  answered.  He's answered that.

18       MR. GILL:  I just want to make sure I

19  understand that that's what his answer is.

20       MR. CARBONE:  He's answered that question.

21  That was his answer.

22  BY MR. GILL:

23    Q.   Please answer.

24    A.   Would you mind just saying it one more time

1  so --

2    Q.   It is your understanding I believe that under

3  the terms of the purchase order agreement Yuanda was

4  required to provide -- required to provide for the cost

5  for a site safety program during remediation?

6    A.   One second.  Yes, I do because -- since the

7  work was rejected by Sciame and Whitestone, therefore,

8  passed on the rejection to Yuanda, in some way it

9  modifies this PO because it's determined as defective

10  work, so yes, they would have to do it because it's all

11  encompassing under the defective work.  That's my -- my

12  answer.

13    Q.   Your prior answer you said that Sciame

14  rejected the work and then you went on and said

15  Whitestone rejected the work, but to be clear, Whitestone

16  never rejected Yuanda's work; right?

17       MR. CARBONE:  Objection.

18  BY THE WITNESS:

19    A.   The word rejected was not in -- if you're

20  referring to that letter, the word rejection was never

21  said, but because the owner rejected it, we were using

22  our PO -- the agreement in our PO; thus, rejecting their

23  work, if that makes sense.

24

42 (Pages 162 - 165)

Page 166

1  BY MR. GILL:
2      Q.   I understand what you're saying.  I just want
3  to clarify it because your earlier -- what you just said
4  contradicts your earlier testimony, and I just want to
5  make sure that I understand Whitestone's position.
6  Whitestone never rejected Yuanda's work.  They were just
7  passing through Sciame's rejection; is that correct?
8          MR. CARBONE:  Objection.  Document speaks for
9  itself, but he can answer that question.
10 BY THE WITNESS:
11     A.   And would you mind saying that one more time,
12 sir, please.
13 BY MR. GILL:
14     Q.   I'm not asking about the document.  I'm
15 asking about Whitestone's actions during -- regarding the
16 rejection.  It's my understanding based on your testimony
17 throughout today that Whitestone itself did not reject
18 Yuanda's work but Whitestone was passing through to
19 Yuanda Sciame's rejection of that work?
20     A.   Yeah, I just want it to be clear that the
21 letter did not say that Whitestone rejected the work, but
22 because the owner rejected the work, we directed them to
23 remediate the work, which I think overall is us rejecting
24 the work.

Page 167

1      Q.   Did you ever -- did Whitestone ever inform
2  Yuanda that Whitestone was rejecting the work rather than
3  just operating as a pass-through?
4          MR. CARBONE:  I'm going to object to the form
5  because you're -- I'm just -- I'm objecting.  He could
6  answer the question, but there's a letter.
7          MR. GILL:  I understand.
8  BY MR. GILL:
9      Q.   I'm asking at any time, at any time in the
10 last four years did Whitestone inform Yuanda that
11 Whitestone itself was rejecting Yuanda's work.
12         MR. CARBONE:  And the witness just answered
13 that question and it referred to Grzic's June letter that
14 was previously marked, so he's already asked -- answered
15 your question.  You're asking again and again.
16         MR. GILL:  He's answering -- let me address
17 your attorney before answering.  He keeps -- you're
18 right.  He keeps referring to the letter.  I'm not
19 referring to that letter.  I want to know if, at any time,
20 including the letter, outside the letter, at any time in
21 the last four years whether Whitestone informed Yuanda
22 that Whitestone rejected Yuanda's work.
23         MR. CARBONE:  And he -- you've asked him that
24 twice, and he's answered it twice, and he's referring to

Page 168

1  the letter.
2          MR. GILL:  Okay.
3  BY MR. GILL:
4      Q.   Do you know of any other time other than that
5  letter when Whitestone rejected Yuanda's work?
6      A.   I'm not aware of any other time.
7      Q.   Under the terms -- Strike that.
8          Under the definition of vendor's work as
9  defined in the purchase order was Yuanda required to
10 provide insulation to the project?
11         MR. CARBONE:  Can we refer to the -- could he
12 look at the purchase order?
13         MR. GILL:  Sure.  I absolutely -- yes, please
14 do look at the purchase order.
15         MR. CARBONE:  That's --
16         MR. GILL:  Which is Exhibit 4.
17         MR. CARBONE:  Exhibit 4.
18         MR. GILL:  Yeah.  The definition of vendor
19 work we looked at before.  It's on Page 1.
20 BY THE WITNESS:
21     A.   Can you add context to the question?
22 BY MR. GILL:
23     Q.   What do you need clarified or put in context?
24     A.   I think insulation.  Yuanda installed

Page 169

1  insulation in their curtainwall before they installed.
2  Are you referring to insulation from the work platform?
3  Is that what you're after?
4      Q.   Is that what this insulation is for?
5      A.   Yes, sir.
6      Q.   Okay.  They were required to provide
7  insulation for a work platform under the definition of
8  vendor's work?
9      A.   Well, I think I -- I think it goes back to
10 what I was saying before because the owner rejected the
11 work.  Therefore, Whitestone rejected the work.  Yuanda's
12 compelled to do this work.  In order to perform this
13 work, there needs to be roof protection which insulation
14 was used for.  That's my best attempt at answering the
15 question.
16     Q.   So it's -- and, again, I'm just trying to
17 understand.  It's your testimony that the rejection
18 changed the type of work that Yuanda was required to
19 provide under the purchase order?
20         MR. CARBONE:  Objection.
21 BY THE WITNESS:
22     A.   Is there a different way of asking that?
23 Because I don't really quite understand.
24

43 (Pages 166 - 169)

Page 170

1 BY MR. GILL:
2     Q.   Okay.  I will try and ask a different way.
3 My understanding from your testimony that it's
4 Whitestone's position that the rejection by Sciame of the
5 installed clerestory in some way altered the work that
6 Yuanda was required to provide to Whitestone?
7         MR. CARBONE:  Objection.  The purchase order
8 has the scope.
9         MR. GILL:  Yes.
10        MR. CARBONE:  And with respect to timing,
11 there -- there's -- the purchase order's the purchase
12 order.  My objection is the purchase order is the
13 purchase order.  Whatever the purchase order says they
14 had to provide.
15        MR. GILL:  Yes.
16        MR. CARBONE:  Right.  There was some original
17 work and then there was remedial work --
18        MR. GILL:  Okay.
19        MR. CARBONE:  -- so that didn't change.
20 That's the -- that's the basis of my objection.
21        MR. GILL:  Okay.
22 BY MR. GILL:
23     Q.   Can you answer the question, please.
24     A.   He did a better job of explaining it than I

Page 171

1 could.  Forgive me if I'm saying the same thing over and
2 over again, but I feel that because the owner declared it
3 defective, therefore, Whitestone declared it defective.
4 Compelled them to do everything in their power at a cost
5 to them to complete the remedial work.  That's -- that's
6 the best way I can answer.
7     Q.   Okay.  Where in the purchase order agreement
8 does it say that Yuanda has to provide tools or
9 scaffolding or engineering services when it is required
10 to do remedial work?
11    A.   You said where does it say that?
12    Q.   Yes.
13    A.   I'm not sure, but where doesn't it say that?
14 I don't want to ask a question with a question, but, you
15 know, it's -- I don't know.
16    Q.   Whitestone is the one who is making the
17 contention that Yuanda is responsible for all of these
18 costs, and I want to know where in the purchase order it
19 says that Yuanda is responsible for these costs.
20    A.   It might say inspections in defective work.
21 I don't know.
22    Q.   Okay.  Looking at --
23    A.   It could also be in a different place as
24 well.  I don't really know.

Page 172

1         MR. CARBONE:  James, why don't you read that
2 section Inspection of Defective Work and try to respond
3 to attorney's answer, please.  Is that okay with you,
4 Adam?
5         MR. GILL:  Sure.  Like I said before, I want
6 the best answer that Yuanda or that Whitestone can give,
7 Mr. Dearth can give.
8         MR. CARBONE:  Okay.  James, read Defendant's
9 Exhibit 4, Page 01105 where it talks about inspection of
10 defective work because I think that's what Mr. Gill is
11 honing in on.
12        THE WITNESS:  Okay.
13             (Witness peruses document.)
14        I'm just going to need another minute,
15 please.
16        MR. GILL:  Take your time.
17             (Witness peruses document.)
18 BY THE WITNESS:
19    A.   I think this might be it.  "Upon approval of
20 the vendor's plan by the subcontractor, vendor shall
21 promptly replace or correct any of the vendor's work.  If
22 the vendor does not -- does not do so within a reasonable
23 time, subcontractor shall have the right to do so and the
24 vendor shall be liable to the subcontractor for the costs

Page 173

1 thereof."  Unless I'm not interpreting that correctly, I
2 think that's pretty close to what I'm saying.
3 BY MR. GILL:
4     Q.   That is what your attorney said, and what you
5 read is exactly what I was pointing to or thinking about.
6 I didn't know if there was another section of this that
7 refers to what is Yuanda's obligation.  You see in what
8 you just read Vendor's Work is capitalized; yes?
9         MR. CARBONE:  We'll stipulate to that.  It's
10 capitalized.
11 BY THE WITNESS:
12    A.   Okay.
13        MR. GILL:  I just want him to see that it's
14 capitalized because then I'm going to ask other
15 questions.
16 BY MR. GILL:
17    Q.   Do you see on the first page Vendor's Work is
18 defined and capitalized?
19    A.   Okay.
20    Q.   And Vendor's Work on the first page as
21 defined does not include engineering services for a work
22 platform, does it?
23    A.   Not specifically.
24        MR. CARBONE:  What are you referring to, if

44 (Pages 170 - 173)

Page 174

1 you would, Adam?
2      MR. GILL:  The first page of the exhibit.
3 It's the large paragraph in the middle.  It starts with:
4 "Yuanda USA Corporation," and goes on for about
5 two-thirds of that and then there's a ("Vendor's Work").
6 And I'm asking whether the preceding ten lines include or
7 require that Yuanda provide engineering services for a
8 work platform.
9      MR. CARBONE:  Engineering services for what?
10      MR. GILL:  For a work platform.
11      MR. CARBONE:  I'm going to object.
12 BY MR. GILL:
13   Q.  Mr. Dearth, can you answer?
14   A.  Well, in my opinion, I don't see any specific
15 language here.  But like I said before at the beginning,
16 you asked me about this document, and I didn't feel
17 comfortable interpreting it because I didn't know what
18 the rest of it says.  I could for this very reason.
19 (Witness mumbles).  Vendor shall be liable to the
20 subcontractor for the costs thereof.
21      THE REPORTER:  Excuse me.  Excuse me.  He
22 keeps breaking up.  I don't know.  Are you having trouble
23 hearing him too?
24 BY MR. GILL:

Page 175

1   Q.  I can't hear you.  Where are you reading
2 from?
3   A.  Inspection and defective work.  You want me
4 to start over?
5      MR. CARBONE:  Sure.
6      THE REPORTER:  I couldn't understand you at
7 all.  You kept breaking up.
8      THE WITNESS:  Sorry.
9 BY THE WITNESS:
10   A.  All right.  Pretty much -- you asked me about
11 Exhibit 4 in the beginning of this section, and I had
12 mentioned that, you know, I didn't feel comfortable
13 interpreting this --
14      THE REPORTER:  Now I can't hear.  Your voice
15 is dropping off completely.  There's no sound.  I don't
16 know if you're pulling it too far.
17      THE WITNESS:  Can you hear me now?
18      THE REPORTER:  Little better.
19      MR. GILL:  Yeah.
20 BY THE WITNESS:
21   A.  Okay.  All right.  So you asked me about
22 Exhibit 4 in the beginning of this section, and I told
23 you that I didn't feel comfortable interpreting this not
24 only because I don't know the language used but also I

Page 176

1 haven't really seen this document and I haven't reviewed
2 it in depth.  However, I did mention that I didn't know
3 if anything in the back of this document supersedes any
4 of the language in the front of it, and I think that's
5 relevant to the question that you're asking now because
6 when I read from 107 -- oh, I'm sorry.  I lost my track.
7 Hold on one second.  If I read from 105, Inspection of
8 Defective Work, "vendor shall be liable to the
9 subcontractor for the costs thereof," and I think that
10 includes all costs required to complete the remedial work
11 including protection of adjacent finishes and whatever's
12 needed to complete that work.  That's my interpretation
13 of it.
14 BY MR. GILL:
15   Q.  Okay.
16   A.  That's my best attempt at answering the
17 question.
18   Q.  And honestly that's all I want, and I said
19 that before, and I'm being honest when I say that.
20   A.  Okay.
21   Q.  It helps your attorney.  It helps me to know
22 what is Yuanda's position or Whitestone's position.
23   A.  Yeah, I think that's -- that's it.
24   Q.  Okay.  If you can again -- Exhibit 17.

Page 177

1      MR. CARBONE:  Can we take a five-minute break,
2 please.
3      MR. GILL:  Five, yeah.
4      MR. CARBONE:  Thank you.
5      THE VIDEOGRAPHER:  Off the record, 15:30.
6           (WHEREUPON, a break was
7           taken.)
8      Back on the record, 15:35.
9 BY MR. GILL:
10   Q.  Okay.  If you can look at in Exhibit 17 5633,
11 sorry, 5634.  What is this document?
12   A.  This is a Whitestone purchase --
13      THE REPORTER:  I'm sorry.
14      MR. GILL:  Sorry.
15      THE REPORTER:  I'm sorry.  Your sound again.
16 This is a?
17 BY THE WITNESS:
18   A.  Whitestone purchase order.
19 BY MR. GILL:
20   Q.  Issued to who?
21   A.  Issued to AJBBC Corporation.
22      THE VIDEOGRAPHER:  The echoing is really bad.
23      MR. GILL:  Yeah.
24      THE WITNESS:  Is it better now?

45 (Pages 174 - 177)

Page 178

1          MR. GILL:  Yeah.
2   BY MR. GILL:
3      Q.   Okay.  So you said AJBBC Corporation; right?
4      A.   Yes.
5      Q.   Okay.  And it says it's for steel brackets?
6      A.   Yes.
7      Q.   Are these steel brackets for the newly
8   designed connection between the head of the WT-3
9   clerestory and the building structure?
10     A.   Yes.
11     Q.   And this was a purchase order issued by --
12  well, your name is on the bottom right.  Did you issue
13  this or did someone else?
14     A.   Someone else in the company created it, but
15  I'm the one who told them to create it.
16     Q.   Okay.  Was this actually sent to AJBBC?
17     A.   Yes.
18     Q.   You can turn back one page to 5633.  What is
19  this document?
20     A.   This is Portland Steel.  AJBBC Corp. and
21  Portland Steel are one in the -- it's the same company.
22  Different name but same guy.
23     Q.   Thank you.  That explains a bunch of my next
24  questions about what the difference is.

Page 179

1          So was there any purchase order or anything
2   between the purchase order 5634 and the invoice 5633?
3      A.   What did you say?  Is there a difference
4   between them?
5      Q.   Was there -- no.  No.  Was there ever
6   communication between you or was there a subsequent
7   purchase order or was there anything else sent to either
8   Portland Steel or AJB for these connections?
9      A.   Yes.
10     Q.   What was -- what happened between the two
11  documents between Whitestone and Portland Steel or AJB?
12     A.   Can you explain the meaning?
13     Q.   Well, I said there anything that occurred
14  or a subsequent purchase order, and you said yes, there
15  was.  So was there a different purchase order or is this
16  one that's 5634 the only, one and only for these
17  brackets?
18     A.   I'm pretty sure that this is the one and
19  only, and then this was the final invoice date.
20     Q.   Got it.  Can you describe the process of
21  ordering these brackets from either AJB or Portland
22  Steel?
23     A.   I sent them the fabrication drawings and they
24  made them.

Page 180

1      Q.   The purchase order is dated February 20th,
2   2018.  Do you see that?
3      A.   Yes.
4      Q.   And that's when you ordered the brackets?
5      A.   Yes.
6      Q.   Why didn't you ask Yuanda to make the
7   brackets in 2018?
8      A.   I think I might have.
9      Q.   Did they say no?
10     A.   No.  They gave me a -- I think they gave me a
11  proposal to do it and ship it in the air or ocean.
12     Q.   So why did Whitestone or you issue this
13  purchase order in February 2018?
14     A.   From what I recall, I think it's because of
15  how long it would take for the material to ship from
16  Yuanda to the job.
17     Q.   And when Yuanda gave you its proposal, was it
18  going to -- was Yuanda going to provide the brackets at
19  its cost?
20     A.   Maybe.  I can't recall whether it's yes or no
21  but maybe.
22     Q.   Early on -- earlier on today I asked about
23  warranty work, and I think I asked about it a couple of
24  times, and you were -- you said, I believe you said this

Page 181

1   was not warranty work because the design criteria
2   changed; is that accurate?
3          MR. CARBONE:  I'm going to object.  I don't
4   think that's his testimony.
5   BY THE WITNESS:
6      A.   I -- I don't recall.
7   BY MR. GILL:
8      Q.   Okay.  Was this installation of the brackets
9   considered -- did Whitestone consider the installation of
10  the new brackets warranty work?
11     A.   I'm not sure.
12     Q.   Do you know if Sciame considered it warranty
13  work?
14     A.   I believe they considered it defective work.
15     Q.   And that it would be -- since it was
16  defective work, Whitestone had to replace it at
17  Whitestone's cost or the cost of its -- Whitestone's
18  subcontractor?
19     A.   I believe so, yes.
20     Q.   If you turn to the first page of Exhibit 17,
21  Whitestone is making the demand that Yuanda pay
22  Whitestone $33,563.12 for overhead and profit.  Why does
23  Whitestone get to receive a profit for this alleged
24  defective work?

46 (Pages 178 - 181)

Page 182

1      A.   I believe the overhead is certainly something
2 that would be a cost, but I'm unsure about the profit.
3 This is our company policy.
4      Q.   You're sure that -- Sorry.  I stepped on your
5 answer.
6           You're sure that the overhead is compensable.
7 Why are you sure of that?
8           MR. CARBONE:  I didn't hear you.
9           MR. GILL:  I believe the prior answer was that
10 he was sure that the overhead would be compensable, and I
11 just want to know why he is sure that the overhead would
12 be something that Whitestone can receive as a damage from
13 Yuanda.
14 BY THE WITNESS:
15      A.   Well, I mean someone had to pay for the
16 lights to be on.  Someone had to pay for the auto CAD
17 licenses.
18           MR. CARBONE:  You have to speak up.
19           THE WITNESS:  Can you guys hear me?
20           MR. GILL:  Yeah.  Yeah, I can hear you.
21 BY THE WITNESS:
22      A.   You know, someone had to pay to keep the
23 lights on.  Someone had to pay the cleaning person to
24 clean the office.  Someone had to pay the internet fees.

Page 183

1 You know, that's all part of overhead and profit -- I
2 mean overhead.
3 BY MR. GILL:
4      Q.   I understand, but why is Yuanda liable to
5 Whitestone for those overhead charges for -- to correct
6 defective work?
7      A.   I've gotta think about it for a second.
8           (Brief pause.)
9           My best answer would be I believe we're
10 entitled to overhead because all of the time that we
11 could have spent -- all the overhead funds, if you will,
12 that could have been allocated to another project or a
13 different scope was allocated to this issue which was not
14 a Whitestone issue.
15      Q.   It wasn't a Yuanda issue either though;
16 right?
17           MR. CARBONE:  Objection.  That's the issue in
18 the lawsuit.
19           MR. GILL:  I didn't hear the objection.
20 Sorry.
21           MR. CARBONE:  I'm sorry.  I'm trying to keep
22 the reverberation low.  That's the issue in the
23           I said objection.  That's the issue in the
24 lawsuit.  What your statement wasn't a question.  It

Page 184

1 was a legal conclusion.  I'm objecting to the legal
2 conclusion.
3           MR. GILL:  And I appreciate that.  I am asking
4 why Yuanda is liable to Whitestone for Whitestone's
5 overhead if Yuanda was not responsible for the design
6 change.
7           MR. CARBONE:  And he -- he answered that.
8           MR. GILL:  No, he didn't.
9           MR. CARBONE:  I'm not -- I have an objection.
10 I'm not stopping him from answering though.  He can
11 answer it.
12           MR. GILL:  Please answer it.
13           MR. CARBONE:  It's asked and answered.
14 BY THE WITNESS:
15      A.   Okay.  Could you just repeat it one more
16 time?  I'll give my best to answer.
17 BY MR. GILL:
18      Q.   As you previously testified, the design
19 change was not the result of anything Yuanda did, and
20 Sciame rejected Whitestone and Yuanda's work because of
21 this design change.  Why does Yuanda owe Whitestone
22 $33,000 for overhead?
23           MR. CARBONE:  Same objection.
24 BY THE WITNESS:

Page 185

1      A.   The reason is we allocated our manpower and
2 our resources to this issue.  That's why we're entitled
3 to it.
4 BY MR. GILL:
5      Q.   Why are you entitled to it from Yuanda?
6      A.   Because --
7           MR. CARBONE:  Objection.  Go ahead.
8 BY THE WITNESS:
9      A.   Because the owner rejected the work.
10 Therefore, we had to reject the work.  Yuanda's the one
11 who bears the cost for this.  That's why we're entitled
12 to it.  That's my best attempt at answering the question.
13 BY MR. GILL:
14      Q.   Okay.  The next line item is insurance charge
15 at 18 percent.  Did Whitestone purchase a rider or policy
16 that was specific to the remediation work?
17      A.   I don't know.
18      Q.   Is that 18 percent a standard Whitestone
19 general condition cost it includes on all projects?
20      A.   I'm not aware.
21      Q.   How did you determine --
22      A.   I don't know.
23      Q.   -- that Yuanda owes Whitestone 18 percent of
24 all of the above costs for insurance?

47 (Pages 182 - 185)

Page 186

1    A.   I was told to put that number on.
2    Q.   Told by whom?
3    A.   I'm not entirely sure who, but I was told to
4  put an insurance cost of 18 percent.
5    Q.   Was a reason given to you when you were told
6  to put the 18 percent down?
7    A.   Just to account for insurance.
8    Q.   Is that 18 percent related in any way to an
9  actual cost incurred for the remediation project?
10    A.   I don't know.  I don't really know too much
11  about insurance to be honest with you.  All I know is I
12  was told to put 18 percent, and that's what I did.
13    Q.   I want to do one follow-up question actually.
14  Your -- the design work was 8 hours, 20 days for 160
15  hours, and then on the new -- Exhibit 19 it was I
16  believe -- your time was 261 hours; is that correct?
17    A.   For supervisor it's 261, and for the design
18  it's 20 days at 8 hours per day.
19    Q.   Okay.  And it's your testimony you spent 421
20  hours working exclusively on the remediation?
21    A.   Yes, if not more.
22    Q.   If you can look at Exhibit 18.
23    A.   Okay.
24    Q.   Have you ever seen this document before?

Page 187

1    A.   I may have seen it yesterday or not last
2  Friday but the Friday before but --
3        THE REPORTER:  I'm -- I'm sorry.  Can you
4  repeat?  The reverb is getting bad again.
5        MR. GILL:  Yeah.
6        THE REPORTER:  Can you repeat?
7  BY MR. GILL:
8    Q.   What I heard you say you may have seen it
9  last Friday or the Friday before but and then you kind of
10  cut out.
11    A.   So I might have seen it yesterday or the
12  Friday before last, but the documents kind of all look
13  the same to me, these legal documents to be honest.
14    Q.   Are you able to testify today as a
15  representative of Whitestone regarding all of the facts
16  that are alleged in this Exhibit 18?
17        MR. CARBONE:  Could you just repeat that?  I'm
18  sorry.  You have to lean forward.
19        THE VIDEOGRAPHER:  Hey, you're on mute.
20        MR. GILL:  No.  No.  I heard well enough.  You
21  want me to repeat the question; right?
22        MR. CARBONE:  Yes.  Yes.
23
24  BY MR. GILL:

Page 188

1    Q.   Okay.  Are you able to testify as the
2  representative of Whitestone regarding all of the facts
3  stated in this Exhibit 18?
4    A.   Can I look at something over here for a
5  second?
6    Q.   Yeah.  Is it something that I -- before
7  looking, is it something that I have shown you today?
8    A.   Well, we went through a list of all the items
9  that I said I could and could not --
10    Q.   This wasn't on that list.  This was not on
11  that list.  But this is -- this document -- I'll tell
12  you, and your attorney will correct me if I'm wrong.
13  This is document Whitestone submitted to the Court of
14  Whitestone's statement of undisputed material facts, so
15  this comes from -- purportedly comes from Whitestone, and
16  I want to know if you are able, if you are a person who
17  is able to testify about the facts that are contained in
18  here.
19    A.   I think I would need to review the whole
20  thing before honestly saying yes because I haven't really
21  seen this before.
22    Q.   Okay.  That's fine.
23        MR. CARBONE:  Want him to read the document?
24        MR. GILL:  No.

Page 189

1        THE WITNESS:  Good.
2        MR. GILL:  That's all I have of Mr. Dearth.
3        I do reserve the remainder of my time for
4  and if Whitestone designates anyone else as the corporate
5  representative.  So I'm done.
6        Do you have anything?
7        MR. CARBONE:  I have no questions.
8        MR. GILL:  Okay.  Reserve signature or waive?
9        MR. CARBONE:  I'm sorry?
10        MR. GILL:  Signature on the transcript.  Do
11  you not do that in -- give the deponent an opportunity to
12  review and make corrections?
13        MR. CARBONE:  Well, yeah, of course we want
14  that opportunity.
15        MR. GILL:  Okay.
16        MR. CARBONE:  Okay.
17        THE VIDEOGRAPHER:  This ends today's
18  deposition.  We're going off the record, 15:53.
19
20
21
22
23
24

48 (Pages 186 - 189)

Page 190

1         SIGNATURE:
2   It was agreed by and between counsel and the parties that
3   the Deponent will read and sign the transcript of said
4   deposition.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 191

1  STATE OF ILLINOIS)
               ) SS:
2  COUNTY OF C O O K)
3
           I, KELLY A. BRICHETTO, a Certified Shorthand
4
   Reporter of said state, do hereby certify
5
   that the within named witness, JAMES DEARTH, was by me
6
   first duly sworn to testify the truth, the whole truth
7
   and nothing but the truth in the cause aforesaid; that
8
   the testimony then given by the above-referenced witness
9
   was by me reduced to stenotype in the presence of said
10
   witness; afterwards transcribed, and that the foregoing
11
   is a true and correct transcription of the testimony so
12
   given by the above-referenced witness.
13
           I do further certify that this deposition was
14
   taken at the time and place in the foregoing caption
15
   specified and was completed without adjournment.
16
           I do further certify that I am not a relative,
17
   counsel or attorney for either party or otherwise
18
   interested in the event of this action.
19
20
21
22
23
24

Page 192

1         IN WITNESS WHEREOF, I do hereunto set my hand
2   this 3rd day of February, 2021.
3
4
5
6                    *Kelly Brichetto*
7               KELLY A. BRICHETTO
8               CSR License No. 84-3252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 193

1                Veritext Legal Solutions
                    1100 Superior Ave
2                      Suite 1820
                   Cleveland, Ohio 44114
3                 Phone: 216-523-1313
4
   February 4, 2021
5
   To: Mr. Carbone
6
   Case Name: Whitestone Construction, Corp.  v. Yuanda Usa Corporation
7
   Veritext Reference Number: 4420612
8
   Witness: James Dearth        Deposition Date:  1/20/2021
9
10  Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24  NO NOTARY REQUIRED IN CA

49 (Pages 190 - 193)

Page 194

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4420612
3      CASE NAME: Whitestone Construction, Corp.  v. Yuanda Usa
       Corporation
       DATE OF DEPOSITION: 1/20/2021
4      WITNESS' NAME: James Dearth
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7      I have made no changes to the testimony
       as transcribed by the court reporter.
8      _____
9   Date        James Dearth
10     Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
              Statement; and
14     Their execution of this Statement is of
              their free act and deed.
15
       I have affixed my name and official seal
16
       this _____ day of_____, 20____.
17     _____
18          Notary Public
19     _____
20          Commission Expiration Date
21
22
23
24
25

Page 195

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4420612
3      CASE NAME: Whitestone Construction, Corp.  v. Yuanda Usa
       Corporation
       DATE OF DEPOSITION: 1/20/2021
4      WITNESS' NAME: James Dearth
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7      I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8      well as the reason(s) for the change(s).
9      I request that these changes be entered
       as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.
13     _____
    Date        James Dearth
14
       Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18         in the appended Errata Sheet;
       They signed the foregoing Sworn
19            Statement; and
       Their execution of this Statement is of
20            their free act and deed.
21     I have affixed my name and official seal
22     this _____ day of_____, 20____.
23     _____
            Notary Public
24     _____
25          Commission Expiration Date

Page 196

1         ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2         ASSIGNMENT NO: 4420612
3   PAGE/LINE(S) /        CHANGE         /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____   _____
20  Date          James Dearth
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date

50 (Pages 194 - 196)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.