Exhibit 28

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
 3    WHITESTONE CONSTRUCTION, CORP.,)
                                     )
 4            Plaintiff,             )
                                     )
 5        vs.                        )  No. 20-cv-1006
                                     )
 6    YUANDA USA CORPORATION,        )
                                     )
 7            Defendant.             )
 8
 9
              The videotaped videoconference deposition of
10
      STEVEN GRZIC, called for examination, taken pursuant to
11
      the Federal Rules of Civil Procedure of the United States
12
      District Courts pertaining to the taking of depositions,
13
      taken before KELLY A. BRICHETTO, CSR No. 84-3252,
14
      Certified Shorthand Reporter of the State of Illinois, on
15
      the 27th day of January, 2021, at 9:09 a.m.
16
17
18
19
      REPORTED REMOTELY FROM CHICAGO, ILLINOIS
20
21
22
23
24
```

Page 2

```
 1  REMOTE APPEARANCES:
 2
        On behalf of the Plaintiffs:
 3
        GOETZ FITZPATRICK, LLP, by
 4      MR. DONALD J. CARBONE
        1 Pennsylvania Plaza
 5      Suite 3100
        New York, New York  10119
 6      (212) 695-8100
        dcarbone@goetzfitz.com
 7
 8      On behalf of the Defendant:
 9      FOX SWIBEL LEVIN & CARROLL, LLP, by
        MR. ADAM GILL
10      222 West Madison Street
        Chicago, Illinois  60606
11      (312) 224-1200
        agill@foxswibel.com
12
13      - - - - - - -
14
15  ALSO PRESENT:
16  MR. JUSTIN BOND, Legal Videographer
17
18
19
20
21
22
23
24
```

Page 4

```
 1           INDEX OF EXHIBITS
 2  NUMBER        DESCRIPTION        IDENTIFIED
 3  Exhibit No. 2    Complaint          143
    Exhibit No. 4    Whitestone PO 13-0139-002   36
 4  Exhibit No. 5    AIA form contract, A401
                     and Rider A          20
 5  Exhibit No. 6    RFI                75
    Exhibit No. 7    Whitestone Proposed
 6                   Change Order Number 98   94
    Exhibit No. 8    E-mail             95
 7  Exhibit No. 10   Description of dispute
                     dated May 6, 2019    97
 8  Exhibit No. 12   Letter Whitestone to
                     Yuanda June 24th, 2019   99
 9  Exhibit No. 17   Summary of Whitestone's
                     costs              149
10  Exhibit No. 19   Updated Summary of
                     Whitestone's costs   149
11  Exhibit No. 20   Plaintiff's Initial
                     Disclosure Pursuant to
12                   Rule 26              8
    Exhibit No. 21   Checklist and Exhibit A
13                   to Rider B           20
    Exhibit No. 22   Spec Section 084413
14                   Glazed Aluminum Curtainwall  63
    Exhibit No. 23   Spec Section 084426
15                   Glass Curtainwalls   63
    Exhibit No. 24   Section 088000 Glazing   63
16  Exhibit No. 25   Original submission returned
                     by the architect dated
17                   October 15th, 2014   81
    Exhibit No. 26   Architect's review and
18                   return of the revised
                     drawings dated
19                   February 23rd, 2015   81
    Exhibit No. 27   Declaration        115
20
21
22
23
24
```

Page 3

```
 1            TRANSCRIPT INDEX

 2  APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2

 3

 4  INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . 4

 5

 6  EXAMINATION OF STEVEN GRZIC

 7  BY MR. GILL . . . . . . . . . . . . . . . . . . . 6

 8

 9

10

11  REPORTER'S CERTIFICATE . . . . . . . . . . . . . 170

12

13  EXHIBIT CUSTODY

14  COURT REPORTER

15

16

17

18

19

20

21

22

23

24
```

Page 5

```
 1        THE VIDEOGRAPHER:  Good morning.  Today is
 2  January 27th, 2021.  The time is 9:09 a.m., and we are on
 3  the record.
 4        Today we'll take a videotaped deposition
 5  in case Number 20-cv 1006.  This deposition is being held
 6  remotely.
 7        Counsel, please state your appearance and
 8  affiliation for the record.
 9        MR. GILL:  Adam Gill, G-I-L-L, with Fox Swibel
10  in Chicago representing Defendant, Yuanda USA
11  Corporation.
12        MR. CARBONE:  Donald J. Carbone for Goetz
13  Fitzpatrick, LLP for the Plaintiff.
14        THE VIDEOGRAPHER:  Thank you.
15        Would you please swear the witness.
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

1              (Witness sworn.)
2  WHEREUPON:
3              STEVEN GRZIC,
4  called as a witness herein, having been first duly sworn,
5  was examined and testified as follows:
6              DIRECT EXAMINATION
7  BY MR. GILL:
8      Q.   Can you state your name and spell your last
9  name for the record, please.
10     A.   My name is Steven Grzic, G-R-Z-I-C.
11         MR. GILL:  Okay.  For the record, this is the
12  discovery deposition of Steve Grzic taken pursuant to
13  notice and agreement of the parties, the Federal Rules of
14  Civil Procedure and all local rules.
15  BY MR. GILL:
16     Q.    Mr. Grzic, have you ever given a deposition
17  before?
18     A.   Yes, I have.
19     Q.   How many times?
20     A.   Five, six times.
21     Q.   Okay.  When was the last time you gave one?
22     A.   Probably two, three years ago.
23     Q.   Okay.
24     A.   Best guess.

Page 7

1      Q.   I'm going to go over the basics just so we're
2  on the same page and you understand my expectations and I
3  understand so that we have the same ground rules.
4          Obviously there's a court reporter here
5  taking down everything you and I say, and even in the
6  best of times, it's difficult to take down the questions
7  and answers properly, but with a remote deposition, it's
8  even more of a problem, so I ask that all of your answers
9  or responses be verbal.  Nods of the head obviously don't
10  translate well but -- so the same thing for um-hum,
11  na-huh, kind of nonverbal but responses like that, so I
12  ask that all your answers be verbally.
13         If you need to take a break at any time, just
14  let me know.  I only ask that if there's a question
15  pending you answer the question and then we take a break.
16         I'm going to ask you about a lot of
17  communication and -- between you and others, and I want
18  to make sure that you understand I'm not talking about
19  any communication with Mr. Carbone, Mr. Kushner or anyone
20  else with their firm.
21         And most importantly, this deposition is
22  going to be about your personal knowledge and not for you
23  as a representative of Whitestone Construction, so I want
24  to know what you, what you saw, what you did, what you

Page 8

1  said, what you heard and things like that, but I don't
2  want you to guess.  I told Mr. Dearth last week I want,
3  you know, the best answer you could give but I also want
4  answers based on what you know or what you saw or what
5  you did.
6          Is that okay as ground rules?
7      A.   Yes.
8      Q.   Okay.  If you can look at Exhibit 20,
9  Defendant's Exhibit 20.  I saw Mr. Carbone open the
10  FedEx.  Thank you for doing that.  Yep.  I'd just like --
11  yep.  Take off the binder clip and look at the top
12  exhibit which is Exhibit 20.
13         And, Don, I do intend to use some of the
14  exhibits I used last week.  Do you have those available
15  for Mr. Grzic?
16         MR. CARBONE:  He has those in a pile.
17         MR. GILL:  Okay.  Thank you.
18  BY MR. GILL:
19     Q.   And, for the record, Exhibit 20 is
20  Plaintiff's Initial Disclosure Pursuant to Rule 26.
21         Mr. Grzic, if you can read on the first page
22  to yourself what it says about what your knowledge is.
23         (Witness peruses document.)
24     A.   Okay.

Page 9

1      Q.   Do you agree with the statement about what
2  your knowledge -- the description of what your knowledge
3  about this project is?
4      A.   Yes, a general knowledge.
5      Q.   Okay.  I just want to ask you that because
6  those are kind of the topics in general that we're going
7  to be discussing today, and I want to make sure you agree
8  with that statement.
9          Before we get into the substance of this, the
10  dispute between Whitestone and Yuanda, aside from
11  conversations with any of your attorneys have you
12  discussed the subject matter of this deposition with
13  anyone?
14     A.   No.
15     Q.   Did you have any discussions with James
16  Dearth after his deposition last week?
17     A.   I simply -- I simply asked him in general how
18  did it go.
19     Q.   And what did Mr. Dearth tell you?
20     A.   He said he thought it went fine.
21     Q.   What did you do to prepare for this
22  deposition today?
23     A.   I -- I met with my lawyer.
24     Q.   Did you look at any documents?

3 (Pages 6 - 9)

Page 10

1     A.   Yes.
2     Q.   What documents did you look at?
3     A.   I was -- it was many documents.  Can I
4  remember specifically anything?  The only thing that I
5  remember specifically was the -- our purchase order of
6  White -- the purchase order between Whitestone
7  Construction and Yuanda.
8     Q.   Okay.  So some background information about
9  you.
10          What is your highest level of education?
11    A.   I have a bachelor's degree in engineering.
12    Q.   Okay.  Where did you receive that?
13    A.   Manhattan College.
14    Q.   When did you receive that?
15    A.   1998.
16    Q.   Are you currently employed?
17    A.   Yes.
18    Q.   What is your position?
19    A.   I'm Vice-President at Whitestone
20  Construction.
21    Q.   As the Vice-President of Whitestone, what are
22  your -- what is your general role or duties?
23    A.   Oversee the -- oversee all the projects in
24  general.  I don't get involved to the day -- day to day

Page 11

1  usually, but if I have to, I do, but otherwise, it's a
2  general -- a general involvement in all the projects.
3     Q.   How many projects generally does Whitestone
4  have going at any one time?
5     A.   Anywhere between 10 to 15.
6     Q.   During the course of the project that's the
7  subject of this dispute from 2013 to 2017, was this the
8  larger -- largest project that Whitestone had?
9     A.   Yes, I believe so.
10    Q.   Who are the -- the founders of Whitestone?
11    A.   The founder was my father.
12    Q.   When did he start Whitestone?
13    A.   I think 1983, 1984, something like that.
14    Q.   And, for the record, what's your father's
15  name?
16    A.   Boris, B-O-R-I-S.
17    Q.   Is this a family-owned business?
18    A.   Yes, it is.
19    Q.   Can you describe your -- briefly describe
20  your history at Whitestone?
21    A.   I started full time at Whitestone around 2007
22  or 2008.
23    Q.   And what was your position when you started?
24    A.   Originally project manager.

Page 12

1     Q.   As project manager, what was your role?
2     A.   To oversee a certain amount of projects
3  specifically, not to be involved in -- in general in the
4  company.
5     Q.   How would you define Whitestone's business
6  generally?
7     A.   We're a construction company based in New
8  York City that does -- that -- that specializes in facade
9  work.
10    Q.   Facade work being window systems,
11  curtainwall, other cladding systems?
12    A.   Windows, curtainwall, roofing, masonry,
13  anything to do with the building enclosure.
14    Q.   For commercial construction projects?
15    A.   Some -- some pri -- some private but mostly
16  public works.
17    Q.   Prior to beginning with Whitestone in 2007
18  did you have any experience in the commercial
19  construction industry?
20    A.   Prior to that, between graduating college and
21  to that year, I was a design engineer.
22    Q.   A design engineer with whom?
23    A.   For an HVA -- mechanical, electrical,
24  plumbing design firm.

Page 13

1     Q.   So it was not a cladding company --
2     A.   No.
3     Q.   -- or facade?  Okay.
4     A.   No.
5     Q.   When did you become vice-president of
6  Whitestone?
7     A.   Vice-president would be probably last year.
8     Q.   What was your role or title prior to becoming
9  vice-president?
10    A.   I was president.
11    Q.   When did you become president?
12    A.   Approximately 2009 I would say, 2008, 2009.
13    Q.   Okay.  So approximately 2009 through
14  approximately 2018 or '19 you were president?
15    A.   2019, yeah.  Probably, yeah.
16    Q.   Why did you go from president to
17  vice-president?
18    A.   Because my sister is the other owner of
19  Whitestone Construction, so we -- for our own internal
20  reasons, she -- we decided to switch roles, which she
21  became the president and I became the vice-president.
22    Q.   Are -- you said it was founded by your
23  father.  Is he still -- is he still involved in the
24  company?

4 (Pages 10 - 13)

1   A.   No, he is not.
2   Q.   Okay.  It's you and your sister who are
3 co-owners?
4   A.   Yes.
5   Q.   When you were -- had the role of president,
6 was your involvement in projects much as it is now, just
7 kind of a general overview of the projects without being
8 involved day to day?
9   A.   Correct.
10   Q.   For this project, this litigation or the --
11 Strike that.
12       For this project relating to the curtainwall
13 system where Whitestone hired Yuanda you were on a
14 significant number of e-mails between Whitestone and
15 Yuanda.  Is that common?
16   A.   This job had more problems than normal job --
17 than the normal job, so yes, when jobs are -- when
18 certain jobs have a lot more issues, then yes, I'm more
19 involved.
20   Q.   Okay.  Are you -- there are also a number of
21 e-mails where you had personally sent e-mails to Yuanda.
22 Is that common when a project is more complicated or has
23 more problems?
24   A.   Yes.

1   Q.   And from the e-mails, it's my interpretation,
2 please correct me if I'm wrong, that you were familiar
3 with Yuanda's work generally; is that accurate?
4   A.   Yes.
5   Q.   What do you understand Yuanda's part of this
6 project to be?
7   A.   They were the design engineers of -- and
8 manufacturers of the curtainwall system and other
9 building enclosure systems.
10   Q.   And are you aware of the problems that arose
11 during or after construction regarding the curtainwall
12 system known as the WT-3 clerestory?
13   A.   Yes.
14   Q.   What is your general understanding of that
15 problem or issue?
16   A.   That the -- that the -- that the system
17 itself was rejected by the architect of record and,
18 therefore, by the owner and, therefore, by -- by the
19 construction manager.
20   Q.   I'm going to ask questions about general
21 construction terms, so, again, you and I have the same
22 understanding, same basis of information so that we can
23 talk in the same language.
24       Do you understand what a scope of work is?

1   A.   Yes.
2   Q.   What is your understanding of that phrase?
3   A.   That's a description of the responsibilities
4 of a -- of any party in a -- in a construction contract.
5   Q.   And that scope of work, since you said the
6 construction contract, is that scope of work defined by
7 the contract?
8   A.   Yes.
9   Q.   The term defective work, does that mean
10 something specific to you?
11   A.   Defective would mean something that's -- that
12 has been rejected by anybody with authority during the
13 project.
14   Q.   Are you familiar with the term warranty work?
15   A.   Yes.
16   Q.   What does that mean?
17   A.   Warranty work is anything that -- anything
18 through the normal use of -- normal use of and wear --
19 natural wear and tear of a product is under our warranty,
20 is under our guarantee for a certain period of time
21 due -- under normal wear and tear just something failing
22 in the system.
23   Q.   Is your understanding that warranty work,
24 correction of warranty work is covered by, generally

1 covered by a contractor's subcontract?
2   A.   I -- can you repeat that one more time?
3   Q.   Is it your understanding whether or not the
4 correction or repairs to something that's determined to
5 be warranty work is covered or not covered by a
6 subcontract or a contract?
7   A.   By a specific -- you mean --
8   Q.   Generally.
9   A.   Yes, it could be covered by a contract or a
10 subcontract, yes.
11   Q.   Are you familiar with the term punch list or
12 punch list work?
13   A.   Yes.
14   Q.   What is punch list work?
15   A.   Punch list work is generally just a list of
16 out -- minor outstanding items that need to be finished
17 in order for the -- for an owner or an architect to -- to
18 finally accept the work.
19   Q.   Okay.  Now I'm going to get into the
20 substance of what we're here to talk about today.  I'm
21 going to start talking about the contracts.
22       Are you familiar with the contract between
23 the general contractor, Sciame, and the owner?
24   A.   Between Sciame and the owner?

Page 18

1    Q.   Yes.
2    A.   Am I aware of the contract?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Are you familiar -- are you aware of it?
6    A.   I'm aware there is a contract, yes.
7    Q.   Okay.  Are you familiar with that contract?
8    A.   I don't believe, no.
9    Q.   Have you seen that contract?
10   A.   Not that I remember specifically, no.
11   Q.   Do you know if you or Whitestone have a copy
12 of that contract?
13   A.   I am not sure if we do.  I can't say for
14 certain --
15   Q.   So you don't know that; right?
16   A.   I can't say definitively -- I cannot say
17 definitively yes, we do have a contract.  I don't -- I'm
18 not sure.
19   Q.   Are you familiar with the subcontract between
20 Whitestone and Sciame?
21   A.   Somewhat, yes.
22   Q.   Did you take any part in negotiating the
23 terms of that contract?
24   A.   I signed that contract.

Page 19

1    Q.   Did you take part in negotiating that
2 contract?
3    A.   This is a public -- public bid.  There's
4 really no negotiating in the contract.
5    Q.   There's no negotiating the terms of the
6 subcontract, is that your testimony?
7    A.   Yeah, pretty much, yes.
8    Q.   Since there's no negotiating, did Sciame just
9 present you with a draft subcontract and say you sign it
10 or you walk away, it's your choice?
11   A.   That's what it was -- that's what's inferred,
12 yes.
13   Q.   Did -- prior to signing the subcontract did
14 Whitestone -- do you know if Whitestone submitted a
15 proposal?
16   A.   It was a -- it was a public bid that we
17 submitted.
18   Q.   So there was a proposed -- you responded to
19 an RFP process?
20   A.   Yes.  Correct.  Yeah, a sealed envelope with
21 our -- with our number.
22   Q.   Even though you were a subcontractor you were
23 required to submit a sealed bid to the general
24 contractor?

Page 20

1    A.   Yes.  Because technically they're not a
2 general contractor.  They're a construction manager.
3 There's -- there are differences.
4    Q.   I know, but you have a contract with Sciame.
5 You don't have a contract with the public owner?
6    A.   Correct.
7    Q.   Were there any parts -- even though you
8 couldn't negotiate were there any parts of the
9 subcontract that Whitestone was concerned about or had
10 objections about?
11   A.   Not that I specifically remember at the time.
12   Q.   If you can look at what was previously marked
13 as Exhibit 5 and new Exhibit 21.
14        And, for the record, Exhibit 5 is the AIA
15 form contract, the A401 and Rider A.  Exhibit 21 is a
16 checklist and Exhibit A to Rider B.
17        Do you recognize these documents, Exhibits 5
18 and 21?
19   A.   Yes.
20   Q.   What are these documents?
21   A.   These are basically the contract between
22 Whitestone Construction and Sciame.
23   Q.   And, for the record, these are just a
24 portion -- I will represent these are just a portion of

Page 21

1 the contract.  It's not the entire contract.
2    A.   Yes.
3    Q.   If you can turn to page WCC859 in Exhibit 5
4 which is the numbered page 18 of the AIA form document.
5 Do you see that?
6    A.   Was it 859?
7    Q.   859.
8    A.   Okay.
9    Q.   Do you recognize the signature, either of the
10 signatures on that page?
11   A.   One of them is my signature, and the other's
12 a signature of the executive vice-president of Sciame.
13   Q.   Okay.  Your signature is above the one that
14 says subcontract; is that correct?
15   A.   Correct.
16   Q.   The first page of the subcontract says it was
17 made as of October 7th, 2013.  Do you know if that's
18 accurate?
19        MR. CARBONE:  What page are you referring
20 to -- the first page of the AIA document?
21        MR. GILL:  Yeah, on the AIA document page 842.
22        MR. CARBONE:  Bates stamp, okay.
23 BY MR. GILL:
24   Q.   The document says --

6 (Pages 18 - 21)

Page 22

1    A.   Are you waiting --
2    Q.   Sorry.  842 says the agreement's made as of
3  October 7th, 2013.  Do you know if that's accurate?
4    A.   Appears to be, yes.
5    Q.   Do you know when you or Whitestone first
6  received a draft of this subcontract relative to that
7  date?
8    A.   I would not know.
9    Q.   Okay.  What is the scope of work for this
10  subcontract?
11    A.   The scope of work is to provide the exterior
12  building envelope for this building.
13    Q.   Does that include the WT-3 clerestory system?
14    A.   Yes, it does.
15    Q.   Does the subcontract or the scope of work
16  include the design for the WT-3 clerestory?
17    A.   Yes, it does.
18    Q.   And includes the fabrication and delivery of
19  the WT-3 clerestory?
20    A.   Yes.
21    Q.   That obviously includes the installation of
22  that; right?
23    A.   Yes.
24    Q.   If you look at Exhibit 21, pages 866 through

Page 23

1  874, it appears to be a chart or a checklist of some
2  kind.  Do you see that?
3    A.   866 through 874?
4    Q.   Yep.
5    A.   Okay.
6    Q.   What is that?
7    A.   It's just a -- the trade scope checklist.
8    Q.   What is a trade scope checklist?
9    A.   It's just basically a list that's part of the
10  contract just to make sure -- to clarify what is in but
11  not limited to our scope of work in the contract.
12    Q.   In this chart, in this checklist, on the
13  right hand column it's a yes and no, and the columns that
14  are marked yes, what does that mean?
15    A.   That this would be in the contract between
16  Whitestone and Sciame.
17    Q.   Is everything that's listed in here the
18  labor, materials and services that Whitestone agreed to
19  provide to the project?
20    A.   Yes, but this list is not all inclusive.
21    Q.   What's not included in this list?
22    A.   I -- because technically all the --
23  everything listed in the specs and the drawings are
24  also -- anything listed in the specs and drawings that

Page 24

1  are not part of this checklist are also part of our
2  contract also, so this -- this contract basically is just
3  a list of general items that are part of -- general major
4  items that are part of our checklist.  I'm sorry.  Major
5  general -- general major items that are part of our scope
6  of work.
7    Q.   Okay.  If you look at page 867 --
8    A.   Okay.
9    Q.   -- line item 41, and, for the record, that
10  states: "Provide all shop drawings, product submittals,
11  details, calculations and samples, et cetera, as
12  specified and/or required to complete the scope of this
13  work."
14    A.   Yes.
15    Q.   What does that mean to you?
16    A.   Basically -- sorry just to repeat to you but
17  basically means exactly what it says.  "Provide all shop
18  drawings, product submittals, detail calculations and
19  samples as specified and are required to complete the
20  scope of work."  I -- I wouldn't know how to break
21  that -- that sentence down any -- any further.
22    Q.   Okay.  Fair enough.
23         If you can turn to 869, line item 66.
24    A.   Okay.

Page 25

1    Q.   And that states:  "Provide PE engineered and
2  stamped drawings for structural review for all scope,
3  provide calculations for review, coordinate them with PE
4  stamped drawings."  My question is the same as the last
5  one.  Is that self-explanatory or does that mean
6  something other than what it states?
7    A.   No.  To me it's self-explanatory.
8    Q.   What are PE engineered and stamped drawings?
9    A.   PE stands for professional engineer who's --
10  who is an engineer that's licensed by the state to
11  provide such services and take responsibility for an
12  engineered system, so for -- an engineer with a license
13  by the state has to engineer and -- engineer, design and
14  provide calculations to back up his design.
15    Q.   The two line items we looked at, 41 and 66,
16  relate to all of the cladding system; is that correct?
17    A.   Correct.
18    Q.   Including the WT-3 clerestory?
19    A.   Yes.
20    Q.   If you look on page 871 and 872.
21    A.   Okay.
22    Q.   I'm not going to read this and I don't -- if
23  you -- you can read it if you need to, but line items 98
24  through 103, generally what does this refer to?

7 (Pages 22 - 25)

1     A.   This has more to do with the -- oh, you said
2  98 through which one?
3     Q.   103.
4     A.   This is again the trade scope checklist.
5  That pretty much just goes into more detail, more
6  technical detail of -- of our scope of work.  Again, this
7  would not -- would not be all inclusive but is more
8  general -- a more generalization of our -- of our
9  technical scope of work.
10    Q.   And, just for the record, part of these -- 98
11 through 102 relates to aluminum, sorry, glazed aluminum
12 curtainwall, and 103 relates to the structural glass
13 curtainwall.
14         It's my understanding from this that 98
15 through 103, the glazed aluminum curtainwall, it lists
16 type.  Does that include the WT10 -- the WT-3 clerestory?
17    A.   Yes, it is.
18    Q.   Is that -- when it says type 1A, 1B, 1C, 3,
19 is the 3 the WT-3?
20    A.   I'm sorry.  You have to say that again.  You
21 lost me.
22    Q.   Sure.  Directly above the line, line item 89,
23 there's a line that --
24    A.   Yes.

1     Q.   -- says project requirements glazed aluminum
2  curtainwall (type 1A, 1B, 1C 3).
3     A.   Yes.
4     Q.   Do you see that?  Does that 3 refer to the
5  WT-3 clerestory or curtainwall system?
6     A.   That would be my understanding, yes.
7     Q.   Okay.  If you look at the last page of
8  Exhibit 21 which is Bates stamped 960 --
9     A.   Yes.
10    Q.   -- it is a document that says Exhibit A,
11 Description of Project.  What is the -- you can read it
12 into the record if you want, read it to yourself.  What
13 is that description?  What does that relate to?
14    A.   "The work consists of the procurement and
15 installation of all exterior wall systems including
16 glazed aluminum, structural glass curtainwall systems,
17 aluminum framed entrances and storefronts, Terracotta
18 wall systems, steel framed window wall, aluminum framed
19 folding wall and channel glass wall assemblies."
20    Q.   And what is that?  Is that work that
21 Whitestone was gonna provide?
22    A.   Yes.  Again, this is just a general overview
23 and description of our scope of work.  Again, not all --
24 again, this is not all encompassing.

1     Q.   And that includes all glazed aluminum
2  curtainwall system in the WT-3?
3     A.   Yes.
4     Q.   If you can turn back to Exhibit 5, page 844,
5  Article 1 on Page 3.
6     A.   Okay.
7     Q.   You see that the first sentence states in
8  part:  "The subcontract documents consist of," and then
9  2:  "The prime contract consisting of the agreement
10 between owner and contractor and the other contract
11 documents enumerated therein."  Do you see that?
12    A.   Yes.
13    Q.   Do you know what that means?
14    A.   Again, this is -- you mean the entire
15 sentence?
16    Q.   The reference to the prime contract being a
17 part of the subcontract documents.
18    A.   Yes.  It means that the -- the contract, any
19 Terms and Conditions of the contract between the
20 construction manager, Sciame, and the owner are made part
21 of the contract between Whitestone and Sciame.
22    Q.   And based on your testimony a couple minutes
23 ago, it's my understanding that you are not aware whether
24 you saw or Whitestone has a copy of that prime contract?

1     A.   No, I don't know.  No.
2     Q.   If you can turn to the next page, 845,
3  Article 2.
4     A.   Okay.
5     Q.   The first sentence states in part:  "The
6  subcontractor expressly assumes to contractor all of the
7  obligations and responsibilities of the performance of
8  this subcontract as the contractor assumes towards the
9  owner -- toward the owner respecting the performance of
10 the prime contract."  What does that sentence mean to
11 you?
12    A.   That any obligations that the contractor has
13 to the owner is also the responsibility -- is also
14 obligations that the subcontractor would owe to the
15 contractor and the owner.
16    Q.   Do you remember seeing that language before
17 you signed this subcontract?
18    A.   Do I specifically remember that?  No, but
19 that's -- it's a general -- it's -- it's industry
20 practice to -- for that to be included in contracts.
21    Q.   How familiar are you with the AIA 401
22 contract?
23    A.   We don't use it that often, but I've come
24 across it before.

8 (Pages 26 - 29)

1    Q.   If you can turn to page 847.
2  Section 4.1.5 --
3    A.   Okay.
4    Q.   -- states in part, the first sentence states:
5  "The subcontractor agrees that the contractor and the
6  architect shall have the authority to reject work of the
7  subcontractor that does not conform to the prime
8  contract."  What does that sentence mean to you?
9    A.   That's, again, pretty self-explanatory, that
10 the contract -- the contractor and the architect have the
11 right to reject work and anything that's -- anything
12 provided under our contract.
13   Q.   In your experience, how common is that?
14   A.   How common that -- that something gets
15 rejected or how common that this term or this condition
16 is in the contract?
17   Q.   Good question.  Fair clarification.
18        How common is it for this requirement to be
19 included in -- in a subcontract?
20   A.   Very, very, very common.
21   Q.   Is it more common than not that this appears
22 in a contract?
23   A.   Yes.  I would -- if I had to guess at a
24 number, this is included 99 percent of the time.

1    Q.   When you signed this contract, were you aware
2  that the owner and the architect had the authority to
3  reject Whitestone's work?
4    A.   Yes.
5    Q.   If you can turn to the next page, 848.  Under
6  Section 4.5, Warranty, the second and third sentences
7  read:  "The subcontractor further warrants that the work
8  will conform to the requirements of the subcontract
9  documents and will be free from defects except for those
10 inherent in the quality of the work of the -- of --
11 strike that -- the quality of the work the subcontract
12 documents require or permit.  Work materials or equipment
13 not conforming to these requirements may be considered
14 defective."  What does that mean to you?
15   A.   The subcontractor further warrants that the
16 work will be -- will conform to the requirements of the
17 subcontract documents and will be free from defects
18 except for those inherent in the quality of the work the
19 subcontract documents require or permit."  What does this
20 mean to me?
21   Q.   Yep.
22   A.   Again, I can't, I can't really -- I wouldn't
23 know how to explain any further or break it down any
24 easier than what this says, so, so I'm not sure I can

1  give you an answer.
2    Q.   Okay.
3    A.   It's -- to me it's self-explanatory.
4    Q.   During the dispute or the discussions between
5  Whitestone and Yuanda, and I believe you had said this in
6  e-mails, Whitestone and I believe, like I said, you had
7  said that Whitestone and Yuanda were required to perform
8  work under protest.  What did you mean by that?
9    A.   That I -- as per Whitestone's contract with
10 the construction manager, Sciame, that -- if they -- if
11 they deemed something defective or not -- not -- or not
12 proscribing to contract documents, that even if we feel
13 that we are owed an extra to conduct the work that we
14 have to -- we cannot -- we cannot -- we -- we are not
15 allowed to not do the work as per contract until -- until
16 a change order is issued, that we have to as per contract
17 proceed with the work while any negotiations or -- or
18 I don't know.  What's the other term?  While any
19 negotiations or claims are filed regarding this --
20 regarding the extra work, that we are not allowed to
21 not -- we are not allowed to not do the work.
22   Q.   If you turn to page 850 in Exhibit 5, down at
23 the bottom is paragraph 5.1.4.  Is your understanding of
24 your requirement to perform under protest as you

1  described it, is that required by this paragraph or is
2  there -- as far as you know -- I'm not asking for a legal
3  conclusion.  I know your attorney is going to interpret
4  the contract, and we're going to argue about that, but as
5  far as you understand the contract and Whitestone's
6  requirements, is that in 5.1.4 or is that somewhere else?
7    A.   Yes.  What I was referring to is -- is
8  mentioned in 5.1.4.  It could also be in another part of
9  the contract that I'm not aware, but this 5.1.4 does --
10 does refer.  What I was saying before is referred to in
11 5.1.4.
12   Q.   Okay.  I want to turn your attention and talk
13 about the purchase order now.  I want to talk about
14 purchase orders generally before we get to the ones
15 specific to this.
16   A.   Am I done with this exhibit?
17   Q.   I believe we are --
18   A.   For now?
19   Q.   -- done with that one -- we're done with it
20 for now, and I believe we are done --
21   A.   Okay.
22   Q.   -- with it for the day.
23        MR. CARBONE:  Where are we going, what
24 exhibit?

Page 34

1       MR. GILL:  Pardon?

2       MR. CARBONE:  What exhibit?

3       MR. GILL:  I'm not -- I'm not directing him to

4  an exhibit yet.

5       MR. CARBONE:  Oh.

6  BY MR. GILL:

7    Q.   In 2013 were you generally familiar with

8  Whitestone's purchase order and the process where it

9  hires vendors?

10    A.   Can you repeat that one more time?

11    Q.   In 2013 were you familiar with Whitestone's

12  purchase orders and the way that Whitestone generally

13  hires vendors to perform work?

14    A.   In general, yes.

15    Q.   Okay.  Generally what is the process that

16  Whitestone used in 2013 to hire vendors?

17    A.   Basically was to get a proposal from them at

18  the time of bid for the project and -- and when we submit

19  our price to -- to an owner or a construction manager,

20  we -- based on our estimate, we -- we come up with our

21  number based on the numbers provided to us by vendors and

22  subcontractors, and we decide to use their numbers

23  basically if we have any history with them, if we trust

24  them, if they've performed in the past and -- and take

Page 35

1  that into account on the -- in our overall -- in our

2  overall estimate.

3    Q.   For this project, is that typically or is

4  that what you did for identifying vendors for this

5  project?

6    A.   Yes.

7    Q.   You said you take into account your history

8  with a vendor.  Do you have or did you have a history

9  with vendor in 2000 -- Or sorry.  Did you have a history

10  with Yuanda in 2013?

11    A.   Yes.

12    Q.   And what was that history?

13    A.   I believe they provided curtainwall to us on

14  a -- on a handful of jobs.

15    Q.   And had you been satisfied with the product

16  and their fulfilling the purchase order in the past?

17    A.   Yes.

18    Q.   Do you know if Whitestone had standard form

19  purchase order agreement Terms and Conditions in 2013?

20    A.   A standard form?

21    Q.   Yes.

22    A.   I do not think we had a standard where we

23  used with every vendor, no.

24    Q.   If you can turn to what's been previously

Page 36

1  marked as Exhibit 4, the document entitled Whitestone

2  Construction Corporation Purchase Order 13-0139-002.  Do

3  you recognize this document?

4    A.   Yes.  This is the purchase order between

5  Whitestone and Yuanda.

6    Q.   Okay.  And if you look at the second page, do

7  you recognize -- there are two signatures.  Do you

8  recognize the signature?

9    A.   One is my signature, and the other one is by

10  the president of Yuanda USA.

11    Q.   All the other pages except the signature page

12  have two sets of initials in the lower right.  Do you

13  recognize one or both sets of initials?

14    A.   One of them is mine.  The other seems to be

15  from the president of Yuanda USA.

16    Q.   Okay.  Looking just at the first two pages,

17  did you take any part in drafting or creating or

18  negotiating this purchase order?

19    A.   Not really.

20    Q.   Who at Whitestone, if you know, drafted and

21  negotiated the terms of this purchase order?

22    A.   It would be Phil Carvelas.

23    Q.   And what is -- what was Phil's title in 2013?

24    A.   He's project manager.

Page 37

1    Q.   Because Whitestone is a family-owned company,

2  I assume that the organization structure is kind of --

3  isn't as extensive as other corporations.  So below the

4  president is the vice-president.  Below the

5  vice-president is who -- project manager?

6    A.   It would be project manager, project

7  managers, project -- to me project manager and project

8  executive is one in the same.  So Phil would be

9  considered either a project executive or project manager.

10    Q.   Okay.  That big paragraph in the middle of

11  the first page of Exhibit 4, read that to yourself down

12  to the ("Vendors work").

13    A.   So from Yuanda Corporation with an address at

14  36 --

15    Q.   Correct.

16    A.   -- blagh, blagh, blagh --

17    Q.   Correct.

18    A.   -- until?

19    Q.   About ten lines down.

20    A.   And "deliverable curtainwall system materials

21  ("vendor's work")?

22    Q.   Correct.

23         (Witness peruses document.)

24    A.   Okay.

10 (Pages 34 - 37)

Page 38

1    Q.   Okay. It's my understanding that that is the
2  definition of what -- of vendor's work or what Yuanda was
3  going to provide. Is my understanding correct,
4  incorrect?
5    A.   It's -- it's a list of -- of some of the --
6  some of the scope that Yuanda needs to provide. Is it a
7  definitive, exhaustive list? No.
8    Q.   Okay. So where is the definitive, exhaustive
9  list of Yuanda's scope of work?
10   A.   It would be in the -- in the plans and specs
11 in conjunction with anything listed in -- in the purchase
12 order.
13   Q.   How would -- we'll get to that. We'll get to
14 that. Sorry. Strike that question.
15       Is there any work that you wanted Yuanda to
16 perform that is not listed in this first paragraph above
17 vendor's work?
18       MR. CARBONE:  Objection to form.
19 BY MR. GILL:
20   Q.   Go ahead and answer, please.
21   A.   Say the question again because --
22   Q.   Is there any --
23   A.   -- I'm not sure how to --
24   Q.   Sorry. I stepped on your answer, and I did

Page 39

1  exactly what I said that we need to do to keep a clear
2  record, and I apologize.
3        Is there anything -- anything that is not
4  listed in that first paragraph above vendor's work that
5  you expected Yuanda to provide or perform for this
6  project?
7    A.   I -- I can't answer that because it really
8  goes into the details of the plans and specs, so I -- to
9  me that's a difficult question to answer if at all.
10   Q.   Was Yuanda required to provide any on-site
11 services?
12   A.   On-site services?
13   Q.   Yes.
14   A.   Not to my knowledge.
15   Q.   Was Yuanda required to provide any
16 installation services?
17   A.   Not to my knowledge.
18   Q.   Was Yuanda required to provide any service
19 after delivery of the fabricated components?
20   A.   Provided that everything was -- that was
21 provided was -- was approved, no.
22   Q.   And that approval came from who? Strike
23 that.
24       What do you mean provided everything that was

Page 40

1  approved?
2    A.   Provide -- provided that they provided
3  everything that is approved and acceptable to the
4  owner/architect/construction manager.
5    Q.   Are you aware of whether Whitestone inspected
6  the components after or upon delivery from Yuanda?
7    A.   I'm sorry but that's kind of -- that's kind
8  of a vague question. Am I aware if anybody from
9  Whitestone specifically looked at every piece of material
10 regarding anything that came from Yuanda? That's --
11 that's difficult for me -- I can't say that.
12   Q.   Do you know if Whitestone was required to
13 inspect the material upon delivery from Yuanda?
14   A.   Well, Whitestone through its installer, yes,
15 probably -- we should have -- during -- during the normal
16 course of the contract, yes, we would -- if we noticed
17 something that was not proper, then we would have
18 notified them. If there was --
19   Q.   Well, isn't it --
20   A.   If there was an issue with the workmanship,
21 yes.
22   Q.   I apologize. I stepped on your answer again.
23       Isn't it a requirement that Yuanda or
24 Whitestone or its subcontractor inspect Yuanda's work and

Page 41

1  reject components that fail to conform to the -- the
2  submittals or the shop drawings?
3    A.   If we would have -- if we were to inspect it,
4  it would happen by -- if we saw something, it would
5  happen by happenstance. It would not be -- I would not
6  say it's our job to make sure they conform with --
7  with -- with their contract, no.
8    Q.   It's your job to make sure that the
9  clerestory conforms to your contract with Sciame though;
10 right?
11   A.   It's -- repeat that one more time.
12   Q.   Is it your job, Whitestone's job, to ensure
13 that its work, Whitestone's work, conforms to the
14 requirements of the subcontract between Whitestone and
15 Sciame?
16   A.   I would say it's the responsibility of
17 whomever we hire to perform that to design and
18 manufacture, to make sure it conforms.
19   Q.   That's not my question. Under your
20 subcontract with Sciame do you have a responsibility to
21 Sciame to make sure Whitestone is providing what
22 Whitestone agreed to provide?
23   A.   Strictly speaking between us, between
24 Whitestone and Sciame, yes.

11 (Pages 38 - 41)

Page 42

1    Q.   And, for the record, you said that you,
2  Whitestone, were providing all of the exterior cladding.
3  This purchase order, this purchase order with Yuanda was
4  only a portion of Whitestone's work on this project; is
5  that accurate?
6    A.   Yeah, correct.
7    Q.   If you turn to the third page of Exhibit 4
8  which is page 1102 through 1109.
9        MR. CARBONE:  What --
10 BY MR. GILL:
11   Q.   What are --
12       MR. CARBONE:  Adam --
13       MR. GILL:  I can't hear you, Don.
14       MR. CARBONE:  Oh, sorry.
15       MR. GILL:  Not a problem.
16       MR. CARBONE:  It's muted.  Adam, what -- I'm
17 using a different Bates stamp document.  What paragraph
18 are you on?
19       MR. GILL:  I'm not on a paragraph.  I didn't
20 give you the -- it's the first -- it's the purchase
21 agreement Terms and Conditions.  I think it's --
22       MR. CARBONE:  Yeah, there's numbered
23 paragraphs, 1, 2.
24       MR. GILL:  I'm not talking about a paragraph

Page 43

1  yet.
2        MR. CARBONE:  Oh, okay.
3        MR. GILL:  I'll let you know what paragraph
4  I'm talking about.
5        MR. CARBONE:  Okay.  Great.  Thank you.
6  Sorry.
7  BY MR. GILL:
8    Q.   So what are on these eight or nine pages in
9  Exhibit 4?
10   A.   Seems to be the Terms and Conditions of the
11 purchase agreement.
12   Q.   Okay.  What does that mean Terms and
13 Conditions?
14   A.   That's pretty self-explanatory.  It's all --
15 this is all -- any terms listed in -- in this section
16 is -- is part of our contract with Yuanda.
17       Don --
18   Q.   Okay.  Were the Terms and Conditions the
19 subject of negotiations --
20       THE WITNESS:  I'm getting feedback.  Don, can
21 you mute?
22 BY MR. GILL:
23   Q.   Were these Terms and Conditions the subject
24 of any negotiations between Yuanda and Whitestone?

Page 44

1    A.   Yes, they could have been.  I'm not -- I
2  don't remember specifically if -- what -- what Phil
3  negotiated back and forth with Yuanda.  I do not know
4  that.
5    Q.   Do you know if these -- I think you said
6  there were no standard Terms and Conditions in 2013.  So
7  these would have been drafted for this project; is that
8  accurate?
9    A.   Probably, yes.
10   Q.   And you also said that you didn't have any
11 negotiating power with Sciame because it was a public
12 project?
13   A.   Yes.
14   Q.   Did you have -- were there any negotiations
15 at all between Whitestone and Yuanda regarding these
16 Terms and Conditions because it was a public project?
17   A.   Were there any negotiations between
18 Whitestone and Yuanda --
19   Q.   Yeah.
20   A.   -- on -- regarding these terms and -- I do
21 not know.  I was not involved with negotiating this
22 purchase order, so I don't -- I don't know.
23   Q.   If you look at paragraph 1, on the first page
24 of the Terms and Conditions, the last sentence states:

Page 45

1  "No changes will be effective unless this purchase
2  agreement is modified in writing by an authorized
3  representative of subcontractor."
4    A.   Okay.
5    Q.   What does that language mean?
6    A.   That any verbal agreements between Whitestone
7  and Yuanda are not -- are void unless it's been -- unless
8  it's put in writing and signed by -- by a -- by an
9  officer of the subcontractor.
10   Q.   Okay.  What counts or what constitutes a
11 change to the purchase agreement?
12   A.   Any change in the terms of conditions.
13 That's the best answer I can give --
14   Q.   Okay.
15   A.   -- give you on that.
16   Q.   If you look at paragraph 2, about six lines
17 down the sentence starts at the very end:  "Vendor shall
18 assume towards subcontractor."  Do you see that?
19   A.   Yes.
20   Q.   And, for the record, the sentence states:
21 "Vendor shall assume towards subcontractor all
22 obligations and responsibilities which under contract
23 documents as set forth in Whitestone purchase order
24 Attachment B related to the curtainwall pertaining to the

12 (Pages 42 - 45)

1 prime contract the subcontractor assumes toward
2 contractor and owner and architect/engineer."
3     A.   Yes.
4     Q.   That is similar to language I pointed out in
5 the Sciame/Whitestone subcontract.  Would you agree with
6 that?
7     A.   Yes.
8     Q.   But it's not identical.  Do you agree with
9 that?
10     A.   I don't -- I'd have to -- I would have to do
11 a word-to-word comparison of each sentence next to each
12 other to say that.
13     Q.   Exhibit 5.
14     A.   Okay.
15         MR. CARBONE:  Adam -- excuse me.  I have an
16 objection only because you stopped reading the sentence
17 in mid sentence and then you were asking about a
18 sentence.  You failed to read the rest of the sentence
19 where it says:  "And shall be bound by the rulings of
20 subcontractor, contractor and owner and
21 architect/engineer including but not limited to
22 extensions for time -- of time."
23         MR. GILL:  Okay.
24         MR. CARBONE:  That's the purpose of my

1 objection.
2         MR. GILL:  Okay.
3         MR. CARBONE:  Okay.
4 BY MR. GILL:
5     Q.   If you can turn to Exhibit 5 -- have both
6 Exhibit 4 and Exhibit 5 in front of you -- and you look
7 at page 845 of Exhibit 5, at the very top paragraph,
8 2.1.1.  And you see that in the purchase order the phrase
9 "under the contract documents as set forth in Whitestone
10 purchase order Attachment B related to the curtainwall"
11 has been added to basically what is in Exhibit 5.  Do you
12 see that?
13         MR. CARBONE:  Objection.
14 BY THE WITNESS:
15     A.   I don't even know where -- where to begin
16 comparing one to the other, so I don't know what you
17 are --
18         MR. GILL:  You're on mute.
19         THE REPORTER:  Excuse me.  You're on mute.
20 You're on mute.
21         THE WITNESS:  Donald, I think you need to --
22         MR. GILL:  Yeah.
23 BY THE WITNESS:
24     A.   Yeah, I'm not sure.  I mean -- repeat that

1 one more time, please.
2 BY MR. GILL:
3     Q.   Okay.  Do you see that Exhibit 4 has the
4 phrase "under the contract documents as set forth in
5 Whitestone purchase order Attachment B related to the
6 curtainwall" in it?  That language has been added to the
7 purchase order that is not -- there's no similar
8 reference in the subcontract?
9         MR. CARBONE:  Objection.
10 BY THE WITNESS:
11     A.   "The contract documents as set forth in the
12 Whitestone purchase order Attachment B related to
13 curtainwall pertaining to the prime contract."  Is that
14 what you're referring to?
15 BY MR. GILL:
16     Q.   Yes.
17     A.   You're saying -- you're asking that -- if --
18 if those words are not in the Exhibit 5?
19     Q.   I'm -- I'm saying you see that those words
20 are not or a similar reference is not included in Exhibit
21 5.
22     A.   I don't -- I would have to read this entire
23 paragraph.
24     Q.   Then go ahead and read the entire paragraph.

1         (Witness peruses document.)
2     A.   No, the contract between Whitestone and
3 Sciame doesn't make -- doesn't mention anything --
4 anything regarding a purchase order between Whitestone
5 and Yuanda.
6     Q.   But it also doesn't refer to curtainwall?
7     A.   No.  The curtainwall is part of the overall
8 contract, and the contract between Whitestone and Sciame
9 refers to the entire contract.
10     Q.   And the provision in Exhibit 5 doesn't refer
11 to any attachments?
12     A.   No, it does not specify any attachments.
13     Q.   Why does the purchase order -- why did
14 Whitestone include that reference to the attachments in
15 the purchase order?
16     A.   Can I -- can I refer to Attachment B?
17     Q.   We're getting there.  I just want to know why
18 that -- that language was inserted in paragraph 2 on page
19 1102.
20     A.   I have no idea.  I can't answer that.
21     Q.   So now, yes, please turn to page 1114 which
22 is a page titled Attachment B Contract Documents.
23     A.   Okay.
24     Q.   Do you know who created Attachment B?

13 (Pages 46 - 49)

Page 50

1      A.   I do not know.
2      Q.   Do you know if it was Yuanda or Whitestone?
3      A.   I do not know.
4      Q.   Do you see that item 1 says: "The contract
5  documents on Attachment B"?
6      A.   Yes.
7      Q.   And do you see that in or under -- listed
8  under item 1 the prime contract is not listed?
9             (Witness peruses document.)
10     A.   No, it's not listed in -- in Attachment B,
11  no.
12     Q.   Do you see that the subcontract between
13  Sciame and Whitestone is not listed in Attachment B?
14     A.   No, it doesn't -- it doesn't specify that
15  either.
16     Q.   Do you know why the prime contract and
17  subcontract were not listed in Attachment B?
18     A.   Why they were not listed on Attachment B? I
19  do not know.
20     Q.   Did you intend or did Whitestone intend that
21  the prime contract be incorporated into the purchase
22  order?
23     A.   Yes.
24     Q.   Did you or Whitestone intend that the prime

Page 51

1  contract be incorporated into the purchase order?
2      A.   Yes.
3      Q.   Do you know why the prime contract and the
4  subcontract are not specifically listed or incorporated
5  into the purchase order?
6      A.   Why the -- can you say that one again?
7      Q.   Do you know why the purchase order is not
8  incorporated into -- sorry.  Strike that.
9             Do you know why the prime contract is not
10  incorporated into the purchase order?
11     A.   I believe --
12          MR. CARBONE:  Objection.
13          MR. GILL:  Okay.
14          MR. CARBONE:  Objection.
15  BY MR. GILL:
16     Q.   Mr. Carbone objected.  Please answer.
17     A.   I believe it is.
18     Q.   How?  Where?
19     A.   I believe I've --
20             (Witness peruses document.)
21          On paragraph 2 of the purchase agreement
22  Terms and Conditions it says:  "The contract documents as
23  set forth in Whitestone purchase order Attachment B
24  related to curtainwall pertaining to the prime contract

Page 52

1  between the owner and subcontractor are incorporated
2  herein by the reference to the extent that the prime
3  contract applies to the work under this purchase order."
4  That's the first --
5      Q.   Okay.  The reference -- what is the purpose
6  of the reference to Attachment B then in that sentence
7  you just read?
8      A.   What is the?  I'm sorry?
9      Q.   The sentence you just read refers to
10  Attachment B; correct?
11     A.   "Contract documents as set forth in
12  Whitestone --" okay.
13     Q.   Not okay.  Yes or no.  What you just --
14     A.   Yes.
15     Q.   -- read refers to Attachment B?
16          Okay.  Attachment B does not refer to the
17  prime contract; correct?
18     A.   No.  It refers to the contract documents.
19     Q.   It lists the contract documents; correct?  It
20  defines the contract documents?
21          MR. CARBONE:  Objection.
22  BY THE WITNESS:
23     A.   Attachment B, yes.  Referring to, yes, to the
24  sentence that I just read, yes.

Page 53

1
2  BY MR. GILL:
3      Q.   So moving on to the --
4          MR. CARBONE:  I was on mute.  Adam, I was on
5  mute.  I just want to make sure my objection was noted.
6  I'm sorry.
7          MR. GILL:  I could -- I could hear you and
8  that's why I kept going.
9             Madam Court Reporter, when Mr. -- even
10  though he's muted, when Mr. Carbone objects, can you --
11  are you -- can you hear that?  Are you recognizing that?
12  Are you I guess noting it?
13          THE REPORTER:  Yes, I can hear him.  Thank
14  you.
15          MR. GILL:  Okay.  I just want to make sure --
16  Don, I just want to make sure we have a clean record, and
17  I'm not trying to do end run around your objections.
18  BY MR. GILL:
19     Q.   Okay.  Getting back to the purchase order,
20  you said that Whitestone intended that the subcontract be
21  incorporated into the purchase order.  Do you know why it
22  was not?
23     A.   Well, I don't --
24          MR. CARBONE:  Objection.

14 (Pages 50 - 53)

Page 54

1

2 BY THE WITNESS:

3     A.   I don't -- I don't agree with that statement

4 you just made, so I mean there's tons of paperwork here.

5 If you want me to -- if you want to wait -- if everybody

6 wants to wait a few hours for me to go review it to look

7 for it, then so be it.

8 BY MR. GILL:

9     Q.   I will represent that there is one reference

10 to the subcontract and that is the first line, actually

11 the second line of article 2 that says:  "Vendor

12 acknowledges that subcontractor has entered into a

13 subcontract with F.J. Sciame Construction Company,

14 Incorporated for the specified work at the CUNY NYCCT New

15 Academic Building located at," and it goes on.  That's

16 the only reference to subcontract in the purchase order.

17     A.   Okay.

18     Q.   You can read the entire document.  I have

19 seven hours.  I have no problem with that.

20        MR. CARBONE:  All right.  Well, I guess we

21 both have seven hours if necessary, but I'm going to

22 object to counsel's characterization because you're going

23 into legal argument.

24        MR. GILL:  Fair enough.

Page 55

1

2 BY MR. GILL:

3     Q.   As far as you are aware, sitting here without

4 reading the entire document, Exhibit 4, is there a

5 location in the purchase order that incorporates the

6 subcontract between Whitestone and Sciame?

7        MR. CARBONE:  Okay.  I'm going to -- I'm going

8 to object because you asked him that question previously.

9 He told you it did.  You asked him where, and he told you

10 where.

11        MR. GILL:  That was on the prime contract.

12 I'm talking about the subcontract.  He said he didn't

13 know where on the subcontract and if we wanted to read

14 the entire document, he would do that, and so I want to

15 know if he knows sitting here without reading the entire

16 document where the reference to the subcontract is not

17 the prime contract.

18        MR. CARBONE:  Objection withdrawn.

19        MR. GILL:  You can still object.  That's fine.

20 BY THE WITNESS:

21     A.   Off the top of my head, no, I can't answer

22 that.

23 BY MR. GILL:

24     Q.   Okay.  If you turn back to the Terms and

Page 56

1 Conditions of the purchase order, page 1105, paragraph D,

2 there's a subparagraph that's not numbered that says

3 "Inspection and Defective Work."  Do you see that?

4     A.   Yes.

5     Q.   The second sentence in that subparagraph

6 reads:  "Vendor shall promptly prepare the plan for the

7 approval of the subcontractor in order to replace or

8 correct any vendor's work which contractor shall reject

9 as failing to conform to the requirements of the purchase

10 order and/or contract documents whether rejected before

11 or after installation with inclusion -- sorry -- with

12 exclusion of those specified in item B listed below."  Do

13 you know who wrote that requirement or term in this Terms

14 and Conditions?

15     A.   I do not know.

16     Q.   Do you know if that was the subject of any

17 negotiations between Whitestone and Yuanda?

18     A.   I do not know.

19     Q.   Okay.  There's a lot in there, and I'm going

20 to break it apart so we can address it in pieces.

21        In your experience, how common is it to

22 replace work that was properly performed the first time?

23     A.   Properly performed?

24     Q.   Yes.

Page 57

1     A.   I don't -- extremely, extremely rare.

2     Q.   Can you recall any time you have ever asked a

3 vendor to replace work that was properly performed?

4     A.   No.

5     Q.   Would you agree that in order to "correct"

6 work that work needs to have some kind of defect or

7 something improper in it?

8     A.   Yes.

9     Q.   Do you agree that the sentence that I just

10 read requires that Whitestone reject Yuanda's work?

11     A.   No, that's not my interpretation of that, no.

12     Q.   Okay.  For the record, the part I'm referring

13 to, it says:  "In order to replace or correct any

14 vendor's work which subcontractor shall reject."  You --

15 is it your opinion that someone other than Whitestone has

16 the authority to reject Yuanda's work?

17     A.   Yes.

18     Q.   Okay.  How do you reach that conclusion?

19     A.   Because it's in Whitestone's contract that

20 the owner/architect/construction manager has the right to

21 reject our work and by extension any work -- the work of

22 any subcontractors or vendors by Whitestone.

23     Q.   Are you aware of anyplace in the purchase

24 order where that same requirement is included?

15 (Pages 54 - 57)

Page 58

1    A.    Like my lawyer previously mentioned, I guess
2 that's a legal argument between you and him.
3    Q.    I'm only -- are you aware as a layman of
4 anyplace in that -- in the purchase order where that same
5 requirement is stated?
6    A.    Off the top of my head, no.
7    Q.    Right after the part that I just read states:
8 Rejection is based on "failing to conform to the
9 requirements of the purchase order and/or contract
10 documents." I'm not asking for a legal conclusion, but
11 do you know what that means?
12   A.    Repeat that.
13   Q.    The second part or actually the middle part
14 of that sentence states that: Rejection is quote or
15 based on "failing to conform to the requirements of the
16 purchase order and/or contract documents."
17   A.    Yes. You're asking me what that means?
18   Q.    Yes.
19   A.    Well, if the -- basically if -- if the work
20 does not conform to the -- to the Terms and Conditions of
21 the purchase order and/or the contract documents.
22   Q.    Well, how does something not conform? Does
23 it have to be defective?
24   A.    If it does not follow the contract -- the

Page 59

1 plans and specs of the contract, yes, defective --
2    Q.    Can properly --
3    A.    -- in that way.
4    Q.    I'm sorry. I stepped on your answer again.
5          Can properly performed work fail to conform
6 to the requirements of the purchase order and/or contract
7 documents?
8    A.    I guess no. That be a contradiction.
9    Q.    The next two sentences state: "Upon approval
10 of the vendor's plan by subcontractor, vendor shall
11 promptly replace or correct any vendor's work. If vendor
12 does not do so within a reasonable time, subcontractor
13 shall have the right to do so and vendor shall be liable
14 to subcontractor for the costs thereof." Do you know who
15 wrote that -- Whitestone or Yuanda?
16   A.    I -- I can't tell you for sure.
17   Q.    Okay. And, again, you don't know if that was
18 the subject of negotiations between Whitestone and
19 Yuanda?
20   A.    No.
21   Q.    What does -- do you know what means --
22 what -- the last part of the sentence where it says:
23 "Vendor shall be liable to subcontractor for the costs
24 thereof," what does thereof refer to?

Page 60

1    A.    Let me -- can I -- give me a second to find
2 that sentence --
3    Q.    Absolutely.
4    A.    -- so I could read it.
5    Q.    That's five and six lines up from the bottom.
6    A.    Okay. So you're talking about: "Upon
7 approval of vendor's plan, vendor shall promptly replace
8 or correct any vendor's work. If vendor does not do so
9 within a reasonable time, subcontractor shall have the
10 right to do so and vendor shall be liable to
11 subcontractor for the costs thereof." Is that what
12 you're referring to?
13   Q.    Exactly. I want to -- I want clarification
14 or your understanding of what the costs thereof refers
15 to. Does it refer to vendor's work or does it refer to
16 something else?
17   A.    Any costs associated with -- of -- what's the
18 term -- remediating or fixing work originally the
19 responsibility of the vendor.
20   Q.    What is that conclusion based on?
21   A.    I don't understand your question.
22   Q.    Well, that language that you just in your
23 answer said, the -- any cost related to the remediation
24 is not included in this paragraph, so I want to know how

Page 61

1 you made that -- came to that conclusion that any cost
2 incurred during the remediation is the responsibility of
3 the vendor.
4          MR. CARBONE: Objection to the
5 characterization of the witness's testimony.
6 BY MR. GILL:
7    Q.    Please answer.
8    A.    That's just my -- my interpretation of the
9 English language. I don't know how else to say that.
10   Q.    Okay. If you turn to page 1110 in Exhibit 4,
11 the page titled "Scope of Worksheet Attachment A." What
12 is Attachment A?
13   A.    Well, I'm on page 1110 but where does --
14 where is --
15   Q.    Isn't that the top -- doesn't it say "Scope
16 of Worksheet Attachment A"?
17   A.    Oh, at the very top, yeah.
18   Q.    What is this Attachment A?
19   A.    It's a list of the scope of work. A
20 generalization, a list of scope of work.
21   Q.    For whom?
22   A.    It appears for Yuanda to provide Whitestone
23 Construction.
24   Q.    Do you know who created this chart?

16 (Pages 58 - 61)

Page 62

1    A.   No.  Specifically, no.
2    Q.   At the top of that page about four lines down
3 it says: "Spec Section 084413, 084426 and 088000
4 curtainwall."  Do you know what that refers to?
5    A.   Specifications in the contract between
6 Whitestone and Sciame.
7    Q.   Do you know why only those three
8 specifications are listed?
9    A.   Specifically why?  No, I don't know why.
10 Maybe those were the only specifications relative to
11 Yuanda's work.  I can't -- I can't say yes or no
12 definitively.
13    Q.   Okay.  The first item, first line item in
14 this chart lists those same three specifications and
15 "related sections."  Do you see that?
16    A.   Yes.
17    Q.   Do you know why it lists related sections?
18    A.   Because sometimes in specific specification
19 sections it can make references to other specification
20 sections.
21    Q.   How would any vendor or Yuanda specifically
22 know what section, specification section, related section
23 they are responsible for?
24    A.   Because any -- it would list -- in the spec

Page 63

1 sections that are specifically listed here, it would make
2 a reference to another specification section.
3    Q.   If you can look at -- we've been going for a
4 little more than an hour.  We can take a break.  I'm not
5 changing topics, but it might be a good time for a break
6 if you need one, Don or Mr. Grzic.
7       THE WITNESS:  If you want, I'm fine.  I can
8 use a bathroom break.
9       MR. GILL:  Okay.  That's fine.  So about a
10 five-minute break.
11       THE VIDEOGRAPHER:  Off the record, 10:23.
12       (WHEREUPON, a break was
13       taken.)
14       We're back on the record at 10:33.
15 BY MR. GILL:
16    Q.   Okay.  If you can take a look at Exhibits 22,
17 23 and 24.
18       For the record, Exhibit 22 is a specification
19 Section 084413, Glazed Aluminum Curtainwalls.  Exhibit 23
20 is Section 084426, Structural Glass Curtainwalls, and
21 Exhibit 24 is Specification Section 088000, Glazing.
22       Do you recognize Exhibits 22, 23 and 24?
23    A.   Hold on one second.
24    Q.   Yep.

Page 64

1    A.   I'm sorry.  It was 22, 23?
2    Q.   And 24.
3    A.   Yes.
4    Q.   And what are these exhibits?
5    A.   These are the technical specifications for
6 the work that Yuanda --
7    Q.   For the curtainwall?
8    A.   Yes, for the curtainwall.  For the -- yes.
9    Q.   That is at least part of Yuanda's scope of
10 work?
11    A.   Correct.  Yes.
12    Q.   Okay.  Looking just at Exhibit 22, do you see
13 the first page there is Section 1.02, Summary
14 subparagraph C?
15    A.   Yes.
16    Q.   And C is "Related Sections Include the
17 Following," and then it lists eight different
18 specification sections?
19    A.   Yes.
20    Q.   And your prior testimony and the testimony of
21 Mr. Dearth was Yuanda would know their entire scope of
22 work by or could know their entire scope of work by
23 looking at the related sections that are referenced in
24 the technical specifications that are listed in their

Page 65

1 purchase order?  Is that accurate or pretty close?
2    A.   Yes.
3       MR. CARBONE:  Objection.  Objection to form.
4 BY MR. GILL:
5    Q.   Okay.  Was that accurate?
6    A.   Yes.
7    Q.   Okay.  Looking at that 1.02 sub C, Yuanda
8 wasn't responsible for the sustainable design
9 requirements; is that true?
10    A.   Where is that?  I'm sorry.  Where's --
11    Q.   1.02 C 1.
12    A.   Okay.  I -- sustainable design requirements.
13 I cannot say yes or no.  I don't know.
14    Q.   Okay.
15    A.   I can't -- I can't --
16    Q.   Was Yuanda responsible for thermal
17 insulation?
18    A.   I -- again, I can't tell -- I can't say
19 definitively yes or no they were not responsible for it.
20    Q.   Was Yuanda responsible for hollow clay tile
21 cladding systems?
22    A.   Not, not that I know.  Not that I -- I can't
23 say definitively yes or no.
24    Q.   How would anyone know definitively yes or no

Page 66

1 by looking at the purchase order what work Yuanda was
2 responsible for?
3      A.   Well, it would -- the purchase order said --
4 referred this spec Section 084413, and this spec section
5 refers to -- to other spec sections, and if you go
6 through the actual technical specifications, it can
7 make -- it can refer to information that's listed -- it
8 can refer to information that's required to perform or
9 complete 084413.  It can require information that's
10 listed in these other spec sections that you -- that you
11 just referred to.  So I -- I can't specifically say what
12 it is, what it refers to, but that's why -- that's why
13 paragraph 102 C exists.
14      Q.   I understand.  How would someone know what
15 Yuanda's actual scope of work is by looking at the
16 purchase order in the specifications?  Would they have to
17 read the entire project manual?
18      A.   No.  They would have to read Section -- when
19 it comes to any work covered under Section 084413, they
20 would have to read the entire spec section and see if any
21 references to any information is -- is made to any of the
22 spec sections referred to in Section 1.02 C.
23      Q.   Looking back at Attachment A to the purchase
24 order, Exhibit 4, look at line item 6.  This references

Page 67

1 Yuanda's proposal drawings.  Are you -- do you recall
2 whether Yuanda provided proposal drawings to Whitestone?
3      A.   Specifically I do not -- I'm not aware.
4      Q.   You see in the right hand column -- it
5 appears to me that there's a typo on one of the dates
6 because the third date down is November 25th, 2013, but
7 this purchase order is dated October 24th, 2013.  Should
8 that refer to November 25th, 2012?
9      A.   I -- I do not know.  I can't say that.  Not
10 necessarily.
11      Q.   Line item 9 says that Yuanda's scope of work
12 included system design engineering.  Do you see that?
13      A.   Yes.
14      Q.   Do you know what that means specifically?
15      A.   Specifically coming up with the -- the
16 working -- the drawings and the design of the system
17 along with all the calculations, the support that
18 everything -- everything -- everything confers to the --
19 what's -- sorry.  I'm having a brain freeze.  And to
20 confirm with the calculations that everything conforms to
21 the plans and specifications.
22      Q.   Okay.  And, again, turn the page to WCC1111,
23 line item 38.  Again refers to proposal drawings but also
24 system design.  Do you see that?

Page 68

1      A.   System design per Yuanda proposal drawings,
2 yes.
3      Q.   So was -- as far as you know, was Yuanda's
4 design of the system based on specific criteria?
5      A.   Yuanda's system was -- is supposed to be
6 based upon the plans and specifications, the requirements
7 listed in the plans and specifications.
8      Q.   Are there -- do the plans and specifications
9 include criteria that Yuanda was to use in forming its
10 design?
11      A.   Yes.  It should, yes.
12      Q.   It should but did it?
13      A.   I -- I -- I never referred to any -- I never
14 reviewed any of the plans and specifications to know.
15      Q.   Do you know if Whitestone provided Yuanda
16 with the -- Strike that.
17           Who provided Yuanda with the drawings and
18 specifications?
19      A.   That would have been my project manager.
20 Probably -- most likely Phil Carvelas.
21      Q.   Do you know if someone from Whitestone
22 provided Yuanda with anything other than the drawings and
23 specifications that relate to design criteria?
24      A.   I wouldn't -- I can't say definitively.  I

Page 69

1 have no idea.
2      Q.   I want to talk about the term deflection for
3 a minute.  It's my understanding in my discussion with
4 Mr. Dearth -- I believe he agrees -- there are two kinds
5 of deflection.  There's deflection within a building
6 component.  In this case, the curtainwall system.  The
7 individual members deflect; is that accurate?
8      A.   Yes.
9      Q.   And then there's also overall building
10 movement; is that accurate?
11      A.   Okay.  Yes.
12      Q.   Well, do you agree with that or disagree with
13 that?
14      A.   Yeah.  It depends -- I guess you can always
15 break it down even further, but I would agree with those,
16 yeah.
17      Q.   Okay.  If you look back to Exhibit 22, the
18 Glazed Aluminum Curtainwall Specification.
19      A.   Okay.
20      Q.   Turn to Page 2 which is WCC11789.  There is a
21 Section 1.03 Performance Requirements A 3.  Do you see
22 that?
23      A.   Yes.
24      Q.   Actually, before we look at A 3, turn to the

18 (Pages 66 - 69)

1 next page.  It would be a numbered subparagraph under 1.3
2 D, Deflection of Framing Members.  Do you see that?
3   A.   Yes.
4   Q.   Generally speaking --
5     MR. CARBONE:  I don't see it.  Adam, could you
6 just get me where you were?
7     MR. GILL:  Yeah.  Page number 11790.
8     MR. CARBONE:  D, Deflection?
9     MR. GILL:  D, as in dog.
10     MR. CARBONE:  Thank you.
11 BY MR. GILL:
12   Q.   Are you familiar with, generally familiar
13 with the format of this specification?
14   A.   I'm sorry.  That's a very vague question.
15   Q.   Sorry.  You're muted.
16   A.   Sorry.  That's a very vague question.  What
17 do you mean familiar with?
18   Q.   Well, typically construction projects use
19 Master Spec or some other specification writing program;
20 right?
21   A.   Okay.  Yes.
22   Q.   Are you familiar with that?
23   A.   Yes.
24   Q.   And so this is a standard specification that

1 is edited by the architect for a specific project;
2 correct?
3   A.   Yeah, I can't answer whether this architect
4 used a standard format then just edited it or started
5 this from scratch.  I -- I can't say that.  I don't know.
6   Q.   But the format is pretty standard.  Like part
7 1 is General.  Part 2 is Execution.  Part 3 is
8 Performance or something like that?
9   A.   Yes.  Yes.  In that --
10   Q.   So are you familiar --
11   A.   -- sense, yes.
12   Q.   Sorry.  I'm talking over your answer.
13     Are you familiar with the requirement in a
14 curtainwall specification of deflection of framing
15 members generally speaking?
16   A.   Yes, generally speaking.
17   Q.   So on Page 11790, paragraph D what is
18 generally listed?  I don't want specifics, but what is
19 your understanding of what's generally listed in that
20 paragraph?
21   A.   The deflections of different members of the
22 building.
23   Q.   Well, this relates -- does it relate to the
24 building or the maximum allowable deflection of the

1 curtainwall components?
2   A.   Well, if it's in this spec section, it would
3 be referring to any -- any deflection referring to the
4 member of -- any -- sorry.  If it's in this
5 specification, it would refer to any deflection of the
6 components of this -- of the glazed aluminum curtainwall.
7   Q.   Okay.  If you now turn back to page 11789,
8 1.03 A sub 3 and that --
9   A.   So 103 B 3?
10   Q.   A 3.  103 A 3.
11   A.   103 A 3.  Okay.
12   Q.   And that states:  "Movements of supporting
13 structure indicated on drawings including but not limited
14 to story drift, twist, column shortening, long-term creep
15 and deflection from uniformly distributed and
16 concentrated live loads."  Do you see that?
17   A.   Yes.
18   Q.   Do you know what that means?
19   A.   Yes, that they're supposed to -- when
20 designing the system, they're supposed to just take into
21 account movements of supporting structure indicated on
22 the drawings included but not limited to story drift,
23 twist, column shortening, long-term creep and deflection
24 from uniformly distributed and concentrated live loads.

1   Q.   Are you aware of anywhere in any of the
2 specifications where the architect gives a maximum amount
3 of building movement, deflection or deformation?
4   A.   Can you say that one more time?
5   Q.   Related to the specification only are --
6   A.   Yes.
7   Q.   -- you aware of any place in the
8 specification, any specification, where the architect or
9 engineer of record provides an amount, a maximum amount
10 for building movement, deflection or deformation?
11   A.   In the specifications or in the contract
12 documents?
13   Q.   Specifications.
14   A.   In the -- not that I am aware of in the
15 specifications, no.
16   Q.   In the architectural or structural drawings
17 are you aware of the location where the architect gives,
18 architect or engineer of record gives an amount for
19 building movement, deflection or deformation for the
20 building?
21   A.   Yes.
22   Q.   Where?
23   A.   I don't know off the top of my head.  I
24 believe it's one of the structural -- structural drawings

19 (Pages 70 - 73)

Page 74

1 where it does list a deflection. I don't -- off the top
2 of my head I do not know -- remember which drawing.
3 Q. Is it -- I will represent -- I wasn't going
4 to show you today -- there is a drawing called S003.
5 Does that ring a bell?
6 A. I believe that that could be the -- the
7 drawing that --
8 MR. CARBONE: Adam --
9 THE WITNESS: Sorry.
10 MR. CARBONE: Hold on. Adam, I have a copy of
11 that drawing if you'd like to provide it to the witness.
12 MR. GILL: No, maybe not because I --
13 depending on my follow-up.
14 BY MR. GILL:
15 Q. Are you aware of whether the maximum
16 deflection is listed in more than one place in the
17 architectural or structural drawings?
18 A. I am not aware.
19 Q. Okay.
20 MR. GILL: No, Don, thank you, I don't need
21 that document.
22 BY MR. GILL:
23 Q. You can put the specifications to the side.
24 And if you can look at the document that was previously

Page 75

1 marked as Exhibit 6.
2 A. Okay.
3 Q. Do you recognize this document?
4 A. This is an RFI.
5 Q. And, for the record, what is an RFI?
6 A. RFI stands for request for information. This
7 seems to be an answer from the architect to an RFI.
8 Q. Okay. Do you recall the first time you saw
9 the RFI from Sciame?
10 A. Vividly, no. Like when, no. I mean I
11 remember seeing this before, but I -- when or where I
12 don't -- I can't answer that.
13 Q. The reason I'm asking is you said generally
14 you're not involved in the day-to-day operations but at
15 some point this project had a lot of questions or
16 problems or concerns, I don't remember your exact words,
17 and so you became -- you came to be copied on a lot of
18 e-mails. Do you know if it was about this time or
19 sometime after January 2017?
20 A. It was about this time, give or take months I
21 would --
22 Q. It's my understanding from this RFI, the
23 original RFI not the response, that Sciame is asking the
24 architect to define the relative movement of the building

Page 76

1 components. Is that an accurate understanding of this?
2 A. Yes, they're ask -- yes.
3 Q. And so it's my understanding also that Sciame
4 is not questioning whether Whitestone installed the WT-3
5 properly; is that an accurate --
6 A. They -- they do not mention any of that.
7 They do not mention that.
8 Q. And, likewise, Sciame doesn't mention that
9 it's questioning the design of the WT-3; is that
10 accurate?
11 A. It's -- repeat that question, please.
12 Q. Also Sciame doesn't indicate whether it's
13 questioning the design of the WT-3 clerestory?
14 A. Can I have a chance to read it again?
15 Q. Absolutely.
16 (Witness peruses document.)
17 A. In a way it is inferring that it is
18 questioning the design in my opinion.
19 Q. If it was questioning the design, wouldn't
20 Sciame be sending you or Whitestone the RFI or a question
21 or a direction for Whitestone or Yuanda to explain its
22 design?
23 MR. CARBONE: Objection.
24

Page 77

1 BY THE WITNESS:
2 A. Not necessarily.
3 BY MR. GILL:
4 Q. Do you recall the first time you saw -- or
5 what was the first time you recall seeing the response to
6 this RFI?
7 A. Do I remember when I first -- okay. Ask the
8 question. I'm sorry.
9 Q. Sorry. That was a bad question. I changed
10 in mid sentence.
11 When is the first time you recall seeing the
12 response?
13 A. I don't remember. I would have to --
14 within -- if I had to guess, it would be within two,
15 three months of this, of the date of this RFI.
16 Q. Do you agree -- Strike that.
17 Are you aware that the architect or its
18 consultant is claiming that the maximum roof deflection
19 at the WT-3 clerestory is 3.4 inches?
20 A. Yes, I am aware of that.
21 Q. Do you agree with that?
22 A. I'm -- I am not the designer of the building.
23 Only the designer of the building would be able to answer
24 that. I did not design the building nor am I qualified

20 (Pages 74 - 77)

Page 78

1  to calculate that movement, so . . .
2      Q.   Did you or Whitestone do anything to verify
3  the movement would be 3.4 inches?
4      A.   I guess my previous answer still applies.
5  It's not Whitestone's -- Whitestone does not have the
6  authority or the -- or the -- Whitestone does not have
7  the authority or the qualifications to -- to do that.
8  We're not the designers of the building.  Only the
9  designers of the building who can take into account the
10 entire building design are able to do that.
11     Q.   So from your answer, I take it that
12 Whitestone did nothing to confirm whether the architect
13 is correct or the consultant is correct?
14     A.   It's -- it's not our place.  We would have no
15 standing to -- to question that.
16     Q.   I'm not asking if you had standing.  I'm
17 asking if you did anything to confirm it.
18     A.   That -- I -- not that I'm aware of because we
19 would have no standing.  We are not -- we are not the
20 ones who signed off on the -- on the building design.
21     Q.   Whitestone -- does Whitestone agree or
22 disagree with Sciame that the WT-3 does not accommodate
23 that kind of movement as originally installed?
24     A.   Does Whitestone -- say that one more time,

Page 79

1  please.
2      Q.   Does Whitestone agree or disagree with Sciame
3  that the WT-3 clerestory as originally installed does not
4  accommodate sufficient building movement?
5      A.   If the architect of record states that
6  the -- that the building movement or deflection is the
7  three -- three inches -- I'm sorry.  What was it -- three
8  inches -- the three plus inches, if they state that is
9  the movement criteria, then no, the system does not
10 con -- does not take into account that -- that movement,
11 no.
12     Q.   How do you know it doesn't take into account
13 that movement?
14     A.   I've seen the original shop drawings and the
15 calculations which take -- which take into account the
16 original -- which take into account a different movement
17 criteria.
18     Q.   And Whitestone is accepting as accurate the
19 3.4 inches of movement?
20     A.   Like I said, I -- we -- we cannot dispute
21 that.  We have no -- we have no standing to dispute that.
22 Whether that's -- whether that's physically true or not,
23 it's not for us to -- to question, so I -- so it's
24 pointless for us to dispute that.

Page 80

1      Q.   Are you familiar with the shop drawings for
2  the WT-3 curtainwall system?
3      A.   Not intimately but I have seen them.
4      Q.   Did you or anyone look at them when
5  Whitestone provided them, at the original time that
6  Whitestone provided them, either the initial submission
7  or the revised submission?
8      A.   At what -- say that one more time, please.
9      Q.   Did you or anyone at Whitestone look at or
10 review Yuanda's original submission and revised
11 submission for the shop drawings?
12     A.   I cannot say.  I know I did not.  At the time
13 of submission and resubmission I know I did not.  Can I
14 say --
15     Q.   Did you look -- sorry.
16     A.   I cannot -- I cannot say if anybody else did
17 or did not from Whitestone.
18     Q.   Have you personally ever looked at the
19 original submission or the revised submission at any
20 time?
21     A.   When this issue did come up, then that's when
22 I reviewed it.
23     Q.   Okay.  Why did you look at the shop drawings?
24     A.   I just wanted to get the information for

Page 81

1  myself.  I wanted to examine the information and
2  situation.
3      Q.   What information did you want to get?
4      A.   To see what was on the shop drawings.
5      Q.   Okay.  If you could look at Exhibits 25 and
6  26.
7           And, for the record, these are incomplete or
8  portions of the documents that they -- of the entire
9  document.  Twenty-five is the original submission as
10 returned by the architect dated October 15th, 2014.
11 Exhibit 26 is the architect's review and return of the
12 revised drawings dated February 23rd, 2015.  Both
13 exhibits are the transmittal page from Perkins Eastman,
14 et al., Limited.  I believe it's the first five pages of
15 the submission, and then it is the documents, the four
16 pages I believe that are referred in RFI 1130, Exhibit 6.
17 Those are sheet numbers D328, D329, D331 and Y52.
18          Do you recognize Exhibits 25 and 26?
19     A.   Yes.
20     Q.   Do you or someone at Whitestone -- well, I
21 know -- I think based on your prior answer you didn't
22 look at these when these were returned from Perkins
23 Eastman; is that accurate?
24     A.   At that time, no.

21 (Pages 78 - 81)

1   Q.   Do you know if anyone at Whitestone looked at
2   these when they were returned from Perkins Eastman?
3   A.   Not that I can say definitively, no.
4   Q.   As a -- does Whitestone have a standard
5   practice or procedure what it does with shop drawings
6   that are returned from an architect when Whitestone has a
7   vendor who has prepared those shop drawings?
8   A.   Then we would submit it -- we would submit it
9   back to the vendor to take any appropriate actions as
10   listed on -- on the shop drawings.
11   Q.   Would the -- as the person or party with
12   responsibility, does Whitestone review the comments
13   itself or does it have a policy to review the comments?
14   A.   Depending on the actual shop drawing and what
15   it's about, we may or may not review the -- we may or may
16   not review the comments from the shop drawings prior to
17   or submit -- prior to sending it back to the vendor.
18   Q.   What is the -- how do you determine whether
19   or not to look at the shop drawings prior to returning
20   them to the vendor?
21   A.   It would be up to the project manager to make
22   that decision.
23   Q.   If you look at Exhibit 25, sheet number
24   YUANDA083, do you know what this sheet represents or what

1   is depicted on this drawing sheet?
2        MR. CARBONE:  You're talking about the larger
3   sheets?
4        MR. GILL:  Correct.
5        MR. CARBONE:  And what number were you --
6   Bates stamp number?
7        MR. GILL:  YUANDA083.
8        MR. CARBONE:  You're on number 25?
9        MR. GILL:  Correct.  On the original
10   submission, Exhibit 25.
11   BY THE WITNESS:
12   A.   What drawing are you looking at?
13   BY MR. GILL:
14   Q.   It's -- the drawing is Bates stamp YUANDA083.
15   It is drawing sheet Y52.
16   A.   I don't see -- I don't see any stamp, date
17   stamps on here, these drawings.
18        MR. CARBONE:  In the lower right-hand corner.
19   BY MR. GILL:
20   Q.   Yeah, below the title block.
21   A.   Okay.  Yuanda what was it?
22   Q.   083.
23   A.   08 -- no, it stops at -- 0238 is -- is the
24   last one.

1   Q.   No, they're not --
2        MR. CARBONE:  The numbers skip.
3        THE WITNESS:  Oh, okay.  Okay.
4   BY MR. GILL:
5   Q.   Are you there?
6   A.   Yes.
7   Q.   Do you know what's depicted on this sheet?
8   A.   Seems to be the clerestory, WT-3.
9   Q.   WT-3?
10   A.   Yes, WT-3.
11   Q.   And do you have an understanding of who made
12   those notes that are kind of red or reddish-brown?
13   A.   It seems that this is from the owner's
14   consultant.  I'm not sure if it's the architect or their
15   curtainwall consultant.  I'm not sure.
16   Q.   Okay.  And I want to keep that open,
17   Exhibit 25 open, and open Exhibit 26 to the same drawing
18   sheet which is YUANDA439.
19   A.   Okay.
20   Q.   And you see that the notes at -- that were
21   included for the elevation have been removed in the later
22   draft in Exhibit 26?
23   A.   Yes.
24   Q.   Do you know why those notes were removed?

1   A.   Pretty much safe to assume that they're --
2   the original comments were addressed by Yuanda in the --
3   in the following submission.
4   Q.   And in your experience, that -- the note was
5   removed because the architect was satisfied by how Yuanda
6   addressed it?
7   A.   Yes.  Most likely, yes.
8   Q.   Okay.  And if you can look to the last page
9   in both exhibits.
10        And, for the record, that's -- Exhibit 25 is
11   YUANDA238, and Exhibit 26 is YUANDA594.
12   A.   238 and 594?
13   Q.   Yep.
14   A.   Okay.
15   Q.   Okay.  In Exhibit 25, the earlier submission,
16   the original submission, do you see the note that says:
17   "See deflections of roof beam"?
18   A.   On the -- Exhibit 25 you said; right?
19   Q.   Correct.
20   A.   Yes.
21   Q.   Do you know what that refers to?
22   A.   "Item of this condition shows glass sitting
23   on roof beam which we believe is correct.  Movement must
24   be accommodated in this connection.  See deflections of

Page 86

1 roof beam." And your question was?
2    Q.   Do you know what "see deflections of roof
3 beam" refers to or means?
4    A.   Probably the -- how much the -- how much
5 the -- the roof beam de -- bends and deflects.
6    Q.   When Whitestone received this back from
7 Sciame and after it sent it to Yuanda, do you know if
8 Whitestone did anything to -- as a follow-up to that
9 comment?
10    A.   Did anything regarding?
11    Q.   Seeing the deflection of the roof beam.
12    A.   I don't know if Whitestone did anything in
13 reference to that comment. I can't -- I do not know.
14    Q.   Do you know if Whitestone provided additional
15 information to Yuanda regarding the roof beam deflection?
16    A.   At that time I do not know. I'm not -- I
17 can't say.
18    Q.   At that time -- what do you mean at that
19 time? At the time -- you're unsure at the time or you're
20 not sure now if anything happened at the time?
21    A.   I am not -- I do not know now if anything
22 happened at that time.
23    Q.   Okay. Do you know if Whitestone did anything
24 at any time regarding investigating the roof beam

Page 87

1 deflection?
2    A.   When we received our de -- our rejection from
3 Sciame based on the architect's and their engineer's
4 comments, that's when we -- that's when we gave that
5 information to Yuanda.
6    Q.   Gave what information?
7    A.   About that the -- that the deflection that
8 was originally taken into account was not correct.
9    Q.   Is there anywhere you are aware of in the
10 architectural drawings and structural drawings or the
11 specifications where the roof beam deflection is stated
12 as a number?
13    A.   That specific roof beam?
14    Q.   Yes.
15    A.   No, I'm not aware of anywhere in the specs or
16 the plans that specifically say that specific roof beam
17 has a specific deflection, no.
18    Q.   Do you know of any way or any place in the
19 contract documents that Whitestone or Yuanda could have
20 determined the roof beam deflection before it received
21 the RFI response?
22    A.   I am not aware of, no.
23    Q.   Prior to the installation of the WT-3
24 clerestory did you have any conversation with anyone at

Page 88

1 Yuanda regarding these notes in Exhibit 25?
2    A.   Prior to the installation?
3    Q.   Yes.
4    A.   No.
5    Q.   Prior to the installation of the WT-3
6 clerestory did you have a conversation with anyone at
7 Yuanda regarding this note about the roof beam
8 deflection?
9    A.   No.
10    Q.   Comparing that drawing sheet, YUANDA238 in
11 Exhibit 25, and the same sheet in Exhibit 26, YUANDA594,
12 the later submission 594 contains comments but that
13 specific comment has been removed. Do you see that?
14    A.   Can I take a second to read the comments?
15    Q.   Absolutely. Like I said, I want the best
16 answer you can give.
17    A.   Okay.
18          (Witness peruses document.)
19          Yes. In the 594, it does not mention
20 anything -- there are no comments from the design team
21 regarding any -- any movements.
22    Q.   Okay. Well, there are comments about
23 movement.
24    A.   Well, it --

Page 89

1    Q.   I'll get to that.
2    A.   Yeah, I'm sorry.
3    Q.   There are no comments about roof beam
4 deflection?
5          (Witness peruses document.)
6    A.   I guess if you -- there could be an inference
7 from the comment "what happens when the roof lowers." In
8 my opinion, it would be -- that's -- they are referencing
9 the roof beam in my opinion. They don't specifically use
10 the term roof beam, but that's what that comment infers
11 in my opinion.
12    Q.   Okay. Because they changed the -- the
13 architect changed the language or the -- they went from a
14 statement of see deflection to asking a question, do you
15 have any, based on your experience, opinion or have any
16 idea why they did that or what that means?
17          MR. CARBONE: Objection.
18 BY THE WITNESS:
19    A.   Say that one more time, please.
20 BY MR. GILL:
21    Q.   Based on your experience, do you have any
22 opinion about what it means that the architect went from
23 a statement saying see deflections to asking the
24 question?

23 (Pages 86 - 89)

Page 90

1        MR. CARBONE:  Objection.
2  BY THE WITNESS:
3      A.   My personal opinion would be that's a, what
4  we call in the industry a cover my ass comment which
5  means they're not asking -- they're not saying anything
6  specific but they're saying something just in case
7  something goes wrong.  They could go back and say see, I
8  told you so, but in reality, it's -- it's a worthless
9  comment.
10  BY MR. GILL:
11      Q.   The second one is a worthless comment?
12      A.   That's -- that's from me dealing -- yes,
13  that's --
14      Q.   I just want a clarification.  You said it's a
15  worthless comment.  I just want to make sure that I
16  understand.  You're referring to the second comment not
17  the first comment?
18      A.   The second comment being which one?
19      Q.   The question.
20      A.   Okay.  We have to -- I'm sorry.  We have to
21  start from the beginning now.  I'm -- I'm --
22      Q.   Okay.  Your statement was it's kind of a
23  worthless comment, and I just want to make sure that I am
24  looking at the same thing you are.  The worthless comment

Page 91

1  is the question what happens -- when the roof lowers is
2  kind of --
3      A.   Yes.
4      Q.   -- a CYA --
5      A.   Yes.
6      Q.   -- worthless --
7      A.   It's a pointless -- pointless comment.
8      Q.   I just want to make sure that we're looking
9  at the same thing.
10      A.   I guess pointless would be a better word than
11  worthless, but it's a cover your -- cover-my-ass comment.
12      Q.   Yep.  In your experience, would a consultant
13  remove the note of see deflections of roof beam if Yuanda
14  did not properly address the roof beam deflection?
15        MR. CARBONE:  Objection.
16  BY THE WITNESS:
17      A.   I -- I can't get into the head of -- of a
18  consultant.  I can't answer that.
19  BY MR. GILL:
20      Q.   Looking at the note just in Exhibit 26, the
21  first comment is:  "Is the movement supposed to be
22  accommodated in the glazing pocket."  Do you know the
23  answer to that question?
24      A.   You're referring to the drawing or to

Page 92

1  the -- you still referring to the drawing?
2      Q.   I'm still referring to the drawing on page
3  594 in Exhibit 26.
4      A.   "Is the movement supposed to be accommodated
5  in the glazing pocket"?  Are you asking me if I
6  technically know the answer to that?
7      Q.   Yes.
8      A.   No, I -- I don't know the technical answer to
9  that.
10      Q.   Did anyone, Sciame or the architect or the
11  architect's consultant, require an answer to that
12  question before installation?
13      A.   I -- I can't say.  I -- I would not know.
14      Q.   They didn't -- you don't know if they
15  required an answer from Whitestone before Whitestone
16  installed or Whitestone's vendor installed the
17  curtainwall?
18      A.   I -- that's -- can you repeat the question
19  one more time?
20      Q.   Okay.  Do you know if Sciame, Perkins Eastman
21  or Perkins Eastman's consultant required Whitestone to
22  provide an answer to that question before Whitestone or
23  its installer installed the WT-3 clerestory?
24      A.   I would say no because the -- the submittal

Page 93

1  is -- is marked as made corrections noted, so I would --
2  well, it's -- I would say no.  It says made --
3  submittal's marked mark corrections noted, so I would say
4  that's not required for them to know beforehand.
5      Q.   And that is not a correction noted.  That's a
6  question; is that accurate?
7      A.   Yes.
8      Q.   The next one I think is a noted correction
9  and states:  "Provide counts showing this is adequate
10  with 50 percent sealant with limit."
11      A.   Okay.
12      Q.   As part of the purchase order or as part of
13  the requirements of the purchase order, was Yuanda
14  required to provide engineer stamped calculations?
15      A.   Yes.  I believe so, yes.
16      Q.   As far as you know, did Yuanda provide
17  engineer stamped calculations?
18      A.   Yes.  As far as I know, they did, yes.
19      Q.   As far as you know, did the architect or the
20  architect's consultant approve that -- those submittal of
21  the engineer stamped calculations?
22      A.   As far as I know, yes.
23      Q.   As we sit here today, can you recall anyplace
24  where the architect or the architect's consultant

24 (Pages 90 - 93)

Page 94

1  provided notes or comments where they state the roof beam
2  or the roof or the building deflection will be up to 3.4
3  inches?
4      A.   Am I aware of anyplace on the contract
5  documents or specifications if they -- if they specified
6  that -- that roof movement of 3 point something inches?
7      Q.   Correct.
8      A.   I'm not aware of any right now.
9      Q.   Are you aware of anywhere after they issued
10 the contract documents but before they issued the RFI
11 where the architect or the architect's consultant advised
12 Whitestone or Yuanda or Sciame that the roof beam or the
13 building movement would be up to 3.4 inches?
14     A.   No.
15     Q.   If you can turn to Exhibit previously marked
16 number 7 which is Whitestone Proposed Change Order Number
17 98.
18     A.   Okay.
19     Q.   Do you recall if you saw this document before
20 it was submitted to Sciame?
21     A.   Before submitted to Sciame, I don't recall.
22     Q.   If you did see this, would you have made
23 comments or asked for corrections to it?
24     A.   Probably not.

Page 95

1      Q.   Have you since read the description that's on
2  the fourth page of this, 794?
3      A.   I'm somewhat familiar with this -- this --
4  these comments.
5      Q.   As of today, do you agree or disagree with
6  this change order narrative as it's stated in Exhibit 7?
7      A.   I agree.
8      Q.   Is there anything you disagree with or is
9  there anything you recall you disagree with?
10     A.   No, not that I am aware of at this point, no.
11     Q.   If you can turn to the exhibit that was
12 previously marked Exhibit 8.
13     A.   Okay.
14     Q.   Do you recognize this document?
15     A.   The first page?
16     Q.   Yes.
17     A.   Yes.
18     Q.   Do you recall receiving this e-mail?
19     A.   Yes.
20     Q.   What was your reaction when you received this
21 e-mail?
22     A.   I don't remember really.  This was -- I
23 really do not remember.  It's close to two years ago.
24     Q.   Do you have -- does Whitestone have any

Page 96

1  internal communication between you, Mr. Carvelas and Mr.
2  Dearth regarding this e-mail May 3rd, 2019 from Michael
3  Pardee?
4      A.   There's any -- anything written?  I do -- not
5  that I specifically -- excuse me.  If there's anything,
6  written communication, I'm -- I don't specifically
7  remember.  I'm not aware of.  It's possible.  I know we
8  did talk about it verbally.
9      Q.   Okay.  Did you take any notes of those verbal
10 conversations?
11     A.   No, I did not take any notes.
12     Q.   Okay.  Mr. Dearth testified -- this is my
13 recollection of his testimony -- was that the first
14 notice from Sciame about rejection -- that this e-mail
15 was the first notice about the rejection of the proposed
16 change order, but he testified at some time prior to
17 May 3rd Sciame directed Whitestone to perform remedial
18 repairs.  Is -- is that an accurate reflection of the
19 time line as far as you recall?
20     A.   I can't -- I do not know.  I can't say yes or
21 no.
22     Q.   Do you recall the first time Sciame asked
23 Whitestone to perform remedial repairs for the WT-3
24 clerestory?

Page 97

1      A.   Specifically, no.  I know they asked us to.
2  I don't specifically remember the conversation or the --
3  or the time frame or anything like that.
4      Q.   Do you know if it was before this May 3rd
5  e-mail in Exhibit 8?
6      A.   We were told that -- that it -- the work was
7  rejected prior to this e-mail, and then at that point I
8  believe we did submit a change order to do the work, and
9  then that's when they came back to us with this e-mail
10 saying it's rejected, go do the work anyway.
11     Q.   I understand.  Between the time that you
12 submitted the change order and this e-mail did Sciame
13 tell you to just do the work?
14     A.   Not that I -- not that I remember.
15     Q.   If you can turn to Exhibit 10, previously
16 marked Exhibit 10.
17     A.   Okay.
18     Q.   Do you recall --
19         MR. CARBONE:  Can you just tell me -- Adam,
20 could you just tell me what Exhibit 10 is?  I don't have
21 that.
22         MR. GILL:  Exhibit 10 is the description of
23 dispute dated May 6, 2019.
24         MR. CARBONE:  Thank you.

25 (Pages 94 - 97)

1 BY MR. GILL:

2    Q.  Do you recall whether you saw this document

3 before it was submitted to Sciame?

4    A.  I could have. I could have not.

5    Q.  Do you recall whether you helped Mr. Carvelas

6 draft this document?

7    A.  No. I most -- I -- I don't believe I did

8 help him draft this document, no.

9    Q.  Have you -- are you aware of what's in this

10 document, the contents of what Mr. Carvelas said?

11    A.  Generally speaking, yes.

12    Q.  Is there anything in this document as we sit

13 here today that you disagree with?

14    A.  I do not think so.

15    Q.  If you look at the second page of this

16 exhibit, YUANDA33307, and continuing onto 33308.

17    A.  Okay.

18    Q.  Do you see at the bottom of 33307 there is

19 what Mr. Carvelas says is the excerpts of Yuanda's

20 commentary?

21    A.  Yes.

22    Q.  Do you recall reading the Yuanda commentary?

23    A.  Specifically, no.

24    Q.  Okay. Do you recall at any time disagreeing

1 with what Yuanda said and Mr. Carvelas put in this

2 Exhibit 10?

3    A.  No.

4    Q.  If you can turn to what's been previously

5 marked as Exhibit 11. Oh, sorry. 12, Exhibit 12.

6      And, for the record, that is a letter from

7 Whitestone to Yuanda dated June 24th, 2019.

8      MR. CARBONE: Thank you.

9 BY THE WITNESS:

10    A.  Okay.

11 BY MR. GILL:

12    Q.  And if you look at the second page, is that

13 your signature?

14    A.  Yes, it is.

15    Q.  Do you recognize this letter?

16    A.  Yes.

17    Q.  Who wrote this letter?

18    A.  I do -- I do not remember.

19    Q.  Did you write this letter?

20    A.  I -- I do not think so. Did I write the

21 letter directly myself? No.

22    Q.  In the first line, you state: "We are

23 writing to formally notify you that Sciame has rejected

24 as non-conforming Yuanda's fabrication of the WT-3

1 clerestory structural components."

2    A.  Yes.

3    Q.  What is the basis for that statement?

4    A.  The rejection that we received from Sciame to

5 our --

6    Q.  Sorry. The rejection of the purchase or the

7 proposed change order?

8    A.  "Informing to notify you Sciame has rejected

9 as non-conforming --" well, technically, no. We're

10 referring not to the rejection of the change order, to

11 the rejection of the system --

12    Q.  Okay.

13    A.  -- technically. That's what that line says.

14    Q.  When did Sciame reject the system?

15    A.  I do not know.

16    Q.  Is there a document that Whitestone or you

17 received that Sciame says we are rejecting the system?

18    A.  I -- I'm not aware of any specific document.

19    Q.  So how did you come to the conclusion that

20 Sciame is rejecting the system that Yuanda provided?

21    A.  I'm sure they provided us something, but I'm

22 just saying my -- my answer's I'm not aware of the

23 specific -- I am not aware of this specific document.

24    Q.  Did Sciame reject the design of the system?

1    A.  Sciame rejected the system which includes the

2 design of the system.

3    Q.  Well, the system has many phases, one of

4 which is design. Do you agree?

5    A.  Yes. Yes.

6    Q.  There's also fabrication. Do you agree?

7    A.  Yes.

8    Q.  Did Sciame reject any component of the system

9 because it was not properly fabricated?

10    A.  My -- my understanding of the issue is it was

11 rejected because of the original design criteria used by

12 Yuanda to take into account the design of the system.

13    Q.  Is there a communication from Sciame where

14 they state what you just said?

15    A.  Again, I'm not familiar -- I'm not exactly --

16 I can't refer to a specific document where they say that

17 that I'm aware of.

18    Q.  On June 24th, 2019 when you sent this letter

19 to Yuanda, did you agree with Sciame that Yuanda's

20 fabrication of the WT-3 clerestory was non-conforming?

21    A.  Can you say -- ask that one more time,

22 please.

23    Q.  Yes. On June 24th, 2019 when you sent this

24 letter to Yuanda, did you, you personally, agree that

Page 102

1 Yuanda's fabrication of the WT-3 clerestory was
2 non-conforming?
3     A.  Give me a minute because I need to word this
4 properly.
5           (Brief pause.)
6       MR. CARBONE:  I'm just going to object to the
7 form.
8 BY THE WITNESS:
9     A.  Can you repeat that one more time, please.
10 BY MR. GILL:
11    Q.  Absolutely.  On June 24th, 2019 when you sent
12 this letter to Yuanda, did you personally agree with
13 Sciame that Yuanda's fabrication or fabrication and
14 design of the WT-3 clerestory was non-conforming?
15      MR. CARBONE:  I'll object to the form again.
16 BY THE WITNESS:
17    A.  I agree that we are owed a -- that Whitestone
18 and Yuanda are owed an extra to be paid for this work,
19 remedial work.
20 BY MR. GILL:
21    Q.  Based on that answer, it sounds like you do
22 not agree with Sciame's conclusion; is that correct?
23    A.  Yes, I agree that the architect and the
24 engineer of record bear responsibility, significant

Page 103

1 responsibility for this.
2    Q.  Does Yuanda bear any responsibility?
3    A.  Yuanda bears responsibility inasmuch as
4 Whitestone bears responsibility to Sciame.
5    Q.  Since the architect and others bear you said
6 significant responsibility, what was the purpose of
7 sending this letter on June 24th, 2019?
8    A.  Because it is our interpretation of the
9 agreement that if there's any work to be rejected that
10 Yuanda is responsible to remedy it.
11    Q.  Mr. Dearth testified that to his knowledge
12 this is the only letter or communication from Whitestone
13 to Yuanda where Whitestone rejected Yuanda's work.  Is
14 that correct?
15    A.  I can't say yes or no.
16    Q.  Is there any other communication where you
17 sent to -- Sorry.  Strike that.
18       Is there any communication that you sent to
19 Yuanda in which you say that Yuanda's work is rejected?
20    A.  I -- I cannot say yes or no.  I'm not aware.
21    Q.  I'm asking about -- and I want to make sure
22 that you understand and the record's clear.  I'm asking
23 about what you did personally.  You are not aware at any
24 other time that you sent a communication to Yuanda where

Page 104

1 you told Yuanda Whitestone was rejecting Yuanda's work?
2    A.  I am -- I do not remember, no.
3    Q.  The way I read this letter and based on your
4 testimony, Whitestone is not rejecting Yuanda's work but
5 is passing through Sciame's rejection.  Is that an
6 accurate understanding?
7       MR. CARBONE:  Objection.
8 BY THE WITNESS:
9    A.  I think it's completely -- no, I would
10 disagree.  I would say that Whitestone is rejecting
11 Yuanda's work based on Sciame's rejection.
12 BY MR. GILL:
13    Q.  Okay.  Where in this do you say Whitestone is
14 rejecting Yuanda's work?
15    A.  We don't specifically use those words, but I
16 think it's clearly inferred and logical to come to that
17 conclusion based on -- based on the letter.
18    Q.  Do you agree with Sciame that Whitestone
19 installed the WT-3 clerestory as non-conforming?
20    A.  We installed it according to the originally
21 approved as-noted shop drawings.
22    Q.  Does that mean it was conforming or
23 non-conforming?
24    A.  The design was non-conforming.  We installed

Page 105

1 it correctly to the -- to the incorrect design that's
2 being claimed by the architect.
3    Q.  Is it your testimony that at the time
4 Whitestone installed the clerestory the design failed to
5 conform to the contract documents?
6    A.  Can you repeat that one more time?
7    Q.  Is it your testimony that at the time
8 Whitestone installed the WT-3 clerestory that the
9 curtainwall failed to conform to the contract documents?
10    A.  It's my understanding that at the time it was
11 installed it was installed at that time according to the
12 contract documents as understood at that time.
13    Q.  And at some later date there was additional
14 design criteria provided by Sciame or Perkins Eastman; is
15 that an accurate statement?
16    A.  Yes.
17    Q.  And Yuanda -- Whitestone neither -- Strike
18 that.
19       Neither Whitestone nor Yuanda had that design
20 criteria at the time that the curtainwall system was
21 designed?
22    A.  The 3.4 inches?
23    Q.  Yes.
24    A.  As far as I know, no, I'm not aware of it.

27 (Pages 102 - 105)

Page 106

1    Q.   And neither Whitestone nor Yuanda had that
2  design criteria at the time that the curtainwall was
3  fabricated; is that accurate?
4         MR. CARBONE:  Objection.
5  BY THE WITNESS:
6    A.   As far --
7  BY MR. GILL:
8    Q.   As far as you know?
9    A.   As far as I'm aware, no.
10   Q.   And neither Whitestone nor Yuanda had that
11 design criteria at the time that Whitestone installed the
12 WT-3 curtainwall as far as you know?
13   A.   As far as I know, no.
14        MR. CARBONE:  Objection.
15 BY THE WITNESS:
16   A.   No.
17 BY MR. GILL:
18   Q.   If you turn to the second page of Exhibit 12.
19 In the first paragraph, you state:  "Yuanda is hereby
20 directed to remediate the misfabricated already installed
21 WT-3 clerestory as directed by Sciame and is advised that
22 all costs and expenses related to the same shall be borne
23 by and be the sole responsibility of Yuanda."
24   A.   Yes.

Page 107

1    Q.   What part of the WT-3 clerestory was
2  misfabricated as you state?
3    A.   In essence, the entire thing was
4  misfabricated because it was -- it was fabricated
5  originally to the wrong design criteria.
6    Q.   Well, do you agree that the components that
7  Yuanda delivered were fabricated based on approved shop
8  drawings?
9    A.   Can you say that one more time, please.
10   Q.   Do you agree that the components that Yuanda
11 delivered to the project site were fabricated based on
12 approved shop drawings?
13   A.   It was based on made -- made corrections
14 noted shop drawings, yes.
15   Q.   Were those components fabricated to conform
16 to the notes and the shop drawings?
17   A.   The notes on the shop drawings at that time,
18 yes, those specific submissions, yes.
19   Q.   And as far as you know, Whitestone installed
20 those components based on the approved shop drawings?
21   A.   On those approved made corrections noted shop
22 drawings, yes.
23   Q.   So what component that Whitestone installed
24 was misfabricated?

Page 108

1    A.   It would be -- the entire system would be
2  misfabricated based on the architect's -- based upon the
3  architect's -- what's the term -- condition that the
4  total deflection was 3.4 inches.
5    Q.   But --
6    A.   Not based on --
7    Q.   Sorry.
8    A.   Not based upon the half an inch that was
9  originally used.
10   Q.   That's a problem with the design not the
11 fabrication; right?
12   A.   In my opinion, yes.
13   Q.   Okay.  And so the components that were
14 delivered to the site matched the components as shown in
15 the shop drawings; is that accurate?
16   A.   The components that were delivered to the
17 site matched the components that were shown as made
18 corrections noted on the previous submission, yes.
19   Q.   And just so we're touching all the bases,
20 your statement that Yuanda bears all costs -- we talked
21 about that when we talked about the purchase order -- is
22 that the section we discussed in the purchase order?
23   A.   I believe --
24        MR. CARBONE:  I'm going to -- I'm going to

Page 109

1  object to form only because you mentioned a lot of
2  sections of the purchase order, so if you want to refer
3  him to what language, that's fine.
4         MR. GILL:  Okay.  I withdraw the question.
5  BY MR. GILL:
6    Q.   When you say that Yuanda is advised that all
7  costs and expenses related to same be borne by and be the
8  sole responsibility of Yuanda, what do you mean?
9    A.   That any remediation of this -- any costs
10 associated with the remediation of this is the
11 responsibility of Yuanda.
12   Q.   What's the basis for you saying that?
13   A.   Based on our purchase order.
14   Q.   What language in the purchase order says
15 that?
16   A.   I'll have to go read all the pages to give
17 you the answer.  I don't know.
18   Q.   Did you read all the pages when you wrote
19 this letter?
20   A.   I -- I don't think I wrote this letter.
21   Q.   Who wrote --
22   A.   Somebody --
23   Q.   -- this letter?
24   A.   Most -- most likely the project manager wrote

28 (Pages 106 - 109)

Page 110

1 it, and I reviewed it and signed off on it.

2    Q.   And you agreed with everything that was said

3 in this letter then?

4    A.   I have no reason not to.

5    Q.   Okay. So what part of the purchase order

6 requires that Yuanda bear all and be the sole

7 responsibility for all costs?

8    A.   Didn't we review -- review that before?

9    Q.   I -- did we? I don't know.

10   A.   I -- I thought I remember we did. What --

11 what was the exhibit number for the purchase order?

12   Q.   Five.

13       MR. CARBONE: Wasn't it 4?

14       MR. GILL: Oh, yes, 4. I'm sorry. Correct.

15 BY MR. GILL:

16   Q.   And are you referring to -- to help not to

17 belabor this, at the bottom of 1105 the paragraph under

18 Paragraph 10, is that the portion that we discussed

19 earlier and is that the portion you're referring to?

20       MR. CARBONE: Just so the record's clear,

21 you're referring to paragraph "Inspection and Defective

22 Work"?

23       MR. GILL: Correct.

24       MR. CARBONE: Okay.

Page 111

1 BY THE WITNESS:

2    A.   The line that says: "If vendor does not do

3 so within a reasonable time, subcontractor shall have the

4 right to do so, and vendor shall be liable to

5 subcontractor for the costs thereof."

6 BY MR. GILL:

7    Q.   Okay. In the last paragraph of your letter,

8 Exhibit 12, you started by saying: "Be assured that

9 Whitestone has taken and will continue to take the

10 position that the information contained in Sciame's

11 response to RFI number 1130 constitutes a belated design

12 change in the contract documents for which Whitestone

13 (and Yuanda) is entitled to a change order." Is that a

14 true statement?

15   A.   Yes.

16   Q.   What do you mean by belated design change?

17   A.   That the architect came in after the fact to

18 make a design change -- to make a change to the design

19 criteria.

20   Q.   And what design criteria are you referring

21 to?

22   A.   The -- the deflection.

23   Q.   So the misfabrication you referred to in this

24 letter is a result of that later provided design

Page 112

1 criteria; is that correct?

2    A.   Yes.

3    Q.   If this is a design change, why are you

4 demanding that Yuanda pay all costs and expenses?

5    A.   Because it's our position that as far as

6 Whitestone is responsible for any of -- any of this that

7 it is actually Yuanda's responsibility.

8    Q.   Yuanda was responsible for installing this

9 new -- newly designed bracket; is that your position?

10   A.   Sorry. That -- that question doesn't make

11 much sense.

12   Q.   You said that it's your position to the

13 extent that Whitestone is responsible that Yuanda is

14 responsible; is that accurate --

15   A.   Yes.

16   Q.   -- what I said?

17   A.   To the -- Yes.

18   Q.   Okay. So why is Yuanda responsible for the

19 actual installation or the cost to actually install this

20 newly designed bracket?

21   A.   Because the installation of the newly

22 designed bracket is a -- is a result of the original

23 design not being correct.

24   Q.   Well, the original -- correct me if I'm

Page 113

1 wrong. I know we're going in circles here. The original

2 design was not correct because of later provided

3 information; right?

4    A.   Again, that's my opinion, yes, but -- and

5 like I said before, but as far as Whitestone is

6 responsible, that responsibility is passed down to

7 Yuanda.

8    Q.   Was Yuanda ever responsible under the terms

9 of the purchase order for installing any part at the

10 project?

11   A.   To install --

12       MR. CARBONE: Objection. Objection to form.

13 BY THE WITNESS:

14   A.   White -- I'm sorry. Ask one more time.

15 BY MR. GILL:

16   Q.   Under the terms of the purchase order was

17 Yuanda ever responsible for the costs to install any

18 component of the WT-3 clerestory?

19       MR. CARBONE: Objection to form.

20 BY THE WITNESS:

21   A.   White -- Yuanda was not responsible to -- for

22 the costs for any of the -- of the original installation

23 of the -- of any material that they provided, no.

24 BY MR. GILL:

29 (Pages 110 - 113)

Page 114

1    Q.   Why are they then responsible for the
2  installation of this newly designed bracket?
3    A.   Because, once again, it's as far as
4  Whitestone was responsible to do this, our interpretation
5  is that Yuanda is responsible because of the design flaw,
6  the original design flaw.
7    Q.   What is the original design flaw?
8    A.   That the deflection went from -- was -- the
9  original -- the original design was based on half an
10  inch, where now the architect is stating that it's based
11  on 3.4 inches.
12    Q.   Why didn't Whitestone provide that 3.5 -- 3.4
13  inches when Yuanda originally designed the clerestory?
14    A.   Because we were not aware of it.
15    Q.   So was Yuanda aware of it?
16    A.   I -- I don't know if they were aware of it or
17  not.  If they weren't or if it was unclear at any point
18  what the design should have been, it was Yuanda's
19  responsibility as the designer to ask the question what
20  is the proper deflection.
21    Q.   Whitestone has a responsibility to Sciame to
22  design the system; correct?
23    A.   Yes.
24    Q.   And Whitestone has a responsibility to Sciame

Page 115

1  to ask the question about deflection; correct?
2    A.   As -- when take into account our contract
3  direct with Sciame, yes, Whitestone is responsible, but
4  Whitestone hired Yuanda as the consultant to do that work
5  for us.
6    Q.   Did Whitestone ever ask Sciame what the
7  maximum deflection was at the WT-3 clerestory?
8    A.   Did Whitestone -- Whitestone never
9  specifically asked that question, no.
10    MR. GILL:  Okay.  I'd like to take a break
11  now.
12    MR. CARBONE:  How long?
13    MR. GILL:  Five minutes.
14    THE VIDEOGRAPHER:  We'll go off record, 11:41.
15       (WHEREUPON, a break was
16       taken.)
17    We're back on the record at 11:49.
18  BY MR. GILL:
19    Q.   I want to talk about the affidavit or
20  declaration you provided in support of Whitestone's
21  motion for summary judgment, so if you could look at
22  Exhibit 27.
23    A.   Okay.
24    Q.   Do you recognize this document?  Have you

Page 116

1  seen this document in this form?
2    A.   Yes.
3    Q.   Now, I suspect that your attorney helped
4  because that's what we do, but who drafted the majority
5  of this declaration?
6    A.   I'm pretty -- most likely my lawyer.
7    Q.   Okay.  Did you have an opportunity to review
8  and make comments of this before it was submitted?
9    A.   Yes, I did.
10    Q.   Before I ask questions about these
11  statements, are you aware of anything in here that's
12  inaccurate or incorrect?
13    A.   Not that I'm aware of.
14    Q.   Okay.  And if you look at declaration number
15  1, statement number 1, it says you have personal
16  knowledge of the facts set forth herein.  Is that
17  accurate?
18    A.   Yes.
19    Q.   In paragraph or statements 6 through 12, you
20  go through a very detailed explanation of the prime
21  contract and the administrative dispute resolution
22  process.  It's my understanding from your prior -- your
23  testimony earlier today you have not seen the prime
24  contract; is that correct?

Page 117

1    A.   I'm sorry?
2    Q.   It's my understanding from your testimony
3  earlier today you had not seen the prime contract; is
4  that correct?
5    A.   Between?  Between whom?
6    Q.   The prime contract as I understand it is
7  between the owner and Sciame.
8    A.   Okay.  I -- yes, my recollection, I've never
9  seen it.
10    Q.   Okay.  If you turn to statement 14 which is
11  on Page 4 of Exhibit 27 and read that to yourself, and
12  I'm going to have you -- when I direct you to a
13  statement, I want you to read it to yourself.
14    A.   Okay.
15       (Witness peruses document.)
16    Okay.  I've read it.
17    Q.   Okay.  You state in this that -- in part,
18  that the construction documents were 100 percent
19  complete, meaning that the builder could construct the
20  project to 100 percent completion without any deviation
21  from the plans.  Did you review the construction
22  documents when Whitestone received them?
23    A.   Prior to bid?
24    Q.   Yes.

30 (Pages 114 - 117)

Page 118

1    A.    Not that I remember.
2    Q.    Who at Whitestone reviewed the construction
3  documents?
4    A.    This would have been Phil Carvelas.
5    Q.    So what is the basis of your statement,
6  your -- based on your personal knowledge that Whitestone
7  reviewed them and they were 100 percent complete?
8    A.    Because that's simply the way things work.
9  That's -- that's the -- that's -- that's industry
10  standard.
11    Q.    That the construction documents are 100
12  percent complete?
13    A.    That they're supposed to be, yes.
14    Q.    I understand they're supposed to be, but this
15  is a statement of fact that you say Whitestone reviewed
16  them and the documents were 100 percent complete.  You
17  don't know that as a fact.  You're basing it on
18  conversations with Phil; right, or someone else?
19    A.    No.  I'm basing that upon -- that's un --
20  it's industry standard, that when you provide a bid that
21  you're providing a bid against drawings that are supposed
22  to be 100 percent completed.
23    Q.    It was intended that the drawings be 100
24  percent complete?

Page 119

1    A.    Yes.
2    Q.    Okay.  Do you know if they were 100 percent
3  complete?
4    A.    I guess it depends on your definition of
5  complete, meaning complete enough to provide a bid to or
6  complete enough to build against.
7    Q.    What did you mean in statement 14 when you
8  said they were 100 percent complete?
9    A.    Meaning to bid.
10    Q.    They were not 100 percent complete to be
11  constructed to then?
12    A.    Well, they never are because it's -- it's --
13  I don't think there's ever been any job in the history of
14  construction that there's never been a change to a -- to
15  a contract document.
16    Q.    Quite frankly, I was surprised to see the
17  number 100 percent complete in your statement of facts
18  because you're absolutely right.  Things happen.  Things
19  change.  Things don't -- aren't the way they are drawn.
20  Architects can draw anything.  I get that.
21        So turning to statement 15, can you read that
22  to yourself?
23    A.    "Whitestone commenced work on the project --"
24        (Witness peruses document.)

Page 120

1        Okay.
2    Q.    Is that a statement that you have personal
3  knowledge of?
4    A.    Personal knowledge at -- at the time -- at
5  the time in -- at the time of April 2014?
6    Q.    Well, you signed these -- okay.  Let me --
7  let me clarify.  These were submitted in November 2020,
8  and so in November 2020 you are stating as fact the
9  statement in 15.
10    A.    Yes.
11    Q.    In November 2020, was that an accurate
12  statement?
13    A.    It was an accurate statement at -- at April
14  2014 that when we commenced that that was the assumption.
15    Q.    Okay.  What anticipated minimum changes did
16  you expect?
17    A.    That's -- that's very difficult to -- to
18  qualify or to describe.  It's -- I would say you probably
19  base that upon a percentage of the contract -- of the
20  original contract value.
21    Q.    Okay.  What percentage is it?  How do you
22  define minimum change?
23    A.    In my opinion, it would be one to two percent
24  shooting from the hip, I guess.

Page 121

1    Q.    Were the WT-3 clerestory not -- sorry.  So
2  for all of the curtainwall, all the work that Yuanda was
3  going to perform not counting this later change, what
4  were the total percentage of changes that occurred during
5  construction?
6    A.    I don't know.  I can't answer that.
7    Q.    Was it more than one or two percent?
8    A.    I am -- I -- I have -- I have no idea.  I
9  can't answer that.  I don't have -- I never saw that
10  information.
11    Q.    Who would have that information?
12    A.    I guess Phil Carvelas would.
13    Q.    If you can turn to statement 19.  Read that
14  to yourself.
15        (Witness peruses document.)
16    A.    Okay.
17    Q.    Okay.  And I'm asking for clarity on this
18  because I'm confused.  This -- the way this reads to me
19  is that Whitestone and Yuanda did all of the work listed
20  here cooperatively.  So -- but it's my understanding that
21  actually Yuanda did the work regarding preparing
22  submittals, drawings and materials needed to obtain
23  approval.  Is that accurate?
24    A.    Yeah, for their -- for their scope of work

31 (Pages 118 - 121)

Page 122

1 that they were hired to do, yes.
2    Q.   Okay.  And that Whitestone and not Yuanda was
3 working to construct and install the curtainwall?
4    A.   I don't get -- I don't get that question.
5    Q.   Well, it says -- the second part is:  "And
6 thereafter, to construct and install the project's
7 curtainwall system including but not limited to the WT-3
8 clerestory."  Do you see that?
9    A.   Yes.
10    Q.   And who was responsible for the construction
11 and installation of the project's curtainwall system?
12    A.   It was -- it was the responsibility of Yuanda
13 to design and fabricate it and for Whitestone to -- to
14 install.
15    Q.   Did White -- or did Yuanda have any
16 responsibility for the installation of the curtainwall
17 system?
18        MR. CARBONE:  Objection.
19 BY THE WITNESS:
20    A.   At the original installation, no.
21 BY MR. GILL:
22    Q.   If you can turn to statement 23 on Page 7.
23    A.   Okay.
24    Q.   Read that to yourself, please.

Page 123

1        (Witness peruses document.)
2    A.   Okay.
3    Q.   In statement 23 you say at the end, the last
4 half is:  "There were no obvious and unambiguous
5 corrections noted with respect to any -- to the --"
6 sorry -- "with respect to the ability of the WT-3
7 clerestory system to accommodate movement."  Is that an
8 accurate statement?
9    A.   Yes.
10    Q.   What do you mean by no obvious and
11 unambiguous corrections noted?
12    A.   At that time the architect never -- never
13 indicated the -- the proper deflection of 3.4 inches at
14 that point, at that time in this submittal.
15    Q.   For the record, we're talking about the
16 second submittal, the make corrections noted --
17    A.   Yes.
18    Q.   -- comments?
19        If you can look at statement 28 on the next
20 page, Page 8.  Read that to yourself, please.
21        (Witness peruses document.)
22    A.   Okay.
23    Q.   In your answer, you quote from the RFI
24 response, and you may want the RFI, you know, response

Page 124

1 which is Exhibit 6.  Do you know what the architect or
2 its consultant was talking about when it talks about
3 concern was previously noted in the 2014 prior submittals
4 to verify the larger movement joint to accommodate roof
5 deflection?
6    A.   Specifically what he's referring to I don't
7 know.
8    Q.   Did you do anything to ask or investigate
9 what the architect meant regarding that comment?
10    A.   I'm not -- I'm not even -- like I said, I'm
11 not even aware of that comment, so I can't -- I can't
12 answer that question.  I'm not even -- I don't even know
13 what -- what comment he's referring to.
14    Q.   If you can turn to Exhibit 6.  In the yellow
15 box on the first page of Exhibit 6, there are four noted
16 items or noted comments or questions.
17    A.   Yes.
18    Q.   The second one appears to be the one you're
19 referring to in your declaration.  So do you recall ever
20 reading that comment on the RFI, Exhibit 6?
21    A.   You mean -- do you mean the comment on the
22 RFI or the comment he's referring to originally?
23    Q.   The comment on the RFI.
24    A.   I don't specifically remember reading this

Page 125

1 comment on this RFI.
2    Q.   Do you remember any communication between you
3 and Sciame or Perkins Eastman regarding previous concerns
4 expressed by the architect or the architect's consultant?
5        MR. CARBONE:  Just for clarity, when you say
6 you, you mean Mr. Grzic --
7        MR. GILL:  I'm not talking about --
8        MR. CARBONE:  -- personally?
9        MR. GILL:  Yes.
10        MR. CARBONE:  Personally?
11        MR. GILL:  Yes.
12        MR. CARBONE:  Okay.
13 BY THE WITNESS:
14    A.   Not that I -- not that I'm aware of, no.
15 BY MR. GILL:
16    Q.   Is there anything that you know of, know
17 about their concerns, meaning Perkins Eastman, Sciame or
18 the consultant, other than what's actually stated in this
19 document?
20    A.   Which document?
21    Q.   The RFI, Exhibit 6.
22    A.   Okay.  So repeat that question then one more
23 time.
24    Q.   Do you have any understanding or information

32 (Pages 122 - 125)

Page 126

1 regarding Sciame, Perkins Eastman or the consultant's
2 concern other than what's stated in the Exhibit 6?
3    A.   Not really.
4    Q.   Do you -- did you do anything to investigate
5 this statement in Exhibit 6?
6    A.   Me personally?
7    Q.   Yes.
8    A.   No.
9    Q.   Do you know if anyone at Whitestone did
10 anything to investigate that comment?
11    A.   Not definitively, no, but they -- not
12 definitively, no.
13    Q.   And then you said but.  I missed what you
14 said.
15    A.   Yeah, I --
16    Q.   They should have or they shouldn't?
17    A.   No.  My answer's I definitively -- no, that's
18 it.  I definitively do not know if anybody looked into
19 this, no.
20    Q.   Okay.  If you can read statement 29 to
21 yourself in Exhibit 27 on Page 8.
22    A.   You said 27 or 29?
23    Q.   No.  No.  Sorry.  I know a lot of numbers.
24 Exhibit 27 --

Page 127

1    A.   Oh, okay.
2    Q.   -- your declaration, on Page 8, paragraph 29.
3    A.   Okay.
4         (Witness peruses document.)
5         Okay.
6    Q.   The second sentence you state:  "Our position
7 was that the architect's submittal disposition" then it
8 continues.  I just -- question about our position.  Are
9 you referring to the combined position of Yuanda and
10 Whitestone or are you talking about Whitestone's
11 position?
12    A.   Well, our appears to be referencing
13 Whitestone and Yuanda in the sentence before, so I would
14 say Yuanda and Whitestone.
15    Q.   Okay.  And so it's your understanding and
16 position that Yuanda was permitted to fabricate the WT-3
17 clerestory based on the second submission as long as they
18 complied with the comments that the architect provided;
19 is that accurate?
20    A.   Yes.
21    Q.   Okay.  If you can look at statement 30 on the
22 same page.
23    A.   Okay.
24    Q.   You say:  "In a -- in a direction by

Page 128

1 Sciame -- Sciame to Whitestone."  What direction are you
2 referring to?
3    A.   That the system is rejected.
4    Q.   I understand.  But the direction came -- was
5 received in some way.  So is that the May 3rd, 2019
6 e-mail or was there something else?  And before you
7 answer, that May 3rd e-mail is Exhibit 8.
8    A.   Exhibit 8?
9    Q.   Yes.
10    A.   Yes, most likely it refers to Exhibit 8, yes.
11    Q.   Okay.  Were there any other directions that
12 you were referring to from Sciame that Whitestone needs
13 to create -- perform remedial repairs?
14    A.   I am not aware of any other one.
15    Q.   Okay.  Now, is the last half of that
16 statement also correct that Sciame was directing
17 Whitestone to make changes to the "previously installed
18 WT-3 clerestory structural members to be modified in the
19 field"?  Is that an accurate statement?
20    A.   That -- say that question one more time,
21 please.
22    Q.   I just want to know if the last half of that
23 sentence is accurate, that Sciame directed Whitestone
24 that the previously installed WT-3 clerestory structural

Page 129

1 members be modified in the field?
2    A.   No, I don't think Sciame -- quote Sciame
3 didn't specifically say to -- Sciame does not -- would
4 not have told us the means and methods of what to do or
5 how to do it.  It would have been our responsibility to
6 propose a remediation, and the architect of record would
7 have to approve it, and then the means and methods of --
8 of -- of finishing that remediation would be up to us, so
9 technically your -- the answer -- the technical answer to
10 your question is Sciame did not direct us to modify it in
11 the field.
12    Q.   It was Whitestone's means and methods on how
13 that modification or remediation was to be accomplished?
14    A.   Along with Yuanda because Yuanda prior --
15 provided us with the drawings of what they would approve
16 of the changes to their system.
17    Q.   If you can turn to the next page and read
18 statement 32 to yourself.
19         (Witness peruses document.)
20    A.   Okay.
21    Q.   You state -- the last half of the first
22 sentence says:  "Whitestone was required under the
23 administrative dispute resolution process to correct the
24 work immediately."  Is that -- where is that requirement

33 (Pages 126 - 129)

1 of Whitestone stated?

2     A.   That would be somewhere in the contract

3 between Whitestone and Sciame.

4     Q.   Is that in the prime contract or the

5 subcontract?

6     A.   I don't know off the top of my head. I'm not

7 sure.

8     Q.   Is that the requirement that Whitestone

9 perform work under protest? Is that tied to the same

10 thing?

11     A.   Yeah. I would -- yeah, they're related.

12     Q.   Are you -- do you know whether the purchase

13 order Terms and Conditions require that Yuanda perform

14 work under protest?

15     A.   That's my understanding, yes.

16     MR. GILL: Mr. Gill?

17     MR. GILL: Yeah.

18     MR. CARBONE: Mr. Gill, our lunch came, so

19 whenever it's good for you to break.

20     MR. GILL: Let me finish up on this statement

21 then we can take a break.

22     MR. CARBONE: Sure.

23

24 BY MR. GILL:

1     Q.   In this last statement, paragraph 32 on Page

2 9, you state: "Yuanda was aware of the need to fix now

3 and agreed to get paid later (if at all) pending the

4 outcome of the dispute resolution process." What is your

5 basis that -- to say that Yuanda was aware of the need to

6 fix now?

7     A.   We -- Whitestone told Yuanda that this is --

8 that it needs to be fixed now. This is -- we cannot

9 delay fixing this because it's a -- one, it's a life

10 safety issue; and, two, by contract we need to fix it now

11 even though we disagree with the owner's stance that it

12 is not an extra.

13     Q.   What does -- what do you refer to or the time

14 frame of now? Because this was raised in January 2017.

15 The work occurred in August/September of 2020, so what is

16 the -- what do you mean by now?

17     A.   ASA -- as soon as possible I would say.

18     Q.   Okay. Was the building shut down between

19 January 2017 and the time that the remediation was

20 completed?

21     A.   Due to COVID, I believe so.

22     Q.   Was it shut down prior to COVID, prior to

23 February 2019 -- 2020? I'm sorry.

24     A.   20 -- not that I'm aware of. I do not know.

1     Q.   I only ask because you said this is a life

2 safety issue.

3        You state in that same sentence that Yuanda

4 agreed to get paid later. What is your factual basis

5 that Yuanda agreed to get paid later?

6     MR. CARBONE: I'm going to object to the --

7 BY THE WITNESS:

8     A.   You know --

9     MR. CARBONE: I'm going to object to the

10 form. I don't think that's what it says.

11     MR. GILL: Okay. I'll read it again into the

12 record.

13     MR. CARBONE: Sure.

14 BY MR. GILL:

15     Q.   "Yuanda was aware of the need to fix now and

16 agreed to get paid later (if at all) pending the outcome

17 of the dispute resolution process." So what is your

18 basis for saying Yuanda agreed to get paid later?

19     MR. CARBONE: Same objection.

20 BY THE WITNESS:

21     A.   That was -- it didn't come through.

22     MR. GILL: I heard it. Yeah, it came through.

23     THE WITNESS: Oh, okay.

24 BY THE WITNESS:

1     A.   Okay. That's based upon our purchase order

2 which we feel that it states that Yuanda's held to the

3 same Terms and Conditions as we are to the owner

4 regarding disputed -- disputed work, saying that Yuanda

5 is bound to those same conditions to fix it now and --

6 and to -- to get compensated at a later date pending the

7 outcome of the dispute resolution process.

8 BY MR. GILL:

9     Q.   You're -- you're not referring to some

10 communication that occurred after January 2017 where

11 Yuanda said we agree to get paid later?

12     A.   No, I'm not aware of Yuanda ever saying that

13 to me.

14     MR. GILL: That's it on this. We'll take a

15 break. What do you need, half hour?

16     MR. CARBONE: Half an hour's good.

17     MR. GILL: Okay. Sounds good.

18     THE VIDEOGRAPHER: Off the record, 12:15.

19        (WHEREUPON, a break was

20         taken.)

21     We're back on the record at 12:49.

22 BY MR. GILL:

23     Q.   Okay. Still looking at Exhibit 27, your

24 declaration, if you can look at Page 13, statement 44 and

34 (Pages 130 - 133)

Page 134

1  read that to yourself, please.
2         (Witness peruses document.)
3      A.   Okay.
4      Q.   In this statement, you say that:  "Whitestone
5  informed Yuanda that the right to seek additional
6  compensation was specifically preserved."  Did you have
7  any discussions with Yuanda regarding the right to seek
8  additional compensation whether that was specifically
9  preserved?
10     A.   I had discussions with Yuanda telling them
11  yes, that we will -- that we have the right to -- to go
12  after this extra and that we fully intend to.
13     Q.   Okay.  What do you mean by was specifically
14  preserved by Whitestone's timely filing of the notice of
15  dispute?
16     A.   The contract -- the contract -- the contract
17  requires us to file a notice of dispute and a description
18  of dispute whenever there's a dispute arises as to extra
19  work and that those notices were filed with the
20  construction manager, Sciame.
21     Q.   Okay.  And was that in the subcontract
22  between Whitestone and Sciame or the prime contract, the
23  requirement?
24     A.   I don't remember which one it was in.  I

Page 135

1  don't know.
2      Q.   And then the second sentence at the very
3  bottom of the page says:  "Whitestone further urged
4  Yuanda to complete the remediation work under protest."
5  Did you have conversations directly with Yuanda regarding
6  Yuanda's requirement to perform work under protest?
7      A.   I talked to Yuanda directly, and I believe
8  that was mentioned.
9      Q.   Okay.  When did you -- if you recall, when
10  did you tell Yuanda that it needed to perform remediation
11  work under protest?
12     A.   I -- the exact dates or even the general time
13  line I don't even know.  I can't even say.  Prior to
14  us -- prior to us commencing with the actual physical
15  work.
16     Q.   In this statement what remediation work are
17  you referring to?
18     A.   What remediation work?  That we -- I don't
19  know if I can technically tell you.  I think some --
20  some -- some of the steel in WT-3 was replaced or added
21  to allow -- to allow more deflection in the system.
22  That's the best I could describe it as.
23     Q.   The remediation work required by Sciame's
24  rejection included redesign of that connection, the head

Page 136

1  connection of the WT-3; correct?
2      A.   Yes.
3      Q.   That included new details for that head
4  connection; is that accurate?
5      A.   Yes.
6      Q.   It included new structural calculations for
7  that connection?
8      A.   I believe so, yes.
9      Q.   Yuanda did, in fact, provide design services
10  for that new connection, didn't it?
11     A.   Yes, they did.
12     Q.   They -- they redesigned the connection
13  detail?
14     A.   I'm not sure if they redesigned it from
15  scratch or if someone from my office proposed to them
16  what -- what we felt would be best in the field to do and
17  they just reviewed it and agreed to it, said yes, go
18  ahead.
19     Q.   Well, they provided --
20     A.   They --
21     Q.   They provided the drawings?
22     A.   Yeah, they provided the actual drawings and
23  the calculation, yes.
24     Q.   And they provided engineer stamped

Page 137

1  calculations?
2      A.   Yes.
3      Q.   So Yuanda did provide work -- remediation
4  with respect to this new connection?
5      A.   They provided some services, yes.
6      Q.   Okay.  If you can look at statement 45 and
7  read that to yourself.
8         (Witness peruses document.)
9      A.   Okay.
10     Q.   My question relates to the -- what you see in
11  the second line where -- the "remediate the purportedly
12  misfabricated previously installed clerestory system."
13  Are you referring to when you say misfabricated what we
14  discussed earlier about the misfabrication, that it was
15  the entire system that was misfabricated?
16         MR. CARBONE:  I object to form.
17  BY THE WITNESS:
18     A.   Can you ask the question one more time?
19  BY MR. GILL:
20     Q.   Okay.  What misfabricated components of the
21  WT-3 clerestory system are you referring to in this
22  statement?
23     A.   Misfabricated means originally fabricated
24  along -- misfabricated according to the new design

35 (Pages 134 - 137)

Page 138

1 criteria, so the -- best I can answer that is the
2 entire system is -- is misfabricated.  I can't point out
3 any specific component of the system that would be
4 misfabricated.
5     Q.    Was any part of the WT-3 clerestory
6 misfabricated based on the information that Whitestone
7 had or Yuanda had as of December 31st, 2016?
8     A.    Is that date -- that date refers to what --
9 what happened on that date specifically?
10     Q.    Nothing.  It's three weeks before the RFI was
11 issued.  So at any time --
12     A.    Oh.
13     Q.    -- prior to the issuance of the RFI was
14 the -- is it your opinion whether the WT-3 clerestory was
15 misfabricated?
16     A.    We were not aware of any reason for it to be
17 misfabricated at that time.
18     Q.    I'm not asking whether you were aware.  I'm
19 saying as you sit here today do you have an opinion about
20 whether the system was misfabricated based on the
21 information known as of the date of the RFI.
22     A.    No.  I'm sorry.  Based on -- upon that --
23 that date prior to that RFI; correct?
24     Q.    Correct.

Page 139

1     A.    Yes, prior to their RFI, no.  You have my
2 answer.
3     Q.    Sorry.  There's a lot of yes, no and dates
4 and things like that, and I'm not trying to trap you or
5 trick you.
6     A.    No, I understand.
7     Q.    As date of the RFI or as of the date before
8 the RFI, you agree that Yuanda's design -- Strike that.
9         You agree that none of the components were
10 misfabricated?
11     A.    Yes.  That was our -- that was our
12 understanding, yes.
13     Q.    If you look at statement 49 on Page 14.
14 Please read that to yourself.
15              (Witness peruses document.)
16     A.    Okay.
17     Q.    What -- you say that Yuanda refused to do any
18 work to correct the WT-3 clerestory system as directed by
19 Whitestone.  What work did Whitestone direct Yuanda to
20 perform?
21     A.    To actually perform the physical remediation,
22 to provide the materials and to perform, physically
23 perform the remediation whether through them directly or
24 if they wanted to hire a third party or if they wanted to

Page 140

1 hire us to do it or any of those means.
2     Q.    Did Whitestone direct Yuanda to come up with
3 a new design for the connection?
4     A.    Once again, I'm not sure if they came up with
5 the design themselves or if we proposed the design.
6     Q.    My question is did Whitestone direct Yuanda
7 to come up with a new design.
8     A.    I don't know because I -- like I said, we
9 could have proposed the design to them.
10     Q.    Did Whitestone direct Yuanda to come up or
11 provide structural calculations?
12     A.    Yes.
13     Q.    Did Whitestone direct Yuanda to fabricate the
14 new connection or the new brackets?
15     A.    Yes.
16     Q.    Did Whitestone direct Yuanda to provide
17 technical support during the remediation?
18     A.    Yes.
19     Q.    Did Whitestone, in fact, come up with a new
20 design whether it was based on a suggestion or not?
21     A.    Once again, are you asking if we came up with
22 the design?
23     Q.    I probably -- I misspoke.  I'm sure I
24 misspoke.

Page 141

1         Did Yuanda come up with a new design whether
2 or not it was based on a suggestion from Whitestone?
3     A.    Yes.
4     Q.    Did Yuanda actually provide engineer stamped
5 calculations?
6     A.    Yes.
7     Q.    Did Yuanda actually offer to fabricate the
8 new connections?
9     A.    Did they?
10     Q.    Offer to fabricate.
11     A.    I'm not sure.  I'm not sure if they ever
12 offered to fabricate it.
13     Q.    Did Yuanda ever offer to provide technical
14 assistance during installation of the new connection?
15     A.    If they ever directly offered technical
16 assistance I'm not -- I cannot say.  If it would have
17 been inferred, I -- that's a different question I would
18 say.
19     Q.    So isn't it true that Yuanda did not refuse
20 to perform any work?  Yuanda did, in fact, refuse to
21 perform installation work though?
22     A.    They refused to perform installation work,
23 but they also refused to provide material in a timely
24 manner which for us the direction was time is of the

36 (Pages 138 - 141)

Page 142

1 essence, and by the time they offered to provide the
2 material, we -- we had to -- by that time we already had
3 to make decisions to go to a local supplier which would
4 have been faster because we had -- we had -- we had heat
5 on us from the owner/Sciame to get this done.
6    Q.   When did you make the demand that they
7 provide material in a timely fashion?
8    A.   I -- I do not know.  I don't know.  I do not
9 know.
10    Q.   Was it prior to the -- 2020?
11    A.   I do not know.
12    Q.   When did Whitestone contact its local
13 supplier in order to get the brackets in a timely
14 fashion?
15    A.   I do not know.
16    Q.   So you really don't know whether or not
17 Yuanda could have provided the brackets in a timely
18 fashion?
19        MR. CARBONE:  Objection to the form.
20 BY THE WITNESS:
21    A.   From my understanding of the situation, it
22 was Yuanda's stance up to the time we had to make the
23 decision, the final decision to go and actually order the
24 material to do the work, it was my understanding that

Page 143

1 their stance at that point was they were not gonna
2 provide anything else besides the drawings that they
3 already provided.
4 BY MR. GILL:
5    Q.   Approximately when was that decision made
6 that you had to deal with the local supplier?
7    A.   I do not know.
8    Q.   Was it in 2020 or before 2020?
9    A.   It was probably in -- that we went -- that we
10 had to go with a local supplier, probably would have been
11 2020 I would have to say.
12    Q.   We looked at vendor's work, the definition of
13 vendor's work, in the purchase order Exhibit 4, and feel
14 free to refer back to that.  It's on the first page.
15    A.   Of what?
16    Q.   Exhibit 4, the purchase order.
17    A.   Oh, Exhibit 4.
18    Q.   Vendor's work does not include the definition
19 of installation of any component of the curtainwall
20 system, does it?
21    A.   No.  In this sense, no.
22    Q.   I want you to look at Exhibit 2 which is the
23 Complaint.
24    A.   Okay.

Page 144

1    Q.   Have you seen this document before?
2    A.   I'm sure it's come across my desk before.  I
3 don't specifically remember reviewing it but --
4    Q.   I only have a few questions.  If you look at
5 Page 5 of the Complaint, allegation paragraph 25.  If you
6 could read that to yourself.
7        (Witness peruses document.)
8    A.   Okay.
9    Q.   Do you know what written requests, Whitestone
10 written requests this allegation refers to?
11    A.   Which specific ones, no, I do not know.
12    Q.   But you agree that if there was written
13 requests, demand design for engineer stamped drawings
14 that Yuanda did, in fact, comply with those requests to
15 design and provide stamped drawings?
16    A.   With that specific portion of the work
17 that -- that they owed us, yes, but that was a miniscule
18 amount to the total cost and effort of what it -- of what
19 it -- of what was needed to actually do the remediation.
20    Q.   If you can turn to the next page, Page 6, of
21 Exhibit 2.  Read paragraph 29 to yourself.
22        (Witness peruses document.)
23    A.   Okay.
24    Q.   Starting on the second line and going to the

Page 145

1 third line, it says:  "Yuanda has refused and/or failed
2 to positively respond to Whitestone's correspondence."
3 Do you know what that refers to?
4    A.   I understand that as being failed to
5 positive -- I take failed to positively respond, meaning
6 that Yuanda's refusing to -- to partake in the
7 remediation work.
8    Q.   Are you aware between January 2017 and
9 October -- August 2019 Yuanda was in communication with
10 James Dearth regarding the remediation work?
11        MR. CARBONE:  Objection.
12 BY THE WITNESS:
13    A.   I am not aware of any specific instances, no.
14 BY MR. GILL:
15    Q.   Okay.  So do you know what this allegation
16 regarding positive response means?
17    A.   My interpretation is that Yuanda was -- was
18 not agreeing to -- to partake in the remediation of the
19 work.  That's what I understand that to mean.
20    Q.   And by partake in the remediation do you mean
21 pay for the installation of the new bracket?
22    A.   Yes, that's what it would mean to me.
23    Q.   Was there anything else that Yuanda was
24 refusing to do regarding the remediation?

37 (Pages 142 - 145)

Page 146

1     A.   To me there was only three components. One
2 was to do the design which was miniscule compared to the
3 other two. The second being provide material, and third
4 would be to either provide the labor or pay for the
5 labor.
6     Q.   So a significant -- based on your answer
7 here, a significant portion of this was to provide the
8 material in your mind?
9     A.   A significant portion?
10    Q.   Of the remediation was to -- if not dollar
11 amount, it was a significant obligation -- was to provide
12 the additional or newly designed connections; is that
13 accurate?
14    A.   No, I would not say that. I'd say
15 dollar-wise it was -- it was not major. It was a
16 relatively minor portion and not only for dollars but in
17 terms of -- of obtaining the material because the
18 material needed was -- is something that any local
19 supplier would be -- would be easily able to do.
20    Q.   What did Yuanda -- did -- Strike that.
21         Did Yuanda provide a lead time or time it
22 would take for them to provide, fabricate and provide the
23 new connections?
24    A.   I am not aware of that.

Page 147

1     Q.   You just are aware or believe that it would
2 take too long to get?
3     A.   No.
4          MR. CARBONE: Objection.
5          THE WITNESS: Do I answer?
6          MR. CARBONE: Yeah.
7 BY MR. GILL:
8     Q.   Please. If you can.
9     A.   So say the answer -- ask the question one
10 more time.
11    Q.   I'm thinking of a better way to ask. It is
12 your opinion that the lead time or the -- Strike that.
13         It was your opinion or you got the impression
14 that it would take too long for Yuanda to get the
15 replacement parts to you so you could, you Whitestone,
16 could install them in a timely fashion?
17    A.   I do not know if that's the case because I
18 don't know at what point Yuanda told us that they would
19 provide the material. It could have been -- as far as
20 I -- as far as I know it, they could have offered that at
21 the point where we've already ordered the material from
22 somebody else. I can't -- I do not know.
23    Q.   And you don't know when you actually ordered
24 the material?

Page 148

1     A.   No, I do not know.
2     Q.   If you can turn to the last page of Exhibit
3 27, Page 15, and read the allegation or statement 53 to
4 yourself.
5     A.   Twenty-seven you said?
6     Q.   Exhibit 27, Page 15, statement 53.
7     A.   Statement 53?
8     Q.   Yes.
9     A.   Okay.
10         (Witness peruses document.)
11         Okay.
12    Q.   When did Whitestone complete the remediation
13 project?
14    A.   I believe September or October of 2020.
15    Q.   Okay. Do you know when Whitestone knew the
16 final actual cost, direct cost incurred for that
17 remediation?
18    A.   I mean the exact to the dollar cost could
19 vary even still to this day, but we knew what the
20 ballpark was or would have been probably within a month
21 of finishing.
22    Q.   Why would the cost, actual direct cost,
23 installation cost vary to this day?
24    A.   Because it all depends. It's not a simple

Page 149

1 this guy makes $20 an hour. It's this guy makes $20 an
2 hour with benefits and then what were the payroll costs
3 at that time, what was the other -- FICA, what was the
4 insurance at that time, so it's -- it's -- not that it's
5 a moving target, but it does take some time to find out
6 what the actual story is.
7     Q.   As of today, does Whitestone know what its
8 actual direct costs incurred are for the remediation?
9     A.   I believe we have a lot better idea of what
10 it costs now. Do I know what the exact cost is right
11 now? No.
12    Q.   Okay. In your declaration, you say that
13 "Costs and expenses are no less than $400,000." Did you
14 believe that that was a correct statement when you made
15 it in November of 2020?
16    A.   Yes. We -- yes.
17    Q.   Okay. If you can look to Exhibit 19. This
18 is an updated --
19    A.   Hold on a second, please.
20    Q.   Yep. Actually, if you can also look at
21 Exhibit 17.
22         (Witness peruses document.)
23    A.   Okay.
24    Q.   Okay. Exhibit 17 was produced by your

38 (Pages 146 - 149)

Page 150

1 attorney to me in the middle of October 2020. Do you see
2 the dollar amount on Page 1 of Exhibit 17 says that the
3 remediation summary for direct -- or for Whitestone's
4 costs is $237,626.88?
5   A.  Yes.
6   Q.  Okay.  Exhibit 19 was updated and provided to
7 me last week, last Wednesday.  You see the total dollar
8 amount is the same -- 237 --
9   A.  Hold on.
10   Q.  Pardon?
11   A.  Okay.  I'm sorry.  Hold on.  Okay.  Look at
12 Exhibit 19?
13   Q.  Yeah.  Do you see the dollar amount stated on
14 the first page of 19 is exactly the same as the dollar
15 amount stated on the cover page of 17?
16   A.  Okay.
17   Q.  You see it states $237,000?
18   A.  Yes.
19   Q.  Why in your declaration did you say
20 Whitestone's costs were no less than $400,000?
21   A.  Because at the time before we actually
22 started the remediation work we thought the work would
23 have been more intensive where we had to actually remove
24 a lot of the glass, but we were -- luckily we were able

Page 151

1 to mitigate the costs for everybody and actually keep the
2 glass in place and install due to the remediation as per
3 the approved remediation drawings and calculations.
4   Q.  But Whitestone had already incurred the
5 $237,000 on November 9th, 2020 when you submitted this
6 declaration.  So why did the declaration say costs were
7 in excess of $400,000?
8   A.  I do not know.
9   Q.  Do you have an opinion whether this
10 remediation work that Whitestone performed, whether it
11 was warranty work or extras or punch list work or any of
12 the above or something different?
13   A.  No, it was not warranty work.  It was not
14 punch list work.  Whether it's a -- an extra work due to
15 errors and omissions from the architectural team, that I
16 would agree with.
17   Q.  You would agree that it is an errors and
18 omissions issue, therefore -- I'm not sure I heard you.
19 That's why I'm repeating.  You would agree that it is an
20 errors and omissions, as a result of errors and
21 omissions, therefore, additional work?
22   A.  That's my personal belief, yes.
23   Q.  If it is errors and omissions additional
24 work, why does Yuanda owe Whitestone Whitestone's

Page 152

1 overhead and profit of $33,000 as shown on Exhibit 19?
2   A.  Overhead is a cost of the -- of the company.
3   Q.  Why does Yuanda owe Whitestone that?
4   A.  Because we believe that we were entitled to
5 the -- all the costs associated with this work, and
6 overhead associated -- is a cost incurred by us.
7   Q.  What is the actual overhead for the costs
8 incurred for the 26 days of this remediation project?
9   A.  Overhead -- for us the way overhead is
10 calculated is usually just a percentage of the total cost
11 of -- of the -- of the work.
12   Q.  I understand how it's generally calculated.
13 I want to know your actual overhead costs for the 26 days
14 of the remediation project.
15   A.  That's the best answer I can give you is
16 overhead is generally calculated as a percentage of the
17 cost performed, so I -- I'm not qualified to give you any
18 other answer other than that.
19   Q.  Is anyone at Whitestone qualified to give an
20 answer as to what the actual overhead costs are?
21   A.  My accountant, I guess.
22   Q.  Who is your accountant?
23   A.  Would be Anchin, Block & Anchin.
24   Q.  Does that $33,000 on the first page of

Page 153

1 Exhibit 19 include profit, the 20 percent?
2   A.  Yes, that would include overhead and profit,
3 yes.
4   Q.  Why are you entitled to your profit from
5 Yuanda for additional work required by errors and
6 omissions?
7   A.  Why?  Because I -- I -- I would make the
8 argument that doing this work took away from Whitestone
9 attending other contracted work and not paying attention
10 on those other contract -- that other contracted work
11 which we should have been and -- and losing out on profit
12 on that.  That would be my argument.
13   Q.  Why is that owed to Whitestone from Yuanda?
14   A.  Because -- because it is our stance that
15 Yuanda is responsible to do this remediation as -- as --
16 until -- until -- at a time that we recoup the money from
17 the owner, if we recoup the money from the owner.
18   Q.  The remediation was due to a design error and
19 omission in a design change; correct?
20   A.  That's my personal opinion, yes.
21   Q.  Okay.  Where --
22   A.  I'm --
23   Q.  Where in the purchase order does it say that
24 Yuanda owed Whitestone Whitestone's overhead and profit

39 (Pages 150 - 153)

Page 154

1 for remediation work?
2    A.   It does not specifically say that as far as
3 I'm aware.
4    Q.   With respect to the 18 percent for insurance
5 listed on Exhibit 19, James Dearth testified that he was
6 informed to add 18 percent but he does not recall who
7 told him.  Did you tell him to add 18 percent to this
8 number for insurance?
9    A.   No.  That probably came from our -- probably
10 from our -- our controller, CFO.
11    Q.   How much in insurance did -- Strike that.
12        How much were Whitestone's actual insurance
13 costs during the 26 days of remediation?
14    A.   I'm sure -- I'm sure the breakdown that we
15 were -- that we've given you is pretty accurate, that
16 that is a very -- that is an accurate portrayal of what
17 our insurance cost was.
18    Q.   How much were Yuanda's actual insurance costs
19 during the 26 days of remediation?
20    A.   Yuanda's?
21    Q.   I'm sorry.  How much was Whitestone's actual
22 insurance -- insurance costs?
23    A.   Oh, according to this calculation, it was
24 36,248.

Page 155

1    Q.   Is there any documentation to support that
2 $36,248?
3    A.   In this --
4    Q.   None was provided I'll tell you.  Does
5 White -- does Whitestone have any documentation to
6 support that 18 percent for insurance.
7    A.   I'm sure this number was not pulled out of
8 thin air.
9    Q.   How was it calculated?
10    A.   I don't know how it was calculated.
11 Basically probably the insurance -- the insurance rates
12 that are indicated on our insurance policy.
13    Q.   How much is Whitestone's annual premium for
14 insurance?
15    A.   I do not know that off the top of my head.
16    Q.   Is it over $500,000?
17    A.   It could be.
18    Q.   What percentage --
19    A.   But this is also -- this insurance also
20 includes general liability.  I mean -- I'm sorry --
21 workmans' comp which has nothing to do with the premium,
22 it gets billed according to the amount of hours that your
23 guys worked, so there's a set rate for every hour that
24 the guys work, so this -- this insurance includes general

Page 156

1 liability and workmans' compensation.
2    Q.   How many total hours did Whitestone work in
3 2020, man hours?
4    A.   I have -- I have no idea.
5    Q.   What percentage of Whitestone's total man
6 hours worked was this remediation project?
7    A.   Of our direct labor?
8    Q.   Yeah.
9    A.   Miniscule probably.
10    Q.   What percentage of Whitestone's revenues is
11 the $102,000 for man hours for the remediation for 2020?
12    A.   The total revenue would be absolutely
13 minimal, but the thing is the vast, vast majority of our
14 work is -- is -- is owner provided insurance, and this is
15 not the case on this job, so even though the total man
16 hours or the total billing is absolutely miniscule
17 compared to our total, its proportion of the billable
18 work that requires us to provide insurance is actually a
19 lot, lot more than what our total would be, so . . .
20    Q.   What was the total number of man hours that
21 you had to provide insurance for in 2020?
22    A.   I do not know.  I do not know.
23    Q.   Do you know an approximate percentage of this
24 remediation project compared to the total number of man

Page 157

1 hours for which you had to provide insurance?
2    A.   I -- I wouldn't -- I wouldn't know.  I
3 wouldn't be able to guess.
4    Q.   If you look at the last page of
5 Exhibit 19 --
6        MR. CARBONE:  Can I just interrupt you for a
7 second?
8        MR. GILL:  Sure.
9        MR. CARBONE:  For whatever reason I
10 disappeared from the gallery view.  I don't know why.
11        MR. GILL:  I think you accidentally hit turn
12 off -- stop video, so --
13        MR. CARBONE:  I -- there we are.
14        MR. GILL:  Yeah.
15        MR. CARBONE:  Thank you.
16        MR. GILL:  I didn't have a problem.  I figured
17 it was a mistake.  I wasn't going to make a big deal of
18 it.
19        MR. CARBONE:  You never -- Adam, you never
20 know.
21        MR. GILL:  I know.  Hey, Don -- and this can
22 be off the record, all of this from Mr. Carbone's
23 statement until now.
24            (Discussion had off the

40 (Pages 154 - 157)

Page 158

1                record.)
2  BY MR. GILL:
3      Q.   If you can look at the 12 lifted descriptions
4  or cost items on page 5788.  Aside -- except for line
5  item 10 are there any costs listed here that are also
6  included in the description of vendor's work as far as
7  you know?
8      A.   Item number 7 could be, item number 8 most
9  definitely and as -- and maybe certain portions of item
10 11 possibly.
11     Q.   The hardware?
12     A.   Yeah, I don't know what -- it have to be more
13 detail.  I -- but quite possibly 11.
14     Q.   You had mentioned in -- a couple minutes ago
15 when I was asking about the overhead and profit that to
16 the extent that Whitestone is not able to recover from
17 Sciame in this dispute.  I want to talk about very
18 briefly the dispute with Sciame.  Do you know where
19 Whitestone is in its process of pursuing its dispute with
20 Sciame or pursuing its claim?
21     A.   We've provided our notice of dispute and our
22 description of dispute.  The ball in court is in
23 Sciame/the owner, and it's been like that for a year and
24 a half unfortunately.

Page 159

1      Q.   In New York is there a process where the
2  owner or the architect and a claimant have to proceed to
3  have some kind of administrative hearing to address the
4  dispute?
5      MR. CARBONE:  I'm going to object.  Aren't you
6  really asking him a legal question?
7      MR. GILL:  Honestly, I'm asking because I
8  don't know.  I mean if he knows --
9      MR. CARBONE:  I could tell you.
10     MR. GILL:  Okay.  Well, we'll go off the
11 record later and you can tell me.
12     MR. CARBONE:  Okay.
13     MR. GILL:  If he doesn't know, then I'll move
14 on.
15 BY THE WITNESS:
16     A.   I don't -- yeah, I'm not the proper person to
17 ask.
18 BY MR. GILL:
19     Q.   And the reason I'm asking -- and I'll tell
20 you.  I'm not going to hide the ball.  You said to the
21 extent that your claim against Sciame or the owner is
22 rejected Yuanda then you would feel owes Whitestone, so I
23 want to understand --
24     A.   Correct.  Yes.

Page 160

1      Q.   -- where you are with the owner.
2      MR. CARBONE:  I'm just going to object to your
3  form of summing up what he said because I disagree with
4  that, but go ahead.
5      MR. GILL:  That's fine.
6  BY MR. GILL:
7      Q.   If Whitestone does prevail against Sciame or
8  the owner and it is found that the RFI includes new
9  design criteria that was not previously known and
10 Whitestone, therefore, recovers against Sciame or the
11 owner, what is Whitestone going to do with the litigation
12 against Yuanda?
13     A.   Assuming we recover prior to the -- to the --
14 completing the litigation against Yuanda or assuming --
15     Q.   Let's take it in two parts.  Prior to?
16     A.   If we recover from before Yuanda, then we
17 would settle -- we would -- I personally would see no
18 reason to continue this.  We would have to speak to
19 Yuanda directly and say look, guys, this is what it is,
20 let's make a decision, how we divvying this up and so
21 forth.
22     Q.   If -- if Sciame or the owner came to you or
23 if a court decided or the governor decided that
24 Whitestone is entitled to $237,000 for this remedial

Page 161

1  work, what happens to the litigation?  What if they
2  decide tomorrow that, what happens to the litigation that
3  Whitestone has against Yuanda?
4      MR. CARBONE:  All right.  Objection.  You're
5  asking him to speculate, but he just answered that the
6  last question.
7      MR. GILL:  He said he would settle up with
8  Yuanda, and I want to make sure -- my follow-up question
9  was if Whitestone gets everything that they are -- they
10 believe they are entitled to -- I don't understand what
11 he means by settle up with Yuanda, so that was my --
12 BY THE WITNESS:
13     A.   Well, the only --
14     MR. CARBONE:  Hold on one second because it's
15 a mischaracterization of what he said because he said he
16 would approach Yuanda to see if they could work out a
17 settlement.  That's what he said.
18     MR. GILL:  Okay.
19     MR. CARBONE:  Okay.
20     MR. GILL:  Let me withdraw the question and
21 ask it a different way.
22
23 BY MR. GILL:
24     Q.   If an administrator, the governor, Sciame,

41 (Pages 158 - 161)

Page 162

1  the owner before trial in this matter decides that
2  Whitestone is entitled to the full amount it is seeking,
3  is there anything else that Whitestone wants from Yuanda?
4      A.  I guess the only -- I'm sorry, Donald.  Oh.
5  The only -- the only remaining issue that I -- that I can
6  think of at this moment that would have to be resolved
7  would be it's my understanding that Yuanda would owe
8  us -- it's also -- we are also entitled to our legal fees
9  according to the purchase order from Yuanda.  As far as I
10 can tell -- see right now, that should hypothetically we
11 settle up with the owner tomorrow, we get paid everything
12 we're asking for, the only thing in question that would
13 remain would be if any legal fees would be reimbursed to
14 us.
15     Q.  One of the things that your -- the very first
16 exhibit I showed you, Exhibit 20, which is your -- the
17 initial disclosures says that -- talks about the
18 aforesaid breaches on the contract, and I assume -- I
19 know that wasn't written by you but that was -- refers to
20 breaches by Yuanda of the purchase order.
21     A.  Where -- what --
22     Q.  It's the very --
23     A.  Exhibit 20?
24     Q.  Exhibit 20 under the statement regarding your

Page 163

1  knowledge.  It's -- the aforesaid breaches is literally
2  the last line but it kind of -- aforesaid refers to
3  everything above that.  Breaches of the contract at
4  issue.
5      A.  What page?
6      Q.  The first page.
7          MR. CARBONE:  Give me an opportunity to get
8  number 20.  You say number 20 was his declaration?
9          MR. GILL:  It was -- no, not the declaration.
10 It's the initial disclosure, the Rule 26 disclosure.
11         MR. CARBONE:  Oh, okay.
12         MR. GILL:  It was the first one --
13         MR. CARBONE:  All right.  Let me see.  No, I
14 know.  I know exactly what it looks like.  I just need to
15 find it.
16             (Brief pause.)
17         No idea where it went.  Do you mind if I
18 look over his shoulder?
19         MR. GILL:  Go right ahead.
20         MR. CARBONE:  Thank you.
21         MR. GILL:  It's really just a question or two,
22 so go right ahead.
23         MR. CARBONE:  Go ahead.
24 BY MR. GILL:

Page 164

1      Q.  Okay.  The second to the last line of the
2  statement about what Steven Grzic knows and will testify
3  about, it says:  "Breaches of the contract at issue."  Do
4  you see that?
5      A.  Yes.
6      Q.  And in your opinion, your lay opinion -- I
7  don't want a --
8      A.  Hold on.  Hold on.  Listen.  Okay.  Go ahead.
9  I'm sorry.
10     Q.  I want to know what you believe or how you
11 believe Yuanda breached the contract.
12     A.  That once the system was rejected by the
13 owner/construction manager that once Yuanda was notified
14 by Whitestone and directed -- and directed by Whitestone
15 to Yuanda to remediate that they refused to remediate it.
16     Q.  And remediate in the way you just said is pay
17 for -- actually perform or pay for the installation of
18 the new connection?
19     A.  Correct.
20     Q.  And I want to make sure.  I want to -- I want
21 to -- we've talked about a lot and gone -- covered a lot
22 of ground, and I want to make sure I understand your
23 position, so I want to summarize.
24         And in summary, it's my understanding that

Page 165

1  you believe Yuanda's design of the WT-3 clerestory was
2  defective because it did not accommodate the 3.4 inches
3  of movement that the architect disclosed?
4      A.  Yes.
5      Q.  But you agree that Sciame, the architect
6  and/or the consultant did not provide that design
7  criteria, the 3.4 inches, until it provided the response
8  to RFI 1130?
9      A.  Yes, but I'd like to clarify going back to
10 your first comment.  I -- I -- I -- I agree that it's
11 rejected by Whitestone as -- so inasmuch as it is
12 rejected by the ownership and -- and the construction
13 manager.
14     Q.  I -- and just for clarification, I
15 intentionally did not say rejected.  I say that the
16 clerestory was defective because of it did not
17 accommodate the movement.  Okay.
18     A.  Well, I -- I find -- okay.  So --
19     Q.  Okay.  But -- but that is true --
20         MR. CARBONE:  Wait.  Wait.  Wait.  Adam, Adam,
21 he was in the middle of -- you're cutting him off.  Let
22 him finish his thoughts, please.
23
24 BY MR. GILL:

42 (Pages 162 - 165)

Page 166

1    Q.   Okay.  Please finish.
2    A.   Okay.  I -- my stance is it is rejected by
3 Whitestone to Yuanda inasmuch as it is -- well, I'm
4 sorry.  What were the terms that you used, sorry, just so
5 I can be on the record?
6    Q.   The question I asked and you said yes to --
7 and feel free to correct me or clarify.  I'm not saying
8 it's set in stone.  The question I asked is you believe
9 that Yuanda's design of the WT-3 clerestory was defective
10 because it did not accommodate the 3.4 inches of building
11 movement.
12   A.   I feel that their design was defective
13 inasmuch as it is rejected by the owner and -- and
14 Sciame.
15   Q.   Do you have an opinion, you personally have
16 an opinion whether the clerestory was defective because
17 it failed to accommodate the movement, the 3.4 inches of
18 movement?
19   A.   Well, yes, it is defective if it failed to
20 accommodate for the 3.4 inches of movement.  In that --
21 in that sense, yes, it is defective.
22   Q.   And you agree that Yuanda was not told by
23 Sciame, the architect or the consultants that the
24 criteria was 3.4 inches of movement until after the RFI

Page 167

1 1130 response?
2    A.   That I agree with, yes.
3    Q.   At the time that Whitestone completed
4 installation of the WT-3 clerestory did Whitestone have
5 any reason to know that the building movement needed to
6 accommodate 3.4 inches of movement?
7    A.   At the time of?
8    Q.   Completion of the original WT-3 clerestory
9 installation.
10   A.   No, we were not aware of that 3.4 inch
11 requirement as far as I know.  I was not aware of it.
12   Q.   At the time that Whitestone completed
13 installation of the WT-3 clerestory, did you have any
14 reason to believe that the components that Yuanda
15 fabricated did not comply with the requirements of the
16 contract documents or purchase order?
17   A.   No.
18       MR. GILL:  That's all I have.
19       MR. CARBONE:  You're done?
20       MR. GILL:  That's it.
21       MR. CARBONE:  Okay.  Good.
22       THE VIDEOGRAPHER:  Like to go off the record?
23       MR. GILL:  Yep.
24       THE VIDEOGRAPHER:  Off the record at 1:36.

Page 168

1       MR. GILL:  And I believe that they're
2 reserving signature.  They did so last time.
3       MR. CARBONE:  Yes, we are reserving signature.
4           (The deposition concluded
5               at 1:36 p.m.)

Page 169

1       SIGNATURE:
2 It was agreed by and between counsel and the parties that
3 the Deponent will read and sign the transcript of said
4 deposition.

43 (Pages 166 - 169)

Page 170

```
1   STATE OF ILLINOIS)
          ) SS:
2   COUNTY OF C O O K)
3
        I, KELLY A. BRICHETTO, a Certified Shorthand
4
    Reporter of said state, do hereby certify
5
    that the within named witness, STEVEN GRZIC, was by me
6
    first duly sworn to testify the truth, the whole truth
7
    and nothing but the truth in the cause aforesaid; that
8
    the testimony then given by the above-referenced witness
9
    was by me reduced to stenotype in the presence of said
10
    witness; afterwards transcribed, and that the foregoing
11
    is a true and correct transcription of the testimony so
12
    given by the above-referenced witness.
13
        I do further certify that this deposition was
14
    taken at the time and place in the foregoing caption
15
    specified and was completed without adjournment.
16
        I do further certify that I am not a relative,
17
    counsel or attorney for either party or otherwise
18
    interested in the event of this action.
19
20
21
22
23
24
```

Page 171

```
1       IN WITNESS WHEREOF, I do hereunto set my hand
2   this 10th day of February, 2021.
3
4
5
6           Kelly Brichetto
7           KELLY A. BRICHETTO
8           CSR License No. 84-3252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 172

```
1           Veritext Legal Solutions
            1100 Superior Ave
2              Suite 1820
            Cleveland, Ohio 44114
3           Phone: 216-523-1313
4   February 10, 2021
5   To: Mr. Carbone
6   Case Name: Whitestone Construction Corp.  v. Yuanda USA Corp.
7   Veritext Reference Number: 4429365
8   Witness: Steven Grzic       Deposition Date:  1/27/2021
9   Dear Sir/Madam:
10  The deposition transcript taken in the above-referenced
11  matter, with the reading and signing having not been
12  expressly waived, has been completed and is available
13  for review and signature.  Please call our office to
14  make arrangements for a convenient location to
15  accomplish this or if you prefer a certified transcript
16  can be purchased.
17  If the errata is not returned within thirty days of your
18  receipt of this letter, the reading and signing will be
19  deemed waived.
20
        Sincerely,
21
22  Production Department
23
24  NO NOTARY REQUIRED IN CA
```

Page 173

```
1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 4429365
3       CASE NAME: Whitestone Construction Corp.  v. Yuanda USA Corp.
        DATE OF DEPOSITION: 1/27/2021
4       WITNESS' NAME: Steven Grzic
5       In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have made no changes to the testimony
        as transcribed by the court reporter.
8
        _____
9   Date              Steven Grzic
10      Sworn to and subscribed before me, a
        Notary Public in and for the State and County,
11  the referenced witness did personally appear
        and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
        _____
18      Notary Public
19      _____
        Commission Expiration Date
20
21
22
23
24
25
```

44 (Pages 170 - 173)

Page 174

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 4429365
3        CASE NAME: Whitestone Construction Corp.  v. Yuanda USA Corp.
         DATE OF DEPOSITION: 1/27/2021
4        WITNESS' NAME: Steven Grzic
5          In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
6        my testimony or it has been read to me.
7          I have listed my changes on the attached
         Errata Sheet, listing page and line numbers as
8        well as the reason(s) for the change(s).
9          I request that these changes be entered
         as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11       as this Certificate, and request and authorize
         that both be appended to the transcript of my
12       testimony and be incorporated therein.
13       _____
         Date              Steven Grzic
14
           Sworn to and subscribed before me, a
15       Notary Public in and for the State and County,
         the referenced witness did personally appear
16       and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18            in the appended Errata Sheet;
           They signed the foregoing Sworn
19            Statement; and
           Their execution of this Statement is of
20            their free act and deed.
21       I have affixed my name and official seal
22       this _____ day of_____, 20____.
23       _____
         Notary Public
24
         _____
25       Commission Expiration Date

Page 175

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 1/27/2021
3   PAGE/LINE(S) /       CHANGE       /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____     _____
20  Date              Steven Grzic
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
         Notary Public
24
    _____
25       Commission Expiration Date

45 (Pages 174 - 175)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.