**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| WHITESTONE CONSTRUCTION CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 - cv - 1006 |
| v. | ) | |
| | ) | |
| YUANDA USA CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**YUANDA'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS RULE 56 MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION ....................1

II. SUMMARY OF UNDISPUTED MATERIAL FACTS....................3

III. LEGAL STANDARD....................6

IV. RELEVANT CONTRACT TERMS....................7

V. ARGUMENT....................9

A. Whitestone is Not Entitled to Recovery Under the Terms of the Purchase Order....................9

1. Yuanda's Work Conforms to the Purchase Order and Contract Documents ....................10

2. Whitestone Never Rejected Yuanda' Work Under the Terms of the Purchase Order ....................12

3. Yuanda Performed Additional Work To Address The New Design Criteria....................14

B. In The Alternative, Yuanda Is Entitled To Partial Summary Judgment With Respect To The Majority Of Whitestone's Alleged Damages ....................16

1. Whitestone Only Incurred $32,287.61 For Items Included In "Vendor's Work"....................17

2. Whitestone's Other Damages Are Not Recoverable ....................18

a. Manpower – Cost to Install the New Brackets ....................18

b. "Whitestone Design" Costs are not Recoverable....................18

c. Miscellaneous Other Costs ....................20

d. Overhead & Profit and Insurance ....................20

3. Whitestone is not Entitled to Costs For the Replacement Brackets....................21

VI. CONCLUSION....................................................................................24

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bailey v. Fish & Neave*
8 N.Y.3d 523 (2007) ....................6, 13

*Gallo v. Prudential Residential Services, Ltd. Partnership*
22 F.3d 1219 (2nd Cir., 1994) ....................6

*Greenfield v. Philles Records, Inc.*
98 N.Y.2d 562 (2002) ....................6

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*
889 F.2d 1274 (2nd Cir., 1989) ....................6

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*
595 F.3d 458 (2nd Cir. 2010) ....................6, 13

**Statues, Rules & Authorities**

Local Civil Rule 56.1 ....................3

Fed. R. Civ. P. 56 ....................6

NOW COMES Yuanda USA Corporation ("Yuanda"), by its attorneys, The Law Offices of Peter Scutero and Fox Swibel Levin & Carroll, LLP, and for its Motion for Summary Judgment, pursuant to Rule 56, respectfully submits this Memorandum of Law, and states as follows:

## I. INTRODUCTION

There are no genuine issues for a trier of fact to consider, and all admissible evidence supports a finding that, as a matter of law, Yuanda properly performed and satisfied all obligations of the contract it has with Whitestone Construction Corp. ("Whitestone"). Therefore, Yuanda is entitled to summary judgment in its favor on all issues.

Whitestone filed the instant lawsuit seeking to recover the costs Whitestone allegedly incurred to replace certain curtainwall components Yuanda designed, fabricated and delivered for a construction project in New York. There is no dispute—and indeed Whitestone openly admits—that Yuanda's work conformed to the requirements of the Purchase Order and the Contract Documents. The replacement of Yuanda's work has nothing to do with Yuanda or its work and resulted entirely from a request made by ***Whitestone's*** client, F.J. Sciame Construction Co., Inc. ("Sciame"). Sciame's request arose out of a design change by the architect, Perkins Eastman Architects ("Perkins Eastman"), a change which Perkins Eastman initiated *after* Yuanda had already completed its work in full compliance with the requirements of the Purchase Order.

Whitestone's contract with Sciame required Whitestone to replace Whitestone's and Yuanda's work, even though the work in question actually conformed to the Purchase Order and Contract Documents and was not defective in any way. However, the contract between Whitestone and Yuanda does not contain a similar requirement. Whitestone's Purchase Order only requires Yuanda to "replace or correct [Yuanda's] Work" if the following conditions are

met: (1) Yuanda's work fails to conform to the requirements of the Purchase Order or the Contract Documents, and (2) Whitestone rejects the subject work on that basis. The undisputed facts demonstrate that neither condition occurred with respect to the curtainwall at issue, and Whitestone's failure to satisfy either condition is grounds for summary judgment in Yuanda's favor. Additionally, even if Yuanda's work did not conform to the Purchase Order or the Contract Documents (which Yuanda's work does), and even if Whitestone properly rejected Yuanda's work (which Whitestone did not), Whitestone was required to give Yuanda a reasonable opportunity to remedy its work before Whitestone did so on Yuanda's behalf.

The undisputed facts demonstrate that immediately after Perkins Eastman issued the untimely design change, Yuanda worked cooperatively with Whitestone to redesign the relevant portion of Yuanda's work in order to incorporate the new design criteria. Rather than allow Yuanda to complete its efforts, Whitestone pursued remediation through third parties and now seeks to improperly charge those costs to Yuanda. Whitestone's failure to allow Yuanda an opportunity to cure is a violation of the Purchase Order and an additional basis for summary judgment in Yuanda's favor.

Finally, even if the Court were to find that Yuanda's interpretation of the Purchase Order is incorrect as a matter of law and Yuanda is potentially liable to Whitestone, Whitestone is not entitled to the damages it seeks. Under the plain and unambiguous language of the Purchase Order, Whitestone is only entitled to recover the costs of the "Vendor's Work" that Whitestone was required to perform. Most of Whitestone's alleged damages do not fit the definition of "Vendor's Work." Therefore, the vast majority of damages Whitestone allegedly incurred are not recoverable from Yuanda, and Yuanda is entitled, at a minimum, to partial summary judgment with respect to such damages.

## II. SUMMARY OF UNDISPUTED MATERIAL FACTS

As required by Local Rule 56.1, concurrent with the filing of Yuanda's Motion and this Memorandum of Law, Yuanda submits its Statement of Undisputed Material Facts, which is attached hereto as Exhibit 1 and incorporated by reference. Yuanda provides the below summary for reference.

On October 24, 2013, Yuanda and Whitestone entered into a contract, whereby Yuanda agreed, *inter alia*, to design, fabricate and deliver the aluminum curtain wall systems to the construction project located at 285 Jay St., New York, New York ("Project"). Ex. 1, ¶¶ 9-11; Ex. 3. The parties' respective obligations and requirements are memorialized in the "Whitestone Construction Corp. Purchase Order 13-0139-002." Ex. 1, ¶¶ 9-11. The Purchase Order expressly incorporates the following documents by reference: (i) the eight-page "Purchase Agreement Terms and Conditions," (ii) the Scope Worksheet attached to the Purchase Order as Attachment A, (iii) the Contract Documents listed in Attachment B, (iv) the Delivery Schedule in Attachment C, and (v) the Schedule of Values in Attachment D (collectively, the "Purchase Order") Ex. 1, ¶¶ 12-16. Conspicuously absent from both the incorporation clause and the list of Contract Documents in Attachment B is the prime contract between the Owner and Sciame ("Prime Contract") and the subcontract between Sciame and Whitestone ("Sciame Subcontract"). Ex. 1, ¶¶ 17-18.

This present dispute relates to the design, fabrication and installation of a section of curtainwall, commonly referred to as the "WT-3 Clerestory." Ex. 1, ¶¶ 3, 6. More specifically, this litigation addresses the connection of the WT-3 Clerestory at its head, and the head connection's ability to accommodate roof deflection. Ex. 1, ¶ 47.

In January 2017, ***after*** Yuanda completed its work under the terms of the Purchase Order with respect to the WT-3 Clerestory, and ***after*** Whitestone fully installed the WT-3 Clerestory, the Design Team[1] initiated a design change when it provided Sciame and Whitestone with new roof deflection information for the WT-3 Clerestory. Ex. 1, ¶¶ 53-55. A "clerestory" is a section of wall that contains a row of windows, above the eye-level, which allows light into a building space. In the case of this Project, the WT-3 Clerestory was a continuous row of windows, approximately 8 feet high and 110 feet long, located between the roof of an auditorium located on the first floor and classrooms above. *See* Ex. 7, pp. 13, 15, 28, 29. Subsequent to this design change, Sciame directed Whitestone to perform "remedial" work, which was only necessary to accommodate the new design criteria, and which resulted in a change in the design of the head connection for the WT-3 Clerestory. Ex. 1, ¶¶ 53, 61, 78.

The new roof deflection criteria the Design Team issued in January 2017 was a change to the Contract Documents, as defined in Attachment B to the Purchase Order. Ex. 1, ¶¶ 52, 54, 63-64. The Design Team never issued a modification to the Contract Documents to incorporate the newly disclosed design criteria. Ex. 1, ¶ 52. And pursuant to the Purchase Order, the obligations and responsibilities of Yuanda "cannot be amended, modified, or changed except in a written Change Order…." Ex. 1, ¶16; Ex. 3, p. 6 (¶ 10). Therefore, Yuanda was not required to redesign or refabricate any component of the WT-3 Clerestory as part of "Vendor's Work," as defined Purchase Order.

In May 2019, Sciame directed Whitestone to commence with "repairs" to the WT-3 Clerestory, which would incorporate the Design Team's new design criteria. Ex. 1, ¶ 62; Ex. 10. These repairs, or "remedial work," were not warranty work, which would be required to remedy

[1] "Design Team" shall refer collectively to Perkins Eastman, Perkins Eastman's structural engineer, WSP, and Perkins Eastman's façade consultant, Alt Ltd. Ex. 1, ¶ 35, n. 5.

poor workmanship or defective work, because Yuanda's work fully conformed to the Purchase Order and Contract Documents and was not defective. Ex. 1, ¶¶ 19-20, 79. Indeed, both Whitestone and Yuanda have always insisted that these repairs or remedial work (1) were not required under the Sciame Subcontract, (2) are a change to the Contract Documents, and (3) are considered additional work for which Whitestone and Yuanda should be compensated by Sciame and/or the Project Owner. Ex. 1, ¶¶ 64, 79, 113.

Even though Yuanda was not required to provide additional design services to address this design change – because there was no formal change to the Purchase Order or Contract Documents – between January 30, 2017 and December 7, 2019, Whitestone and Yuanda collaborated on developing design and construction solutions that would satisfy the Design Team's new design criteria. Ex. 1, ¶¶ 66-67, 80-87, 105-106, 111. During this period, Yuanda was always responsive to Whitestone's requests for Yuanda to provide additional design services. *Id.*

As of October 7, 2019, Yuanda provided multiple redesigns for the head connection and engineer-stamped structural calculations, which incorporated Perkins Eastman's new design criteria. Ex. 1, ¶¶ 66-67, 80-86. On November 27, 2019, for the first time, Whitestone asked Yuanda to provide proposals for the cost to fabricate and deliver replacement brackets according to the revised design Yuanda developed. Ex. 1, ¶ 104. Yuanda provided the requested information on December 7, 2019. Ex. 1, ¶¶ 104-107; Ex. 16. Whitestone did not pursue Yuanda's proposal or request that Yuanda fabricate and deliver the replacement components. Rather, as Yuanda discovered during the course of this litigation, more than 21 months earlier (on February 20, 2018), Whitestone ordered the replacement components from a local supplier. Ex. 24, p. 18. The cost of these replacement components is included in Whitestone's damages.

## III. LEGAL STANDARD

Summary Judgment is proper when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). While the moving party bears the burden and "all ambiguities must be resolved and all inferences drawn in favor of the" non-movant, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223-24 (2d Cir., 1994) (internal citations omitted).

The purpose of "contract interpretation is to give effect to the *expressed* intentions of the parties." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010), *quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir., 1989) (emphasis in original). The Court is to interpret a written agreement on the plain meaning of its terms, when the agreement "is complete, clear and unambiguous on its face." *Maverick Tube*, 595 F.3d at 467, *quoting Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569 (2002). Furthermore, in interpreting a contract, the Court should not "add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Maverick Tube*, 595 F.3d at 468, *quoting Bailey v. Fish & Neave,* 8 N.Y.3d 523, 528 (2007).

In this matter, summary judgment in Yuanda's favor is proper because all disputed issues between Yuanda and Whitestone can be disposed of through an interpretation of the relevant contract terms, which are clear and unambiguous. To be clear, the Purchase Order does contain certain ambiguous and contradictory terms and requirements; however, those ambiguities and contradictions are not relevant to this dispute. Furthermore, addressing and/or resolving those

ambiguities and contradictions is not necessary to find that Yuanda is entitled to judgment as a matter of law.

## IV. **RELEVANT CONTRACT TERMS**

As noted immediately above, determining liability and the amount of damages, if any, requires nothing more than applying the plain and unambiguous conditions and requirements of the Purchase Order to the undisputed facts. In this litigation there are only a handful of Purchase Order provisions that will control the outcome, as follows: (1) Section 3 of the Purchase Order Terms and Conditions, which identifies the documents that form the contractual agreement between Yuanda and Whitestone, (2) Section 10 of the Purchase Agreement Terms and Conditions, which sets forth the conditions under which Yuanda is required to repair or replace its work, and (3) the face of the Purchase Order, which delineates the specific services Yuanda was required to perform, defined as "Vendor's Work."

Section 3 of the Purchase Agreement Terms and Conditions provides that the Purchase Order consists of the following documents:

> …the body of the Purchase Order, Attachments A, B, C and D attached, these Terms and Conditions and the Contract Documents as set forth in Attachment B (Contract documents [*sic*]) related to curtain wall under the Prime Contract. Further, the Contract Documents and any addenda and written modifications to them are hereby incorporated by reference and made a part of this Purchase Order as if fully set forth herein except as specifically set forth in Attachment A.

Ex. 3, p. 3 at ¶ 3.

Therefore, the only "Contract Documents" that are incorporated by reference into the Purchase Order are those documents listed in its Attachment B. Attachment B does not list, or even reference, the Sciame Subcontract or the Prime Contract. As such, neither document is part of the Purchase Order, which governs Yuanda's and Whitestone's relationship. Consequently, any requirement contained in those agreements is not binding on Yuanda.

Also at issue in this litigation is Section 10 of the Purchase Agreement Terms and Conditions, which provides the conditions under which Yuanda was required to repair or correct its work. That Section states, in relevant part:

> Vendor shall promptly prepare the plan for the approval of the Subcontractor, in order to replace or correct any Vendor's Work which Subcontractor shall reject as failing to conform to the requirements of this Purchase Order and/or Contract Documents whether rejected before or after installation, with exclusion of those specified in item (b) listed below. Upon approval of Vendor's plan by Subcontractor, Vendor shall promptly replace or correct any Vendor's Work. If Vendor does not do so within a reasonable time, Subcontractor shall have the right to do so and Vendor shall be liable to Subcontractor for the cost thereof.

Ex. 3, p. 6 at ¶ 10. As clearly stated in the Purchase Order, only the Subcontractor (*e.g.* Whitestone) has the authority to reject Yuanda's work, and only if Yuanda's work "fail[s] to conform to the requirements of th[e] Purchase Order and/or Contract Documents." *Id.* In that event, Whitestone is only permitted to "replace or correct any Vendor's Work" on Yuanda's behalf if Yuanda "does not do so within a reasonable time." *Id.*

Finally, the scope of Yuanda's services on the Project, called "Vendor's Work," is relevant to this Motion. The Purchase Order defines "Vendor's Work" as follows:

> …all curtain wall system design, engineering, structural calculations, shop drawings, product data & sample submittals including product certifications and test reports, curtain wall system thermal analysis, sealant compatibility and adhesion tests for material assembled and glazed in plant, material, fabrication, transportation to Test Lab and Project Site, transportation insurance from Vendor's manufacturing facility up to acceptance of material deliveries at Test Lab and Project Site final destination, bond in the form of a non-reducible percentage performance, labor and material bond to be in full effect to six (6) months after the last delivery to Project Site from an A rated bonding company acceptable to the Subcontractor and allowed to conduct business in the State of New York, lab mock-up curtain wall material including qualified Yuanda technical witness at Test Lab during mock-up installation and testing, as required to furnish and deliver all curtain wall system materials….

Ex. 3, p. 1. Importantly, "Vendor's Work" does not include installation of the WT-3 Clerestory (or any component) or the costs associated with installation.

## V. ARGUMENT

Whitestone can only recover the costs it allegedly incurred to re-perform, correct or replace Yuanda's work if Whitestone can prove that: (1) Yuanda's work "fail[ed] to conform to the requirements of th[e] Purchase Order and/or Contract Documents," (2) Whitestone rejected Yuanda's work on this basis, and (3) Yuanda failed to revise its work after the work was properly rejected. Ex. 10, p. 6, ¶ 10. If any one of these conditions is not satisfied, Whitestone is not entitled to recovery of the amounts it seeks. The undisputed facts demonstrate that all conditions fail, and Yuanda is therefore entitled to summary judgment.

Alternatively, if this Court declines to grant summary judgment as to Yuanda's liability, this Court should grant partial summary judgment with respect to Whitestone's damages. Even if Whitestone were entitled to recover its costs to revise Yuanda's conforming, non-defective work, that recovery would be limited, by the express terms of the Purchase Order, to the costs defined as "Vendor's Work." As the majority of Whitestone's alleged damages relate to items not included in "Vendor's Work," including installation costs, overhead, profit and insurance, summary judgment on those portions of Whitestone's damages is appropriate.

### A. Whitestone is Not Entitled to Recovery Under the Terms of the Purchase Order

The Purchase Order only requires that Yuanda "replace or correct any Vendor's Work" if that Work "fail[s] to conform to the requirements of th[e] Purchase Order and/or Contract Documents." It is undisputed that Yuanda's work does, in fact, conform to the requirements of the Purchase Order and Contract Documents. Therefore, Yuanda had no obligation to replace or correct any of its Work. For this reason alone, this Court should grant summary judgment in Yuanda's favor.

As an additional basis for granting summary judgment, the Purchase Order only requires Yuanda to "replace or correct any Vendor's Work" if that work was rejected ***by Whitestone*** for failing to so conform. Whitestone never rejected Yuanda's work for failing to conform to the Purchase Order and/or Contract Documents. Whitestone cannot reject Yuanda's work on that basis because Whitestone agrees that Yuanda's work in fact conforms to the requirements. Therefore, Yuanda's obligation to replace or correct its work never materialized.

Finally, Whitestone only has a right to "replace or correct any Vendor's Work," and charge Yuanda for those costs actually incurred, if Yuanda was provided the reasonable opportunity to make the corrections but failed to do so. The undisputed facts demonstrate that, even though Yuanda's work conformed to the Purchase Order and Contract Documents, after the Design Team provided new design criteria, Yuanda worked closely with Whitestone to revise the design of the WT-3 Clerestory to incorporate these late design changes. Whitestone ignored Yuanda's offer to provide replacement components – an offer which was not required by the Purchase Order because Yuanda's work was not defective in the first instance – and incurred additional costs when it obtained replacement components from a third party. These costs are not recoverable.

Each of the foregoing provides an independent basis for summary judgment in Yuanda's favor.

**1. Yuanda's Work Conforms to the Purchase Order and Contract Documents**

Under the terms of the Purchase Order, Whitestone may only reject Yuanda's work "…for failing to conform to the requirements of the Purchase Order and/or Contract Documents." Ex. 3, p. 6. Yuanda's work, *e.g.* the design and fabrication of the WT-3 Clerestory, conforms to the requirements of the Purchase Order and Contract Documents. Ex. 1,

¶¶ 41-46, 64(b)-(c), 69, 77.  Whitestone unequivocally agrees that Yuanda's work conforms to these requirements.  *Id*.  Not only did Whitestone agree that Yuanda's work conformed to the Purchase Order at the time Whitestone installed the WT-3 Clerestory in December 2016, ***as of today***, Whitestone agrees that Yuanda's work conformed to the requirements of the Purchase Order and Contract Documents.  *Id*.

Whitestone's entire argument for its claim is that Yuanda's work is "non-conforming" because Yuanda's design (completed and approved in 2015) does not conform to the new design criteria provided on January 30, 2017, ***after*** Yuanda's design was already approved, fabricated and installed.  Ex. 1, ¶¶ 54, 61, 64(f); Ex. 4, p. 3 (¶ 1); Ex. 28, pp. 105:7-106:13.  Whitestone's position is nonsensical and not supported by any legal authority.

Furthermore, the Design Team never issued a modification to the Contract Documents in order to incorporate the belated design change.   Ex. 1, ¶ 52.  Since the new design criteria is not part of the Contract Documents, it is not incorporated by reference into the Purchase Order. Consequently, the redesign and fabrication of new components is not work required by the terms of the Purchase Order.  Ex. 1, ¶¶ 19-20, 88, 113.

Since 2017 and continuing until today, Whitestone has fiercely argued that the Design Team's new design criteria is a substantive deviation from the information provided in the Contract Documents.   Ex. 1,  ¶¶ 55-60, 63-65; Ex. 7; Ex. 8; Ex. 9.   Whitestone has also repeatedly claimed that it and Yuanda are entitled to a contract modification and payment from Sciame or the Owner for the additional work that was necessitated by the new design criteria, work which Whitestone and Yuanda performed at their own cost.  Ex. 1, ¶¶ 55-60, 63-65, 88, 111-113; Ex. 7; Ex. 8; Ex. 9.  Since Yuanda's work conforms to the Contract Documents – and

Whitestone readily and whole-heartedly agrees that Yuanda's work conforms – Whitestone has no right to reject Yuanda's work, and Yuanda has no obligation to replace it.

**2. Whitestone Never Rejected Yuanda's Work Under the Terms of the Purchase Order**

Additionally, Whitestone never properly rejected Yuanda's work, which is a further condition precedent to any obligation by Yuanda to replace or correct such work. The Purchase Order clearly states that "Vendor shall promptly prepare the plan for the approval of the Subcontractor, in order to replace or correct any Vendor's Work ***which Subcontractor shall reject*** as failing to conform to the requirements of this Purchase Order and/or Contract Documents…." Ex. 3, p. 6, ¶ 10 (emphasis added). No other provision of the Purchase Order addresses rejection of Yuanda's work, and no provision of the Purchase Order grants authority to any other party to reject Yuanda's work. Thus, before Yuanda had any obligation to repair or correct its work, not only was Whitestone required to reject Yuanda's work, that rejection needed to be as a result of a failure of that work to conform to the Contract Documents.

Whitestone never issued a notice or any other communication to Yuanda wherein Whitestone informed Yuanda that Whitestone was rejecting Yuanda's work. Ex. 1, ¶¶ 73-74. The only purported reference to a rejection of the WT-3 Clerestory is Whitestone's June 24, 2019 letter, in which Whitestone merely informed Yuanda of Sciame's determination that Sciame had rejected Whitestone's PCO No. 98, a determination which Whitestone disputes to this day. Ex. 1, ¶ 75.

Whitestone has previously argued that Yuanda's reading of this rejection requirement is merely semantics and Whitestone ***intended*** that the Purchase Order would grant third parties with the right to reject Yuanda's work. Whitestone's argument fails for at least three reasons. First, in order for Whitestone's reading to be correct, the Court must find that the relevant

language of the Purchase Order is ambiguous. As shown above (and as previously argued by Whitestone), the contract terms on which this case center are not ambiguous.

Second, in order for Whitestone's interpretation to be correct, the Court must add additional language to the relevant contract terms, whereby others (*e.g.* Sciame, Owner and/or Design Team) have the authority to reject Yuanda's work. Such a reading is prohibited by standard contract interpretation, where the Court is constrained to the actual language of the contract and cannot "…add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties…." *Maverick Tube*, 595 F.3d at 468, *quoting Bailey v. Fish & Neave,* 8 N.Y.3d 523, 528 (2007).

Finally, such additional language does not comport with the parties' expectations and would materially alter the terms of the Purchase Order that the parties negotiated. In the Sciame Subcontract, which Whitestone executed more than two weeks before it executed the Purchase Order, Whitestone expressly agreed "that the Contractor [Sciame] ***and the Architect*** each have the authority to reject Work of the Subcontractor that does not conform to the Prime Contract." Ex. 19, p. 10 (§ 4.1.5) (emphasis added). Whitestone was well-aware that the Sciame Subcontract contained this language, which permits third parties to reject Whitestone's work. Ex. 28, pp. 30:1-31:4. However, Whitestone chose not to include this, or similar language, in the Purchase Order.

Furthermore, in defining which documents comprise the "Contract Documents," which are incorporated into the Purchase Order and specified in its Attachment B, Whitestone decided not to include the Sciame Subcontract or Prime Contract. Consequently, there is no contractual mechanism whereby Sciame or any other third-party has the authority to reject Yuanda's work. The right to reject Yuanda's work resides solely with Whitestone.

In order to trigger the requirement that Yuanda replace or correct its work, Whitestone must have rejected Yuanda's work on the basis that it failed to conform to the Contract Documents. This did not occur, and Yuanda is therefore entitled to summary judgment.

**3. Yuanda Performed Additional Work To Address The New Design Criteria**

As a final hurdle, Whitestone is only entitled to perform Vendor's Work and recover those costs from Yuanda if Yuanda failed to replace or correct its defective work "within a reasonable time" after Whitestone's rejection. Ex. 3, p. 6, ¶ 10. In other words, Whitestone was required to provide Yuanda with a reasonable opportunity to remedy any non-conforming work before doing so itself and charging those costs to Yuanda. The undisputed facts demonstrate that, notwithstanding the fact that Yuanda's work entirely conformed with the requirements of the Purchase Order and Contract Documents, when Whitestone advised Yuanda of the need to alter Yuanda's work, Yuanda immediately commenced to do so.

Yuanda provided design services even before Sciame purportedly rejected[2] Whitestone's work on May 3, 2019. According to Whitestone's Project Manager, Whitestone and Yuanda collaborated on a redesign of the head connection between January 30, 2017 (when the Design Team changed the design criteria) and November 27, 2018. Ex. 1, ¶¶ 80-83; Ex. 4; Ex. 5; Ex. 6. Within days after Sciame's purported rejection, Yuanda provided an analysis of the WT-3 Clerestory, which Whitestone accepted as true and included in its Description of Dispute that Whitestone submitted to Sciame. Ex. 1, ¶¶ 66-68; Ex. 9, pp. 2-3.

Even after Whitestone's claimed "rejection" of the WT-3 Clerestory on June 24, 2019, Yuanda continued to respond to Whitestone's requests for assistance with the redesigned

[2] Whitestone has been unclear about what it considers to be the date of rejection – the May 3, 2019 email from Sciame or the June 24, 2019 letter from Whitestone to Yuanda. However, the date of Sciame's rejection is immaterial, because Yuanda provided remedial design services from January 2017 until at least December 2019.

connection.   On August 7, 2019, Yuanda provided engineer-stamped calculations for the new head connection.  Ex. 1, ¶ 84; Ex. 13, p. 2.  The ten-month gap (between October 8, 2018 and August 5, 2019) in communication regarding the remedial design is solely the result of Whitestone's failure to follow up with Yuanda after Yuanda asked that Whitestone "[p]lease review the adjusted calculations."   Ex. 27, p. 147:2-13; Ex. 13, pp. 2-3.   The Design Team rejected Yuanda's August structural calculations, and on October 7, 2019, Yuanda provided new engineer-stamped calculations, which the Design Team accepted.  Ex. 15, pp.  1-2.

In late October or early November 2019, Whitestone and Yuanda continued to discuss Sciame's demands to revise the head connection.  Ex. 17, pp. 2-3.  On November 27, 2019, Whitestone asked that Yuanda provide "a proposal to fabricate and deliver all the brackets required to complete the clerestory remediation."   Ex. 16, p.1.   However, at no time did Whitestone demand that Yuanda provide the replacement components.   In fact, during this litigation, Yuanda has discovered that on February 20, 2018 – more than 21 months before Whitestone requested a cost proposal for the brackets – Whitestone ordered replacement components from a local supplier, at a significantly greater cost.  Ex. 24, p. 18.

Even if Yuanda's work was non-conforming and rejected by Whitestone, which it was not, Whitestone could only perform Yuanda's work and charge the costs incurred to Yuanda if Yuanda failed to provide those services "within a reasonable time."   The undisputed facts demonstrate that Yuanda took timely steps following Sciame's unfounded rejection of Yuanda's work to re-perform its work.  Whitestone made the independent decision to perform certain work itself and through a third party, but Whitestone's decision is not one for which Yuanda is financially responsible under the Purchase Order.

**B. In The Alternative, Yuanda Is Entitled To Partial Summary Judgment With Respect To The Majority Of Whitestone's Alleged Damages**

Even if the Court rejects all of Yuanda's arguments and finds Yuanda potentially liable to Whitestone for the cost to "replace or correct . . . Vendor's Work," Whitestone's damages are limited to Vendor's Work, which does not include the costs of labor and installation, overhead, profit, or insurance, which such costs account for the vast majority of Whitestone's alleged damages. Based on the admissible evidence, Yuanda could be liable for no more than $32,287.61.

In this litigation, Whitestone is seeking recovery of $237,626.88, as follows:

| **Description of Alleged Damage** | | | | **Alleged Damage** |
|---|---|---|---|---|
| Whitestone Manpower | | | | $102,825.94 |
| Whitestone Design Costs | | | | $17,600.00 |
| Equipment / Material / Services | | | | $47,389.65 |
| | The above Equipment / Material / Services consist of: | | | |
| | 1 | Engineering services for work platform | $3,060.00 | |
| | 2 | Rigid Insulation for work platform | $2,182.86 | |
| | 3 | Wood for base of scaffold | $4,955.80 | |
| | 4 | Aluminum for interior work platform | $342.31 | |
| | 5 | Rental for man / material lift | $2,551.77 | |
| | 6 | Wood for interior work platform | $1,466.90 | |
| | 7 | Waterproofing / sealants / gaskets | $686.48 | |
| | 8 | Exterior silicone sealant | $786.50 | |
| | 9 | Torque wrench | $542.40 | |
| | 10 | Replacement Clerestory brackets | $24,395.00 | |
| | 11 | Invoices from Tanner (hardware / tools / safety) | $6,419.63 | |
| | | | | |
| **Sub Total** | | | | **$167,815.59** |
| Whitestone's Overhead and Profit (20% of the above) | | | | $33,563.12 |
| Insurance (18% of the above, including Overhead & Profit) | | | | $36,248.17 |
| **Total** | | | | **$237,626.88** |

Ex. 23, pp.1, 4.

Section 10 of the Purchase Agreement Terms and Conditions states that if Yuanda failed to provide a plan within a reasonable time to replace or correct its defective work, "Subcontractor [Whitestone] shall have the right to do so [replace or correct Yuanda's defective work] and Vendor [Yuanda] shall be liable to Subcontractor [Whitestone] for the costs thereof." Ex. 3, p. 6, ¶ 10. Whitestone admits that "the costs thereof" refers to the "costs associated with … remediating or fixing work originally the responsibility of the vendor." Ex. 28, p. 60:13-19. Therefore, Yuanda is only liable to Whitestone for the costs to replace work for which Yuanda was ***originally*** responsible.

In this matter, a significant portion of Whitestone's alleged damages ($205,340.27 of its $237,626.88 alleged damages) relates to work, materials and costs that are not included in the definition of Vendor's Work, and for which Yuanda was not originally responsible. Pursuant to the clear and unambiguous terms of the Purchase Order, if Yuanda is liable to Whitestone, Yuanda is only potentially liable for the costs to redesign the head connection, fabricate replacement components and deliver the replacement components to the Project, as these are the only costs allegedly incurred by Whitestone for which Yuanda was originally responsible.

**1. Whitestone Only Incurred $32,287.61 For Items Included In "Vendor's Work"**

According to Whitestone and its records of the costs it incurred during the remediation efforts, only $32,287.61 of the $237,626.88 it claims in damages are costs included in the definition of Vendor's Work. Ex. 1, ¶ 99; Ex. 22; Ex. 23; Ex. 24. Whitestone's Vice President, Mr. Grzic, agrees that only the costs for waterproofing, sealants, silicone gaskets, fabrication of the replacement brackets and certain other supplies fall within the definition of Vendor's Work; these costs are identified in the above chart at line items 7, 8, 10 and 11. Ex. 23, pp. 1, 4; Ex. 24, pp. 23-44; Ex. 28, p. 158:3-13. None of the other costs for which Whitestone currently seeks

recovery from Yuanda fall within that definition. *Id*; Ex. 1, ¶ 92. Pursuant to the terms of the Purchase Order, Yuanda' potential liability is limited to the actual costs Whitestone incurred to perform Vendor's Work. All of the admissible evidence demonstrates that Yuanda's maximum liability is $32,287.61.

**2. Whitestone's Other Damages Are Not Recoverable**

For the reasons detailed immediately below, Whitestone is not entitled to recover from Yuanda any other cost it seeks.

**a. Manpower – Cost to Install the New Brackets**

Whitestone seeks to recover $102,825.94 for the costs it incurred to install the newly designed head connection. Presuming that Whitestone is able to offer sufficient foundation at trial, which is unclear, Whitestone is not entitled to recover the costs it incurred to install the replacement components for "Manpower." Ex. 23, p. 1. Yuanda was never responsible for the costs to install the WT-3 Clerestory or any of its components, and any argument to the contrary by Whitestone simply rewrites the terms of the Purchase Order. Ex. 3, p. 1. Therefore, Whitestone is not entitled to recover the installation costs from Yuanda, as they are not part of "Vendor's Work."

**b. "Whitestone Design" Costs are not Recoverable**

Whitestone seeks to recover $17,600.00 in "design costs," but Whitestone has no suitable explanation to what design services it provided, what activities it performed or why it is otherwise entitled to recover its supposed "design costs." First, Whitestone has no documentation or other admissible evidence to support these alleged damages. Mr. Dearth testified that he is the Whitestone employee that provided these "design services." Ex. 27, p. 160:6-8. However, Mr. Dearth is not an engineer, Whitestone does not employ any engineers

and Mr. Dearth stated that in addition to coordinating and/or collaborating with Yuanda he only provided "CAD drawings." Ex. 27, pp. 159:21-161:6. None of Mr. Dearth's activities could be considered design services, especially since Yuanda, and not Whitestone, took the information provided by Perkins Eastman, developed a design solution, created design drawings and then provided engineer-stamped calculations. Ex. 5; Ex. 6; Ex. 13; Ex. 15. Mr. Dearth's explanation appears redundant with other costs Whitestone is seeking for Overhead, Profit and Mr. Dearth's supervisory time, none of which are compensable under the terms of the Purchase Order. Additionally, Whitestone has not produced any documentation to support, explain or detail Mr. Dearth's 160 hours for design services. Ex. 27, p. 159:14-20. Whitestone can present has no admissible evidence to support this alleged damage.

Furthermore, Whitestone is not entitled to recover for its alleged "design costs," because Yuanda actually provided those services. Even though Whitestone never formally rejected Yuanda's work, between January 30, 2017 and October 7, 2019, Yuanda provided significant redesign services for this new connection and new head brackets. *See supra*, pp. 5, 13-15. After the Design Team provided the new design criteria on January 30, 2017, Yuanda actively assisted Whitestone in developing a remediation plan that would be acceptable to Sciame and the Owner. *See id.*

At Whitestone's request, Yuanda designed new brackets for the head connection of the WT-3 Clerestory. *See supra*, p. 13-15; Ex. 5, pp, 1-2, 5, 7, 10; Ex. 6, pp. 1, 13-16. When Whitestone requested, Yuanda provided engineer-stamped calculations for the new connection. Ex. 13, pp. 1, 7-10. After the Design Team rejected Yuanda's new design and calculations, without complaint Yuanda promptly prepared new calculations. Ex. 13, pp. 1-2; Ex. 15, p. 2.

Once Whitestone advised that the new design was acceptable, Yuanda provided updated engineer-stamped calculations. Ex. 15, pp. 1, 4-9.

After Sciame directed Whitestone to redesign the head connection on May 3, 2019, Yuanda performed the necessary design services, and it is unclear what if any design services Whitestone provided. Therefore, Whitestone is not entitled to recover its $17,600.00 in "design costs" from Yuanda.

**c. Miscellaneous Other Costs**

Whitestone's "Clerestory Remediation Summary Cost Tracking" document identifies $15,102.04 in miscellaneous costs for "equipment / material / services." However, Whitestone executive Mr. Grzic admitted that those costs are not included in the definition of Vendor's Work. Ex. 23; Ex. 28, p. 158:3-13. Since those costs do not qualify as Vendor's Work, Whitestone is not entitled to recover for those costs.

**d. Overhead & Profit and Insurance**

Whitestone seeks $33,563.12 for overhead and profit and $36,248.17 for insurance. Whitestone's demand that Yuanda reimburse Whitestone for its overhead and profit or costs for insurance has no basis in the language of the Purchase Order and cannot be supported with admissible evidence. Vendor's Work, as defined in the Purchase Order, does not include the costs for Whitestone's overhead, profit or insurance, and no fair reading of the Purchase Order makes Yuanda liable for these costs. Ex. 3, p. 1.

Even if, *arguendo*, these costs are recoverable as Vendor's Work, Whitestone has produced no admissible evidence to support a finding that it incurred damage, in any amount, for overhead and profit or insurance as a direct result of the remediation project. Ex. 28, pp. 152:7-155:12, Ex. 27, pp. 181:20-185:12. In fact, Mr. Dearth included a line item for insurance at 18%

of the remediation costs (which includes the costs for overhead and profit) simply because he was directed to. Ex. 27, pp. 185:14-186:1. During this litigation Yuanda has repeatedly asked that Whitestone produce its insurance policies and evidence of premiums actually paid as a direct result of the remediation work; however, Whitestone failed and/or refused to do so. Accordingly, Whitestone has no admissible evidence that it incurred any damage, *e.g.* an increase in insurance premiums, during the course of the remediation project, which spanned a total of 26 days. Ex. 24; Ex. 27, pp. 185:14-186:12; Ex. 28, pp. 154:4-155:12.

**3. Whitestone is not Entitled to Costs For the Replacement Brackets**

Whitestone seeks $24,395.00 for the cost to fabricate and deliver replacement brackets. While there is no dispute that the costs to fabricate and deliver the replacement brackets is included in Vendor's Work and Yuanda ***could have been*** responsible for those costs, Whitestone is not entitled to those costs because Whitestone failed to allow Yuanda "reasonable time" to correct the alleged defective work. *See* Ex. 3, p. 6 ("If Vendor does not do so within a reasonable time, Subcontractor shall have the right to do so….").

Whitestone has consistently claimed that Sciame's rejection of the WT-3 Clerestory occurred when Whitestone received Sciame's rejection of the PCO No. 98 on May 3, 2019. Ex. 10. Furthermore, Whitestone has argued that Yuanda's liability and responsibility to remediate the WT-3 Clerestory arise from Whitestone's notice to Yuanda on June 24, 2019. Ex. 11. Therefore, *under Whitestone's own theory*, Yuanda owed no obligation to remediate (*e.g.* design a new head detail or fabricate replacement components) until some reasonable time after June 24, 2019.

Even if Yuanda was required to fabricate replacement brackets, Whitestone never provided Yuanda with a reasonable opportunity to do so. On February 20, 2018, Whitestone

issued a purchase order to AJBBC Corporation for the fabrication and delivery of the replacement components. Ex. 24, p. 18; Ex. 27, pp. 177:10-180:3. Thus, Whitestone ordered replacement brackets – the same ones for which Whitestone seeks reimbursement here – ***13 months before*** Sciame allegedly rejected Whitestone's and Yuanda's work, and ***15 months before*** Yuanda's liability to provide those brackets purportedly arose. Whitestone chose to obtain replacement components from a local supplier and never gave Yuanda the reasonable opportunity to cure its allegedly defective work.

Whitestone claims it needed to use a local supplier because of a delay in shipping replacement components from China. Ex. 27. p. 180:12-16. This is patently false. Whitestone did not ask Yuanda about the fabrication of replacement brackets until November 27, 2019. Ex. 1, ¶ 104. On December 7, 2019, Yuanda advised Whitestone that the new brackets would cost between $4,488 and $10,032, depending whether the brackets were sent by ocean or air, respectively. Ex. 16, pp. 2-3. Furthermore, in that same communication Yuanda advised that fabrication would take 35 days. *Id.* Whitestone never responded to Yuanda's December 7, 2019 offer to fabricate and ship the replacement brackets. On April 27, 2020, Yuanda reiterated that Yuanda would "bear the materials and shipping costs required for the modification." Ex. 17, p. 1.

On August 5, 2020, Whitestone apparently took delivery of the brackets provided by AJBBC Corp. Ex. 24, pp. 16-17[3]. Whitestone did not pay for the brackets until October 26, 2020, about a month after Whitestone completed its remediation work, and more than two and half years after it ordered the replacement material. Ex. 24, pp. 16-18, 69.

---

[3] AJBBC Corp. and Portland Steel Inc. are different names for the same company. Ex. 27. (Deposition of James Dearth), p. 178:18-22.

Whitestone has not produced any supporting documents that identify when it asked AJBBC to actually fabricate and expedite the replacement brackets.  However, that information is entirely irrelevant.  If Whitestone requested the material from AJBBC prior to December 7, 2019, then fabrication by the local supplier was not more timely than Yuanda could have provided, and Whitestone's rationale is specious.  On the other hand, if Whitestone directed fabrication after December 7, 2019, then Whitestone failed to provide Yuanda with the opportunity to cure the alleged defect and supply the replacement components.

If Whitestone directed Yuanda to fabricate the brackets after receipt of Yuanda's December 7 cost proposals instead of ignoring Yuanda's offer, Yuanda could have fabricated the replacement components before the end of January 2020.  Whitestone would have received those brackets before it mobilized to the project site to begin replacing the head connections in August 2020.  Whitestone alone made the decision to obtain more costly brackets from AJBBC, and Whitestone failed to allow Yuanda reasonable time to cure the alleged defect.

The Purchase Order clearly provides Yuanda with the right to cure any claimed defect in Vendor's Work.  Whitestone breached the contract, in this respect, when it failed to provide Yuanda with a reasonable opportunity to supply replacement brackets.  If Whitestone accepted Yuanda's offer to supply these components, Whitestone would not have incurred any costs for the replacement parts; instead, Whitestone decided to obtain the components at a significantly higher cost.  The additional costs Whitestone incurred are a direct result of its own breach.  Therefore, Whitestone should not be permitted to recover the costs ($24,395.00) it incurred to fabricate the replacement brackets.

## VI. CONCLUSION

Yuanda is entitled to summary judgment in its favor for all of the reasons detailed above. First, Yuanda's design and fabrication of the WT-3 Clerestory conforms to the requirements of the Purchase Order and Contract Documents. This is an undisputed fact, with which Whitestone agrees, and the Purchase Order does not require Yuanda to replace or correct its work unless it is non-conforming. Additionally, Whitestone never properly rejected Yuanda's work, which is an explicit contractual condition precedent necessary to require Yuanda to provide additional services. Finally, Yuanda took steps to re-perform and revise its work following the design change, notwithstanding that Yuanda's work was properly performed in the first instance, and Whitestone did not allow Yuanda to complete this effort, opting instead to do so through third parties. The Purchase Order requires Whitestone to provide a fair opportunity to cure, and Whitestone's failure to do so precludes it from recovering from Yuanda costs Whitestone incurred to re-perform Yuanda's work.

Alternatively, even if this Court disagrees with Yuanda and concludes that Yuanda could potentially be liable to Whitestone, Whitestone is not entitled to the damages it seeks. Under the plain and unambiguous language of the Purchase Order, Whitestone could only be awarded the costs to re-perform "Vendor's Work;" such costs total $32,287.61, as follows:

| Costs included in "Vendor's Work" | | |
|---|---|---|
| | Waterproofing / sealants / gaskets | $686.48 |
| | Exterior silicone sealant | $786.50 |
| | New Clerestory brackets | $24,395.00 |
| | Invoices from Tanner (hardware / tools / safety) | $6,419.63 |
| | **Damages for "Vendor's Work"** | **$32,287.61** |

However, as discussed above, Whitestone cannot recover the $24,395.00 for the cost of the replacement brackets, because Whitestone plainly did not provide Yuanda with an

opportunity to provide replacement components in order to cure the purported non-conformance, as required by the Purchase Order. Thus, Yuanda is entitled to summary judgment on that component of Whitestone's alleged damages.

Whitestone is not entitled to the remaining $205,339.27 in purported damages, which consist of:

| **Description of Alleged Damage** | | **Alleged Damage** |
|---|---|---|
| Whitestone Manpower | | $102,825.94 |
| Whitestone Design Costs | | $17,600.00 |
| Equipment / Material / Services | | $15,102.04 |
| The above consisting of | | |
| Engineering services for work platform | $3,060.00 | |
| Rigid Insulation for work platform | $2,182.86 | |
| Wood for base of scaffold | $4,955.80 | |
| Aluminum for interior work platform | $342.31 | |
| Rental for man / material lift | $2,551.77 | |
| Wood for interior work platform | $1,466.90 | |
| Torque wrench | $542.40 | |
| | | |
| Whitestone's Overhead and Profit (20%) | | $33,563.12 |
| Insurance (18%) | | $36,248.17 |
| **Total** | | **$205,339.27** |

Because these costs are not included in the definition of Vendor's Work, Yuanda entitled to summary judgment on these amounts. As such, if this Court does not grant summary judgment as to the entirety of Whitestone's claim in Yuanda's favor, the Court should grant partial summary judgment in the amount of $229,734.27 ($24,395.00 + $205,339.27), leaving $7,892.61 as the damages that Whitestone may present at trial.

For all of the foregoing reasons, Yuanda respectfully requests that this Court grant Summary Judgment in its favor on all issues, or in the alternative, find that Whitestone's damages can be no more than $7,892.61.