IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITESTONE CONSTRUCTION CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 20 - cv – 1006 - GHW |
| v. ) | |
| ) | |
| YUANDA USA CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT YUANDA USA CORPORATION'S
<u>RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

<u>Contract, Subcontract and Responsibilities</u>

1. On or about October 7, 2013, Whitestone Construction Corporation ("Whitestone") entered into a subcontract agreement with F.J. Sciame Construction Co., Inc. ("Sciame"), whereby Whitestone agreed to perform the work generally described in the document attached and incorporated into that subcontract agreement bearing the title "Exhibit A Description of Project" and described in more detail throughout the subcontract ("Sciame Subcontract"). Grzic Dep.[1], pp. 20:12-22:4; Ex 19 and Ex. 20.

2. Under the terms of the Sciame Subcontract, Whitestone agreed to provide the exterior building envelope for the new building located at 285 Jay St., New York, New York. Grzic Dep., p. 22:9-12.

3. In furtherance of its obligations to Sciame, Whitestone entered into a subcontract with Yuanda (described herein) and at issue in this litigation is Yuanda's obligations under that subcontract to design, fabricate and deliver the portion of the work commonly referred to as the "WT-3 Clerestory." Complaint (ECF Doc. No. 4), pp. 3-8.

---

[1] The transcript of the deposition of Whitestone's Vice President, Mr. Steven Grzic, is attached to Yuanda's Motion as Exhibit 28. For clarity, the transcript will be referenced as "Grzic Dep."

4. The Sciame Subcontract explicitly incorporates by reference the Prime Contract between Sciame and the Owner, the City University Construction Fund ("Owner"). Grzic Dep., p. 28:7-21; Ex. 19, pp. 1, 3-4.

5. Whitestone never received a copy of the Prime Contract and Whitestone's Vice President[2], Mr. Grzic, has never seen it. Grzic Dep., pp. 18:7-10; 117.

6. Under the terms of the Sciame Subcontract, Whitestone agreed to and was required to design, fabricate and install the curtainwalls for the new building, including the curtainwall designated as the "WT-3 Clerestory." Dearth Dep.[3], p. 28:8-11; Grzic Dep., p. 22:9-23.

7. The Sciame Subcontract also incorporated a document titled "Trade Scope Checklist," which clarifies and more specifically identifies Whitestone's work under the Sciame Subcontract. Grzic Dep., pp. 22:24-28:3; Ex. 20, pp. 2-9.

8. Even though Yuanda requested a copy of the Sciame Subcontract, Whitestone did not provide Yuanda with a copy of the Sciame Subcontract. Tan Dep[4]., pp. 38:24-40:14.

9. Yuanda USA Corporation ("Yuanda") and Whitestone entered into a contract, specifically the "Whitestone Construction Corp. Purchase Order 13-0139-002," dated October 24, 2013 ("Purchase Order"), whereby Yuanda agreed to perform the work detailed and defined on the first page of the Purchase Order. *See* Ex. 3.

---

[2] At the time of his deposition, Mr. Grzic was Whitestone's Vice President; however, during all relevant times of the construction project, he was Whitestone's President. Grzic Dep., pp. 10:18-13:15.

[3] The transcript of Mr. James Dearth's deposition is attached to Yuanda's Motion as Exhibit 27. For clarity, the transcript will be referenced as "Dearth Dep."

[4] The transcript of Mr. Minghua Tan's deposition is attached to Yuanda's Motion as Exhibit 29. For clarity, the transcript will be referenced as "Tan Dep."

10. Mr. Feng Zhu signed the Purchase Order on behalf of Yuanda, as its President. Ex. 3, p. 10.

11. Mr. Steven Grzic signed the Purchase Order on behalf of Whitestone as its President. Dearth Dep., p. 41:3-10; Grzic Dep., p. 36:6-10; Ex. 3, p. 10.

12. The Purchase Order includes a contract provision that specifically incorporates by reference other documents. Ex. 3, pp. 3 (§3), 15.

13. The face of the Purchase Order (page 1) states that the Purchase Order is comprised of: (i) the two-page Purchase Order document; (ii) the eight-page "Purchase Agreement Terms and Conditions;" (iii) the scope worksheet included as Attachment A to the Purchase Order; (iv) the "Contract Documents" as described in Attachments A and B; (v) the delivery schedule set forth in Attachment C; and (vi) the schedule of values set forth in Attachment D. Ex. 3, pp. 1, 15.

14. Attachment B to the Purchase Order defines the "Contract Documents" as follows:

    a. The Purchase Order;

    b. The Purchase Order Terms and Conditions (also referred to as the Purchase Agreement Terms and Conditions), attached to the Purchase Order;

    c. Attachments A through D, as attached to the Purchase Order;

    d. Project safety and/or quality control manual; and

    e. Modifications to the above.

Ex. 3, p. 15.

15.     In addition to the above, the only other documents incorporated into the Purchase Order were "Drawings and Specifications as may be prepared by Architect after the execution of this Purchase Order Agreement…." Ex. 3, p. 15.

16.     However, if such later provided drawings or specifications materially changed Yuanda's work, as defined in the Purchase Order, the subsequently changed drawings and specifications would "be treated as a Change Order." Ex. 3, p. 15.

17.     The Purchase Order does not incorporate by reference the Sciame Subcontract. Grzic Dep., p. 50:12-15; Ex. 3, p. 15.

18.     The Purchase Order does not incorporate by reference the Prime Contract, between Sciame and the project's Owner. Grzic Dep., p. 50:7-11; Ex. 3, p. 15.

## Relevant Construction Terms

19.     In the construction industry, "warranty work" refers to work that (1) is improperly performed work, *e.g.* improper workmanship/craftsmanship and/or substandard quality of materials, or (2) fails under normal wear and tear, within a specified time. Dearth Dep., p. 58:5-13; Grzic Dep., pp. 16:17-17:10.

20.     Correction of warranty work is controlled by the contract. *Id*.

21.     In the construction industry, "defect" or "defective work" refers to work that fails to conform to the requirements of the contract documents, as defined in the contract. Ex., 19, p. 7, § 4.5.

22.     A contractual requirement to correct work only arises if the work in question is "defective" or if the work was improperly performed. Grzic Dep., p. 57:5-8.

23.     By definition, properly performed work is not defective. Grzic Dep., p 59:5-8.

24.     Only defective work can be rejected. Grzic Dep., p. 58:12-59:8.

### "Vendor's Work" and Rejection of Work, As Defined in the Purchase Order

25. Under the terms of the Purchase order, Yuanda was required to provide the services and perform the work defined as "Vendor's Work," which is explicitly defined as:

> "…all curtain wall system design, engineering, structural calculations, shop drawings, product data & sample submittals including product certifications and test reports, curtain wall system thermal analysis, sealant compatibility and adhesion tests for material assembled and glazed in plant, material, fabrication, transportation to Test Lab and Project Site, transportation insurance from Vendor's manufacturing facility up to acceptance of material deliveries at Test Lab and Project Site final destination, bond in the form of a non-reducible percentage performance, labor and material bond to be in full effect to six (6) months after the last delivery to Project Site from an A rated bonding company acceptable to the Subcontractor and allowed to conduct business in the Stale of New York, lab mock-up curtain wall material including qualified Yuanda technical witness at Test Lab during mock-up installation and testing, as required to furnish and deliver all curtain wall system materials ("Vendor's Work")…."

Ex 3, p. 1.

26. The scope of "Vendor's Work," as defined in the Purchase Order, was based on architectural drawings and structural drawings Whitestone provided to Yuanda before the date of the Purchase Order, October 24, 2013. *See*, Ex. 3, p. 11 (Line Item No. 1).

27. In performing its work, Yuanda was required to provide a curtainwall that conforms to the requirements stated in specification sections 084413, 084426 and 088000. Ex. 3, p. 11.

28. As part of "Vendor's Work," as defined in the Purchase Order, Yuanda was responsible for providing structural calculations for the WT-3 Clerestory, calculations which included the stamp of a licensed professional engineer. Dearth Dep., pp. 147:5-148:5; Ex 3, p. 1.

29. As part of "Vendor's Work," as defined in the Purchase Order, Yuanda was not responsible for providing any on-site services for the Project. Dearth Dep., p. 43:21-23; Grzic Dep., p. 39:10-14; Ex 3, p. 1.

30.     As part of "Vendor's Work," as defined in the Purchase Order, Yuanda was not responsible for providing any installation services, specifically with respect to the WT-3 Clerestory.  Dearth Dep., pp. 43-44; Grzic Dep., pp. 39:15-17; 122; Ex 3, p. 1.

31.     As part of "Vendor's Work," as defined in the Purchase Order, Yuanda was not responsible for installing any component of the WT-3 Clerestory.  Grzic Dep., p. 143:18-21; Ex 3, p. 1.

32.     As part of "Vendor's Work," as defined in the Purchase Order, Yuanda was not responsible for the costs to install the WT-3 Clerestory or any of its components.  Dearth Dep., p. 44:4-9; Ex 3, p. 1; Grzic Dep., pp. 113:16-23, 122:10-14.

33.     As part of "Vendor's Work," as defined in the Purchase Order, Yuanda was not required to provide any services after Yuanda delivered the fabricated curtainwall components to the Project site.  Grzic Dep., p. 39:18-21; Ex 3, p. 1.

34.     Whitestone had the right to reject Yuanda's work, *e.g.* Vendor's Work, if Yuanda's work failed "to conform to the requirements of this Purchase Order and/or Contract Documents…."  Ex. 3, p. 6.

35.     The Purchase Order does not grant Sciame, the Owner or Design Team (as defined herein[5]) with the authority to reject Yuanda's work.  Ex. 3, p. 6.

36.     If Whitestone rejected Yuanda's work, Yuanda must "promptly prepare the plan…in order to replace or correct Vendor's Work…."  Ex. 3, p. 6.

---

[5]  For the purposes of these statement of facts "Design Team" shall refer collectively to Perkins Eastman Architects ("Perkins Eastman" or "PEA"), Perkins Eastman's structural engineer, WSP, and Perkins Eastman's façade consultant, Alt Ltd.  Dearth Dep., pp. 73:19-74-3.

37. If Yuanda failed to provide a plan to correct work Whitestone rejected "within a reasonable time, Subcontractor [Whitestone] shall have the right to do so and Vendor [Yuanda] shall be liable to the Subcontractor for the costs thereof." Ex. 3, p. 6.

38. The phrase "costs thereof," as used in the Purchase Order, refers to the costs to remediate or fix the work that was originally Yuanda's responsibility. Grzic Dep., p. 60:13-19.

### Performance of the Work

39. During the course of performing its work, Yuanda provided engineer-stamped calculations for the WT-3 Clerestory, which the Design Team approved. Grzic Dep., p. 93:16-22.

40. Whitestone or its subcontractor inspected the WT-3 Clerestory components Yuanda fabricated, upon delivery of the components to the Project site. Dearth Dep., p. 101:13-24; Grzic Dep., p. 40:5-21.

41. Whitestone's inspection confirmed that the WT-3, as fabricated by Yuanda, conformed to the shop drawings. Dearth Dep., p. 101:13-24; Grzic Dep., p.108:13-18.

42. Yuanda's design for the WT-3 Clerestory conforms to the shop drawings Yuanda created, which the Design Team reviewed and approved, with the condition that Whitestone and Yuanda make the corrections the Design Team noted in the shop drawings. Dearth Dep., pp. 64:22-66:7.

43. Whitestone's installation of the WT-3 Clerestory conformed to the shop drawings, including incorporation of the Design Team's comments, which were returned with Yuanda's shop drawings. Dearth Dep., p. 104:18-21.

44. The components of the WT-3 Clerestory, as fabricated by Yuanda, conform to the shop drawings Yuanda created, as reviewed and approved by the Design Team.  Dearth Dep., pp. 64:22-66:7; Grzic Dep., p. 107:10-22.

45. At the time Whitestone installed the WT-3 Clerestory, Yuanda's design for the WT-3 Clerestory conformed to the requirements of the Purchase Order.  Dearth Dep., pp. 64:22-66:7; 126:8-13.

46. At the time Whitestone installed the WT-3 Clerestory, Yuanda's fabrication of the WT-3 Clerestory components conformed to the requirements of the Purchase Order.  Dearth Dep., p. 67:9-16; 126:8-13.

47. This litigation only relates to the head condition of the WT-3 Clerestory and its ability to accommodate roof deflection.  Dearth Dep., pp. 101:17-102:23; Grzic Dep., pp.135:16-136:4

### Design Changes After Yuanda's Products Were Installed

48. Whitestone performed all work under its contract with Sciame, and Whitestone complied with all obligations as required by the Sciame Subcontract, including the design, fabrication and installation of the WT-3 Clerestory.  Dearth Dep., pp. 32:19-33:4; Ex. 25, ¶ 11.

49. The Design Team failed to include critical design information regarding the building's movement, *e.g.* including the anticipated roof deflection, in the Contract Documents.  Dearth Dep., p. 31:22-32:1.

50. Yuanda was in no way responsible for generating the design information regarding the movement criteria, including roof deflection.  Dearth Dep., p, 32:2-11.

51. Yuanda was only responsible for designing the curtainwall, including the WT-3 Clerestory, based on the information contained in the plans and specifications Whitestone provided to Yuanda. Grzic Dep., p. 68:3-11; Ex. 3, pp. 11-14.

52. The Design Team did not issue a formal change to the Contract Documents that incorporated information included in the Design Team's response to RFI 1130, which provides new design information regarding roof deflection at the WT-3 Clerestory. Dearth Dep., pp. 91:13-93:12.

### Whitestone's Proposed Change Order No. 98

53. After Whitestone completed installation of the WT-3 Clerestory, the Design Team provided Sciame and Whitestone with new information about the expected roof deflection, which impacted the design for the WT-3 Clerestory. Dearth Dep., pp. 98:9-100:16, 111:10-114:7; Ex. 9.

54. The design information the Design Team provided was not otherwise available in the Contract Documents, prior to the date the new information was disclosed to Whitestone and Sciame, January 30, 2017. Dearth, pp. 111-14, 118-19; Ex. 9.

55. On November 27, 2018, Whitestone submitted its Proposed Change Order No. 98 ("PCO No. 98"), which includes the costs to modify the WT-3 Clerestory in order to accommodate the newly disclosed design criteria, which the Design Team disclosed on or after January 30, 2017. Dearth Dep., pp. 95:20-96:3; Ex. 7.

56. In its PCO No. 98, Whitestone informed Sciame that:

    a. The remediation, *e.g.* the "supply and installation of new components for WT-3 Clerestory head anchors," was only necessary "to accommodate new auditorium roof deflection design criteria." Ex. 7, p. 4.

      b. This remediation was "caused by omission of new auditorium roof deflection design criteria prior to MCN [Design Team's shop drawing review], fabrication and installation of WT-3 clerestory, and subsequent untimely issuance of said criteria in RFI 1130 response after fabrication and installation was completed."[6] *Id*; Dearth Dep., pp. 89:9-99:2.

      c. Yuanda's "submittals clearly detailed capacity of system to accommodate movement." Ex. 7, p. 4.

      d. When the Design Team returned its response to RFI-1130 on January 30, 2017, it "issued new relative movement design criteria between the auditorium and academic building after the façade was fabricated and installed." *Id*; Dearth Dep., pp. 99:20-100:16.

57. The statements contained in PCO No. 98, including those identified above, were true and correct at the time Whitestone made those statements, November 27, 2018. Dearth Dep., pp. 98:2-100:16.

58. As of today, Whitestone agrees that all of the statements listed above are true and correct. Dearth Dep., pp. 98:2-100:16; Grzic Dep., p. 95:1-7.

59. On May 3, 2019, Whitestone submitted a Notice of Dispute to Sciame, with respect to PCO No. 98. Ex. 8.

60. The statements included in Whitestone's Notice of Dispute were true and correct at the time Whitestone made those statements, May 3, 2019, and continue to be true today. Dearth Dep., p. 109:15-18.

---

[6] "RFI" stands for "Request for Information," which is a document whereby a contractor asks an architect for clarification. Dearth Dep., p.69:12-15.

61. All remedial work that Sciame demanded with respect to the WT-3 Clerestory were the direct result of the Design Team's issuance of new design criteria, which occurred on or after January 30, 2017. Ex. 9.

62. On May 3, 2019, Sciame rejected Whitestone's PCO No. 98. Dearth Dep., pp. 104:19-105:4; Ex. 10.

63. On May 6, 2019, Whitestone submitted a Description of Dispute to Sciame, which details the reasons Whitestone believes it is entitled to a contract modification for the additional work performed to the WT-3 Clerestory. Ex. 9.

64. In its Description of Dispute, Whitestone informed Sciame that:

   a. Whitestone's installation of the WT-3 Clerestory complied with the shop drawings Yuanda created for that potion of the work, shop drawings which were approved by the Design Team. Ex. 9, p. 1.

   b. Yuanda's shop drawings were "in turn compliant with the contract documents." *Id*; Dearth Dep., pp. 110:21-111:9.

   c. Yuanda's shop drawings conform to the design requirements, as stated on drawing sheet S-003.00. Ex. 9, p. 2.

   d. Drawing sheet S-003.00 is the only drawing or specification that contains exterior façade and roof deflection design criteria, and "no other deflection criteria has been issued." *Id.* at pp. 2, 3.

   e. Whitestone's and Yuanda's "work with respect to WT-3 Clerestory is 100% complete." *Id.* at p. 1.

11

  f. The "design team changed the contract deflection criteria noted on S-003.00 when" it issued its response to RFI-1130 on January 30, 2017. *Id*; Dearth Dep., p. 111:10-20.

  g. The information contained in the Design Team's response to RFI-1130 is a change to the contract requirements. *Id*. at p. 3.

65. The statements contained in Whitestone's Description of Dispute, including those as stated above, were true and correct at the time Whitestone made those statements, May 6, 2019, and continue to be true today. Dearth Dep., pp. 110:13-20; 122:4-9; Grzic Dep., p. 98:12-14.

66. Yuanda provided an analysis, that Whitestone included in its Description of Dispute. Dearth Dep., pp. 120:2-121:19; Grzic Dep., pp. 98:18-99:3.

67. Yuanda's analysis includes that:

  a. The Design Team's comments, which were returned with the shop drawings, directed Yuanda to use the deflection criteria, as stated on structural drawing S-003.00. Ex. 9, p. 2.

  b. According to the deflection criteria, as stated on S-003.00, the expected deflection was 1/2 inch. *Id*.

  c. The failure to provide proper timely roof deflection criteria was "totally the fault of the construction manager and the design team." Ex. 9, p. 3.

68. Whitestone agrees with Yuanda's analysis. Dearth Dep., pp. 120:2-121:19; Grzic Dep., pp. 98:18-99:3.

69.     The WT-3, as designed and fabricated by Yuanda and as installed by Whitestone, complies with the requirements of the Contract Documents.  Dearth Dep., pp. 110:21-111:9; Ex. 9, p. 1.

### "Rejection" of the WT-3 Clerestory

70.     Whitestone did not receive a formal notice from Sciame in which Sciame actually rejected Whitestone's or Yuanda's work, with respect to the WT-3 Clerestory.  Grzic Dep., pp. 100:24-101:17.

71.     On June 24, 2019, Whitestone issued a letter to Yuanda in which Whitestone informed Yuanda that "Sciame rejected as non-conforming Yuanda's fabrication of the WT-3 Clerestory structural components."  Ex. 11.

72.     In transmitting the June 24, 2019 letter, Whitestone did not inform Yuanda that Whitestone rejected Yuanda's work.  Dearth Dep., pp. 125:9-126:13.

73.     Whitestone did not send Yuanda any letter or communication, other than the June 24 email, in which Whitestone informed Yuanda that Whitestone rejected Yuanda's work.  Grzic Dep., pp. 103:18-104:2.

74.     Whitestone never informed Yuanda that Whitestone rejected Yuanda's work. Grzic Dep., p. 104:13-17.

75.     Whitestone does not agree with Sciame or its rejection of the WT-3 Clerestory. Dearth Dep., p. 126:8-13.

76.     Whitestone does not agree that the WT-3 Clerestory was improperly fabricated in any way.  Dearth Dep., pp. 126:19-127:3.

77.     Yuanda did not "misfabricate" the WT-3 Clerestory or any of its components. Dearth Dep., pp. 126:19-127:3; Grzic Dep., pp. 138:13-139:12.

**Yuanda's Continued Work to the WT-3 Clerestory after January 2017**

78. The remedial work for the WT-3 Clerestory was extra and additional work, which was a direct result of a design change initiated by the Design Team after January 30, 2017. Dearth Dep., p.108:6-19; Grzic Dep., pp. 151:17-22, 153:18-20.

79. Due to the Design Team's design change, Whitestone's and Yuanda's remedial work is not "warranty work" or "punchlist work." Dearth Dep., p. 108:6-19; Grzic Dep., p. 151:9-16.

80. Between January 30, 2017 and November 27, 2018, Yuanda collaborated with Whitestone in developing a remediation plan for the WT-3 Clerestory. Dearth Dep., p. 96:4-8.

81. Yuanda redesigned the head connection for the WT-3 Clerestory in collaboration with Whitestone. Dearth Dep., p. 135:19-24; Grzic Dep., pp. 135:23-136:18; Ex. 5.

82. As part of Yuanda's redesign services, it provided a new head detail. Dearth Dep., p. 140:7-11; Grzic Dep., pp. 135:23-136:23, 141:4-6; Ex. 5.

83. Yuanda provided structural calculations for the WT-3 Clerestory head connection. Dearth Dep., pp. 136:1-3, 141:9-17; Grzic Dep., pp. 136:21-23, 141:4-6; Ex. 6.

84. Ten months later, on August 5, 2019, Whitestone requested that Yuanda provide structural calculations that include the stamp of a licensed professional engineer, which Yuanda provided on August 7, 2019. Dearth Dep., p. 147:2-12; Ex. 13, p. 2.

85. Whitestone submitted Yuanda's structural calculations for the new WT-3 Clerestory head connection to Sciame and the Design Team for review. Dearth Dep., pp. 144:24-145:3.

86. The Design Team did not initially approve the calculation provided on August 7, 2019, and on October 7, 2019, Yuanda submitted a revised set of structural calculations for the

new WT-3 Clerestory head connection, which the Design Team approved. Dearth Dep., pp. 145:21-147:21; Ex. 15, p.2.

87. On August 1, 2019, Yuanda reiterated its intention to "cooperate with the implementation of WCC's [Whitestone's] proposed solutions…." Ex. 12.

**Costs to Perform Remedial Work – Whitestone's Damages**

88. Under the terms of the Sciame Subcontract and Purchase Order, Whitestone and Yuanda are entitled to be paid, by the Owner and/or Sciame, for the work performed to redesign, fabricate and reinstall brackets that conform to the remedial design criteria, information which was disclosed after January 30, 2017. Grzic, p.102:11-19.

89. Under the terms of the Purchase Order, Yuanda is only responsible for the costs to remedy or fix defective work that Yuanda was originally responsible for providing. Grzic Dep., p. 60:13-16.

90. In this litigation, Whitestone created and produced to Yuanda a summary of its alleged damages in a document titled "Clerestory Remediation Summary." Dearth Dep., pp. 153:14-162:9; Ex. 22.

91. On January 19, 2021, Whitestone tendered to Yuanda Whitestone's updated Clerestory Remediation Summary. Dearth Dep., pp. 153:14-162:9; Ex. 23.

92. Those costs listed in line items 1 through 6 and 9, under "Cost Tracking" in the updated Clerestory Remediation Summary, are *not* costs included in the definition of "Vendor's Work," as defined in the Purchase Order. Grzic Dep., p. 158:3-13; Ex. 23, p. 4.

93. The costs for "waterproofing / sealants / MISC" ($686.48) may be work and a cost included in the definition of "Vendor's Work," as defined in the Purchase Order. *Id*.

94. The costs for "exterior silicone gasket" ($785.50) may be work and a cost included in the definition of "Vendor's Work," as defined in the Purchase Order. *Id.*

95. Certain costs for "Tanner invoices" ($6,419.63) could possibly be work and costs included in the definition of "Vendor's Work," as defined in the Purchase Order. *Id.*

96. "Vendor's Work," as defined in the Purchase Order, does not include the costs for manpower necessary to install the WT-3 Clerestory. Ex. 3, p. 1.

97. "Vendor's Work," as defined in the Purchase Order, does not include the costs for Whitestone's overhead and profit. Ex. 3, p. 1.

98. Whitestone does not employ structural engineers. Dearth Dep., p. 160:3-5.

99. All of the supporting documentation for Whitestone's alleged remediation costs, *e.g.* Whitestone's damages, are reflected on documents Bates numbered WCC005617 through WCC005685. Dearth Dep., p. 153:14-17; Ex. 24.

100. Whitestone has not provided any documentation to support its alleged costs for structural design services in the amount of $17,600, purportedly performed by Mr. James Dearth. Dearth Dep., pp. 153:14-17, 159:8-20; Ex. 23; Ex. 24.

101. Whitestone has not provided any documentation to support its alleged costs of $33,563.12 for overhead and profit. Dearth Dep., p. 153:14-17; Ex. 23; Ex. 24.

102. Whitestone has not provided any documentation to support its alleged costs of $36,248.17 for insurance. Dearth Dep., pp. 153:14-17, 185:14-186:12; Ex. 23; Ex. 24.

103. On February 20, 2018, Whitestone placed an order with AJBBC Crop. for the replacement, remedial brackets for the WT-3 Clerestory. Dearth, pp. 178-180; Ex. 24, p. 18.

104. On November 27, 2019, Whitestone requested that Yuanda provide a proposal for the costs to fabricate and deliver the replacement brackets. Ex. 16.

105. On December 7, 2019, Yuanda responded that the brackets could be delivered at a cost of between $4,488.91 and $10,002.23, depending on whether the brackets were shipped from China by ocean freight or air freight, respectively.  Ex. 16.

106. Yuanda advised that the fabrication time for the replacement brackets would be 35 days.  Ex. 16.

107. On April 27, 2020, Yuanda offered to fabricate the replacement brackets at Yuanda's cost and at no cost to Whitestone.  Ex. 17.

108. Installation of the replacement brackets occurred between September 1, 2020 and September 22, 2020.  Ex. 24, pp. 56-69.

109. Between February 6, 2020 and June 26, 2020, Whitestone had not incurred any damages, as a result of purchasing materials for the remedial work or installing the remedial materials.  Dearth Dep., p. 26:18-20; Grzic Dep., p. 148:12-14.

110. Whitestone did not incur costs for the replacement brackets until October 26, 2020 and costs for labor to install those brackets until August 10, 2020.  Ex. 24, pp. 19, 48.

**<u>Whitestone Agrees Remedial Costs are the Owner's / Sciame's Responsibility</u>**

111. On March 6, 2018, Whitestone directed Yuanda to examine the Contract Documents in order to "find facts and define a time line showing the design omission in order to have the client bear the cost of remediation activity."  Ex. 4, p. 1; Ex. 5, pp. 4-5.

112. On August 19, 2019, Whitestone informed Yuanda, in pertinent part, that "Whitestone agrees with Yuanda in our mutual claim that the cause of Sciame's May 3, 2019 direction to remediate WT-3 clerestory is solely the cause of CUNY/PEA/Sciame and that they alone are responsible to pay for all of the costs associated with said remediation…."  Ex. 14, p. 1.

113. The cost to perform additional work to the WT-3 Clerestory was only necessary because of a design change, and the remediation costs are the responsibility of the Owner. Dearth Dep., p. 137:9-19.