**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WHITESTONE CONSTRUCTION CORP., <br><br> *Plaintiff*, <br><br> *v.* <br><br> YUANDA USA CORPORATION, <br><br> *Defendant*. | 1:20-cv-01006-GHW <br><br><br> **WHITESTONE'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** |

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Plaintiff Whitestone Construction Corp. ("Whitestone") hereby presents the following statement of material facts as to which there is no genuine issue to be tried.

**A. <u>Relevant Procedural History</u>**

1.      Whitestone commenced this action on February 5, 2020. Whitestone's complaint (Docket No. 4, "Complaint") alleged claims for breach of contract, unjust enrichment and breach of the implied covenant of good faith and fair dealing, and sought a declaratory judgment. Complaint. *Id.; see also* Declaration of Gary M. Kushner dated July 23, 2021 ("Kushner Decl."), Ex. "A."

2.      Defendant Yuanda USA Corporation ("Yuanda") filed its answer on June 26, 2020 (Docket No. 39, "Answer"); Kushner Decl., Ex. "B."

3.      Whitestone voluntarily dismissed its claims for unjust enrichment (Count II of the Complaint), breach of the implied covenant of good faith and fair dealing (Count III of the Complaint), and for a declaratory judgment (Count IV of the Complaint), pursuant to Fed.R.Civ.P. 41(a)(1) (Docket No. 62).

4.      By minute order entered on September 18, 2020, Yuanda was authorized to file a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) (Docket No. 60).

5.      By minute order entered on October 1, 2020, Whitestone was authorized to file a motion for summary judgment under Fed.R.Civ.P. 56 (Docket No. 68).

6.      On September 25, 2020, Yuanda filed its motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) (Docket No. 64).

7.      On November 11, 2020, Whitestone filed its motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Docket Nos. 72-76).[1]

8.      By order dated December 21, 2020, the Court (i) denied Yuanda's motion for judgment on the pleadings; (ii) denied, without prejudice, Whitestone's motion for summary judgment, and (iii) granted leave for Yuanda to amend its Answer (Docket No. 89).[2]

9.      Yuanda filed an amended answer on January 7, 2021 (Docket No. 91, "Amended Answer"). Kushner Decl., Ex. "D."

10.     Yuanda's Amended Answer does not deny any of the allegations contained in Whitestone's Complaint. Kushner Decl., Ex. "D."

11.     Yuanda filed its motion for summary judgment pursuant to Fed.R.Civ.P. 56 on July 2, 2021 (Docket Nos. 121-123).

**B.  The Prime Contract and the Subcontract Between Whitestone and Sciame**

12.     In March 2010, F.J. Sciame Construction Co. Inc. ("Sciame") contracted ("Prime Contract") with the City University Construction Fund ("Owner") to serve as the Construction Manager for the project known as "New York City College of Technology – New Academic Building," located at 285 Jay Street, Brooklyn, New York ("Project"). Second Grzic Decl. ¶7.[3]

13.     The Prime Contract contains mandatory administrative procedures for the resolution of claims and disputes related to the Project. Second Grzic Decl. ¶8, Ex. "L."

---

[1] Whitestone's original motion for summary judgment was filed on November 9, 2020 (Docket No. 71) and redocketed on November 11, 2020 to correct a filing error.

[2] The Court's full ruling is set forth in the transcript of a December 21, 2020 hearing ("Transcript"). Kushner Decl., Ex. C.

[3] "Second Grzic Decl." refers to the declaration of Steven Grzic dated July 23, 2021 submitted in support of Whitestone's present Motion for Summary Judgment.

14.     Under the mandatory administrative process, there is a defined procedure involving the delivery of notices of dispute, detailed dispute reports, administrative reports, administrative appeals (if warranted) and, ultimately, a single judicial remedy – namely, a proceeding pursuant to Article 78 of the Civil Practice Law and Rules if an administrative ruling is alleged to be arbitrary or capricious. Second Grzic Decl. ¶ 8, Ex. "L," Section 29.2-29.5.

15.     The administrative dispute resolution process applies to all disputes including whether certain work performed by a subcontractor (like Whitestone) was non-conforming – requiring remediation with no additional compensation – or, as a result of a design change – requiring payment of additional compensation in accordance with a proposed change order. *See* Second Grzic Decl., ¶ 9; Ex. "L."

16.     Further, the Prime Contract specifies certain "Subcontract Requirements" in Section 10.2.3. Among other things, it required that each subcontract involving work on the Project contain the provisions of Article 29 of the Prime Contract and to "require the Subcontractor's compliance with the same." *See* Second Grzic Decl., ¶ 10; Ex. "M."

17.     On October 7, 2013, Sciame contracted with Whitestone to perform certain exterior wall system work as a subcontractor on the Project ("Sciame Subcontract"). Yuanda Rule 56 Statement of Undisputed Facts (Docket No. 123, "Yuanda Rule 56 Statement"), ¶1. Kushner Decl., Ex. "E."

18.     Under the terms of the Sciame Subcontract, Whitestone agreed to provide the exterior building envelope for the new academic facility located at 285 John Street, New York, New York. Yuanda Rule 56 Statement, ¶ 2. *See* Second Grzic Decl., ¶ 11.

19.     Under the terms of the Sciame Subcontract, Whitestone agreed to and was required to design, fabricate and install the curtainwalls for the new building, including the curtainwall designated as the "WT-3 Clerestory." Yuanda Rule 56 Statement, ¶ 6.; January 20, 2021 deposition

of James Dearth (Ex. "F," "Dearth Dep.") at 28:8-11; January 27, 2021 deposition of Steven Grzic (Ex. "G," "Grzic Dep.") at 22:9-23.

20.    The Sciame Subcontract incorporates by reference the Prime Contract. Yuanda Rule 56 Statement, ¶ 4.

21.    Article 16 of the Sciame Subcontract contains the dispute resolution clauses mandated by the Prime Contract. It fulfills the requirement of Section 10.2.3 of the Prime Contract, and parallels the process and procedures outlined in Article 29 of the Prime Contract. *See* Second Grzic Decl., ¶ 12; Ex. "N."

**C.   The Contract Between Whitestone and Yuanda**

22.    Yuanda and Whitestone entered into a contract, specifically the "Whitestone Construction Corp. Purchase Order 13-0139-002," dated October 24, 2013 ("Purchase Order"). Yuanda Rule 56 Statement, ¶ 9.

23.    The Purchase Order is a valid and enforceable contract. Complaint, Ex. "A," at ¶ 32; Answer, Ex. "B," at ¶15; Yuanda's Amended Answer, Ex. "D," (no denial).

24.    The Purchase Order physically consists of (i) the two-page Purchase Order; (ii) an eight-page document identified as the "Purchase Agreement Terms and Conditions" ("Terms and Conditions"); (iii) a scope worksheet identified as Attachment A to the Purchase Order; (iv) Attachment B to the Purchase Order which, in turn, references several other documents; (v) Attachment C, which is a delivery schedule; (vi) Attachment D, which sets forth the schedule of values; and (vii) Yuanda's exclusions. Yuanda Rule 56 Statement ¶ 12.

25.    Attachment B to the Purchase Order defines the term "Contract Documents" as follows:

> (a) the Purchase Order;
> (b) the Terms and Conditions (annexed to the Purchase Order);
> (c) Attachments A through D of the Purchase Order;
> (d) project safety and/or quality control manuals;

(e)  all modifications to the above; and

(f)  Yuanda's clarification.

Yuanda Rule 56 Statement ¶ 1.

26.     The Purchase Order also includes several contract provisions that specifically incorporate by reference other documents. Yuanda Rule 56 Statement ¶ 12. *See* Second Grzic Decl., Ex. "O" at ¶¶ 1-2.

27.     Yuanda's acceptance of the Purchase Order includes all plans, specifications and exhibits referenced in the Purchase Order and all agreements and documents set forth in paragraphs 2 and 3 of the Purchase Order. Second Grzic Decl., Ex. "O," Purchase Order Terms and Conditions, at ¶ 1. Paragraph 2 of the Terms and Conditions refers to "Other Agreements Incorporated by Reference." That section of the Terms and Conditions specifically references the Sciame Subcontract. *Id.* at, ¶ 2.[4]

28.     Yuanda became aware of the Sciame Subcontract when it was negotiating to enter into the Purchase Order with Whitestone. *See* Deposition of Minghiua Tan ("Tan Deposition"), Exhibit "H," at 40:23-24.

29.     The Purchase Order is unambiguous. Tan Deposition at 46:16-18 (Purchase Order "is as what is written").

30.     Pursuant to the Purchase Order, Yuanda agreed to provide Whitestone with "all curtain wall system design, engineering, structural calculations, shop drawings, product data & sample submittals … material, fabrication, transportation … and testing, as required to furnish and deliver all curtain wall system materials" ("Vendor's Work"). Yuanda Rule 56 Statement ¶ 25;

---

[4] For the sake of clarity, the Terms and Conditions of the Purchase Order defined the Sciame Subcontract as the "Prime Contract." Second Grzic Decl., Ex. "O," ¶ 2.

Complaint ¶ 12; Answer ¶ 9; Yuanda's Amended Answer (no denial); Second Grzic Decl., Ex. "O" at ¶ 1.

31.     Under the Purchase Order, Yuanda agreed that it "shall assume towards Subcontractor [Whitestone] all obligations and responsibilities which, under the Contract Documents as set forth in Whitestone Purchase Order Attachment B related to curtain wall pertaining to the Prime Contract [Sciame Subcontract], the Subcontractor [Whitestone] assumed towards Contractor [Sciame] and Owner [CUNY] and Architect/Engineer and shall be bound by the rulings of Subcontractor [Whitestone], Contractor [Sciame] and Owner [CUNY] and Architect/Engineer, including, but not limited to, extensions of time." Second Grzic Decl., Ex. "O" at ¶ 2.

32.     In exchange for completion of the Vendor's Work, Yuanda was to be compensated by lump sum payment of Five Million Nine Hundred Eleven Thousand Five Hundred Nine and 27/100 ($5,911,509.27) Dollars. Second Grzic Decl. at ¶ 15; Ex. "O" at p. 1.

**D.   WT-3 Clerestory Work Performed on the Project**

33.     Yuanda was required under the Purchase Order to provide a curtainwall that conformed to the requirements stated in specification sections 084413, 084426 and 088000. Yuanda Rule 56 Statement, Ex. "E" at ¶ 27.

34.     Yuanda was responsible for providing structural calculations for the WT-3 Clerestory, calculations which included the stamp of a licensed professional engineer. Yuanda Rule 56 Statement at ¶ 27; Ex "F," Dearth Dep., at 147:5-148:5.

35.     During the course of performing its work, Yuanda provided engineer-stamped calculations for the WT-3 Clerestory. Yuanda Rule 56 Statement, ¶ 39; Grzic Dep., 93:16-22.

36.     Yuanda provided Sciame and its design team with Shop Drawing Submittal #084413-020-02 and related Calculation Submittal relating to the WT-3 Clerestory, which were

approved by the Project architect on February 23, 2015. Second Grzic Decl., ¶ 17; Yuanda Rule 56 Statement, ¶ 39.

37.    The project architect's approval of Shop Drawing Submittal #084413-020-02 was returned with the notation "MCN." Yuanda Rule 56 Statement, ¶ 42; Dearth Dep., 64:22-66:7.

38.    On February 24, 2015, the Project architect's approval of Shop Drawing Submittal #084413-020-02 was returned with the notation "MCN." Second Grzic Decl., ¶ 18

39.    Submittals marked "MCN" ("Make Corrections Noted") required only minor corrections. Ex. "Q."

40.    The "MCN" submittal disposition on #084413-020-02 provided Whitestone (and Yuanda) with approval to proceed with fabrication and installation in accordance with the submittal, without risk of having to make changes to the installed work without additional compensation for changes that were due to new design criteria issued by Sciame after the submittal was approved and the work was fabricated and installed. Second Grzic Decl., ¶ 19; Ex. "Q."

41.    If fabrication is not made strictly in accordance with corrections noted, the item will be rejected in the field and the contractor will be required to replace such work in accordance with corrected submittals. Second Grzic Decl., ¶ 20; Ex. "Q."

42.    When Shop Drawing Submittal #084413-020-02-MCN was returned by the Project architect (and Sciame), there were no obvious and unambiguous corrections noted with respect to the ability of the WT-3 Clerestory System to accommodate movement. Second Grzic Decl., ¶ 21.

43.    Yuanda fabricated and delivered the WT-3 Clerestory System which Whitestone installed and completed in or about December 2016 in accordance with the approved shop drawings. Second Grzic Decl., ¶ 22.[5]

---

[5] From Whitestone's perspective, that its work and Yuanda's work conformed to the approved submittals is a fact. Yuanda does not disagree. As set forth herein, Sciame took the opposing position when it rejected PCO No. 98.

44. Yuanda was paid in full for the Vendor Work that was installed and completed in or about December 2016 in accordance with the approved shop drawings. Second Grzic Decl., ¶ 23.

45. The components of the WT-3 Clerestory, as fabricated by Yuanda, conformed to the shop drawings Yuanda created, as reviewed and approved by the Design Team. Yuanda Rule 56 Statement, ¶ 44; Dearth Dep., 64:22-66:7; Grzic Dep., 107:10-22. *See also* FN 5, *supra*.

46. At the time Whitestone installed the WT-3 Clerestory, Yuanda's design for the WT-3 Clerestory conformed to the requirements of the Purchase Order. Yuanda Rule 56 Statement, ¶ 45; Dearth Dep., 64:22-66:7; 126:8-13. *See also* FN 5, *supra*.

47. At the time Whitestone installed the WT-3 Clerestory, Yuanda's fabrication of the WT-3 Clerestory components conformed to the requirements of the Purchase Order. Yuanda Rule 56 Statement, ¶ 46; Dearth Dep., 67:9-16; 126:8-13. *See also* FN 5, *supra*.

48. Whitestone performed all work under the Sciame Subcontract, and Whitestone complied with all obligations as required by the Sciame Subcontract, including the design, fabrication and installation of the WT-3 Clerestory. Yuanda Rule 56 Statement, ¶ 48; Dearth Dep., 32:19-33:4. *See also* FN 5, *supra*.

49. The Design Team failed to include critical design information regarding the building's movement, *e.g.* including the anticipated roof deflection, in the Contract Documents. Yuanda Rule 56 Statement, ¶ 49; Dearth Dep., p. 31:22-32:1. *See also* FN 5, *supra*.

---

However, whether or not Yuanda's design for the WT-3 Clerestory conformed to the shop drawings, Yuanda agreed in the Purchase Order that any disputes over the scope of its work, and whether Whitestone is entitled to a change order and additional compensation, will be determined by an alternative dispute resolution process, by which Yuanda agreed to be bound. *See* Ex. "O," ¶¶ 2, 21. Regardless of Whitestone's subjective belief as to the conformity of Vendor's Work, Yuanda agreed that the ultimate arbiter of disputes (including disputes over the conformity of Vendor's Work) is Sciame. *Id.* That determination will be made in the alternative dispute resolution process, or potentially by the state court. *Id.*

**E.** **The Rejection of the WT-3 Clerestory Work**

50.      After Whitestone completed installation of the WT-3 Clerestory, the Design Team provided Sciame and Whitestone with new information about the expected roof deflection, which impacted the design for the WT-3 Clerestory. Yuanda Rule 56 Statement, ¶ 53; Dearth Dep., 98:9-100:16, 111:10-114:7; Second Grzic Decl., ¶ 37. *See also* FN 5, *supra.*

51.      On or about January 17, 2017, Sciame issued "RFI-1130" to the Project engineer. RFI-1130 was a "request for information" concerning the design criteria of the WT-3 Clerestory system which had been fabricated by Yuanda and installed by Whitestone pursuant to approved Shop Drawing Submittal 08443-020-02-MCN. Second Grzic Decl., ¶ 25, Ex. "R."[6]

52.      RFI-1130 was a "request for information" concerning the design criteria of the WT-3 Clerestory System which had been fabricated by Yuanda and installed by Whitestone pursuant to approved Shop Drawing Submittal 08443-020-02-MCN. Second Grzic Decl., ¶ 26, Ex. "R."

53.      RFI-1130 questioned the adequacy of the WT-3 Clerestory System to accommodate building movement. Second Grzic Decl., ¶ 30, Ex. "R."

54.      On January 30, 2017, the Project engineer responded to RFI-1130. In that response, Sciame, the Project engineer and ALT Limited (Sciame's curtain wall consultant) made four notations which indicated, among other things that "concern was previously noted in 2014 under [prior] submittals ... to verify a larger movement joint to accommodate roof deflections ...". Second Grzic Decl., ¶ 31, Ex. "S."

55.      In essence, the response to RFI-1130 from the Design Team claimed that the deflector extension should have been designed to accommodate 3.4" of movement rather than the submittal approved design of less than 1." Second Grzic Decl., ¶ 31, Ex. "S."

---

[6] Exhibits "R" and "S" are identical. The yellow portion on each exhibit reflects the architect's response. All other written content reflects the original RFI.

56.     From the perspective of Whitestone and Yuanda, the response by the Project engineer to RFI-1130 issued new relative movement design criteria between the auditorium and main academic building after the façade was fabricated and installed by Yuanda and Whitestone in accordance with the approved Shop Drawing Submittal #08443-020-02 MCN. Yuanda Rule 56 Statement, ¶ 53; Second Grzic Decl., ¶ 37.

57.     Whitestone promptly notified Yuanda about the engineer's response to RFI-1130. Second Grzic Decl., ¶ 34, Ex. "T."

58.     The response to RFI-1130 resulted in a direction by Sciame to Whitestone that the previously installed WT-3 Clerestory structural members be modified in the field. Second Grzic Decl., ¶ 39.

59.     Whitestone and Yuanda took a unified position against Sciame and the response to RFI-1130. Second Grzic Decl., ¶ 35.

60.     Both Whitestone and Yuanda held the same view that the architect's submittal dispositions (#084413-020-02-MCN) provided the necessary approval to proceed to fabrication and installation in accordance with the submittal (*i.e.*, with deflection creation of less than 1"). Second Grzic Decl., Ex. "Y."

61.     In the parties' view, the response to RFI-1130 by the Project engineer issued **new** relative movement design criteria between the auditorium and main academic building after the façade was designed and fabricated by Yuanda and installed by Whitestone in accordance with the approved Shop Drawing Submittal #08443-020-02 MCN. Yuanda Rule 56 Statement, ¶ 53; Second Grzic Decl., ¶ 37; Ex. Y."

62.     Whitestone and Yuanda also took the unified position against Sciame that they had designed, fabricated and installed the WT-3 Clerestory System exactly as approved by Sciame. The project engineer's response to RFI-1130 resulted in a direction by Sciame to Whitestone that

the previously installed WT-3 Clerestory structural members be modified in the field. Yuanda Rule 56 Statement, ¶¶ 63,68; Second Grzic Decl., Ex. Y."

63.     Subsequent to the response to RF-1130 in late January 2017, Yuanda and Whitestone collaborated to develop a remediation plan for the WST-3 Clerestory. The collaboration between Whitestone and Yuanda continued through approximately November 2018. During this period, Yuanda and Whitestone jointly developed and provided to Sciame's design team structural calculations for the WST-3 Clerestory head connection. Yuanda Rule 56 Statement, ¶¶ 80-83; Second Grzic Decl., ¶¶ 40-41.

64.     On November 27, 2018, Whitestone submitted its Proposed Change Order No. 98 ("PCO-098"), which includes the costs to modify the WT-3 Clerestory in order to accommodate the newly disclosed design criteria, which the Design Team first disclosed on or after January 30, 2017. Yuanda Rule 56 Statement, ¶ 55; Dearth Dep., 95:20-96:3; Second Grzic Decl., ¶ 43; Ex. "U."

65.     In its PCO-098, Whitestone informed Sciame that:

    a.  the remediation, *e.g.* the "supply and installation of new components for WT-3 Clerestory head anchors," was only necessary "to accommodate new auditorium roof deflection design criteria."

    b.  this remediation was "caused by omission of new auditorium roof deflection design criteria prior to MCN [Design Team's shop drawing review], fabrication and installation of WT-3 clerestory, and subsequent untimely issuance of said criteria in RFI 1130 response after fabrication and installation was completed."

    c.  Yuanda's "submittals clearly detailed capacity of system to accommodate movement."

    d.  When the Design Team returned its response to RFI-1130 on January 30, 2017, it "issued new relative movement design criteria between the auditorium and academic building after the façade was fabricated and installed."

Yuanda Rule 56 Statement, ¶ 56.

66.     On May 3, 2019, Sciame rejected Whitestone's PCO-098. Yuanda Rule 56 Statement, ¶ 62; Dearth Dep., 104:19-105:4; Second Grzic Decl., ¶ 44; Ex. "V."

67.     In its rejection, Sciame indicated that it had reviewed PCO-098 with CUCF and the Project architect and determined that the extra work was remedial in nature and not a result of a design change warranting a change order to Whitestone. Second Grzic Decl., ¶ 45; Ex. "V."

68.     Whitestone was directed by Sciame to proceed immediately with the remediation by finalizing any submissions, obtaining new approvals from the Sciame design team, procuring all materials and beginning coordination with Sciame to accomplish this repair by the end of August 2019. Second Grzic Decl., ¶ 46; Ex. "V."[7]

69.     Sciame's May 3, 2019 email also notified Whitestone that it was moving PCO-#098 to "rejected" status in its change order log. Second Grzic Decl., ¶ 47; Ex. "V."

70.     Pursuant to the Sciame Subcontract, Whitestone was required, and instructed by Sciame, to resolve the payment dispute and rejection of PCO-098 through the alternate dispute resolution procedure without additional payment. Second Grzic Decl., ¶ 47; Ex. "N," Article 16.

71.     On May 3, 2019, Whitestone submitted a Notice of Dispute to Sciame with respect to PCO No. 98. Yuanda Rule 56 Statement, ¶ 59; Second Grzic Decl., ¶ 49, Ex. "X."

72.     In its Notice of Dispute, Whitestone informed Sciame that all remedial work that Sciame demanded with respect to the WT-3 Clerestory was the direct result of the Design Team's issuance of new design criteria, which occurred on or after January 30, 2017. Second Grzic Decl., Ex. "X;" Yuanda Rule 56 Statement, ¶ 61.

---

[7] A formal rejection or acceptance of a "PCO" is required under the alternative dispute resolution process. *See* Exhibit "N," Article 16.

73.     The statements included in Whitestone's Notice of Dispute were true and correct at the time Whitestone made those statements, May 3, 2019, and continue to be true today. Yuanda Rule 56 Statement, ¶ 60; Dearth Dep., 109:15-18.

74.     On May 6, 2019, Whitestone submitted a "Description of Dispute" (the "Dispute Report") to Sciame, which details the reasons Whitestone believes it is entitled to a contract modification for the additional work performed to the WT-3 Clerestory. Second Grzic Decl., ¶ 50; Ex. "Y;" Yuanda Rule 56 Statement, ¶ 63.

75.     In its Description of Dispute, Whitestone informed Sciame that:

   a.  Whitestone's installation of the WT-3 Clerestory complied with the shop drawings Yuanda created for that portion of the work, shop drawings which were approved by the Design Team.

   b.  Yuanda's shop drawings were "in turn compliant with the contract documents." Dearth Dep., 110:21-111:9.

   c.  Yuanda's shop drawings conform to the design requirements, as stated on drawing sheet S-003.00.

   d.  Drawing sheet S-003.00 is the only drawing or specification that contains exterior façade and roof deflection design criteria, and "no other deflection criteria has been issued."

   e.  Whitestone's and Yuanda's "work with respect to WT-3 Clerestory is 100% complete."

   f.  The "design team changed the contract deflection criteria noted on S-003.00 when" it issued its response to RFI-1130 on January 30, 2017.

   g.  The information contained in the Design Team's response to RFI-1130 is a change to the contract requirements.

Second Grzic Decl., ¶ 51, Ex. "Y;" Yuanda Rule 56 Statement, ¶ 64.

76.     Yuanda also provided an independent analysis that Whitestone included in its Description of Dispute. Second Grzic Decl., ¶ 52; Ex. "Y;" Yuanda Rule 56 Statement, ¶ 66.

77.     Yuanda's analysis states, in full agreement with Whitestone, that:

      a.  the Design Team's comments, which were returned with the shop drawings, directed Yuanda to use the deflection criteria, as stated on structural drawing S-003.00.

      b.  according to the deflection criteria, as stated on S-003.00, the expected deflection was 1/2 inch.

      c.  the failure to provide proper timely roof deflection criteria was "totally the fault of the construction manager and the design team."

Yuanda Rule 56 Statement, ¶ 67.

78.     Whitestone agrees with Yuanda's analysis. Yuanda Rule 56 Statement, ¶ 68; Dearth Dep., 120:2-121:19; Grzic Dep., 98:18-99:3.

79.     Both Whitestone and Yuanda believe that the WT-3, as designed and fabricated by Yuanda and as installed by Whitestone, complies with the requirements of the Contract Documents. Dearth Dep., 110:21-111:9; Ex. 9, p. 1; Second Grzic Decl., ¶ 36.

80.     Whitestone does not agree with Sciame or its rejection of the WT-3 Clerestory. Yuanda Rule 56 Statement, ¶ 67; Dearth Dep., 126:8-13; Second Grzic Decl., ¶ 36.

**F.  Operative Provisions of the Purchase Order**

81.     Under the Purchase Order, the "review by Subcontractor [Whitestone], Contractor [Sciame], Owner [CUNY] or Architect [Perkins Eastman] of Submissions is limited to conformance with the general design concept for the Project and shall not be construed as a complete check or approval, either in whole or in detail, nor shall it relieve the Vendor [Yuanda] from responsibility for errors and/or omissions of any sort therein, or from the necessity of furnishing any Vendor's Work required by the Contract Documents which may have been omitted from the Submissions." Second Grzic Decl., Ex. "O," ¶ 7.

82.     The Purchase Order further provides that even if the Project's architect or engineer approves Yuanda's design, that shall not relieve Yuanda from its obligations under the Purchase Order. "[Yuanda's drawings and related documents ("Submissions") are] subject to submission,

review and approval by the Architect and Engineer. No approval granted of a Submission shall relieve [Yuanda] from full compliance with the Contract Documents" – which by definition include the Purchase Order. Second Grzic Decl., Ex. "O," ¶ 7.

83.     "No progress payment made under [the] Purchase Order shall be considered an acceptance of Vendor's Work." Second Grzic Decl., Ex. "O," ¶ 12.

84.     "Neither partial nor final payment shall constitute or imply acceptance of any of Vendor's Work or waiver of any of [Whitestone's] rights and remedies under [the] Purchase Order and the Contract Documents." Second Grzic Decl., Ex. "O," ¶ 17.

85.     "[N]either failure to inspect nor use by [Whitestone] shall constitute acceptance of Vendor's Work." Second Grzic Decl., Ex. "O," ¶ 10.

86.     Yuanda agreed that if Whitestone was required by the Sciame Subcontract to arbitrate or submit to an alternative dispute resolution forum any dispute or claim with Whitestone or another party and such dispute or claim involves the Purchase Order Work, Yuanda shall participate in the prosecution or defense of such dispute, provide notice and furnish information within the time required by the Sciame Subcontract, share in the legal costs associated with the prosecution or defense, and be bound by the results of such arbitration or alternative dispute resolution forum. Second Grzic Decl., Ex. "O," ¶ 21.

87.     Paragraph 10 of the Purchase Order required Yuanda to prepare a plan for replacing or correcting any Vendor's Work "which [Whitestone] shall reject as failing to conform to the requirements of this Purchase Order … whether rejected before or after installation." Second Grzic Decl., Ex. "O," ¶ 10.

88.     Upon approval of that plan, the Purchase Order required Yuanda to promptly replace or correct rejected Vendor's Work. Grzic Decl., Ex. "O," ¶ 10.

89.     If "Vendor [Yuanda] does not do so, within a reasonable time, Subcontractor

[Whitestone] shall have the right to do so and Vendor [Yuanda] shall be liable to Subcontractor [Whitestone] for the cost thereof." Second Grzic Decl., Ex. "O," ¶ 10.

90.     Under the Purchase Order, "TIME IS OF THE ESSENCE … [Yuanda] will proceed with Vendor's Work in a prompt and diligent manner…" Second Grzic Decl., Ex. "O," ¶ 9 (emphasis in original).

91.     In the event of any dispute involving the Purchase Order, Vendor's Work or any claims of Vendor, Vendor nevertheless, and without interruption, shall continue to perform Vendor's Work in a diligent manner. Second Grzic Decl., Ex. "O," ¶ 21.

92.     If Yuanda "shall at any time … (4) fail to comply with any provisions of the Purchase Order or the Contract Documents; then, …within five (5) calendar days either of transmittal of a written notice advising Vendor [Yuanda] of the default, the duty to submit within (7) days a written cure plan for approval and Subcontractor's [Whitestone's] intent to exercise one or more of the following options, and to the extent that Vendor's [Yuanda's] written cure plan fails to be approved by the Subcontractor [Whitestone] and the Vendor [Yuanda] is informed of such failure, Subcontractor [Whitestone] at Subcontractor's [Whitestone's] option, without voiding the other provisions of the Purchase Order, may (i) take such steps as are necessary to overcome the condition, in which case the Vendor [Yuanda], shall be liable to Subcontractor [Whitestone] for the cost thereof; (ii) terminate for default Vendor's [Yuanda's] performance on all or part of the Purchase Order Work; and/or (iii) obtain specific performance or interlocutory mandatory injunctive relief …". Second Grzic Decl., Ex. "O," ¶ 6.

93.     Yuanda "shall reimburse all damages resulting from [Yuanda's] failure to prosecute or complete Vendor's Work in a timely manner; [Whitestone's] damages may include, without limitation, extended overhead…" Second Grzic Decl., Ex. "O," ¶ 9.

94.     In the event of "any loss, damage or destruction thereof from any cause … as a result of [Yuanda's] breach of [the] Purchase Order" except for personal injury claims, which are not relevant here, Yuanda's liability to Whitestone includes, but is not limited to: (1)damages and other delay costs payable by [Whitestone]; (2) [Whitestone] and any Trade Subcontractor's increased costs of performance, such as extended overhead and increased performance costs resulting from [Yuanda]-caused delays or omitted or defective Vendor's Work; (3) warranty, rework and repair costs; (4) liability to third parties, including, but not limited to, [Whitestone]'s Subcontractors; (5) excess reprocurement costs; (6) costs to obtain a substitute Vendor or costs incurred to demand and ensure performance in the event of [Yuanda]'s default; (7) consultants' and experts' fees; and (8) attorneys' fees and related costs." Second Grzic Decl., Ex. "O," ¶ 19.

95.     Yuanda's liability for its breach "includes but is not limited to assumption on account of, or in any way related to, Vendor's Work, which Whitestone may have assumed pursuant to the Contract Documents or under agreements with third parties." Second Grzic Decl., Ex. "O," ¶ 19.

**G. Whitestone Rejects Yuanda's Work and Yuanda Refuses to Remediate**

96.     By letter dated June 24, 2019, Whitestone rejected Yuanda's work and directed Yuanda to remediate the misfabricated previously installed WT-3 Clerestory system as directed by Sciame. Second Grzic Decl., ¶ 55, Ex. "Z."

97.     In its June 24, 2019 letter to Yuanda, Whitestone reiterated that PCO-098 had been rejected by Sciame.  Whitestone further advised Yuanda that a timely Notice of Dispute was filed, Whitestone was directed to perform the field modification depicted in PCO-098 without compensation, and Whitestone was instructed to complete all work by the end of August 2019. Second Grzic Decl., ¶ 56, Ex. "Z."

98.     The June 24, 2019 letter directed Yuanda to remediate the misfabricated, already installed WT-3 Clerestory at its own expense.  A copy of Whitestone's Notice of Dispute was delivered to Yuanda along with the June 24, 2019 letter. Second Grzic Decl., ¶ 57, Ex. "Z."

99.     The June 24, 2019 letter reassured Yuanda that it was pursuing payment on the rejected PCO-098 through the dispute resolution process, in which Yuanda's cooperation was fully expected. Second Grzic Decl., ¶ 58, Ex. "Z."

100.    Yuanda understood Whitestone's June 24, 2019 letter to be Whitestone's rejection of Yuanda's work. *See* Tan Deposition at 47:14-20 ("Q: Mr. Tan, isn't it your understanding that at some point in time Whitestone rejected Yuanda's work based on Sciame's rejection of Yuanda's work? A: Yes, Yuanda did receive such notification from Whitestone containing this information.").

101.    In response to Whitestone's June 24, 2019, Yuanda dispatched a letter to Whitestone dated June 28, 2019. Second Grzic Decl., ¶ 59, Ex. "AA."

102.    In its June 28, 2019 letter, Yuanda relied upon the approved submittals to excuse it from performing any additional work on the WT-3 Clerestory system without additional pay. Yuanda refused to fully repair and correct the WT-3 Clerestory system as directed by Whitestone. Second Grzic Decl., ¶ 60, Ex. "AA."

103.    Yuanda conveyed to Whitestone that it would only do the remedial work if it were paid. *See* Ex. "AA;" *see also* Tan Deposition at 51:18-20 ("My understanding is that if we are compensated additionally then we are willing to go ahead and do the work.").

104.    By counsel's letter dated July 26, 2019, Whitestone again asked Yuanda to proceed with the remediation work in accordance with the Purchase Order. The July 26, 2019 letter specifically asked Yuanda for plans, specifications, and shop drawings as required by the Purchase Order. Second Grzic Decl., ¶ 62, Ex. "BB."

105.     Yuanda was given notice that if the foregoing requests were not provided immediately, Whitestone would deem Yuanda to have breached the Purchase Order and would seek recovery of all costs and expenses for work that it did on Yuanda's behalf. Ex. "BB."

### H. **Whitestone Rejects Yuanda's Work and Yuanda Refuses to Remediate**

106.     In response to Sciame's initial directive to complete the remediation work by the end of August 2019, on or about August 5, 2019, Whitestone requested that Yuanda provide structural calculations, stamped by a licensed professional engineer. Yuanda complied with that request on or about August 7, 2019. Yuanda Rule 56 Statement, ¶ 84; Second Grzic Decl., ¶ 63.

107.     After several submissions that were reviewed by Sciame, the Project design team approved the new design for the WT-3 Clerestory on November 4, 2019. Yuanda Rule 56 Statement, ¶ 86; Second Grzic Decl., ¶ 64, Ex. "CC."

108.     On November 27, 2019, Whitestone inquired whether Yuanda could provide replacement brackets, as the prior delivery by AJBBC was unsuitable for the newly accepted redesign. On December 7, 2019, Yuanda responded that replacement brackets could be delivered at a rough cost of between $4,000 and $10,000 in 35 days. Yuanda Rule 56 Statement, ¶ 104; Second Grzic Decl., ¶ 69.

109.     As of December 7, 2019, Yuanda had never offered, let alone agreed, to pay for the costs of the replacement brackets. Second Grzic Decl., ¶ 70; *see* Exhibit "W."

110.     On December 23, 2019, Whitestone sent a default letter to Yuanda on account of its failure to fully replace, correct and pay for the remediation of the rejected WT-3 Clerestory work. Second Grzic Decl., ¶ 71; *see* Exhibit "DD."

111.     In the December 23, 2019 letter, Yuanda was given seven (7) days to provide a plan for the remediation work. Exhibit "DD."

112. Yuanda was further advised that its failure to timely provide a plan for the completion of the remediation work would (i) constitute a default, (ii) would result in the commencement of litigation, and (iii) that Whitestone would undertake performance of the remediation work and seek to collect its costs from Yuanda. Second Grzic Decl., ¶ 72; Exhibit "DD."

113. In April 2020, Yuanda finally, and for the first time, offered to fabricate replacement brackets at no cost to Whitestone. Second Grzic Decl., ¶ 76; Exhibit "FF."

114. Whitestone and Yuanda exchanged numerous emails subsequent to Yuanda's April 27th offer to provide various materials/replacement brackets. Yuanda could not guarantee prompt delivery of the new brackets because of the ongoing COVID pandemic. Consequently, Whitestone sourced the replacement materials with a local vendor who guaranteed prompt delivery. Second Grzic Decl., ¶ 77; Exhibit "HH."

115. Yuanda concedes that the Purchase Order says that if Yuanda does not correct rejected Vendor's Work, then Whitestone shall have the right to do so. Tan Deposition at 56:21 – 58:3.

116. Jobsite work was started by Whitestone on or about August 10, 2020 and was completed on or about September 22, 2020. Second Grzic Decl., ¶ 81.

117. Whitestone provided all of the labor to reinstall the new design of the WT-3 Clerestory; Yuanda provided none of that labor. Second Grzic Decl., ¶ 80.

**I.  Whitestone's Damages**

116. On January 19, 2021, Whitestone tendered to Yuanda Whitestone's Clerestory Remediation Summary which provides a breakdown of the costs of remediating the rejected work. Dearth Dep. 153:14-162:9; *see also* Yuanda Rule 56 Statement, ¶ 91; Second Grzic Decl., ¶ 84, Ex. "JJ."

117.    The Remediation Costs Summary is supported by (i) a comprehensive manpower tracking schedule identifying the labor costs by (a) trade (carpenter, laborer, ironworker, PCC and roofer); (b) hours spent by each worker; (c) the applicable labor rate; and (d) a schedule detailing the specific days worked by each tradesman; (ii) a cost-tracking schedule identifying the costs of engineering services, materials and equipment; and (iii) invoices detailing (and supporting) the costs of material purchases, supplies and equipment.  Second Grzic Decl., ¶ 85, Ex. "JJ."

118.    As set forth in the Remediation Cost Summary, non-supervisory manpower/labor costs amounted to $102,825.94.  Materials, equipment and supplies totaled $47,389.65.  In addition, Whitestone incurred $17,600 in costs for supervisory work incurred during the remediation of the WT-3 Clerestory work.  These supervisory services were provided by Mr. Dearth, Whitestone's Project supervisor, consisting of 20 8-hour days at $110/hour. Second Grzic Decl., ¶ 86, Ex. "JJ."

119.    Whitestone also seeks recovery of its overhead and profit ($33,563.12).  Whitestone calculates overhead and profit on a flat percentage (20%) of the total cost of manpower, design and equipment/materials. Second Grzic Decl., ¶ 87.

120.    A flat percentage of 20% for overhead and profit is industry standard for remediation on a New York City public works projects. Second Grzic Decl., ¶ 88.

121.    Whitestone also seeks recovery of a portion of its cost for insurance premium in the amount of $31,248.17. The calculation for reimbursement of insurance is premised upon a percentage of Whitestone's entire premium for general liability coverage, an umbrella policy and composite coverage. Second Grzic Decl., ¶ 89.

122.    In 2020, when new WT-3 Clerestory work was performed, the premium for Whitestone's insurance policies exceeded $422,000.  The $31,248.17 sought in this action is based upon a calculation where the numerator is the amount of the Project work, the denominator is

Whitestone's total sales and the resulting fraction is multiplied by the total premium. Second Grzic Decl., ¶ 90.

123.    Whitestone has received no payment from Sciame on account of the redesign work on PCO-098. Second Grzic Decl., ¶ 91.

124.    Whitestone is pursuing Sciame for payment on account of the redesign work on PCO-098. *See* Kushner Decl., ¶¶ 20-26.