USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/9/2021

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
   WHITESTONE CONSTRUCTION CORP.,          :
                                           :
                           Plaintiff,      :
            -against-                      :     1:20-cv-1006-GHW
                                           :
   YUANDA USA CORPORATION,                 :     MEMORANDUM OPINION
                                           :            AND ORDER
                           Defendant.      :
-----------------------------------------------------------------X
```

GREGORY H. WOODS, United States District Judge:

## I. INTRODUCTION

Defendant Yuanda USA Corporation ("Yuanda") designed and installed a curtain wall system for a new academic building on the New York City College of Technology's Brooklyn campus (the "Project") pursuant to a purchase order (the "Purchase Order") with Plaintiff Whitestone Construction Corporation ("Whitestone"). After its installation, the Project's architects issued new design criteria because the original curtain wall designs failed to properly account for the movement of the building. As a result, Whitestone and Yuanda worked to remediate the curtain wall system to comply with the new design specifications. The parties now dispute whether Yuanda was contractually obligated to perform that remedial work.

Presently before the Court are the parties' cross motions for summary judgment. Whitestone claims that Yuanda breached the Purchase Order by failing to replace or remediate the curtain wall. Yuanda disagrees, asserting that it was under no obligation to remediate the wall, and that regardless, the work it did toward the remediation was sufficient to satisfy the terms of the Purchase Order. Because Yuanda was not obligated to remediate the WT-3 Clerestory System under the unambiguous terms of the Purchase Order, Yuanda's motion for summary judgment is granted in part and denied part, and Whitestone's motion for summary judgment is denied.

## II. BACKGROUND

### a. *The Project Begins*

In March 2010, F.J. Sciame Construction Co. Inc. ("Sciame") and the City University Construction Fund ("City University") contracted for Sciame to construct a new academic building in downtown Brooklyn (the "Project"). *See* Dkt. No. 128-12 (the "Prime Contract"); Dkt. No. 121-28, Deposition of Steven Grzic ("Grzic Dep") 17:22-18:14. Sciame, in turn, subcontracted with Whitestone to construct the exterior building envelope for the Project. Dkt. No. 128-13 (the "Sciame Subcontract"). As part of that work, on October 24, 2013, Whitestone entered into the Purchase Order with Yuanda, which required, among other things, that Yuanda design, furnish, and install a curtainwall system, referred to as the "WT-3 Clerestory System," for the building. *See generally*, Dkt. No. 128-15 (the "Purchase Order").

Yuanda began the process of submitting shop drawings for the WT-3 Clerestory System for the approval of Sciame, its design team (the "Design Team"), and its project architect (the "Project Architect"). Dkt. No. 136 ("Yuanda Resp. to 56.1 Statement") ¶¶ 33–36. When the Project Architect returned the relevant WT-3 Clerestory System submittal, it bore the notation "MCN" which meant only minor corrections were needed. Yuanda Resp. to 56.1 Statement ¶¶ 37–40; Dkt. 128-17. That notation gave Yuanda license to proceed with fabrication and installation of the required materials "without risk of having to make changes to the installed work without additional compensation." Yuanda Resp. to 56.1 Statement ¶¶ 37–40; Dkt. 128-17.

Yuanda fabricated and delivered the WT-3 Clerestory System in accordance with the approved shop drawings. Yuanda Resp. to 56.1 Statement ¶ 43; Dkt. No. 121-27, Deposition of James Dearth ("Dearth Dep."), 64:22-66:7; Dkt. No. 121-28, Grzic Dep. 107:10–22. Whitestone then installed the WT-3 Clerestory System in late 2016. Yuanda Resp. to 56.1 Statement ¶¶ 44–48; Dearth Dep. 32:19–33:4. Whitestone and Yuanda agree that, at the time of installation, Yuanda's

design and fabrication of the WT-3 Clerestory System conformed to the Project's requirements and design specifications. Yuanda Resp. to 56.1 Statement ¶¶ 46–48.

      b.  *Sciame Issues New Design Criteria.*

In January 2017, the Design Team provided Sciame and Whitestone with information about the building's expected roof deflection. Yuanda Resp. to 56.1 ¶ 50; Dearth Dep. 98:9–100:16, 111:10–114:7. That information impacted the design of the WT-3 Clerestory System. Yuanda Resp. to 56.1 ¶ 50; Dearth Dep. 98:9–100:16, 111:10–114:7. After receiving that information, Sciame issued a request for information ("RFI #1130") to the Project's engineer. Yuanda Resp. to 56.1 Statement ¶ 51–53; Dkt. No. 128-18. On or about January 30, 2017, the Project's engineer issued to new design criteria for the already-installed WT-3 Clerestory System, which Sciame passed along to Whitestone. Yuanda Resp. to 56.1 Statement ¶ 56; Dkt. No. 133 ("Second Grzic Decl.") ¶ 37.

On November 27, 2018, Whitestone submitted to Sciame a Proposed Change Order ("PCO-098") that included the costs to modify the WT-3 Clerestory System to accommodate the newly disclosed design criteria. Dearth Dep., 95:20-96:3; Dkt. No. 128-21; Yuanda Resp. to 56.1 Statement ¶ 64. Sciame rejected PCO-098, asserting that the changes to WT-3 Clerestory System were "remedial work, and not a design change warranting a change order to Whitestone."[1] Dkt. No. 128-22.

Whitestone disputed Sciame's rejection by submitting a Notice of Dispute to Sciame on May 3, 2019. Dkt. No. 121-8. Whitestone reiterated its position that the modifications to the WT-3 Clerestory were "new design criteria." Yuanda Resp. to 56.1 Statement ¶ 72; Dkt. No. 128-24. In a description of the dispute, Whitestone again reiterated that "Whitestone's and Yuanda's respective

---

[1] Yuanda claims that the email containing Sciame's rejection, Dkt. No. 128–19, is inadmissible hearsay. Yuanda Resp. to 56.1 Statement ¶ 67. It is well established that "[i]n ruling on a motion for summary judgment, the district court may rely on 'any material that would be admissible at a trial.'" *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) (quoting *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)). Here, however, the Court does not consider the contents of the letter for the truth of the matter asserted—i.e., whether the work was, in fact, "remedial" and "not a design change." Rather, the Court considers the email only to the extent that it demonstrates Sciame's stated reasons for the rejection of the Purchase Order.

installed WT-3 clerestory work is compliant" with the initial drawings and the original contract documents. Dkt. No. 128-25 at 1. The description of dispute also contained Yuanda's commentary—Yuanda took the position that neither Whitestone nor Yuanda should bear responsibility for the alterations to the WT-3 Clerestory System because the "architect didn't issue the new design criteria . . . [until] Jan 30, 2017," after the WT-3 Clerestory System had been installed. *Id.* at 2–3.

In 2019, Whitestone brought an action against Sciame in New York State Court claiming that Sciame had refused to engage in the dispute resolution process mandated by the Sciame Subcontract. That litigation is ongoing. Dkt. No. 133 ("Second Grzic Decl.") ¶ 53 n.4.

    *c.   Yuanda and Whitestone Dispute Obligations to Remedy WT-3 Clerestory System*

On June 24, 2019, Whitestone sent a letter to Yuanda stating that "Sciame has rejected as non-conforming Yuanda's fabrication of the WT-3 Clerestory structural components." Dkt. No. 128-26 (the "June 24, 2019 Letter") at 1. It continued, "Sciame has directed Whitestone to perform the field modification as depicted in Whitestone's PCO-098 without compensation by the end of August 2019." *Id.* According to Whitestone, Yuanda was "[t]hereby directed to remediate the misfabricated already installed WT-3 Clesestory [sic] as directed by Sciame and is advised that all costs and expenses related to the same shall be borne by and be the sole responsibility of Yuanda." *Id.* at 2. Still, Whitestone maintained that the original WT-3 Clerestory work had conformed to the design specifications, "assur[ing]" Yuanda that "Whitestone has taken and will continue to take the position that the information contained in Sciame's response to RFI #1130 constitutes a belated design change in the contract documents for which Whitestone (and Yuanda) is entitled to a Change Order." *Id.*

Four days later, Yuanda responded, stating that it did not "think it [was] appropriate" to bear "responsibilities" related to the WT-3 Clerestory System. Dkt. No. 128-27 (the "June 28, 2019 Letter"). Yuanda explained that it had not "made any mistakes" in the process of designing and

4

providing the WT-3 Clerestory System. *Id.* It continued, "if Sciame insists on the modification and Yuanda is provided with corresponding cost, then Yuanda is willing to cooperate with Whitestone to complete the relevant remedial work." *Id.*

The parties continued to communicate regarding the dispute. Whitestone's counsel wrote on July 26, 2019 that "[p]ursuant to the [Purchase Order], if Whitestone is directed to perform work under protest at its cost and expense while a dispute as to payment is pending, then Yuanda is required to do so as well." Dkt. No. 128–28 at 1. According to Whitestone's counsel, Yuanda was only entitled to receive "any compensation which Whitestone receives as a result of Whitestone and Yuanda's working together to successfully pursue Whitestone's claim against Sciame and [City University]." *Id.* Whitestone's counsel instructed Yuanda to "immediately provide Whitestone with any plans . . . required to perform the directed work immediately, along with a schedule for Yuanda's performance of that work in August 2019, albeit, under protest." *Id.* (emphasis in the original). This letter also voiced Whitestone's belief that "[f]ailure to provide . . . the aforementioned immediately will constitute a material breach of the Whitestone/Yuanda [Purchase Order]." *Id.* at 2.

    *d.   Yuanda and Whitestone Remediate the WT-3 Clerestory System*

Although Yuanda and Whitestone disputed who was responsible for completing the remedial work, they nonetheless began remediating the WT-3 Clerestory System in the late summer of 2019. On August 7, 2019 Yuanda provided new structural calculations to Whitestone. Yuanda Response to 56.1 Statement ¶ 106. After several such submissions were reviewed by Sciame, the Design Team approved the new design for the WT-3 Clerestory on November 4, 2019. *Id.* ¶ 107; Dkt. No. 128-29.

On November 7, 2019, Whitestone requested that Yuanda provide replacement brackets for the Project, and Yuanda responded that replacement brackets could be delivered at a cost between $4,000 and $10,000 in 35 days." Yuanda Resp. to 56.1 Statement ¶ 108; Second Grzic Decl. ¶ 69. On December 7, 2019, Yuanda followed up to state that the replacement brackets could be

delivered at a rough cost of between $4,000 and $10,000 in 35 days, thus extending the potential timeline in which the brackets could be delivered. Yuanda Resp. to 56.1 Statement ¶ 108; Second Grzic Decl. ¶ 69. Yuanda did not provide the brackets in 35 days, but in April 2020, Yuanda sent an email to Whitestone offering to fabricate replacement brackets at no cost to Whitestone. Dkt. No. 121-17 at 1. However, as explained in a June 2020 email exchange between the parties, due to the COVID-19 pandemic, there were delays in the delivery of material for the brackets. Dkt. No. 128-34. Whitestone eventually sourced the replacement materials from a local vendor. Second Grzic Decl. ¶ 77.

In August 2020, jobsite work on the WT-3 Clerestory system resumed, and that work was completed on or about September 22, 2020. Yuanda Resp. to 56.1 Statement ¶ 116; Second Grzic Decl. ¶ 81. Whitestone provided all of the labor required to reinstall the new design of the WT-3 Clerestory System. Yuanda Resp. to 56.1 Statment ¶ 117.

On January 19, 2021, Whitestone provided Yuanda a summary of the remediation costs. Dearth Dep. 153:14-162:9; Second Grzic Decl., ¶ 84, Dkt. No. 128-36. That summary included $102,824.94 for "Whitestone Manpower," $17,600 for "Whitestone Design," and $47,389.65 for "Equipment/Material/Services." Dkt. No. 128-36. In this action, Whitestone also seeks recovery of its overhead and profit at $33,563.12, and a portion of its cost for insurance premiums at $31,248.17. Yuanda Resp. to 56.1 Statement ¶ 119–21.

### III. PROCEDURAL HISTORY

Whitestone filed this action on February 5, 2020, bringing claims for breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and a claim for declaratory judgment. Dkt. No. 1 ("Compl"). On September 24, 2020 all of Whitestone's claims were dismissed except Whitestone's breach of contract claim. Dkt. No. 62. The next day, Yuanda filed a motion for judgment on the pleadings. Dkt. No. 64. Whitestone filed a motion for summary judgment on November 11, 2021. Dkt. No. 72. On December 21, 2020, the Court denied Yuanda's

motion for judgment on the pleadings and denied without prejudice Whitestone's motion for summary judgment. Dkt. No. 85.

Yuanda filed the present motion for summary judgment on July 2, 2021. Dkt. No. 121 ("Yuanda Mot."). Whitestone's filed its cross motion for summary judgment on July 23, 2021. Dkt. No. 128 ("Whitestone Mot."). Yuanda filed its reply brief on August 13, 2021. Dkt. No. 135 ("Yuanda Reply"). Whitestone filed its reply brief on August 27, 2021. Dkt. No. 137 ("Whitestone Reply").

## IV. DISCUSSSION

### A. Legal Standard

The plaintiff in this case is entitled to summary judgment on a claim if it can show that "there is no genuine dispute as to any material fact and that [defendant is] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted). Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita*, 475 U.S. at 585-86). The issue of fact must be genuine—plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the Court must decide whether a rational juror could find in favor of the non-moving party. *Id.*

### B. Applicable Law

The Purchase Order is governed by New York law. Purchase Order ¶ 21. Under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* at 569. (internal quotation marks omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms." *Id.*; *see South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272, 277 (2005) ("In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." (internal quotation marks omitted)).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *Krumme v. West Point Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). The question of "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) (citation omitted). "It is well settled that a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion. Conversely, . . . the language of a contract is ambiguous

if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin Corp.*, 639 F.3d at 69 (citations omitted).

"'Ambiguity is determined by looking within the four corners of the document, not to outside sources.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)). "[T]he intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014). "It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" *W.W.W. Assoc.*, 77 N.Y.2d at 163 (quoting *Intercontinental Planning v Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)). "An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified ambiguity, unnecessarily denigrates the contract and unsettles the law." *Id.* at 163. "[B]efore looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract." *Id.* at 162.

Under New York law, the elements of a breach of contract claim are (1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach. *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). "Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).
9

1. **The Undisputed Facts Demonstrate that Yuanda Did Not Breach the Purchase Order**

    a. *There is No Dispute that Yuanda's Work Complied with the Requirements in the Purchase Order*

Under the unambiguous terms of the Purchase Order, Yuanda is not obligated to remediate the WT-3 Clerestory System. Paragraph 10 of the Purchase Order states:

> **Inspection & Defective Work**: (a) Without any duty of Subcontractor [Whitestone] to Vendor [Yuanda] to provide continuous or exhaustive inspections, the Subcontractor may inspect Vendor's Work for compliance with this Purchase Order or the Contract Documents, whether at the Project site or any other place where items or services for such Vendor's Work, or documents may be in preparation, manufacture, storage or installation. ***Vendor shall promptly prepare the plan for the approval of the Subcontractor, in order to replace or correct any Vendor's Work which Subcontractor shall reject as failing to conform to the requirements of this Purchase Order*** and/or Contract Documents whether rejected before or after installation, with exclusion of those specified in item (b) listed below. Upon approval of Vendor's plan by Subcontractor, Vendor shall promptly replace or correct any Vendor's Work. If Vendor does not do so within a reasonable time, Subcontractor shall have the right to do so and Vendor shall be liable to Subcontractor for the cost thereof.

Purchase Order ¶ 10 (emphasis added).[2]

Pursuant to that provision, Yuanda was bound to "replace or correct" any of its work that Whitestone "shall reject as failing to conform to the requirements of this Purchase Order and/or Contract Documents." *Id.* That contractual provision is unambiguous: Yuanda must correct work that Whitestone rejects "*as failing to conform to the requirements* of [the] Purchase Order and/or Contract Documents." *Id.* Here, the undisputed facts demonstrate that Whitestone has never rejected Yuanda's work for failing to conform to the requirements of the Purchase Order or Contract Documents; instead, the parties took the position that Yuanda's work did, in fact, conform to the requirements in the Purchase Order and Contract Documents. Specifically, in responding to

---

[2] "Contract Documents" is defined as the documents set forth in Attachment B to the Purchase Order, and includes: (a) the Purchase Order (b) the Purchase Order Terms and Conditions; (c) Attachments A though D, as attached to the Purchase Order; (d) Project safety and/or quality control manual; and (e) modifications to [the same]. Purchase Order, Attachment B. *See also*, Dkt. No. 131 ¶ 14. The parties do not dispute that the remedial changes to the WT-3 Clerestory were never incorporated into the Contract Documents.

10

Sciame's newly issued design criteria, Whitestone and Yuanda expressly agreed their "respective installed WT-3 clerestory work [was] compliant" with the initial drawings and the original contract documents, and also that "the design team changed the contract deflection criteria . . . after the [WT-3 Clerestory] work was fabricated and installed." Dkt. No. 128-25 at 1.

The parties continue to maintain the position that their work conformed to the Purchase Order and Contract Documents. *See* Dkt. No. 131 ("Whitestone Resp. to 56.1 Statement") ¶ 46 ("Whitestone has taken the position at the time Whitestone installed the WT-3 Clerestory, Yuanda's fabrication of the WT-3 Clerestory components conformed to the requirements of the Purchase Order"); *id.* (Yuanda stating "[a]t the time Whitestone installed the WT-3 Clerestory, Yuanda's fabrication of the WT-3 Clerestory components conformed to the requirements of the Purchase Order"). Thus, there is no dispute that the work did, in fact, conform to the requirements of the Purchase Order.

The parties also agree that the remedial work was performed because Sciame imposed *new* requirements for the WT-3 Clerestory System. Yuanda Resp. to 56.1 Statement ¶ 61 (noting that it is undisputed that "the Design Team issued new design criteria after installation of the WT-3 Clerestory"); Whitestone Resp. to 56.1 Statement ¶ 61 (noting that it is undisputed that "[a]ll remedial work that Sciame demanded with respect to the WT-3 Clerestory systems were the direct result of the Design Team's issuance of new design criteria, which occurred on or after January 30, 2017"); Whitestone. Mot. at 24 ("[T]he gravamen of Whitestone's claim here is not that Yuanda's work is non-conforming . . . .").[3] Given that there is no dispute that Yuanda's work complied with the Purchase Order and Contract Documents, and that the "remedial" work was the result of new

---

[3] Whitestone raises a number of arguments related to judicial estoppel to argue that it is "not barred . . . from taking purportedly contradictory factual positions in two courts." Whitestone Mot. at 22. These arguments are irrelevant; it is not the case that Whitestone is bound by its statements in a separate state court proceeding; rather, it is the case that Whitestone at no point rejected Yuanda's work "as failing to conform to the requirements of [the] Purchase Order and/or Contract Documents."

11

design criteria imposed after the completion of the work, there are no material issues of fact precluding a finding that Yuanda did not breach the Purchase Order by declining to perform the requisite remedial work.

Here, the undisputed facts establish that the additional work undertaken by Yuanda was the result of modifications to the requirements in the Purchase Order. Thus, for Yuanda to be contractually obligated to perform the requisite remedial work, the remedial work would have been formalized in a change order. By its terms, the Purchase Order cannot be "amended, modified, or changed except in a written Change Order, signed by the designated representative of Subcontractor." Purchase Order ¶ 10; *see also*, *id.* ¶ 24(B) ("Changes to Vendor's Purchase Order cannot be billed until Subcontractor issues a formal change order document and [sic] executed by both Vendor and Subcontractor."). The same is true for changes or amendments to the Contract Documents: Attachment B to the Purchase Order provides that "Drawings and Specifications" provided by the Project's architect after the execution of the Purchase Order would be "included . . . as Contract Documents by Change Order." *Id.*, Attachment B. The change order process contained in the agreement provided Yuanda the opportunity to negotiate for additional payments as a result of a change in the scope of work (which undisputedly occurred here). At no point did Whitestone obtain a change order for the remedial work to the WT-3 Clerestory System; rather, Whitestone's PCO-098 was rejected by Sciame. Dkt. No. 128-22; *see also*, Whitestone Resp. to 56.1 Statement ¶52. Nor did Yuanda present Whitestone with a proposed change order regarding its work. *See* Whitestone Mot. at 19 n.9. Accordingly, without a formal change order, Yuanda was not obligated to perform the remedial work under the unambiguous terms of the Purchase Order.[4]

---

[4] Given the express language of the Purchase Order, there is no textual support for Whitestone's argument that Whitestone's "unambiguous direction to Yuanda" to perform the remedial work means that "no change order is required." *See* Whitestone Mot. at 3. Nor is there any support for Whitestone's claim, in its July 26, 2019 letter to Yuanda, that Yuanda would breach the Purchase Order if it failed to provide "plans" to remediate the WT-3 Clerestory System. *See* Dkt. No 128-12 at 1. Rather, the express terms of the Purchase Order nowhere require Yuanda to submit plans or a change order to Whitestone.

#### b. **Whitestone Did Not Reject Yuanda's Work**

Despite the parties' consistent, shared position that Yuanda's work met the requirements of the Purchase Order, Whitestone argues that its June 24, 2019 letter to Yuanda constituted a rejection that triggered Yuanda's obligation to pay for remedial work to the WT-3 Clerestory. That letter states only that Sciame had "rejected as non-conforming Yuanda's fabrication of the WT-3 Clerestory structural components." June 24, 2019 Letter at 1. The letter does not state that Whitestone rejected Yuanda's work—rather, Sciame did. Nor does it state that Yuanda's work did not conform to the requirements in the Purchase Order or Contract Documents. Quite the opposite: in the letter, Whitestone explained that it disputed Sciame's rejection of the WT-3 Clerestory System and told Yuanda,"[b]e assured [that] Whitestone has taken and will continue to take the position that the information contained in Sciame's response . . . constitutes a belated design change in the contract documents." *Id.* at 2.[5] Because the unambiguous terms of the Purchase Order provide that Yuanda could only be required to perform remedial work if the reason for the work's rejection was Whitestone's rejection of the WT-3 Clerestory System for nonconformance with the Purchase Order and Contract Documents, this letter fails to constitute a "rejection" that would trigger Yuanda's obligation to remediate.[6]

Neither did Sciame's rejection of the WT-3 Clerestory System "pass through" to Yuanda. In arguing to the contrary, Whitestone identifies language in the Purchase Order that states, "if Subcontractor [Yuanda] is required by the Prime Contract to arbitrate or submit to an alternative dispute resolution forum" that relates to Yuanda's work, Yuanda "shall participate in the

---

[5] Of course, given the undisputed fact that Yuanda's work confirmed to the requirements of the Purchase Order, there was no basis for Whitestone to reject the work as non-conforming.
[6] Whitestone argues that Yuanda's June 28, 2019 letter in response to Whitestone's June 25, 2019 letter "manifest[s] an understanding that Whitestone June 24, 2019 letter was Whitestone's rejection of Yuanda's work." Whitestone Mot. at 13–14. The letter provides no basis for Whitestone's contention. In it, Yuanda expressly (1) explains that Sciame, and not Whitestone, rejected the WT-3 Clerestory and (2) disclaims any obligation to pay for the remedial work; noting "if Sciame insists on the modification *and Yuanda is provided with corresponding cost*, then Yuanda is willing to cooperate with Whitestone to complete the relevant remedial work." June 28, 2019 Letter (emphasis added).

13

prosecution or defense of such dispute . . . and be *bound by the results* of such arbitration or alternative dispute resolution forum." Purchase Order ¶ 21. That provision is unambiguous; it merely states that Yuanda is bound by the *results*—the outcome—of an alternative dispute resolution proceedings. It does not state that Yuanda is bound by Sciame's arguments in an alternative dispute proceeding that the work was non-confirming. Moreover, although Whitestone pursued alternative dispute resolution proceedings with Sciame, those were never completed and are the subject of the current dispute in New York state court. Thus, there exist no "results" to which Yuanda could be bound.

### c. Sciame's Rejection of the WT-3 Clerestory Did Not "Pass Through" to Yuanda

Whitestone also argues that the Purchase Order incorporates by reference the Sciame Subcontract, such that Yuanda is bound by Sciame's rejection of the WT-3 Clerestory. As an initial matter, Whitestone does not identify a contractual mechanism in the Sciame Subcontract that would bind Yuanda to Sciame's rejection; rather, it merely advances the amorphous position that Sciame's rejection would "pass through" to Yuanda. *See* Whitestone Mot. at 25. In other words, Whitestone has not shown that the Sciame Subcontract would, if incorporated by the Purchase Order, bind Yuanda to its rejection of the WT-3 Clerestory.[7]

Regardless, Whitestone has not made a showing that the Purchase Order incorporates the Sciame Subcontract. "To determine whether a contract has incorporated a document by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard." *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018), aff'd, 774 F. App'x 714 (2d Cir. 2019). Courts

---

[7] Indeed, the language in the Sciame Subcontract pertaining to rejection of the work nowhere mentions Yuanda or other vendors; instead, it only permits "the Contractor [Sciame] and the Architect . . . to reject the Work of the Subcontractor that does not conform to the Prime Contract." Dkt. No. 121-19 § 4.1.5. Thus, the provision's only effect is to allow Sciame and the Project Architect to reject Whitestone's work—it in no way pertains to rejection of Yuanda's work. Moreover, by allowing both Sciame and the Architect to reject Sciame's work, that provision demonstrates that Whitestone was aware that it could contract to permit multiple parties reject another party's work. Theoretically, it could have done so in the Purchase Order to permit Sciame to reject Yuanda's work, but did not.

consider two factors in making this determination: (1) whether the allegedly incorporated document is expressly identified and 'so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt.' and (2) whether the language incorporating the document clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract." *Id.* (quoting *Nat'l Union Fire Insurance of Pittsburg v. Beelman Truck Co.*, 203 F.Supp.3d 312, 322 (S.D.N.Y. 2016). In support of incorporation, Whitestone identifies the following language:

> Vendor [Yuanda] acknowledges that Subcontractor [Whitestone], has entered into a Subcontract with [Sciame] . . . . The Contract Documents as set forth in Whitestone Purchase Order Attachment B related to curtain wall pertaining to the Prime Contract between the Owner and Subcontractor are incorporated herein by reference to the extent that the Prime Contract applies to the work under this Purchase Order. Vendor shall assume toward Subcontractor all obligations and responsibilities which, under the Contract Documents as set forth in Whitestone Purchase Order Attachment B related to curtain wall pertaining to the Prime Contract, the Subcontractor, Contractor and Owner and Architect/Engineer including, but not limited to, extensions of time. Upon the Vendor's request, the Subcontractor shall afford the Vendor an opportunities to review any or all of the Prime Contract documents.

Purchase Order at ¶ 2.

Though that language "acknowledges" the Sciame Subcontract, it does not clearly communicate that the purpose of that reference is to incorporate the Sciame Subcontract. Quite the opposite: that provision expressly explains that "[t]he Contract *Documents as set forth in Whitestone Purchase Order Attachment B* related to curtain wall pertaining to the Prime Contract between the Owner and Subcontractor are incorporated herein by reference to the extent that the Prime Contract applies to the work under this Purchase Order." *Id.* Attachment B does not list the Sciame Subcontract.[8] Purchase Order, Attachment B. As such, the Sciame Subcontract is not

---

[8] Attachment B lists the "Purchase Order Agreement Form, the Purchase Order Terms and Conditions and Attachments A through D; such other Drawings and Specifications as may be prepared by Architect after the execution of this Purchase Order Agreement which shall be included in this Purchase Order Agreement as Contract Documents by Change Order; [a]ny safety/quality control manuals as may be issued after the execution of this Trade Contract; [a]ll modifications of the above; [and] Yuanda's Clarification of CUNY project – Item 4 at Attachment A." Purchase Order, Attachment B.

15

incorporated. *Federated Mut. Ins. Co. v. Woodstock '99, LLC,* 140 F. Supp. 2d 225, 228 (N.D.N.Y. 2001) (finding no incorporation where an agreement contains "various references" to another agreement, but lacked a "clear manifestation" of the parties intent to be bound by terms in that agreement).

### d. None of the Other Provisions of the Purchase Order Obligate Yuanda to Remediate the WT-3 Clerestory

In addition, contrary to Whitestone's argument, Paragraph 21 of the Purchase Order does not obligate Yuanda to pay for remedial work. *See* Whitestone Mot. at 19–20. Paragraph 21 of the Purchase Order states, "[i]n the event of any dispute involving this Purchase Order, Vendor's Work or any claims of Vendor, Vendor . . . shall continue to perform Vendor's Work in a diligent manner."[9] Purchase Order at ¶ 21. According to Whitestone, Sciame's rejection of its proposed change order created such a dispute, such that Yuanda had an "unabated duty" to "perform" under the Purchase Order. Whitestone Mot. at 19. However, Paragraph 21 merely requires Yuanda to "*continue*" to perform its work during the pendency of a dispute—it does not expressly state that Yuanda is obligated to pay for that work. Moreover, that provision is embedded in a section of the Purchase Order titled "Settlement of Disputes" which explains procedures that Yuanda was required to follow to bring a dispute involving the Purchase Order or Yuanda's work, including that an action must be brought against Whitestone within a certain time period and requiring any dispute to be brought in a New York State Court. *See* Purchase Order ¶ 21. Read as a whole, that provision is unambiguous: if Yuanda were to bring a dispute against Whitestone, it was not permitted to cease its work during the pendency of that dispute. The provision nowhere suggests that Yuanda would, by virtue of a dispute having been brought, be obligated to pay for that work even if the work

---

[9] "Vendor's Work" is defined broadly as the provision of "all curtain wall system design, engineering, structural calculations, shop drawings, product data and sample submittals . . . ." Purchase Order at p.1.

reflected a change in the scope to which they had originally agreed—as Whitestone suggests is the case.

Neither do Paragraphs 7 or 12 of the Purchase Order require Yuanda to bear financial responsibility for the remedial work on the WT-3 Clerestory System, as those paragraphs do not apply to the circumstances of this case. *See* Whitestone Mot. at 20–21. Paragraph 7 provides that Yuanda is not relieved from performance if its design submissions were approved. *See* Purchase Order ¶ 7. Paragraph 12 provides that, should Whitestone make a progress payment to Yuanda, that payment would not constitute acceptance of Yuanda's work. *Id.* ¶ 12. Purporting to rely on these paragraphs, Whitestone argues that the "initial approval" of Whitestone's work in 2015 do not "grant Yuanda a free pass when its design was later rejected." *See* Whitestone Mot. at 21. While that may be generally true, the issue in this case is not whether Yuanda was excused from its work because of a prior acceptance; rather, it is whether, after new design requirements were ordered by Sciame and the Project Architect, Yuanda was obligated to pay for the subsequent remedial work. And design changes are governed by Paragraph 10, not by Paragraphs 7 and 12. Thus, Whitestone's arguments regarding those paragraphs are largely irrelevant.

Finally, Whitestone argues that, were it unable to pass through Sciame's rejection to Yuanda, it would be left with an unreasonable "Sophie's Choice," in which it would either have to either (1) reject Yuanda's work as failing to comply with the requirements in the Purchase Order and Contract Documents, thereby admitting that Yuanda's work did not comply with the Sciame Subcontract; or (2) decline to reject Yuanda's work and pay for the remedial work itself in order to allow it to challenge a rejection by Sciame. Whitestone Mot. at 25–26. That outcome is not, as Whitestone claims, "extreme" or "commercially unreasonable." *See id.* Indeed, Whitestone has not identified any contractual provision that would prevent it from seeking costs for the remedial work from Sciame, nor does it explain why it did not negotiate to allow Sciame's rejection to pass through to Yuanda during contractual negotiations.

17

Here, the undisputed facts demonstrate that Whitestone did not reject Yuanda's work on the WT-3 Clerestory for failing to comply with the requirements of the Purchase Order and Contract Documents. Accordingly, on the issue of breach of contract, Yuanda's motion for summary judgment on the issue of breach is granted, and Whitestone's is denied.

### 2. Because Yuanda Did Not Breach the Purchase Order, Whitestone is Not Entitled to Damages

As explained, Yuanda did not breach the purchase order, it is not liable to Whitestone for the amounts Whitestone expended to remediate the WT-3 Clerestory System.[10] Accordingly, Whitestone's motion for summary judgment is denied to the extent it requests damages. Yuanda's motion for partial summary judgment on the issue of damages is denied as moot.

### V.    CONCLUSION

For the reasons described above, Yuanda's motion for summary judgment is granted to the extent it relates to whether Yuanda breached the Purchase Order., and Whitestone's motion for summary judgment is denied. Because Yuanda did not breach the Purchase Order, Yuanda's motion for partial summary judgment is denied as moot to the extent is seeks to limit the damages sought by Whitestone.

The Clerk of Court is directed to enter judgment for Yuanda, terminate all pending motions, and close this case.

SO ORDERED.

Dated: November 1, 2021  
New York, New York

_____  
GREGORY H. WOODS  
United States District Judge

---

[10] The Court notes that, in April 2020, Yuanda offered to provide replacement brackets at no cost to Whitestone, but the delivery of those brackets was delayed and Whitestone eventually obtained the brackets from another vendor. It its motion and reply, however, Whitestone does not identify that it incurred any damages in reliance on Yuanda's promise to provide the brackets at cost. Thus, the Court declines to consider whether any damages stemming from Yuanda's promise to pay for replacement brackets at its own cost are warranted.